UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **FIDELITY INTERNATIONAL** )<br>**CURRENCY ADVISOR A FUND, LLC,** )<br>**by the Tax Matters Partner,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**UNITED STATES of AMERICA,** )<br>)<br>**Defendant.** )<br>_____) | **Civil No.**<br>**05-40151-FDS**<br>**06-40130-FDS** |
| **FIDELITY HIGH TECH ADVISOR** )<br>**A FUND, LLC, by the Tax** )<br>**Matters Partner,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**UNITED STATES of AMERICA,** )<br>)<br>**Defendant.** )<br>_____) | **Civil No.**<br>**06-40243-FDS**<br>**06-40244-FDS** |

## AMENDED [CORRECTED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

**SAYLOR, J.**

This is a dispute concerning two complex tax shelter transactions.  The plaintiffs in these

consolidated actions are Fidelity International Currency Advisor A Fund, LLC and Fidelity High

Tech Advisor A Fund, LLC.  The tax matters partner, and the principal taxpayer who invested in

and benefitted from the tax shelter transactions at issue, was Richard J. Egan.[1]

---

[1] Richard Egan has since died, and his sons Michael J. Egan and John R. Egan, as co-executors of his
estate, have been substituted as tax matters partner.

Richard Egan was one of the founders of EMC Corporation and the former ambassador to Ireland. He entered into the tax shelter transactions to avoid large tax liabilities on the sale of EMC stock and the exercise of non-qualified stock options. Together with his wife, Maureen, Richard Egan claimed a tax loss of $158.6 million in 2001, a further tax loss of $1.7 million in 2002, and capital losses of $167.1 million in 2002 as a result of their participation in the tax shelter transactions.

The IRS disallowed the tax treatment claimed by the Egans and issued Final Partnership Administrative Adjustments adjusting various partnership items and assessing accuracy-based tax penalties. This litigation followed.

The case was tried before the Court over 44 trial days beginning in late 2008. The Court also received more than 3,700 exhibits, and heard extensive testimony from multiple expert witnesses. For the reasons set forth below, the Court concludes that the partnership item adjustments made by the IRS are correct, and accordingly will enter judgment for the United States. The Court also finds that various accuracy-related penalties are applicable.

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | INTRODUCTION ..................................................................................................... | | 17 |
| | A. | Summary of Facts ...................................................................................... | 17 |
| | B. | Summary of Legal Conclusions ................................................................. | 21 |
| | | | |
| II. | NATURE OF PROCEEDINGS................................................................................. | | 24 |
| | | | |
| III. | FINDINGS OF FACT ............................................................................................. | | 27 |
| | A. | Jurisdictional Facts ................................................................................... | 27 |
| | | 1. | Fidelity High Tech ......................................................................... | 27 |
| | | 2. | Fidelity International ..................................................................... | 28 |
| | B. | EMC, the Egans, and Related Parties ....................................................... | 29 |
| | | 1. | EMC and Richard Egan ................................................................. | 29 |
| | | 2. | The Egan Family ........................................................................... | 31 |
| | | 3. | Carruth Management and Subsidiaries .......................................... | 31 |
| | | 4. | Burke, Warren Law Firm .............................................................. | 34 |
| | C. | The Tax Promoters and their Associates ................................................... | 34 |
| | | 1. | The Diversified Group Incorporated ............................................. | 34 |
| | | 2. | Helios Financial LLC .................................................................... | 34 |
| | | 3. | KPMG, LLP .................................................................................. | 35 |
| | | 4. | Alpha Consultants, LLC ............................................................... | 35 |
| | | 5. | Samuel Mahoney ........................................................................... | 35 |
| | | 6. | Refco Capital Markets Limited ..................................................... | 35 |
| | | 7. | Proskauer Rose, LLP .................................................................... | 36 |
| | | 8. | Sidley Austin Brown & Wood, LLP ............................................. | 36 |
| | | 9. | RSM McGladrey, Inc. ................................................................... | 36 |
| | D. | The Egans' Tax Problems .......................................................................... | 36 |
| | | 1. | Low-Basis EMC Stock .................................................................. | 36 |
| | | 2. | Non-Qualified Stock Options ........................................................ | 37 |

| E. | The Delegation of Authority for Tax Affairs to Michael Egan and Carruth .............................................................................................. | 38 |
|----|---|---|
| F. | Early Discussions Concerning Tax Shelters ............................................ | 39 |
| G. | The "Short Option Strategy" .................................................................... | 43 |
| H. | The May 2000 Meetings .......................................................................... | 45 |
| | 1. The May 15, 2000 Meetings in New York ................................... | 45 |
| | 2. The May 19, 2000 Meeting in Chicago ....................................... | 50 |
| | 3. Denby's Comparison of the Tax Strategies – May 2000 ............ | 53 |
| | 4. The May 25, 2000 Meeting in Massachusetts .............................. | 55 |
| I. | Further Developments in July 2000 ......................................................... | 56 |
| | 1. The July 10-13, 2000 Meetings in Chicago ................................. | 56 |
| | 2. The July 18, 2000 Meeting with Helios in Chicago .................... | 59 |
| | 3. Carruth's Due Diligence Concerning the Promoters ................... | 62 |
| J. | Formation of Fidelity Entities in July 2000 ............................................. | 63 |
| | 1. Fidelity High Tech Transaction Entities ...................................... | 64 |
| | 2. Fidelity International Transaction Entities ................................... | 64 |
| K. | Carruth Prepares to Implement the Strategies ......................................... | 64 |
| | 1. Denby's Fax of July 20, 2000 ...................................................... | 64 |
| | 2. Further Discussions in July 2000 ................................................ | 65 |
| | 3. The August 2, 2000 Meeting in Boston ....................................... | 66 |
| L. | IRS Notice 2000-44 and Its Aftermath .................................................... | 68 |
| | 1. The Issuance of IRS Notice 2000-44 ........................................... | 68 |
| | 2. The Reaction to IRS Notice 2000-44 ........................................... | 68 |
| | 3. The August 23, 2000 Conference Call ......................................... | 72 |
| | 4. The Initial Draft Legal Opinions for Fidelity High Tech ............ | 74 |
| M. | Carruth Resumes Implementation of the Capital Gains Strategy ............ | 76 |
| | 1. The September 5, 2000 Memorandum ........................................... | 76 |
| | 2. The Parties Begin Implementation of the High Tech Transaction ................................................................................. | 79 |
| | 3. The Withdrawal of HSBC as the Counterparty ............................ | 79 |

4

|    | 4. | The Selection of Refco as the Substitute Counterparty ............... | 81 |
|    | 5. | The First Registration of EMC Shares ......................................... | 81 |
|    | 6. | Carruth Puts the Fidelity High Tech Transaction on Hold .......... | 81 |
|    | 7. | The Year-End Transfer of Maureen Egan's Fidelity High Tech Interest ................................................................................ | 82 |
| N. | Resumption of the High Tech Transaction in January 2001 .................... | | 84 |
|    | 1. | The January 23, 2001 Tax Analysis by Shea ................................ | 84 |
|    | 2. | The January 24, 2001 Memorandum from Shea ........................... | 85 |
|    | 3. | The Initial Draft Legal Opinion Letter from Proskauer ............... | 86 |
|    | 4. | The January 29, 2001 Memorandum by Shea ............................... | 87 |
|    | 5. | The Decision to Allocate 99% of the High Tech Transaction to Maureen Egan ..................................................... | 87 |
|    | 6. | Planning for Tax Reporting of the High Tech Transaction .......... | 88 |
|    | 7. | The Second Registration of EMC Shares ..................................... | 89 |
| O. | Implementation of the Fidelity High Tech Transaction ........................... | | 90 |
|    | 1. | Index A and Option A Enter into Option Trades ......................... | 90 |
|    | 2. | The Possibility of a One-Option Payout ...................................... | 92 |
|    | 3. | The Capitalization of Fidelity High Tech ..................................... | 93 |
|    | 4. | The Purported Increase in Basis ................................................... | 94 |
|    | 5. | The Receipt of McData Stock Dividend ....................................... | 95 |
|    | 6. | The Cover/Termination of NASDAQ 100 Options ...................... | 96 |
| P. | "Stuffing" of Additional Low-Basis Stock into Fidelity High Tech ........ | | 99 |
|    | 1. | "Stuffing" Activities in May and June 2001 ................................ | 100 |
|    | 2. | Additional "Stuffing" in Late 2001 ............................................. | 102 |
| Q. | The Change of Structure of the Fidelity High Tech Transaction ............. | | 105 |
|    | 1. | The Original Final Step of the Transaction .................................. | 105 |
|    | 2. | The October 31, 2001 Tilevitz "Stock Dribble" Memorandum ................................................................................ | 105 |
|    | 3. | The Initial Proposal to Use a Subchapter S Corporation ............. | 106 |
|    | 4. | The Change to a Partnership ........................................................ | 107 |

|     | 5.  | The Transfer of Maureen Egan's Interest to an LLP and Section 754 Elections ................................................................... | 108 |
|-----|-----|---------------------------------------------------------------------------------------------------|-----|
|     | 6.  | Discussions at Year-End 2001 Concerning Sale of Stock ........... | 111 |
|     | 7.  | The Sale of Stock Held by Fidelity High Tech in 2002 ............... | 112 |
| R.  | The Egans Continue to Explore an Ordinary Loss Strategy .................... | | 114 |
|     | 1.  | Exercise of Options ..................................................................... | 114 |
|     | 2.  | The Search for Ordinary Income Strategies ................................. | 116 |
| S.  | The Design and Development of the FDIS Strategy ................................. | | 119 |
|     | 1.  | DGI's "2001 Partnership Strategy Memorandum" ...................... | 119 |
|     | 2.  | Further Development of the "Financial Derivatives Investment Strategy" .................................................................... | 120 |
|     | 3.  | The Foreign Partners – Mahoney and Hawkes ............................ | 122 |
|     | 4.  | The Model Opinion for FDIS Strategy ......................................... | 123 |
|     | 5.  | The 2001 FDIS Transactions ........................................................ | 124 |
| T.  | KPMG and Helios Pitch the FDIS Strategy to the Egans ......................... | | 125 |
|     | 1.  | The September 2001 KPMG PowerPoint Presentations .............. | 126 |
|     | 2.  | Further Discussions and the "Outline of Proposed Transaction" ................................................................................. | 127 |
|     | 3.  | The Decision to Adopt the FDIS Strategy ................................... | 128 |
| U.  | Implementation of the Fidelity International Transaction ........................ | | 129 |
|     | 1.  | Step One: Creation of Entities .................................................... | 129 |
|     | 2.  | Step Two: Fidelity World Enters Into Interest Rate Options ...... | 129 |
|     | 3.  | Step Three: Capitalization of Fidelity International .................... | 132 |
|     |     | a.  The Contribution of Fidelity World ................................. | 132 |
|     |     | b.  The Purported Increase in Basis ....................................... | 132 |
|     |     | c.  Other Capital Contributions ............................................ | 133 |
|     | 4.  | Step Four: Fidelity International Enters Into Foreign Currency Options ........................................................................ | 135 |
|     |     | a.  The Terms of the Foreign Currency Options ................... | 135 |
|     |     | b.  The Structure of the Foreign Currency Option Pairs ....... | 137 |

|   |    |    | c. | The Possibility of a One-Option Payout ........................... | 139 |
|   |    |    | d. | Targeting of Gains ............................................................ | 140 |
|   | 5. | Step Five: Termination of Gain Legs and Entering Into Replacement Legs ........................................................................... | | | 141 |
|   | 6. | Step Six: Buyout of Foreign "Partner" ......................................... | | | 144 |
|   | 7. | Step Seven: Close Out of Interest Rate Options .......................... | | | 146 |
|   | 8. | Step Eight: Termination of Remaining Foreign Currency Options .......................................................................... | | | 147 |
|   | 9. | The Stockton and Mariner Investments ........................................ | | | 148 |
|   | 10. | The Actual Economic Loss From the Termination of the Foreign Currency Options ............................................................ | | | 149 |
| V. | | Documentation of the Purported "Business Purpose" of the Fidelity International Transactions .......................................................... | | | 150 |
|   | 1. | The October 5, 2001 Buesinger Memorandum ............................. | | | 151 |
|   | 2. | The Proposed David Henry Memorandum ................................... | | | 152 |
|   | 3. | "Business Purpose" Discussions in October-December 2001 ..... | | | 153 |
|   | 4. | Proposed Discussions with Samuel Mahoney ............................. | | | 154 |
|   | 5. | The December 18, 2001 Shea Memorandum ................................ | | | 155 |
|   | 6. | The March 12, 2001 Speiss Memorandum ................................... | | | 157 |
| W. | | The Proskauer and Sidley Austin Opinion Letters .................................... | | | 157 |
|   | 1. | The Proskauer Legal Opinion for the High Tech Transaction ..... | | | 158 |
|   | 2. | The Sidley Austin Legal Opinion for the Fidelity International Transaction .............................................................. | | | 163 |
|   | 3. | Payment of the Legal Fees of Proskauer and Sidley Austin ........ | | | 168 |
| X. | | Costs and Fees for the Transactions ........................................................... | | | 169 |
|   | 1. | Costs and Fees on the Fidelity High Tech Transaction ............... | | | 169 |
|   |    |    | a. | Helios and KPMG Fees .................................................... | 169 |
|   |    |    | b. | Refco Fees ........................................................................ | 171 |
|   |    |    | c. | Other Fees ......................................................................... | 172 |
|   | 2. | Costs and Fees on the Fidelity International Transaction ........... | | | 172 |
|   |    |    | a. | Helios and KPMG Fees .................................................... | 172 |

|     |     | b. | Refco Fees .......................................................................... | 173 |
|     |     | c. | Other Fees ........................................................................ | 175 |
| Y.  | The KPMG Engagement Letters ............................................................. | | | 175 |
|     | 1.  | KPMG Engagement Letter Policy for the Short Option Strategy ............................................................ | | 176 |
|     | 2.  | The Initial Negotiations Concerning a High Tech Engagement Letter ..................................................... | | 177 |
|     | 3.  | The Proposed Modifications to the High Tech Engagement Letter ..................................................... | | 178 |
|     | 4.  | The Fidelity International Engagement Letter ............................. | | 179 |
|     | 5.  | The Egans' Concerns about Appearing on a "List"...................... | | 181 |
|     | 6.  | Renewed Discussions Concerning the High Tech Engagement Letter ..................................................... | | 181 |
| Z.  | The Preparation and Filing of the Egans' 2001 Tax Returns ................... | | | 184 |
|     | 1.  | The Partnership Tax Returns (Forms 1065) ................................ | | 184 |
|     | 2.  | The Individual Income Tax Return (Form 1040) ......................... | | 185 |
|     | 3.  | The Impact of the New IRS Regulations in June 2002 ............... | | 186 |
|     | 4.  | The Proskauer Non-Disclosure Letter .......................................... | | 188 |
|     | 5.  | KPMG's Refusal to Sign the Egans' 2001 Tax Return .............. | | 192 |
| AA. | The Preparation and Filing of the Egans' 2002 Tax Returns ................... | | | 199 |
| BB. | The Tax Consequences of the Fidelity High Tech Transaction Claimed by the Egans ............................................................................... | | | 200 |
|     | 1.  | The Egans' Claimed Tax Basis in Their Partnership Interests in Fidelity High Tech ..................................................... | | 200 |
|     | 2.  | Fidelity High Tech's Claimed Tax Basis in Stock Contributed by Egans ...................................................... | | 201 |
| CC. | The Reporting of the Fidelity High Tech Transaction on Partnership Returns (Form 1065) .............................................................. | | | 203 |
|     | 1.  | Form 1065 for the Short Tax Year Ending December 21, 2001 ........................................................................ | | 204 |
|     | 2.  | Form 1065 for the Short Tax Year Ending December 31, 2001 ........................................................................ | | 205 |
|     | 3.  | Form 1065 for the Tax Year Ending December 31, 2002 ........... | | 206 |

|     |     | a. |     | Reporting of Claimed Losses ........................................... | 206 |
|     |     | b. |     | Other Required Explanations and Disclosures ............... | 207 |
| DD. | Reporting of the Fidelity High Tech Transaction on the Egans' 2002 Individual Return (Form 1040) ........................................... | | | | 208 |
| EE. | The Tax Consequences of the Fidelity International Transaction Claimed by the Egans ................................................................... | | | | 209 |
|     | 1. | Richard Egan's Claimed Basis in His Partnership Interest in Fidelity International ..................................................................... | | | 209 |
|     | 2. | The Claimed Allocation of $163 Million Gain to Mahoney ........ | | | 210 |
|     | 3. | The Claimed Allocation of $163 Million Loss to Richard Egan ............................................................................... | | | 212 |
|     | 4. | The Capitalization of Fees ........................................................... | | | 214 |
|     | 5. | The Reallocation of Fees to Richard Egan ................................... | | | 215 |
| FF. | The Reporting of the Fidelity International Transaction on the 2001 Partnership Return (Form 1065) .................................................... | | | | 215 |
|     | 1. | The Netting of Gains and Losses ................................................. | | | 215 |
|     | 2. | The Reporting of the Loss as "Other Income" ............................ | | | 216 |
|     | 3. | The Treatment of the Currency Option "Loss" as a Section 988 Loss ......................................................................... | | | 217 |
|     | 4. | The Failure to File a Form 4797 .................................................. | | | 217 |
|     | 5. | The Failure to Report the Net Loss as a "Trade or Business" Loss ............................................................................ | | | 219 |
|     | 6. | The False Entries on Schedules L and M-2 ................................. | | | 220 |
|     |     | a. | The Purpose of Schedule L ............................................. | | 220 |
|     |     | b. | The 2001 Fidelity International Schedule L ..................... | | 220 |
|     |     |     | (1) | "Investment in Fidelity World" of $150,304,982 ................................................. | 221 |
|     |     |     | (2) | Investment in "Foreign Exchange Options" of $134,832,153 ..................................... | 222 |
|     |     |     | (3) | The Effect of the False Reporting on Schedule L ............................................................. | 223 |
|     | 7. | The Purpose of Schedule M-2 ...................................................... | | | 224 |
|     | 8. | The 2001 Fidelity International Schedule M-2 ............................. | | | 224 |

9

|     | 9.  | The Effect of the False Schedule M-2 on the Schedule K-1 ........ | 225 |
|     | 10. | The Ultimate Effect of the False Schedules L and M-2 ............. | 227 |
|     | 11. | The Failure to Disclose the Transaction Otherwise ..................... | 227 |
|     |     | a.   Schedule K-1, Line 25 ..................................................... | 227 |
|     |     | b.   Form 8275 ....................................................................... | 228 |
|     |     | c.   Schedule K-1, Line G ..................................................... | 229 |

GG. The Reporting of the Fidelity International Transaction on the 2002 Partnership Return (Form 1065) ..................................................... 229

|     | 1.  | The Reporting of the Capital Loss as an Ordinary Loss ............. | 229 |
|     |     | a.   The Purported "Section 988 Loss" ................................... | 229 |
|     |     | b.   The Failure to Report the Loss on Schedule D ............... | 230 |
|     |     | c.   The Resulting Tax Benefit .............................................. | 231 |
|     |     | d.   A Capital Loss ................................................................ | 231 |
|     | 2.  | The Use of the Accrual Method of Accounting ........................... | 232 |
|     | 3.  | The False Statements on Schedules L and M-2 and on Richard Egan's Schedule K-1 ...................................................... | 234 |

HH. The Reporting Of The Fidelity International Transaction on the Egans' 2001 1040 Return ........................................................................ 236

|     | 1.  | The Reporting of the "Loss" as a "White-Paper Netting Transaction" ................................................................... | 236 |
|     | 2.  | The Reporting of the "Loss" under "Miscellaneous Income" ...... | 237 |
|     |     | a.   The Reporting on Statement 1 ......................................... | 237 |
|     |     | b.   The Reporting of the "Loss" on Schedule E .................... | 238 |
|     | 3.  | The Reporting of the Options Income as "Other Income" ........... | 239 |

II.  The Reporting of the Fidelity International Transaction on the Egans' 2002 1040 Return ........................................................................ 239

|     | 1.  | The Reporting of the Claimed Loss ............................................. | 239 |
|     | 2.  | The Resulting Tax Benefits ......................................................... | 240 |

JJ.  The Egans Sought to Conceal the Transactions from the IRS ................. 241

|     | 1.  | Denby's Discussions with Reiss in April 2000 ............................ | 242 |
|     | 2.  | Denby's May 2000 Analysis ........................................................ | 242 |

|   | 3. | Discussions in July 2000 ............................................................ | 243 |

|   | 4. | Discussions of Increased Risk after Notice 2000-44 ................... | 244 |

|   | 5. | Later Discussions Concerning Reporting and Audit Risk ........... | 244 |

KK. From a Subjective Standpoint, the Transactions Had No Business Purpose ..................................................................................... 247

LL. From an Objective Standpoint, the Transactions Had No Economic Substance ................................................................................ 248

1. Reasonable Hedging or Risk-Shifting Function ........................... 248

2. Reasonable Possibility of Profit .................................................... 249

MM. The Fidelity High Tech Transaction Lacked Economic Substance ........ 249

1. The Transaction Served No Reasonable Hedging Function ........ 249

    a. The NASDAQ 100 Option Transactions Were Not a Rational Economic Hedge ...................................... 249

    b. Various Components of the Transaction Served No Hedging Function ...................................................... 252

2. There Was No Reasonable Possibility of Profit on the Fidelity High Tech Transaction .................................................... 252

    a. The Costs and Fees for the Transaction Were Extremely High ................................................................. 252

    b. The Expected Return on the Transaction Was Materially Negative ......................................................... 255

    c. The Net Present Value of the Options Was Materially Negative ......................................................... 256

    d. The One-Option Payout Was Not a Real Possibility ....... 256

    e. The Options Were Not in Fact Profitable ........................ 257

NN. The Fidelity International Transaction Lacked Economic Substance ...... 257

1. The Transaction Served No Reasonable Hedging Function ........ 257

    a. The Interest Rate and Currency Option Transactions Were Not Rational Economic Hedges ............................. 257

       (1) The Interest Rate Options ..................................... 259

       (2) The Currency Options ......................................... 261

    b. Various Components of the Transaction Served No Hedging Function .............................................................. 262

|  | 2. | | There Was No Reasonable Possibility of Profit on the Fidelity International Transaction .............................................................. | 263 |
|--|----|--|----------------------------------------------------------------------------------------------------------------------------------------|-----|
|  |    | a. | The Capital Structure Was Not Rational ......................... | 263 |
|  |    | b. | The Costs and Fees for the Transaction Were Extremely High ................................................................ | 264 |
|  |    | c. | The Expected Rate of Return of the Transaction Was Materially Negative .................................................. | 265 |
|  |    |    | (1) The Expected Return Before Fees ........................ | 266 |
|  |    |    | (2) The Expected Return on the Transaction Was Materially Negative ...................................... | 271 |
|  |    | d. | The One-Option Payout Was Not a Real Possibility ....... | 273 |
|  |    | e. | The Court Does Not Credit the Conclusion of Plaintiff's Expert ............................................................... | 274 |
|  |    | f. | The Fidelity International Transaction Was Intended to be Profitless ................................................... | 275 |

OO. Mahoney Was Not a Real Partner in Fidelity International ..................... 276

| 1. | Mahoney Participated in 47 Identical Transactions in 2001 ........ | 276 |
|----|--------------------------------------------------------------------|-----|
| 2. | Mahoney's Capital Contributions Were Treated as Costs of the Promoters ................................................................. | 278 |
| 3. | Any Value of the Remaining Interests of Mahoney Was Split Among the Promoters ......................................................... | 280 |
| 4. | Mahoney Was Reimbursed for His Expenses and Paid a Fee for His Participation ............................................................ | 280 |
| 5. | Mahoney Could Not Realize a Profit on the FDIS Transactions, Absent Fees ............................................................ | 281 |

PP. Fidelity High Tech Was a Sham Partnership for Federal Income Tax Purposes ............................................................................................ 284

QQ. Fidelity International was a Sham Partnership for Federal Income Tax Purposes ............................................................................................ 284

RR. The Step Transaction Doctrine Applies to Collapse Steps of the Fidelity High Tech Transaction ................................................................ 285

| 1. | The Steps of the Fidelity High Tech Transaction Should Be Collapsed under the "Interdependence" Test .......................... | 285 |
|----|----------------------------------------------------------------------|-----|

|  |  | a. |  | None of the Individual Steps Had an Independent Business Purpose ............................................................. | 285 |

|  |  | b. |  | Certain Intermediate Steps Had No Business Purpose .... | 286 |

|  |  |  | (1) | There Was No Business Purpose to the Formation and Use of the Index A and Option A to Acquire the Options ......................... | 286 |

|  |  |  | (2) | There Was No Business Purpose to the Transfer of Maureen Egan's Interest to MEE Holdings ...................................................... | 287 |

|  | 2. |  |  | The Steps of the Fidelity High Tech Transaction Should Be Collapsed Under the "Component" Test ................................ | 287 |

SS. | The Step Transaction Doctrine Applies to Collapse Steps of the Fidelity International Transaction ............................................................ | | | | 288 |

|  | 1. |  |  | The Steps of the Fidelity International Transaction Should Be Collapsed Under the "Interdependence" Test ......................... | 288 |

|  |  | a. |  | None of the Individual Steps Had an Independent Business Purpose ............................................................. | 288 |

|  |  | b. |  | Certain Intermediate Steps Had No Business Purpose .... | 289 |

|  |  |  | (1) | There Was No Non-Tax Business Purpose for the Use of Fidelity World to Purchase the Options ............................................................ | 290 |

|  |  |  | (2) | None of the Other Intermediate Steps of the Transaction, Standing Alone, Had Any Independent Business Purpose ............................. | 290 |

|  | 2. |  |  | The Steps of the Fidelity International Transaction Should Be Collapsed Under the "Component" Test ................................ | 291 |

TT. | The Fidelity High Tech and Fidelity International Paired Options Were, Economically, Single Positions ..................................................... | | | | 292 |

|  | 1. |  |  | The Parties Treated the Option Pairs as a Single Position ........... | 292 |

|  | 2. |  |  | Separating the Paired Options Would Have Required Huge Amounts of Collateral or Margin ................................................. | 293 |

UU. | The Egans Did Not Receive Independent Legal Advice from Proskauer and Sidley Austin ..................................................................... | | | | 294 |

|  | 1. |  |  | Proskauer and Sidley Austin Did Not Provide Independent Legal Advice ............................................................................... | 294 |

|  | 2. | The Egans Knew That the Legal Advice from Proskauer and Sidley Austin Was Not Independent ............................................. | 297 |

VV. The Proskauer Opinion for Fidelity High Tech Was Based on Unreasonable Factual Assumptions .......................................................... 298

1. The Opinion Contained False and Misleading Factual Assumptions ................................................................................. 299

    a. Investor Representation No. 1 Was False ........................ 299

    b. Investor Representation No. 2 Was False ........................ 299

    c. Investor Representation No. 3 Was False ........................ 300

    d. Investor Representation No. 10 Was False or Misleading .................................................................... 301

    e. The Date of the Original Contribution of EMC Stock Was False ............................................................... 302

2. The Opinion Omitted Essential Facts ......................................... 303

3. Proskauer Knew That the Opinion Contained False and Misleading Factual Assumptions and Omitted Critical Facts .................................................................................. 304

4. Richard Egan Did Not Read the Certificate of Facts or the Proskauer Opinion Letter ....................................................... 304

WW. The Sidley Austin Opinion for Fidelity International Was Based on Unreasonable Factual Assumptions .................................................... 305

1. The Opinion Contained False and Misleading Factual Assumptions .................................................................... 305

    a. Investor Representation No. 1 Was False ........................ 305

    b. Investor Representation No. 2 Was False ........................ 306

    c. Investor Representation No. 3 Was False ........................ 307

    d. Investor Representation No. 9 Was False or Misleading .................................................................... 308

2. The Opinion Omitted Essential Facts ......................................... 309

3. Sidley Austin Knew That the Opinion Contained False and Misleading Factual Assumptions and Omitted Critical Facts .................................................................................. 310

4. Richard Egan Did Not Read the Investor Representation Letter .................................................................... 311

|  | XX. | Both the Proskauer Opinion Letter and the Sidley Austin Opinion Letter Were Based on Unreasonable Legal Assumptions ........................ | 311 |
|  | YY. | The Egans Did Not Reasonably Rely on Any Other Professional Advisors for Tax Advice ........................................................................... | 318 |
|  |  | 1. | The Egans Did Not Reasonably Rely on the Tax Advice of KPMG ....................................................................................... | 318 |
|  |  | 2. | The Egans Did Not Reasonably Rely on the Tax Advice of RSM McGladrey ...................................................................... | 319 |
|  |  | 3. | The Egans Did Not Reasonably Rely on the Tax Advice of Stephanie Denby .................................................................... | 319 |
| IV. | CONCLUSIONS OF LAW ...................................................................................... | | | 320 |
|  | A. | Jurisdiction and Nature of Proceeding ...................................................... | 320 |
|  | B. | The Economic Substance Doctrine ........................................................... | 322 |
|  |  | 1. | The Doctrine Generally ................................................................. | 322 |
|  |  | 2. | The Doctrine in the First Circuit .................................................. | 326 |
|  |  | 3. | The Objective Inquiry ................................................................... | 333 |
|  |  | 4. | The Subjective Inquiry .................................................................. | 336 |
|  | C. | The Treatment of Sham Partnerships ........................................................ | 336 |
|  | D. | The Step Transaction Doctrine ................................................................. | 338 |
|  |  | 1. | The "Interdependence" Test ......................................................... | 339 |
|  |  | 2. | The "End Result" Test .................................................................. | 340 |
|  | E. | The Partnership Anti-Abuse Rules – Treasury Regulation § 1.701-2 ................................................................................. | 340 |
|  | F. | Recharacterization of Transactions Based on Substance Rather than Form ..................................................................................... | 341 |
|  | G. | Section 165(c) .......................................................................................... | 342 |
|  | H. | Accuracy-Related Penalties ...................................................................... | 344 |
|  |  | 1. | Gross Valuation Misstatement Penalty ......................................... | 345 |
|  |  | 2. | Substantial Valuation Misstatement Penalty ................................. | 346 |
|  |  | 3. | Substantial Understatement Penalty ............................................. | 346 |
|  |  |  | a. | "Substantial Authority" ..................................................... | 347 |
|  |  |  | b. | "Adequately Disclosed" and "Reasonable Basis" ........... | 348 |

|  |  | c. | Limitation on Relief for Tax Shelter Transactions .......... | 348 |
|  | 4. |  | Negligence or Disregard of Rules Penalty ................................... | 349 |
|  | 5. |  | Defense to Penalties ..................................................... | 351 |

V.    SUMMARY FACTUAL CONCLUSIONS ............................................................ 353

   A.    Fidelity High Tech .................................................................... 353

   B.    Fidelity International .............................................................. 354

   C.    Penalty Issues ......................................................................... 355

   D.    Other Issues ........................................................................... 356

VI.    CONCLUSION ..................................................................................... 357

# I.   INTRODUCTION

## A.   Summary of Facts

Richard J. Egan was one of the founders of EMC Corporation, a large, publicly-traded manufacturer of computer storage devices. By the year 2000, Richard Egan and his wife Maureen had amassed enormous personal wealth, the great majority of which was in the form of EMC stock.

The Egans were highly sophisticated taxpayers; Richard Egan was one of the most successful businessmen in the history of the United States. His personal and family financial affairs, including the management of his wealth and the payment of his taxes, occupied an entire organization of twenty or so employees, which included his three sons, at least two certified public accountants, and a variety of other business and financial specialists. Richard and Maureen Egan expressly delegated power over their tax affairs to their son Michael, and explicitly and implicitly delegated authority for those matters throughout the family organization.

With the Egans' wealth and income came potentially large tax liabilities. As of 2000, the Egans beneficially owned approximately 25 million shares of EMC stock. At its peak in September 2000, EMC shares traded at more than $100 per share. Because the Egans' basis in those shares was extremely small—approximately two cents per share—the sale of any substantial portion of that stock would have produced huge capital gains, subject to a long-term capital gains tax at a rate of 20%.

In addition, the Egans owned non-qualified options to purchase more than 8 million shares of EMC stock at very low strike prices. The exercise of those options would generate large amounts of ordinary income, subject to taxes at a marginal rate that approached 40%.

In early 2000, Richard Egan and his son Michael became interested in investing in tax

17

shelters to avoid taxes on the capital gains and ordinary income that was likely to result from the sale of EMC stock and the exercise of the options. With the assistance of an attorney from Chicago named Stephanie Denby, the Egans interviewed several tax shelter promoters in May 2000. They eventually selected the large international accounting firm KPMG. Through KPMG, the Egans were introduced to a small firm called Helios, which (with a related company called Diversified Group International, or DGI) had designed a highly complex tax shelter transaction that it was marketing to wealthy individuals.

The original tax shelter scheme involved the contribution of both paired offsetting options (in large notional amounts) and appreciated assets (such as EMC stock) to an entity taxed as a partnership. In simplified terms, the promoters claimed that the purchased option was an asset, but that the sold option was not a liability; the taxpayer thus supposedly contributed assets to the partnership entity, but not liabilities, creating a grossly inflated basis in his interest in the entity. The taxpayer's interest would then be sold, and the taxpayer would claim that the inflated basis (from the contribution of the options) "eliminated" any gain from the disposition of the stock or other assets. Variations of the scheme were designed to create artificial losses to offset ordinary income.

A significant feature of the scheme was the fact that four major law firms—including Proskauer Rose and Brown & Wood, eventually Sidley Austin Brown & Wood—had been recruited by the promoters to provide favorable opinion letters. The taxpayers were told in advance that they could choose one of the four firms for their favorable opinion. The opinion letters were in essence intended to serve as insurance against tax penalties should the IRS ever discover the transactions, and thus to induce investors to invest in the tax shelters.

By early August 2000, the Egans were on the brink of engaging in a transaction with

18

KPMG and DGI/Helios that was designed to eliminate up to $200 million in capital gains by artificially inflating basis, and were considering a follow-up transaction designed to create up to $200 million in artificial losses to offset ordinary income.

In August 2000, the IRS issued Notice 2000-44. That notice directly attacked the types of tax shelter schemes that the Egans were about to enter into, and stated that the IRS would not recognize transactions of the type described in the Notice.

In the wake of Notice 2000-44, the promoters and their law firms concluded that it was too risky to proceed with the ordinary income portion of the scheme in its present form. The promoters and the Egans nonetheless pressed forward with the capital gains strategy, with a transaction designed to create $160 million in artificial basis. The strategy involved an orchestrated series of steps that were principally conducted through Fidelity High Tech Advisor A Fund, LLC. The essential steps of the transaction, other than the sale of the stock, were completed by early 2001. Unfortunately for the Egans, however, the price of EMC stock declined, to the point where they had created a purported "basis" of $160 million without sufficient offsetting assets to take advantage of it. The Egans accordingly decided to "stuff" additional low-basis stock into Fidelity High Tech in an effort to use the artificial basis they had created.

In the meantime, the Egans continued to speak with the promoters about a possible tax shelter strategy for ordinary income from the exercise of the options. By early 2001, the promoters had devised a new variation of the strategy that they called the "Financial Derivatives Investment Strategy," or FDIS. The FDIS strategy, among other things, generated paper "losses" for taxpayers by assigning any offsetting "gains" offshore—to one of two Irish confederates of the tax promoters (neither of whom, of course, filed U.S. tax returns).

19

The Egans exercised their stock options at various points in 2001, resulting in a gain of $162.9 million. By early October 2001, the Egans had decided to use the FDIS strategy to shelter that income from taxes. Like the prior transaction, the strategy involved an orchestrated series of steps, this time through Fidelity International Currency Advisor A Fund, LLC. The various steps of the transaction were completed by the end of 2001.

The IRS, however, continued its efforts to crack down on tax shelters. In June 2002—before the Egans had filed their individual tax return for the year 2001—the IRS adopted a temporary regulation that required the filing of a disclosure statement if a taxpayer had participated in certain tax shelter transactions. KPMG, which was preparing the Egans' return, concluded that such a disclosure statement was required with the Egans' return. Rather than make the disclosure, however, the Egans fired KPMG and hired an accountant at another law firm—who was also a confederate of the promoters—to sign their return.

Around the same time, and as promised by the promoters, the Egans received opinion letters from Proskauer Rose (as to the Fidelity High Tech transaction) and Sidley Austin (as to the Fidelity International transaction) purporting to opine that it was "more likely than not" that the proposed tax treatment would be upheld. The Egans also received a separate letter from Proskauer Rose opining that the disclosure insisted upon by KPMG was not required.

The Fidelity International transaction resulted in the creation of artificial "losses" of $158.6 million in 2001, which the Egans used to offset the ordinary income of $162.9 million from the option exercise on their 2001 income tax return that year. The disclosure statement that was prepared by KPMG, and never filed, stated that "expected reduction in federal income tax liability" from the Fidelity International transaction was $65.5 million. The Egans also claimed a loss of $1.7 million from Fidelity International on their 2002 tax return.

The Egans sold all of the stock in Fidelity High Tech in 2002, for $76.2 million in proceeds. The real basis for that stock was $8.7 million; the inflated claimed basis was more than $163 million. Instead of reporting a capital gain of $67.4 million from the sale of that stock for 2002, the Egans reported a huge loss.

The IRS eventually learned of the scheme, and disallowed the treatment of the transaction on the various partnership returns on multiple grounds.

## B.   Summary of Legal Conclusions

In substance, plaintiffs Fidelity High Tech and Fidelity International seek to overturn the various adjustments made by the IRS to items on the partnership tax returns. The principal argument advanced by the government in response is premised on the economic substance doctrine, sometimes referred to as the sham transaction doctrine.

A fundamental principle of tax law is that transactions without economic substance, or sham transactions, will not be recognized. The precise contours of the economic substance doctrine have not been set, and vary from circuit to circuit. Nonetheless, it is clear that courts are required to consider the substance of a transaction, rather than its mere form, in considering the tax effect to be given to it. In making that determination, courts normally are required to consider two aspects of a transaction: the subjective purpose of the taxpayer (that is, whether the taxpayer actually had a non-tax business purpose for entering into the transaction) and the objective purpose of the transaction (that is, whether the transaction, objectively viewed, had a reasonable possibility of profit or other business benefit).

Here, the Egans claim that the principal purpose of the transactions, viewed objectively, was to serve as a hedge: to mitigate the risk of a decline in the price of EMC stock (in the case of the Fidelity High Tech transaction) or to mitigate the risk of fluctuating interest rates or foreign

21

currency values (in the case of the Fidelity International transaction). From an objective standpoint, however, the transactions were entirely irrational; they were unnecessarily and extravagantly expensive, and did not hedge the purported risks effectively (or at all). The Egans also appear to claim that the transactions were entered into for profit. If so, they were also irrational for that purpose; the transactions were designed and intended to lose money, and in fact did so.

The objective features of the transactions were irrational because, of course, the Egans subjectively had no actual business purpose for entering into them. None of the participants in these complex transactions believed that they were real business transactions, with any purpose other than tax avoidance. Indeed, it is highly doubtful that any participant believed, even for a minute, that the transactions would withstand legal scrutiny if discovered. No one with the slightest understanding of the tax laws could reasonably believe that $160 million in basis could be created out of thin air, or that $160 million in income could be made to vanish in a puff of smoke. In accordance with that belief, the Egans and their advisors went to great lengths to try to ensure that the IRS would never find out about the transactions—including, among other things, the filing of partnership and individual tax returns with multiple false and misleading entries.

The Egans contend that their subjective intentions are irrelevant. In substance, they contend that as long as the transactions were not fictitious—that is, as long as the entities existed, the money was transferred, and the options were purchased and sold—the economic substance doctrine does not apply. But the transactions at issue were "real" only in the sense that a performance by actors on stage is "real." The actors are real human beings, and the stage sets are made of real wood and real paint. But the actors are reading from a script. No one watching "Macbeth" believes that they are witnessing the murder of a Scottish king, and the actors do not

believe it either. Here, too, the participants were simply following a script—a script that had little or no connection to any underlying business or economic reality.

The Egans also make a number of technical arguments, all of which assume that the transactions were real and should be respected. The linchpin of the scheme from a technical standpoint was a potential anomaly in the tax code: under a line of cases interpreting Section 752, a purchased option is an asset, but a sold option is only a contingent liability. The Egans thus take the position that a taxpayer can purchase offsetting options and contribute them to a partnership entity, and thereby contribute an asset but not a liability. From there, it is but a few steps to use the "asset" to inflate the basis of the partner's interest in the entity. If the tax system depended entirely on form over substance, the argument might well pass muster.

But tax liabilities are not so easy to dodge. It would be absurd to consider offsetting options—purchased and sold at the same time, and with the same counterparties—as separate items, and to act as if the one item existed and the other did not. That is particularly true where (as here) the individual option positions were gigantic, and might bankrupt the taxpayer or the options dealer if no offset were in place.

The Egans also point to the longstanding principle that it is perfectly legitimate to arrange one's affairs so as to pay as low a tax bill as possible. That assertion is true, as far as it goes. It is entirely appropriate, for example, for a taxpayer to decide to buy a house rather than to rent, in order to take advantage of the many tax advantages of home ownership. A taxpayer may buy a house with a mortgage in order to take advantage of the deductibility of mortgage interest. But a taxpayer cannot undertake phony or meaningless transactions and claim a tax advantage; he cannot, for example, lend money to himself, pay "interest" on the loan, and claim the interest deduction. If the tax laws permitted such a result, they would be nonsensical, and anyone who

23

paid taxes would be a fool. The tax laws are neither so simple nor so easily evaded.

Finally, the Egans claim that they relied in good faith on formal legal opinions issued by Proskauer Rose and Sidley Austin, two highly prominent law firms. It is true that both firms issued opinions to the Egans. And it is true that both firms opined that it was more likely than not that their tax treatment of the transactions would be upheld.

But those opinions, too, were just additional acts of stagecraft. The lawyers were not in the slightest rendering independent advice; the promoters of the tax shelters had arranged favorable opinions from those firms well in advance, and as part of their marketing strategy. Indeed, the promoters (not the Egans) paid the law firms' fees. More fundamentally, the opinions were themselves fraudulent: they were premised on purported "facts" that the Egans and the law firms knew were false, and reached conclusions that everyone involved knew could not possibly be correct. The opinions had but one purpose: to serve as a form of insurance against the imposition of penalties if the transactions were ever to come to light.

The claim of good faith reliance on counsel is thus wholly without merit. The Egans knew that the opinion letters were simply part of the tax shelter scheme, and did not for a moment believe that they were receiving independent legal advice after a full disclosure of all underlying facts.

In short, the Fidelity High Tech and Fidelity International transactions were complete shams, without any economic substance of any kind. For that reason, and for the other reasons set forth below, the transactions should not be recognized, and the adjustments made by the IRS will be upheld.

## II.  NATURE OF PROCEEDINGS

These consolidated cases were brought by Richard J. Egan pursuant to 26 U.S.C. § 6226

24

to challenge adjustments made by the Internal Revenue Service to tax returns filed by Fidelity

High Tech Advisor A Fund, LLC and Fidelity International Currency Advisor A Fund, LLC for

their 2001 and 2002 tax years. Richard Egan brought the matters in his capacity as tax matters

partner and notice partner of both entities. *See* 26 U.S.C. § 6226(a). The IRS's adjustments were

set forth in various notices of Final Partnership Administrative Adjustment ("FPAAs"), issued in

2005 and 2006. Plaintiffs calculated the taxes due by reason of those adjustments and made

deposits of those amounts with the IRS. Plaintiffs then filed these actions to obtain a refund of

the deposits.

Fidelity High Tech and Fidelity International are limited liability companies ("LLCs").

As LLCs, they are treated as partnerships for federal income tax purposes. *See* Treas. Reg.

§ 301.7701-2(a). Partnerships are "flow-through" entities and are not subject to an entity-level

tax, although they must file annual informational returns (Forms 1065) reporting various items.

26 U.S.C. §§ 701, 6031(a). Tax liability on a partnership's income is calculated and imposed at

the partner level. Accordingly, Fidelity High Tech and Fidelity International did not pay federal

income tax on their income; instead, they allocated their income among their partners.

This Court has jurisdiction to determine all partnership items of Fidelity High Tech and

Fidelity International that were raised in the FPAAs. *See* 26 U.S.C. §§ 6221 and 6226(f). Unlike

other judicial tax proceedings, such a decision does not determine the amount of tax owed by a

taxpayer or the amount of any refund of tax due to a taxpayer. Instead, the determination of

partnership items in a case such as this is in the nature of a declaratory judgment. This

proceeding determines the nature or amount of partnership items, and those determinations are

then applied uniformly in subsequent, separate, partner-level proceedings to determine each

partner's separate tax liability. 26 U.S.C. § 6231(a)(5), (6).

25

Although this proceeding generally addresses partnership-level items, not partner-level matters, it does not mean that the treatment of the two transactions on the Egans' individual tax returns is irrelevant. To the contrary, the goal of the entire enterprise was to minimize the tax liability of Richard and Maureen Egan, and the tax shelter scheme included the making of false entries on the Egans' individual tax returns in order to minimize the risk of audit and detection. The tax returns of the Egans are therefore discussed at some length in this opinion, although no adjustments to those individual returns are made in this proceeding.

In summary, and for the reasons stated below, the Court will uphold the administrative adjustments made by the IRS as to the nature of the partnerships and the relevant transactions. Among other things, the Court concludes that (1) the Fidelity High Tech and Fidelity International transactions lacked economic substance; (2) that Fidelity High Tech and Fidelity International were sham partnerships, and should be disregarded for federal income tax purposes; (3) that Samuel Mahoney, the Irish citizen who was a purported "partner" in Fidelity International, was not in fact a true partner; and (4) that the offsetting options pairs should be treated as a single position for federal income tax purposes. The Court also finds that various accuracy-related penalties, including the 40% gross valuation misstatement penalty, are applicable. *See* 26 U.S.C. § 6662(f).

For the sake of convenience, the Court will use the following terms, unless the context indicates otherwise:

"Fidelity High Tech" means Fidelity High Tech Advisor A Fund, LLC.

"Fidelity International" means Fidelity International Currency Advisor A Fund, LLC.

"The Egans" means Richard and Maureen Egan and their son Michael, when acting on their behalf under a power of attorney or otherwise as their agent or representative.

## III.   FINDINGS OF FACT

A.   **Jurisdictional Facts**

    **1.**    **Fidelity High Tech**

1.    Fidelity High Tech Advisor A Fund, LLC ("Fidelity High Tech") timely filed its U.S. Return of Partnership Income (Form 1065) with the IRS for its December 21, 2001 tax year by mailing it on April 15, 2002.  (*Id.*).

2.    Fidelity High Tech timely filed its tax return with the IRS for its December 31, 2002 tax year by mailing it on April 15, 2003.  (*Id.*).

3.    At the time he filed these actions, Richard Egan was the Tax Matters Partner ("TMP") of Fidelity High Tech for its 2001 and 2002 tax years.  (Ex. 108).

4.    Richard Egan was the authorized and proper party to bring the Fidelity High Tech cases under section 6226(a).  (*Id.*).

5.    As a notice partner of Fidelity High Tech, Richard Egan was the authorized and proper party to bring the Fidelity High Tech cases under section 6226(b).  (*Id.*).

6.    On October 11, 2006, the IRS sent a Notice of Beginning of Administrative Proceeding ("NBAP") to the TMP of Fidelity High Tech with respect to its December 31, 2002 tax year.  (*Id.*).

7.    On October 13, 2006, the IRS mailed a Notice of Final Partnership Administrative Adjustment ("FPAA") to the TMP of Fidelity High Tech with respect to its December 21, 2001 tax return.  (*Id.*).

8.    On October 13, 2006, the IRS mailed an FPAA to the TMP of Fidelity High Tech with respect to its December 31, 2002 tax return.  (*Id.*).

9.    On November 13, 2006, Richard Egan timely filed a complaint with respect to

Fidelity High Tech's December 21, 2001 tax year pursuant to section 6226. (*Id.*).

10. On November 13, 2006, Richard Egan timely filed a complaint with respect to Fidelity High Tech's December 31, 2002 tax year pursuant to section 6226. (*Id.*).

11. Prior to filing the complaint in the Fidelity High Tech cases, Richard Egan deposited $13.6 million with the IRS. (*Id.*).

12. At the time the complaints in the Fidelity High Tech cases were filed, Fidelity High Tech's principal place of business was located in Westborough, Massachusetts. (*Id.*).

## 2. **Fidelity International**

13. Fidelity International Currency Advisor A Fund, LLC ("Fidelity International") timely filed its tax return with the IRS for its 2001 tax year by mailing it on April 15, 2002. (*Id.*).

14. Fidelity International timely filed its tax return with the IRS for its 2002 tax year by mailing it on April 15, 2003. (*Id.*).

15. Richard Egan was the TMP of Fidelity International for the 2001 and 2002 tax years. (*Id.*).

16. In his capacity as both the TMP and a notice partner of Fidelity International, Richard Egan was the authorized and proper party to bring the Fidelity International cases under section 6226(a) and (b). (*Id.*).

17. On April 6, 2005, the IRS mailed an FPAA with respect to Fidelity International's 2001 tax return to the TMP of FICA A Fund. (*Id.*).

18. On September 1, 2005, Richard Egan timely filed a complaint with respect to Fidelity International's 2001 tax year. (*Id.*).

28

19.    On April 26, 2006, the IRS mailed an FPAA to the TMP of Fidelity International
        with respect to its 2002 tax return. (Ex. 265).

20.    On June 30, 2006, Richard Egan timely filed a complaint with respect to Fidelity
        International's 2002 tax year. (Ex. 108).

21.    Prior to filing the complaints in the Fidelity International cases, Richard Egan
        deposited $62,600,000 with the IRS ($62,100,000 for its 2001 tax year and
        $500,000 for its 2002 tax year). (*Id.*).

22.    At the times that the complaints in the Fidelity International cases were filed,
        Fidelity International's principal place of business was located in Westborough,
        Massachusetts. (*Id.*).

23.    Richard J. Egan died on August 28, 2009. (Docket # 513).

24.    Michael J. Egan and John R. Egan, as co-executors of the estate of Richard J.
        Egan, have been substituted as plaintiffs for Richard J. Egan. (Docket # 513).

## B.    **EMC, the Egans, and Related Parties**

### 1.    **EMC and Richard Egan**

25.    EMC Corporation is a large, publicly-traded corporation headquartered in
        Hopkinton, Massachusetts. It develops and sells, among other things, data storage
        and retrieval technology and products. In 2000, it had revenues of more than $8.8
        billion and more than 24,000 employees. (Ex. 108; Ex. 788).

26.    Richard Egan co-founded EMC in 1979. (Ex. 108).

27.    Richard Egan held the position of Chief Executive Officer from the founding of
        EMC until 1992. (R. Egan, 1:111-12).

28.    Richard Egan was the Chairman of the Board of Directors of EMC from January

29

1988 until January 17, 2001, when he was named Chairman Emeritus. (Ex. 108).

29.    Richard Egan resigned as Chairman Emeritus of EMC on September 10, 2001.
       (*Id.*).

30.    Richard Egan served as the U.S. Ambassador to Ireland from September 10, 2001,
       until January 31, 2003. (*Id.*).

31.    EMC had its initial public stock offering, and became a publicly-traded company,
       in 1986. (R. Egan, 1:110, Exs. 108, 788).

32.    Prior to EMC's first public offering, Richard Egan owned approximately 70% of
       the stock of EMC. (R. Egan, 1:110). All, or almost all, of the EMC stock that the
       Egan family owned at the beginning of 2000 was unregistered founders stock.
       (*Id.* at 2:13; Denby, 28:42).

33.    The number of EMC shares held by Richard Egan grew over time due to multiple
       stock splits. (R. Egan, 2:29-30).

34.    As of September 7, 2001, Richard and Maureen Egan beneficially owned
       approximately 25 million shares of EMC stock. (Ex. 108). As of January 1,
       2001, Richard and Maureen Egan also owned fully-vested options to purchase
       8,320,000 shares of EMC stock at relatively low strike prices. (Ex. 1414).

35.    Richard and Maureen Egan were subject to various restrictions on the sale of their
       stock, including SEC rules and EMC policies that restricted stock trades to certain
       windows of time. (Exs. 21, 22, 326).

36.    On August 28, 2009, after the trial of this matter, Richard Egan died. (Docket #
       507).

**2.    The Egan Family**

30

37.     Richard and Maureen Egan were married. (R. Egan, 1:107-08).

38.     The Egans had three sons, Michael, John (also known as "Jack") and Christopher,
        and two daughters, all of whom were adults at the relevant times. (*Id.* at 1:108).

39.     Richard Egan was a resident of Massachusetts. (*Id.* at 1:107).

40.     During the relevant years, Maureen Egan claimed residency in Florida, although
        the couple was not legally separated. (*Id.* at 1:108; M. Egan, 5:47).

41.     Maureen Egan was a director of EMC from March 1993 until she resigned
        effective January 17, 2001. (Ex. 108).

**3.    Carruth Management and Subsidiaries**

42.     The appreciation in the price of EMC stock in the 1990's rapidly increased the
        Egan family's wealth. (R. Egan, 2:28; M. Egan, 5:36, 44).

43.     In the early 1990's, Richard Egan formed a "family office" to manage his wealth,
        make investments, and handle personal administrative matters. (Ex. 108; R.
        Egan, 2:26-30).

44.     Michael Egan, who previously had worked at EMC, began working full-time at
        the family office in approximately 1992. (M. Egan, 5:29, 36). Jack Egan and
        Christopher Egan also began working for the family office in the 1990's. (*Id.* at
        5:78-79).

45.     In the 1990's, the Egan family office began to operate under the name Carruth
        Management. (*Id.* at 5:26).

46.     Carruth Management LLC was formed in Delaware in 1997. (Ex. 120). It is
        located in Westborough, Massachusetts. (M. Egan, 5:26). Carruth is owned in
        equal parts by Michael, Jack, and Christopher Egan. (Exs. 120, 108).

31

47.   Michael Egan is the Chief Executive Officer of Carruth Management. During the
      relevant time, he had general authority to invest and manage Egan family assets.
      (R. Egan, 2:31, 39, 50).

48.   In 2000-2001, the Egan family's investments consisted principally of the
      following asset classes: EMC stock and options; commercial real estate; publicly-
      traded stocks and other securities; and private equity investments. (Exs. 73, 120,
      201).

49.   Christopher Egan largely handled real estate investments for Carruth, and Jack
      Egan largely handled venture capital and private equity investments. (M. Egan,
      5:78-79; Ex. 120).

50.   Carruth Partners is a wholly owned subsidiary of Carruth Management. (M.
      Egan, 5:79). Carruth Partners was used to control the commercial real estate that
      the Egans owned. (*Id.*; Ex. 120).

51.   Carruth Associates LLC was formed in Delaware in 2000, and is a wholly-owned
      subsidiary of Carruth Management. (Ex. 120).

52.   During the period from 2001 to 2003, Carruth Associates had approximately
      twenty employees. (Reiss, 26:119).

53.   The following persons were employees of Carruth Associates during the relevant
      time:

      (a)   James Reiss was the Chief Financial Officer of Carruth Associates. (*Id.* at
            26:112; Ex. 120). He has been a certified public accountant since 1989.
            (Reiss, 26:114). He joined the Egan family office in 1996. (*Id.* at 26:117).

      (b)   Patrick Shea was the Chief Operating Officer of Carruth Associates.

                                    32

(Shea, 14:91; Ex. 120). He has been a certified public accountant since 1981. (Shea, 14:91). He joined Carruth on June 26, 2000. (*Id.* at 14:91, 15:128). Among other things, Shea was the supervisor of the tax and accounting group at Carruth. (*Id.* at 14:92).

(c) Melissa Seaver was the Senior Tax Manager of Carruth Associates. She joined Carruth in July 2001. (Seaver, 25:116, 120). She has been a certified public accountant since 1999. (*Id.* at 25:119).

(d) Carolyn Fiddy was the Manager of Investments at Carruth Associates until March 2002. (Calkins, 35:27-28).

(e) Robin Calkins was an Investment Assistant at Carruth Associates in 2000. In March 2002, when Fiddy left Carruth, Calkins became Manager of Investments. (*Id.*; Ex. 120).

(f) David Henry was the Director of Investments at Carruth Associates. He joined Carruth in March 2001. (Henry, 4:106; Ex. 120).

54. In the period from 2001 to 2003, Carruth was generally responsible for preparing and reviewing tax returns for Richard and Maureen Egan and various Egan family entities. (Seaver, 25:120-23).

55. Carruth also relied on outside accountants and advisors for tax advice and preparation of tax returns. (Seaver, 25:125; M. Egan, 5:67).

## 4.     Burke, Warren Law Firm

56. The law firm of Burke, Warren, MacKay & Serritella, P.C. is located in Chicago, Illinois.

57. Stephanie Denby was a partner of Burke, Warren. (Denby, 28:8-9). Richard and

Maureen Egan became clients of Denby in 1994, when she was hired by Michael

Egan to assist them with estate planning. (*Id.* at 28:10-11; R. Egan, 2:54).

## C.    The Tax Promoters and their Associates

### 1.    The Diversified Group Incorporated

58.    The Diversified Group Incorporated ("DGI") was a self-described "boutique

merchant banking firm" based in New York that, among other things, designed

and marketed tax shelter products. (Ex. 811).

59.    James Haber was the President of DGI. (*Id.*).

60.    Orrin Tilevitz was Vice-President and General Counsel of DGI. (*Id.*).

61.    Mox Tan was a Managing Director of DGI based in Chicago. (*Id.*).

62.    Philip L. Kampf, Jr., was a Managing Director of DGI based in Chicago. (*Id.*).

### 2.    Helios Financial LLC

63.    Helios Financial, LLC was also a self-described "boutique merchant banking

firm" based in Chicago. (Ex. 28). Helios had a contractual relationship with DGI

under which, among other things, it marketed DGI tax shelter products and

assisted in their development. (Ex. 400). As described by one colleague, James

Haber had two companies that ran "similar deals" because he had "different

partners." (Ex. 29).

64.    James Haber was the Managing Director of Helios. (Ex. 28).

65.    Mox Tan and Phil Kampf were Principals of Helios. (*Id.*).

### 3.    KPMG, LLP

66.    KPMG, LLP is a national accounting firm.

67.    John Schrier was a partner of KPMG. He was a member of KPMG's "Innovative

Strategies Group" in the New York office. (Ex. 470).

68. Timothy Speiss was a partner of KPMG. He was a member of KPMG's "Personal Financial Planning" ("PFP") group in the New York office. (Ex. 1684).

69. Robert Prifti was a Senior Manager in KPMG's Boston office and was a member of its PFP group. (*Id.*).

70. Brian Rivotto was a partner in KPMG's Boston office and was a member of its PFP group. (Exs. 249, 658).

## 4. **Alpha Consultants, LLC**

71. Alpha Consultants, LLC is a Florida limited liability company that, among other things, conducted trades in options and foreign currencies. (Ex. 811).

72. Ivan J. Ross was the managing member of Alpha. (*Id.*).

73. Ronald Buesinger was a manager of Alpha. (*Id.*).

## 5. **Samuel Mahoney**

74. Samuel Mahoney is a citizen of Ireland. He was a director and owner of Biosphere Finance Limited, an Irish company, with offices in Dublin, Ireland. (Mahoney Dep. at 4-5; Ex. 1012).

## 6. **Refco Capital Markets Limited**

75. Refco Capital Markets Limited ("Refco") was a dealer in options. (Ex. 108).

## 7. **Proskauer Rose, LLP**

76. Proskauer Rose, LLP ("Proskauer") is a national law firm.

77. Ira Akselrad and Janet Korins were partners in the New York office of Proskauer.

78. Matthew Sabloff and Michael Swiader were associates in the New York office of Proskauer.

**8. Sidley Austin Brown & Wood, LLP**

79. Sidley Austin Brown & Wood, LLP ("Sidley") is a national law firm. Sidley was the result of a merger in May 2001 between Sidley Austin and Brown & Wood, LLP ("Brown & Wood").

80. R.J. Ruble was a partner in the New York office of Brown & Wood. He became a partner in Sidley in May 2001.

**9. RSM McGladrey, Inc.**

81. RSM McGladrey, Inc. ("RSM") is a national accounting firm.

82. Ronald G. Wainwright, Jr., was Director of Tax Services in the Raleigh, North Carolina, office of RSM McGladrey. (Wainwright Dep. 1:27-28, 33-34).

**D. The Egans' Tax Problems**

**1. Low-Basis EMC Stock**

83. As a result of the success of EMC Corporation, the value of its stock rose enormously from 1979 to 2000.

84. The market price of EMC stock peaked in September 2000, when it traded at more than $100 per share. (Ex. 108). As of that date, the Egans' shares were worth more than $2 billion. (Ex. 278).

85. The basis of Richard Egan's shares of EMC was very low. For example, the EMC shares that were eventually sold as part of the Fidelity High Tech transaction had a basis of $0.0208 per share. (Ex. 10).

86. In 2000 and 2001, EMC stock and options comprised the great majority of Richard Egan's wealth. (R. Egan. 2:14; M. Egan, 5:46; Ex. 278).

87. The long-term capital gains tax rate for high-income taxpayers was 20% in 2000

and 2001. Accordingly, if Richard Egan had sold EMC stock for $150 million, he would likely be subject to a long-term capital gains tax of approximately $30 million.

## 2.   Non-Qualified Stock Options

88.   As of January 1, 2001, Richard and Maureen Egan owned fully-vested options to purchase an additional 8,320,000 shares of EMC stock. (Ex. 1414).

89.   The options had been granted in 1996 and 1997. (Exs. 325, 780, 791). The strike prices varied, but ranged between approximately $1.15 and $3.05. (Exs. 325, 780, 791).

90.   The options were "non-qualified options" within the meaning of the Internal Revenue Code. (Shea, 15:72). As a result, any gain from the exercise of those options would result in income taxable at the ordinary income tax rate, rather than at the lower long-term capital gains tax rate.

91.   The highest marginal federal income tax rate in 2000 was 39.6%, and in 2001 it was 39.1%. For planning purposes, and to take other taxes into account, the Egans and their advisors assumed an effective tax rate on income from the exercise of options of 40%-43.5%. (Exs. 471, 1034). Accordingly, if Richard Egan had exercised non-qualified options producing a gain of $150 million, he would likely be subject to tax on that gain of approximately $60 million to $65.25 million.

92.   As described above, Richard Egan became Ambassador to Ireland on September 10, 2001. In order to become ambassador, it was necessary for Egan to resign as chairman of EMC. (Ex. 791).

93.     The non-qualified options held by Richard Egan would expire upon his
        resignation from the board of EMC. (*Id.*).

**E.    The Delegation of Authority for Tax Affairs to Michael Egan and Carruth**

94.     During the relevant time, Michael Egan had primary responsibility for his parents'
        tax affairs. That responsibility included the decision to invest in the tax shelters at
        issue in this litigation, and the filing of the 2001 and 2002 individual income tax
        returns of Richard and Maureen Egan, which he signed under a power of attorney.
        (Exs. 8, 232).

95.     On October 12, 2001, Richard Egan executed a power of attorney granting
        Michael Egan broad authority, including authority as to his "tax matters." (Ex.
        1128).

96.     On December 12, 2001, Maureen Egan executed a power of attorney granting
        Michael Egan broad authority, including authority as to her "tax matters." (Ex.
        15).

97.     Richard Egan had knowledge of, and was involved in, the decision to invest in the
        tax shelters at issue and the later filing of tax returns with the IRS, although he
        delegated much of the responsibility, particularly the day-to-day responsibility, to
        Michael Egan and employees of Carruth.

98.     Maureen Egan had no role at all with regards to her tax affairs, which were
        handled by her husband Richard and her son Michael. (Maur. Egan Dep. at 15-16,
        59).

99.     Employees of Carruth, acting at Michael Egan's direction and pursuant to his
        delegation, also exercised authority over the tax affairs of Richard and Maureen

                                            38

Egan to various degrees. James Reiss, the CFO, and (after June 2000) Patrick Shea, the COO, had day-to-day responsibility at Carruth for the tax matters at issue in this litigation.

F.   **Early Discussions Concerning Tax Shelters**

100.   By late April 2000, the Egan family and its advisors had begun discussing possible strategies to minimize or eliminate taxes on the exercise of options and sale of EMC shares. In particular, the Egans began considering tax strategies that would generate an artificial step-up in basis to eliminate capital gains or the creation of artificial losses to offset ordinary income.

101.   The strategies they were considering, and that they eventually adopted, were tax reduction strategies—not investment strategies that were intended to make money, or hedging strategies that were intended to reduce risk or preserve capital.

102.   Jim Reiss of Carruth and attorney Stephanie Denby of the law firm Burke, Warren took the early lead in exploring possible tax strategies and setting up meetings with tax advisors and promoters.

103.   On April 25, 2000, Reiss wrote to Denby that Michael Egan was "anticipating unloading his father's EMC shares at $140" per share, and asked if she had a "good lead on a transaction and insurance." (Ex. 3568). The "transaction" he had in mind was one that would avoid taxes. (Denby, 28:71).

104.   On April 27, 2000, Denby wrote a memorandum to Richard Egan regarding the availability of "capital gains offset strategies." (*Id.* at 28:72; Ex. 3566). Denby wrote:

There are several strategies still in play which through a

39

series of transactions will create for tax purposes a step-up
in basis or capital loss while transactions net out as
economically neutral. The basis or loss could then be used
to offset capital gains upon the sale of EMC stock. These
transactions exploit instances in which the tax code has
inconsistent treatment for what is in effect offsetting
positions.

In 1998 we looked at several of these transactions. Similar
types of transactions are still available. The IRS is certainly
aware that these transactions are out there. They have
implemented new reporting requirements to try to stop
these transactions. To date new reporting requirements
have focused solely on C corporations. Although, they
could have easily applied similar restrictions to individuals,
they have failed to do so.

(Ex. 3566).

105.    In her April 27 memorandum, Denby also addressed the audit risks, as follows:

These transactions clearly take advantage of "loopholes."
The reporting is consistent with tax law although the results
are unintended. The promoters will provide tax opinion
letters to avoid penalties if audited. It appears that there is
a very low chance that these transactions would ever be
picked up by the IRS. The promoters I have talked to have
not had any audits. The reported tax cases for similar
transactions all involve C corporations. . . . There are
further steps that we can take to limit these risks. First,
some of the promoters limit use of the transactions to 5 to 7
clients. Therefore, they will only allow to be used in large
situations. Secondly, some of the transactions focus on
generating basis as opposed to capital loss. Basis is more
discrete [sic] and less likely I believe to cross the IRS radar
screen.

(Id.).

106.    In her April 27 memorandum, Denby also addressed the availability of penalty

insurance to further offset the risk of audit, as follows:

We are simultaneously looking at the availability of
purchasing insurance to further offset risk in case of audit.

40

> Initially, I was optimistic that this product will be available for these type of transactions. However, as we are digging deeper it appears that this is a less likely option. I do not think that we will know whether insurance is available until we are a little further down this path because insurance companies will have to look at the tax opinions before making a final decision.

(*Id.*).

107. Finally, Denby balanced the possible tax savings from the strategies against the cost and risk, as follows:

> I think the risk of this transaction catching the IRS attention is very low. At least for one of these transactions, the fees involved will be less than 25% of the potential tax liability.

(*Id.*).

108. From the inception of their search for tax strategies, the Egans and their advisors knew that these strategies were not normal business transactions and would likely expose them to tax penalties if the transactions were ever discovered by the IRS.

109. Before writing the April 27 memorandum, Denby had investigated the possibility of obtaining insurance to cover any tax liability or tax penalty that might be assessed if the transactions were disallowed.

110. By e-mail dated April 19, 2000, with the subject line "income tax techniques," Denby wrote to Reiss regarding the availability of such insurance from an off-shore entity:

> Today I met with a representative of AIG on an unrelated matter. They are underwriting tax liabilities with a tax opinion letter. . . . The cost is 10% of the tax exposure and it also covers interest and penalties. This would suggest that you go for it and the total cost would [be] lets estimate 10% of the tax exposure with no future risk. They are also underwriting offshore so that you don't have to worry about

41

> a public policy bar to coverage for the penalties. If my
> estimate of the costs is correct we could get the insurance
> on one of these techniques, it would appear to be a 50%
> home run (easy money -- maybe too easy). We may need to
> have structures in place before sales for some of the
> techniques -- so let me know if you want me to get moving.
> Do you have any particular techniques in mind? Let me
> know what you think.

(Ex. 3595).

111.    By e-mail dated May 2, 2000, Denby wrote to Reiss as follows:

> Marsh & McLennan does not issue insurance for
> "transactions with no economic purpose other than the tax
> benefits." I think if we pursue this and get rejected, we
> would be creating a bad trail. Accordingly, I think this is
> not something to pursue. Let me know if you agree.

(Denby, 28:69; Ex. 3600 (internal quotation marks in original)).

112.    That same day, Reiss replied by e-mail as follows:

> They probably help insure "straight" transactions. What fun is
> there to that? I agree with your comment.

(Denby, 28:69; Ex. 3600 (internal quotation marks in original)).

113.    After May 2, 2000, the Egans made no further attempt to acquire insurance for tax

liabilities or tax penalties.

114.    The bill sent by Burke, Warren to the Egans for April 2000 for the work

performed by Denby includes entries for "reviewing possible income tax

strategies," "exploring capital gains strategies," and "capital loss strategies risk

assessment insurance alternatives." (Ex. 2802). The bill for May 2000 includes

entries for "tax strategies, shelter legislation and insurance" and "issues regarding

gains techniques." (Ex 2803).

## G. The "Short Option Strategy"

115. The record does not indicate who developed the initial variant of the tax shelter strategies at issue in this litigation. Nonetheless, by early 2000, KPMG, DGI/Helios, and Alpha were working together (and with other firms) to develop, market, and implement paired-option tax shelter strategies.

116. The basic strategy involved the use of offsetting short and long options that were contributed to an entity taxed as a partnership, in which the taxpayer took the position that one leg of the options created a "loss" or a "step-up" in basis and the other leg should be disregarded.

117. One of the keys to the tax shelter strategy was the general principle, set forth in *Helmer v. Comm'r*, 34 T.C.M. (CCH) 727 (1975), that the claim of the holder of an option against the grantor of an option is not a liability within the meaning of section 752. The strategy took the position that when a taxpayer contributed paired offsetting options to a partnership, the taxpayer contributed an asset but not a liability.

118. By early 2000, KPMG was marketing the tax shelter strategy under the name "Short Option Strategy." (Ex. 458).

119. Variations of the strategy could function as a "gain eliminator" or a "loss generator." A "gain eliminator" would create an artificial step-up in basis to avoid capital gains taxes on the sale of appreciated property. A "loss generator" would create an artificial loss to offset capital gains or ordinary income.

120. For example, by e-mail dated July 14, 2000, Peter Prescott of KPMG sent James

43

Haber of DGI/Helios a "short summary of short options strategy variations." (Ex. 464). The e-mail summarized several variations on the "plain vanilla" strategy that could be used to "increase" basis or generate a purported "loss." (*Id.*).

121.  By June 2000, KPMG had developed a PowerPoint presentation for the Short Option Strategy for marketing to prospective clients. (Ex. 458). The PowerPoint presentation showed how the strategy could offset capital gains from the sale of appreciated property. (*Id.*).

122.  An important aspect of the Short Option Strategy was the preparation of individual legal opinion letters for each taxpayer and each "investment." (Ex. 426). A law firm would agree in advance to provide a favorable opinion letter after the transaction was consummated, in order to induce the taxpayer/investor to purchase the strategy and to serve as a form of insurance against tax penalties.

123.  Four law firms worked with DGI/Helios and KPMG to develop and market the strategy and to issue favorable opinions:  Brown & Wood (later Sidley Austin Brown & Wood); Proskauer Rose; Bryan Cave; and Lord, Bissell & Brook.

124.  KPMG and DGI/Helios used a "model opinion" from Brown & Wood to assist them in marketing the Short Option Strategy. (Exs. 443, 132, 3565).

125.  The fee paid by the tax payer/investor for the Short Option Strategy normally included the cost of the opinion letter on the transaction, which was paid directly by DGI/Helios to the law firm. (Exs. 563, 1519, 2771).

126.  Helios had a fee sharing arrangement with KPMG with respect to the Short Option Strategy. (Exs. 3231, 3232). Helios also had a fee sharing arrangement

with DGI and Alpha. (Exs. 1640, 2771).

127.    The Short Option Strategy was marketed to dozens of taxpayers. (Ex. 532).

128.    As described below, the IRS issued a notice on August 11, 2000, that in

substance identified the Short Option Strategy as an abusive tax shelter. Four

days later, KPMG issued a directive to "stop marketing" the strategy. (Ex. 282).

KPMG partners continued, however, to work with DGI and Helios on new

variations of the paired-option strategies.

## H.    The May 2000 Meetings

### 1.    The May 15, 2000 Meetings in New York

129.    In May 2000, Stephanie Denby helped set up a series of meetings in New York

City between the Egan Family and the law firm Jenkens & Gilchrist ("J&G") and

the accounting firms KPMG and Ernst & Young LLP ("E&Y") in order to explore

tax shelter strategies. (Denby, 28:63-64; Ex. 431).

130.    By e-mail dated May 4, 2000, Denby wrote to Reiss that she had "hooked up"

with Steven Rosenthal, a tax partner at KPMG. (Denby, 28:83; Ex. 3226). Denby

had contacted Rosenthal at Reiss's suggestion, and spoke with him about

"techniques in conjunction with the sale of EMC stock." (Denby, 28:83).

Rosenthal cautioned that he was "very skeptical about these kinds of techniques,"

but "offered to look over any techniques [and] offer his risk assessment." (Ex.

3226). Denby did not pursue Rosenthal's offer. (Denby, 28:84).

131.    On May 4, 2000, Denby e-mailed Reiss concerning planned meetings with J&G

and E&Y. (*Id.* at 28:93; Ex. 3227). Denby wrote:

> ... the E&Y guys are very squirrelly. I am having a hard
> time getting detail out of them. They are very
> proprietary. ...

(Ex. 3227).

132.   On May 5, 2000, Denby sent the following e-mail to Reiss:

> Have hooked up with the right person at KPMG (John
> Schweiyer)[sic]. He is very knowledgeable about the
> market. He has 2 transactions that are interesting. I would
> like to add him to the [May 15] event. Even if we do not
> use his product he has a good knowledge of the range of
> products out there and a good critical eye for the pluses and
> minuses. He would be a good special consultant. . . . This
> is also heavy stuff so I hope we don't have overload. ...

(Ex. 3229).

133.   By e-mail to Reiss dated May 8, 2000, Denby confirmed that she had made a

tentative schedule for Richard Egan and Michael Egan to meet sequentially with

KPMG, J&G, and E&Y in New York on May 15. (Denby, 28:88; Ex. 3228).

Denby noted that the planned meeting with J&G would be "fairly short since they

are only talking about one strategy" and that "[t]he KPMG meeting should be the

most informative since the presenter [John Schrier] is familiar with all these types

of strategies & is very helpful in risk assessment etc." (Ex. 3228). Denby again

noted, "I am having a hard time getting additional information from E&Y." (*Id.*).

134.   J&G required the Egans and their representatives to sign non-disclosure

agreements prior to the meeting at which they disclosed their tax strategy. (Exs.

432, 438, 3552, 3554).

135.   On May 11, 2000, KPMG sent Denby a copy of a PowerPoint presentation as

"preparation material for your upcoming meeting." (Ex. 131).

136. Before the planned meeting with J&G on May 15, 2000, J&G provided Denby with a memorandum dated April 2000, entitled "Tax Consequences of Contribution of Option Spread to Partnership or Corporation," that described its tax strategy. (Denby, 28:92; Ex. 434).

137. On May 10, 2000, E&Y sent a fax to Denby outlining its "Personal Investment Corporation Strategy." (Denby, 28:96-97; Ex. 437).

138. On May 12, 2000, three days prior to the planned meetings in New York City, Denby faxed Michael Egan charts that she had prepared outlining her analysis of "each of the strategies" that were to be presented by J&G, KPMG, and E&Y. (Denby, 28:62-63; Ex. 3551).

139. One of Denby's charts was entitled "Jenkens & Gilchrist Step Up in Basis for EMC Stock." (Ex. 3551). Next to "Step 1," Denby noted that the strategy was implemented using "short and long currency positions which offset each other" with "very limited downside risk." (*Id.*). Next to "Step 2," Denby noted that the transaction "generates $100 million of basis [for Maureen Egan] when the transaction is economically neutral." (*Id.*). Next to "Step 3," Denby noted:

> When options expire, [Maureen Egan] contributes LP units to LLC. Transfer will allow 754 election. This 'unleashes' the basis so it can be applied against the sale of EMC stock.

(*Id.*).

140. Another of Denby's charts was entitled "KPMG Capital Gains Elimination Strategy." (*Id.*). Denby noted the following in her May 12 cover letter:

> The KPMG strategy involves creation of a lot of entities and subsequent redemptions and liquidations. Therefore, the chart is

> very confusing. However, these redemptions and liquidations
> create the same type of tax inconsistency that occurs in the Jenkens
> & Gilchrist structure.

(*Id.*).

141.   Another of Denby's charts was entitled "Ernst & Young Deferral Strategy." (*Id.*).

Next to "Step 3," Denby noted "Capital gains triggered by sale of EMC stock

offset by investment 'losses' generated under Step 1." (*Id.*).

142.   On May 15, 2000, Richard Egan, Michael Egan, Reiss, and Denby met with

representatives of KPMG, J&G, and E&Y in New York. (Ex. 3532; M. Egan,

6:112; Denby, 28:34; Reiss, 27:8-9).

143.   Michael Egan and Denby testified that the Egans attended the meetings in New

York on May 15 because the Egans were looking for a new accounting firm to

replace O'Connor & Drew, the local accounting firm that they had been using.

(M. Egan, 5:72, 76, 6:112; Denby, 28:34).

144.   In response to a question as to what was "the purpose of that trip" to New York on

May 15, Michael Egan testified:

> As I understood it, we were -- I was looking for -- to
> talk to other accounting firms, more larger -- Big
> Eight size accounting firms to understand if they
> had ideas, they were qualified to be our new lead
> accountant.

(M. Egan, 5:72). He acknowledged that "tax planning was discussed" at the

meetings. (*Id.* at 5:74). He said, however, that the KPMG presentation "wasn't

that interesting" and "wasn't really useful." (*Id.* at 5:83).

145.   Richard Egan testified that he did not remember much about the May 15

48

meetings. (R. Egan, 2:47-48). He testified that he understood he was included in

the meetings in order to "size up the people that Michael was looking to learn

from or hire." (*Id.* at 2:47). He also testified that he did not recall that he and

Michael Egan, or anyone else at the family office, "ever talk[ed] about taxes."

(*Id.* at 2:55-56). He attributed his lack of memory to the fact that he kept excusing

himself from the meetings. (R. Egan, 2:48).

146.    The Court does not find the testimony of Michael Egan, Stephanie Denby, or

Richard Egan concerning the purpose of the May 15 meetings to be credible.

147.    The purpose of the meetings in New York on May 15, 2000, was for the Egans

and their representatives to listen to presentations by J&G, E&Y, and KPMG

concerning tax avoidance strategies.

148.    On May 16, 2000, the day after the meetings, Reiss sent the following e-mail to

Denby:

> Dick [Egan] did tell Mike [Egan] on the trip back that he'd
> rather have us help him make money than save it (i.e. [tax]
> Reduction Strategies are not his cup of tea I guess). I'll
> ping Mike more on this later in the week.

(Denby, 28:105; Ex. 3230).

149.    On May 17, Denby sent the following e-mail: "Interesting. Keep me up to date if

there is anything more they want me to do on the reduction strategies." (Denby,

28:105-06; Ex. 3562). Reiss then replied as follows:

> Mike's comment to me today was 'that may have been
> what you heard but that's not what he really said.' Dick
> knows how to make money but may not know how to save
> it. I.e. we should keep pursuing our options.

49

(Ex. 3562).

150.    The bills sent by Burke, Warren to the Egans for May 2000 did not include any

reference to work performed to replace O'Connor & Drew.   (Ex. 2803).   For May

15, 2000, Denby billed the Egans 8.5 hours, which she described as "Meet with

client regarding loss strategies."   (*Id.*).   For May 16, 2000, Denby billed the Egans

3.5 hours, which she described as "Issues regarding reliance on opinion.   Review

[Redacted]."   (*Id.*).   For May 4, 2000, Greg Winters, an associate at Burke,

Warren, billed the Egans 5 hours, which he described as "draft memorandum to

Stephanie Denby regarding substantial understatement of tax penalty and tax

shelters."   (*Id.*).

## 2.    The May 19, 2000 Meeting in Chicago

151.    During the presentation in New York City on May 15, 2000, John Schrier of

KPMG told Denby about Helios and recommended that she meet with them.

(Denby, 28:110; Ex. 3527).   Although the details are unclear, it appears that

Schrier suggested Helios as a promoter of a more complex or sophisticated variant

of the Short Option Strategy.

152.    On May 18, 2000, Denby sent the following e-mail to Jim Reiss:

> I am meeting with [Helios] tomorrow.  It sounds like a very similar
> transaction to the [Jenkens] transaction.  It uses Nasdaq options.  It is a
> more limited circulation.  Brown & Wood supplies the opinion letter.  The
> letter will be more likely than not or possibly should be.  The actual
> options are more expensive.  Between 2.5% to 3.5%.  After that the fee
> component is priced similarly and subject to the same type of negotiation.

(Denby, 28:107; Ex. 3565).

153.    Reiss responded to the May 18 e-mail as follows:

> Company is called [Helios]? Is Brown & Wood reputable (should be
> opinion is unusual)? No issue with corps allowed into this strategy?
> I think we need to start to grid out the different products for concepts,
> permanent, deferral, #/ types of entities, breakdown of fees, opinion letter,
> compliance, etc.
> Let's include info on KPMG Option strategy as well.

(Ex. 3565).

154. On May 19, 2000, Denby met with Mox Tan of Helios in Chicago to discuss the

Helios tax strategy. (Denby, 28:109; Ex. 3527).

155. The proposed tax strategy involved the use of offsetting options on the NASDAQ

100 Index Tracking Stock, which are also referred to as "QQQ" options, based on

their stock ticker symbol.

156. Immediately following her May 19 meeting with Tan, Denby sent an e-mail to

Michael Egan and Reiss with the subject line "Helios strategy." (Denby, 28:109;

Ex. 3527). The e-mail summarized what she had learned about Helios, including

the fact that Helios had both a gain elimination strategy for capital gains stock and

a loss generation strategy for ordinary income. (Ex. 3527). She also proposed a

follow-up meeting with Helios in Boston:

> As I discussed with Jim [Reiss], Helios offers a very similar transaction to
> the [Jenkens] & Gilchrist transaction. Helios is the group that KPMG
> recommended. The foreign currency transaction can be used to offset
> ordinary income on the sale of EMC options. They also offer a QQQ
> strategy with Nasdaq options. This can only be used to offset capital gain
> (not EMC options). I think the Helios will be a much more customized
> solution compared to [Jenkens]. They have also limited distribution.
> Currently they have only done 12 foreign currency swaps. The QQQ
> strategy is new so there have been none of these yet. The QQQ will only
> be marketed to individuals. Some corps have done the foreign currency
> swap. Jim [Reiss] thought you would be interested in meeting with them.

(*Id.*).

51

157.   On May 19, after the meeting with Denby, Mox Tan of Helios sent her a "form of

a tax opinion from Brown & Wood." (Ex. 132). In the cover memorandum, Tan

wrote, "Although the opinion discusses an investment in foreign currency, the

analysis for the QQQ trade should be the same, with the exception of the [Internal

Revenue Code] Section 988 discussion." (*Id.*).

158.   The Brown & Wood opinion sent by Tan was labeled as a "model opinion" in

bold letters at the top, and stated that it was intended "for the purpose of

facilitating an analysis of the issues." (*Id.*).

159.   Patrick Shea received a copy of the model opinion after he joined Carruth in June

2000, on which he made handwritten notes. (Ex. 2768).

160.   Shea's notes on the model opinion include the following:

> 1).   Business reason - hedge against drop in
>        EMC stock
>
> 2).   Need to be a partnership for [Section] 721
>        [nonrecognition] of gain on transfer to partnership
>
> 3).   Section 752 states short option not a
>        liability, therefore, not a reduction in basis to
>        fund
>
> 4).   No penalties under [Section] 6662 due to
>        reasonable basis for tax treatment
>
> 5).   Reasonable assurance more likely than not
>        from attorneys

(*Id.*).

161.   Also on May 19, Reiss notified Michael Egan that Denby wanted them to meet

with Helios on May 25 "to discuss their tax reduction strategy." (Denby, 28:127-

28; Reiss, 27:24-25; Ex. 442).

**3.      Denby's Comparison of the Tax Strategies – May 2000**

162.    On May 22, 2000, Denby sent Reiss a letter enclosing an outline for the proposed

Helios transaction, a summary "Comparison of Structures," and a separate chart

for each of the E&Y, J&G, KPMG, and Helios strategies "that weigh[ed] the

advantages and disadvantages of the various capital loss techniques." (Denby,

28:113; Ex. 3555).

163.    In her May 22 outline of the Helios transaction, Denby noted the following:

>       Eliminates ordinary income and capital gains so strategy can be
        used for both EMC stock options and EMC stock
>       Can have third party purchase for step-up (I like this)
>       Brown and Wood opinion letter
>       Customize option period to meet your business goals
>       Have done 12 or so transactions
>       Can do similar strategy with QQQ but will only work for EMC
        stock (not options)

(Ex. 3555).

164.    In each of the May 22 charts that Denby prepared for the E&Y, J&G, KPMG, and

Helios strategies, she rated and commented upon the strategies, noting a plus if

the transaction was a tax "elimination" strategy and a minus if the transaction was

only a tax "deferral" strategy.  (*Id.*).  For the "Helios Elimination Strategy," she

noted that it "eliminates capital gains and ordinary income so can use for options

as well as stock."  (*Id.*).

165.    Denby also rated and commented upon the length of time to implement the

strategies, noting a plus if the transaction time was shorter and a minus if the time

for completion of the implementation and receipt of the tax benefits was longer.

(*Id.*). She gave a positive rating to the "Helios Elimination Strategy." (*Id.*).

166.   Denby also rated and commented with respect to the manner in which the tax loss
       was generated, noting a plus if the transaction was "harder for [the] IRS to find"
       and a minus if the transaction was "easier" for the IRS to find. (*Id.*). For the
       "Helios Elimination Strategy," she noted that it "will be structured as basis offset
       so harder for IRS to find (other Helios deals done as loss offset)." (*Id.*).

167.   Denby also rated and commented with respect to their complexity, noting a plus if
       the complexity of the structure made it harder for the IRS to "unwind" or "pick-
       up" and a minus if the simplicity of the structure made it easier for the IRS to
       trace. (*Id.*). For the "Helios Elimination Strategy," she noted a concern that its
       "simplicity of structure" might "make it easier for IRS to trace." (*Id.*).

168.   Denby also rated and commented with respect to the breadth of the marketing of
       each strategy, noting a plus if the transaction had "limited marketing" and a minus
       if the transaction was "broadly marketed." (*Id.*). For the "Helios Elimination
       Strategy," she noted as a positive that it had "limited marketing (expect no more
       than 20ish [customers])." (*Id.*).

169.   Denby also rated and commented with respect to the proffered opinion letter,
       noting a plus if the opinion was not issued directly by the marketing firm and a
       minus if it was. (*Id.*).

170.   Denby summarized her conclusions in a chart entitled "Comparison of
       Structures," in which she listed and compared the fees for the "instruments" and
       the "advisors." All the strategies involved a fee based on a percentage of the size

54

of the transaction. (*Id.*).

171. Denby also specifically noted that the Helios strategy made it "[e]asier to establish

business purpose" because it "can be used to hedge EMC stock depending on your

market view." (*Id.*).

## 4.    The May 25, 2000 Meeting in Massachusetts

172. By e-mail dated May 23, 2000, Reiss advised Jack Egan about the upcoming

meeting with Helios, stating:

> I wanted to touch base with you to let you know we have recently
> coordinated a meeting for a group called Helios to come in . . . to discuss
> their tax reduction strategy. Stephanie Denby and I preliminarily like what
> this group has to offer. They even have a strategy for stock options as well
> as straight stock.

(Reiss, 27:27; Ex. 442).

173. The meeting with Helios was placed on the calendar for Michael Egan as a "Mtg.

w/ Helios, S. Denby & Jim to discuss tax reduction strategy." (Ex. 447).

174. The meeting with Helios occurred at Carruth's offices in Hopkinton,

Massachusetts, on May 25, 2000. (Exs. 427, 442).  Michael Egan, Denby, and

Reiss attended the meeting for Carruth. (Denby, 28:133-34; Ex. 442).

175. On May 26, 2000, Denby sent Reiss an e-mail regarding the previous day's

meeting and her discussions with Helios after the meeting concerning fees:

> . . . after the meeting I discussed with Helios the fees. The fees are based
> on a 3% rate. If KPMG were not involved Helios would just pocket a
> larger percentage. Since our connection came from KPMG, Helios would
> pay them a referral fee anyway. I think at the same rate. So [their]
> involvement does not cost more but just results in reallocation of the base
> fee. I know from other situations this reallocation occurs simply from
> [our] getting the name [from] KPMG. We are in the wrong business!

(Denby, 28:134; Ex. 3232).

176.   Reiss responded by e-mail the same day, stating: "Mike [Egan] has some very specific opinions about this. 1 like his thoughts on this though." (Reiss, 35:82-83; Ex. 3232).

177.   The bill sent by Burke, Warren to the Egans for May 2000 describes the work performed by Denby on May 25 as, among other things, "Attend meeting regarding capital loss strategies." (Ex. 2803).

## I.   **Further Developments in July 2000**

### 1.   **The July 10-13, 2000 Meetings in Chicago**

178.   On July 10, 2000, Pat Shea (who had joined Carruth as COO on June 26), Jim Reiss, and Stephanie Denby met to discuss the proposed Helios transaction. (Ex. 3236).

179.   At one or more times between July 11 and 13, 2000, Pat Shea, Jim Reiss, Stephanie Denby, and a Burke, Warren attorney named Wayne Cooper met with representatives of Helios in Chicago. (*Id.*; Exs. 3235, 3237). James Haber, Phil Kampf, and Mox Tan attended on behalf of Helios. (Ex. 3237). The purpose of the meetings with Helios was "to review the tax elimination strategies." (*Id.*).

180.   Shea took handwritten notes on July 13 that he titled "Helios Deal - Capital Gain Reduction." (Shea, 15:108; Ex. 2569). The notes were based on information provided by Haber.

181.   In his notes, Shea outlined the tentative steps of a capital gains reduction strategy, including (1) "Dick [Egan] transfers stock to Maureen [Egan]"; (2) "Maureen [Egan] creates an entity and buys option positions, either QQQ or foreign currency

options"; (3) Maureen Egan "holds the options for at least 14 days"; (4) "on day 15 [she] contribute[s] the EMC stock and the option position" to Fidelity High Tech "along with [a] second partner with exactly [the] same securities"; and (5) "on day 31 [a] Helios entity buys [the securities] for FMV of EMC stock and value of the options," less a fee of 2.1%. (Ex. 2569).

182. Shea's notes indicated that the "basis in the partnership" would be the "long position in the options . . . plus [the] basis in EMC stock (low)." (Ex. 2569). He also noted that the purported "business purpose" would be a "hedge against [a] downward drop in EMC [stock]." (*Id.*).

183. Shea's notes also stated the following:

> - shows as one line item on tax returns
> - clean transaction - not easily discovered
> - easily reported

(*Id.*).

184. Under the heading "Risk," Shea listed three items. First, he noted that any risk that Helios would "not do [the] deal" was addressed by the fact that "they don't get paid until the deal is done." Second, he noted that there was a risk that the "IRS [would] disallow" the transaction, in which case the Egans "[would be] facing interest charges, [but] no penalties, as we [would] have [a] legal opinion letter." Third, he noted that there would be risk of a "gain [or] loss on [the] options and stock price fluctuations." (*Id.*). Shea also noted that "we want Maureen to do the transaction because there will be a capital gain here and we do not want it subject to [Massachusetts] taxes. (*Id.*).

185. Shea also took notes on July 13 that he titled "Helios Ordinary Income

Reduction." (Shea, 15:103; Ex. 496). Those notes detail a sequence of steps to implement an ordinary income reduction strategy: (1) "Dick [Egan] exercises his options NQO's – personally or through special trust – transfers shares to Maureen"; (2) "Helios & Alpha create an entity as a hedge fund"; (3) "Maureen's entity purchases a foreign currency options position – 100m long – 98m short – cost approx 2m – Maureen gets basis for 100m long position (cost of 2m)"; (4) "Maureen holds for 30-90 days when partnership distributes foreign currency to Maureen for her interest in the fund"; (5) "Maureen liquidates the foreign currency to trigger the loss"; and (6) "Code Section 988 treats loss on foreign currency as ordinary loss." (Ex. 496).

186.   Shea noted that it was "risky that we have reporting entity EMC for options," which made it "hard to bury on the [tax] return." (*Id.*). Shea further noted that the exercise of the options would be a "taxable reportable event by EMC" that would result in the issuance to Richard Egan of a Form 1099 or W-2. (*Id.*).

187.   Shea also prepared typewritten notes dated July 13, 2000. (Ex. 3237). In those notes, he described the planned roles and timing for implementation of the Helios strategy as follows:

> Their strategy involves using various code sections and Egan and unrelated entities to eliminate tax on stock and options.
>
> [Helios] with KPMG will handle all filing and paperwork to effect the transaction.
>
> Depending on size of transaction their fee is between 3-4% - seems we have some negotiation room there
>
> Timing -- need  2 weeks to hold stock -- 30-90 days in partnership is recommended to show IRS business purpose -- transaction to be

> completed in the same tax year. Point being -- if we want to do need to consider windows for selling and timing for paperwork to complete prior to 12-31
>
> We should get decision makers involved to understand the risk/rewards to see if we want to do in 2000 or 2001 -- please advise
>
> KPMG is involved with Helios in this transaction -- We discussed w/ them possibility of bundling their services to Carruth Management LLC. . . .
>
> Will follow up w/ a meeting with John Schrier of KPMG - to discuss fees and their services.

(*Id.*).

## 2.  The July 18, 2000 Meeting with Helios in Chicago

188.  A further meeting was scheduled with Helios in Chicago for July 18, 2000. (Shea, 15:64; Ex. 26).

189.  Prior to the July 18 meeting, Denby prepared an updated analysis that included updated charts outlining both the "Helios Capital Gain Strategy" for the EMC stock and the "Helios Ordinary Income Strategy" for the options. (Denby, 28:146; Ex. 3549). Denby also prepared a "Timeline and Fees Chart" and a "Comparison of Structures" chart comparing the two Helios transactions to the KPMG, J&G, and E&Y products. (Ex. 3549). The "Comparison of Structures" table included a column for the "tax reporting profile" of the various strategies; the Helios Capital Gain Strategy profile was described as "extremely low," and the others were described as "visible." (*Id.*).

190.  Denby noted that the "Capital Gains Elimination Strategy" had "very clean reporting on [the] tax return" so it would be "hard for [the] IRS to find." (*Id.*).

191.  The scheduled meeting with Helios was held in Chicago on July 18, 2000. (Shea,

15:64; Ex. 26).  The participants at the meeting included Michael Egan, Pat Shea,

and Jim Reiss of Carruth; Stephanie Denby; John Schrier of KPMG; James Haber,

Mox Tan, and Phil Kampf of Helios; and Ivan Ross of Alpha.  (Shea, 15:64; Ex.

26).

192.   At the July 18 meeting, both Haber and Schrier made presentations about "tax

reduction strategies."  (Shea, 15:65-66).

193.   Prior to the July 18 meeting, Shea prepared a typewritten list of questions that he

wanted to discuss with Helios.  (*Id.* at 15:63; Ex. 471).

194.   At the meeting, Shea wrote in, by hand, notes from the meeting with respect to his

questions.  (Shea, 15:67-68, 70-73; Ex. 26).  Shea's typewritten notes include the

following questions and corresponding notes as to the answers to his questions:

> Q.   Do you have a narrative for various code sections that you rely on
>       and a description of the strategy other than a legal opinion?
> *A.   He gave us case and Stephanie has draft legal opinion.*
> Q.   Do you have to register as a tax shelter?
> *A.   No*
> Q.   How will we handle the reporting on the returns - can we run
>       through Schedule E to avoid a large loss on the face of 1040 -
>       would like to bury with other entities on Schedule E.
> *A.   Schrier and KPMG to handle.*
> Q.   Does KPMG handle filing all entity returns - is that included in our
>       transaction fee or are there additional fees?
> *A.   - included in the fee - they will file returns and structure the deal*
> . . .
> Q.   What is the chronology of the transactions?  Do you have some
>       sort of document detailing the chain of events and the timing of the
>       same?
> *A.   -They will walk us through and will go as fast as we want*
> Q.   What is the role of each?
>
>> Helios
>> Alpha
>> KPMG
> *A.   [no handwriting]*

> . . .
> Q.   What mix of [non-qualified options] and long term shares - it is
>      advantageous for us taxwise to use NQO's because bigger tax
>      savings for us 40% vs. 20% - what about state impact - will state
>      follow fed rules here?
> *A.   Mike [Egan]'s preference [is] to use shares as Dick [Egan] wants
>      to sell some now-*
> Q.   We need to confirm how EMC will report the option income to
>      Dick - W-2 or 1099 form.
> *A.   Jim [Reiss] to push for answer*
> Q.   We need to decide the size of the transaction and the size of each
>      block - we need to get pricing from them reflecting the volume rate
>      and apply that to our blocks.
> *A.   Looks like 250m -300m on stocks - maybe another 100m on NQO's
>      Michael will discuss with family to get amounts -*

(Ex. 26 (emphasis added)).

195.   Thus, as of July 18, 2000, the Egans were considering entering into a capital gains

       elimination transaction of between $250-$300 million and possibly another $100

       million for an ordinary income loss generator. (*Id.*). The size of the transaction

       had not, however, been determined, and following the July 18 meeting, Michael

       Egan was to discuss the size of the investment in the proposed Helios tax

       reduction strategy with his family. (*Id.*; Shea, 15:73).

196.   At the July 18 meeting, the parties discussed the fact that EMC might issue a

       Form W-2 or 1099 to Richard Egan if he exercised his nonqualified options,

       reflecting the payment of ordinary income. (Shea, 15:74; Ex. 26).

197.   At the July 18 meeting, the parties also discussed various ways that a large loss

       might be disguised on the face of the Egans' tax return, such as reporting it on a

       Form 4797 (Foreign Currency Transaction) filed with a partnership return.

       (Denby, 29:147-150; Exs. 468, 3582).

198.   Shea also took handwritten notes of the July 18 meeting. (Ex. 468). In those

notes, he wrote, "how do we handle the [$]500,000,000 1099 form[?]" (*Id.*).

199.    On July 19, 2000, Shea had a telephone conversation with John Schrier of KPMG. (Ex. 472). Among other things, Shea and Schrier discussed a "short option" strategy in order "to generate ordinary loss." (*Id.*).

200.    The bill sent by Burke, Warren to the Egans for July 2000 include entries for work on "tax deferred strategies, "capital loss strategy," and "capital loss strategy issues." (Ex. 2806). There are no entries in those bills that refer to hedging or investment strategies.

## 3.    Carruth's Due Diligence Concerning the Promoters

201.    On July 19, 2000, Jim Reiss sent an e-mail to Stephanie Denby and Pat Shea with the subject line "Re: Elimination Strategy." (Ex. 3238). Reiss reported that he and Shea had met that afternoon with Richard Egan, and that "we got a lukewarm response from him. He really wants us to do due diligence on Helios." (*Id.*).

202.    On July 20, 2000, Phil Kampf of Helios sent a fax to Shea responding to questions about Helios. (Ex. 28). The fax included marketing materials about Helios that included the following statement:

> Because our transactions are "document intensive," we view our ability to firmly manage and control the process of getting two to four sets of attorneys and accountants to expeditiously reach the desired conclusions as being one of our most valuable contributions to our clients.

(*Id.*).

203.    On July 21, 2000, Shea wrote a memorandum entitled "Memo Re: Due Diligence Helios Financial LLC." (Shea, 15:91-92; Ex. 29). In that memorandum, Shea wrote that "before entering into a significant transaction with Helios as a

62

facilitator we wanted reasonable assurance they were experienced in transactions of this size and could handle our deal." (Ex. 29). The memorandum describes the due diligence conducted to date. (*Id.*). According to the memorandum, Schrier told Shea that he had worked with Haber for several years, and that Haber had a history of working on tax shelter deals going back as far as the late 1980's and early 1990's, and that litigation had been brought against Haber when a tax shelter deal went sour. (*Id.*).

## J. Formation of Fidelity Entities in July 2000

204. By mid-July 2000, the proposed transactions with Helios and KPMG had progressed to the stage where the Egans decided to form the various entities necessary to implement the transactions.

205. On July 19 and 20, 2000, certificates of formation were filed in Delaware for five different limited liability companies.

206. Each of these LLCs was named with the word "Fidelity" at the beginning of its name. Fidelity Investments is the name of a well-known company in Boston that sells mutual funds and other investment products. (Denby, 29:14). Michael Egan selected the name "Fidelity" for these entities. (*Id.*).

207. The selection of the name "Fidelity" was intended, at least in part, to help disguise the transactions.

### 1. Fidelity High Tech Transaction Entities

208. Fidelity High Tech Advisor Fund, LLC was formed as a Delaware LLC on July 19, 2000. Richard and Maureen Egan were its two members. (Exs. 1, 108).

209. Fidelity High Tech Option A LLC ("Option A") was formed as a single-member

63

Delaware LLC on July 19, 2000, on behalf of Maureen Egan. (Exs. 1, 108).

210.   Fidelity High Tech Index A Fund LLC ("Index A") was formed as a single-
       member Delaware LLC on July 20, 2000, on behalf of Richard Egan. (Exs. 1,
       108).

## 2.   Fidelity International Transaction Entities

211.   Fidelity World Currency Advisor A Fund, LLC ("Fidelity World") was formed as
       a single-member Delaware LLC on July 19, 2000. (Exs. 2, 108). Richard Egan
       was the sole initial member of Fidelity World. (Ex. 108). The Limited Liability
       Company Agreement for Fidelity World was signed by Richard Egan and
       Michael Egan. (Ex. 2).

212.   Fidelity International Currency Advisor A Fund, LLC was formed as a Delaware
       LLC on July 19, 2000, on behalf of Richard Egan. (*Id.*; Ex.108).

## K.   Carruth Prepares to Implement the Strategies

### 1.   Denby's Fax of July 20, 2000

213.   On July 20, 2000, Stephanie Denby faxed various documents to Pat Shea,
       including a memorandum entitled "Steps for Capital Gains Elimination Strategy"
       that detailed the planned steps to implement the strategy. (Denby, 29:13; Ex.
       3240.1). In that memorandum, Denby wrote:

> For business purpose reasons, it may be desirable to purchase QQQ
> [i.e., NASDAQ 100 index] options. However, you can also use
> foreign currency options or a combination of the two.

(Ex. 3240.1).

214.   On July 20, 2000, in anticipation of implementing the capital gains reduction

strategy, Richard Egan transferred 4 million shares of EMC stock to Maureen

Egan. (Ex. 778). At the time, EMC stock was trading at approximately $86.00

per share. The 4 million shares of EMC therefore had a market value of

approximately $344 million.

## 2.   Further Discussions in July 2000

215.   On July 25, 2000, Pat Shea attended a meeting with Richard Egan, Michael Egan,

and Jack Egan concerning the tax reduction strategy. (Ex. 489, Ex. 490). Shea

prepared a memorandum of the meeting that listed the following topics for

discussion: "Fee, Risk vs. Reward" and "Audit Representation." (Ex. 489).

216.   On July 26, 2000, Shea sent a memorandum to Michael Egan recapping the July

25 meeting. (Ex. 490). In that memorandum, Shea stated:

> Dick will commit to the following
>
> > 200m capital gains reduction strategy-
> > 200m ordinary income reduction strategy-
>
> I will follow up with Jack to see how much, if any, if he wants to
> participate.

(*Id.*).

217.   Shea spoke on July 27 with Jack Egan, who indicated he was interested in

participating in a $30 million capital gains reduction strategy. (*Id.*; Shea, 15:99).

Ultimately, however, Jack Egan did not participate.

218.   Following the July 25 meeting, Shea instructed the accounting department of

Carruth to begin preparations for the Helios capital gains and ordinary income

transactions. (Shea, 15:99-101).

219. On July 26, 2000, the accounting department of Carruth held a meeting to discuss the Helios "special strategies" for reducing taxes on "200 mill stock" and "200 mill. non-qualified stock options." (Ex. 2477). The meeting was attended by Pat Shea, Jim Reiss, and members of the accounting department. (*Id.*; M. Egan, 7:21-22). The meeting notes taken by one of the Carruth participants state that part of the strategy was to "increase cost basis by putting in new entity." (Ex. 2477).

220. On July 28, 2000, Pat Shea, James Haber of Helios, and Ivan Ross of Alpha participated in a telephone conference call. (Shea, 15:101-02; Ex. 2564). In his notes of the call, Shea wrote: "Cap gains EMC stock - 200m Maureen - 30m Jack" and "Foreign Currency 200 mill - 4 Currencies 50 mill each." (Ex. 2564).

221. On July 31, 2000, Ross e-mailed Shea a spreadsheet containing several foreign currency option trades showing a net investment ranging from 1% to 1.5%. (Ex. 32). Shea wrote the following on the document: "They want us to show that we are investing more than the fees we are paying to show IRS a good economic deal." (Ex. 31).

### 3. The August 2, 2000 Meeting in Boston

222. On August 2, 2000, a meeting was held in Boston. The attendees were Michael Egan, Jim Reiss, Stephanie Denby, Pat Shea, John Schrier of KPMG, and James Haber of Helios; Ivan Ross of Alpha participated by telephone. (Ex. 502). The purpose of the meeting was to discuss the implementation of the tax strategies. (*Id.*). Among other topics, the participants discussed the "benefits [and] drawbacks of an Egan entity remaining in the QQQ investment partnership for an

extended period of time after Helios buys the main interest out." (*Id.*).

223. Michael Egan took notes at the August 2 meeting. (M. Egan, 7:36; Ex. 2565).

These notes diagram how the Helios strategies appeared to him. (M. Egan, 7:36;

Ex. 2565).

224. Pat Shea wrote a memorandum to the file concerning the August 2 meeting. (Ex.

502). That memorandum lists the following as "to do" items with respect to the

planned Helios strategies:

> Confirm what family members are interested and which program and how
> much
> Confirm that Dick is in for 200m QQQs
> Confirm how much Dick wants for foreign currency – 100-200m
> Confirm [stock] registration requirements with EMC
> Capitalize the partnerships to begin option trading
> Review and sign the engagement letter for KPMG
> Get engagement letters for other family members

(*Id.*).

225. On Thursday, August 10, 2000, Shea sent a fax to Denby stating the following:

> I spoke with Mike [Egan] this AM - we will execute Helios next week -
> Tues [August 15] or Wed [August 16] - Can you and I get all the
> groundwork done before then so we can just sign and execute - I have
> enclosed the process as I see it – please comment and let me know if I am
> missing anything -

(Ex. 3248).

## L. IRS Notice 2000-44 and Its Aftermath

### 1. The Issuance of IRS Notice 2000-44

226. On Friday, August 11, 2000, the Internal Revenue Service released IRS Notice

2000-44. (Ex. 137). The Notice was entitled "Tax Avoidance Using Artificially

67

High Basis." It addressed certain "transactions that were being marketed to taxpayers for the purpose of generating artificial tax losses," and concluded that the "purported losses" from such transactions do not represent bona fide losses reflecting "actual economic consequences" and were not allowable as deductions. (*Id.*). It also noted that penalties might be imposed on taxpayers or promoters who participated in such transactions. (*Id.*).

227. IRS Notice 2000-44 provided two examples of the type of transactions it was targeting. (*Id.*). Both examples involved a taxpayer artificially stepping up the basis of his interest in a partnership. One of the examples referred to a taxpayer transferring paired options to a partnership where the taxpayer claimed that only the purchased option should be taken into account in calculating his basis in the partnership. In the example, the taxpayer took the position that the sold option could be ignored because it was not a liability for purposes of Section 752. (*Id.*).

## 2.   The Reaction to IRS Notice 2000-44

228. On August 11, 2000, John Schrier of KPMG sent Pat Shea and Stephanie Denby a fax attaching a copy of IRS Notice 2000-44. (Ex. 137).

229. Later that same day, August 11, Schrier sent Shea and Denby a fax attaching a copy of Treasury Decision 8896 announcing new temporary regulations. (Ex. 520). Among other things, the new regulations required certain tax promoters to maintain a list of persons who were sold an interest in a tax shelter. (*Id.*).

230. Minutes later on August 11, Mox Tan of Helios sent a fax to Denby attaching a

copy of IRS Notice 2000-44. (Ex. 521).

231. On August 11, 2000, Pat Shea and Jim Reiss of Carruth, Stephanie Denby, John

Schrier of KPMG, and Phil Kampf and Mox Tan of Helios participated in a

telephone conference call. (Ex. 519). The subject of the call was IRS Notice

2000-44 and its potential impact on the planned transactions. (*Id.*; Shea, 15:125).

232. Among other things, the participants in the August 11 conference call were

concerned that the transactions would have to be described on a list that the IRS

could review, and that the law firms participating in the strategy would no longer

issue a favorable opinion. Shea's notes of the conference state the following:

- More likely than not opinion – need to wait for the opinion before we do anything-
- These are listed transactions-
- Time frame for the opinion - not <u>clear</u> yet – lawyers have to read notice and decide if they will give opinion –
- list requirements – not sure what details are or will be –
- registration issue – 2 registrations – SEC filings
- The beauty of the transaction was [that it was] so hidden but now it is not hidden –

(Ex. 519 (emphasis in original)).

233. Also on August 11, Richard Egan sent a copy of a news article from the Boston

Globe bearing the headline, "'Son of BOSS' Tax Shelter on U.S. Hit List" to

Michael Egan, Shea, and Reiss. (R. Egan, 2:63-64; Ex. 518). The article referred

to a notice issued by the Treasury Department targeting certain tax shelter

transactions. (Ex. 518). It further stated that the "government's action spells out

the practices the IRS has found objectionable and puts taxpayers on notice that

they cannot use those practices to avoid paying taxes." (*Id.*). It also quoted an

anonymous Treasury official as stating that the new tax shelter was being
marketed by one or two of the "Big Five" major accounting firms, and listed
KPMG by name. (*Id.*).

234.  Richard Egan testified that he circulated the article because he knew his son
Michael "wasn't happy" with the accounting firm of O'Connor & Drew, the
article contained "a list of accounting firms in it, all the big ones," and his son
"was thinking of moving up, so to speak." (R. Egan, 2:64).

235.  The Court does not find Richard Egan's testimony concerning the reason he
forwarded the news article to be credible. The reason Richard Egan sent the
article was because he was concerned that the proposed tax shelter transaction
might be subject to the new IRS rules.

236.  On August 14, 2000, Shea spoke with John Schrier at KPMG regarding the status
of the transactions in the wake of IRS Notice 2000-44. (Ex. 526). In his notes of
that call, Shea wrote that KPMG "doesn't know if they will stand behind the
transaction yet." (*Id.*).

237.  On August 15, 2000, KPMG advised its employees to "stop marketing" the Short
Option Strategy in light of Notice 2000-44. (Ex. 282).

238.  On August 15, 2000, Shea met with Richard Egan, Jack Egan, and Christopher
Egan to discuss the impact of Notice 2000-44 on the proposed transactions.
(Shea, 15:131; Ex. 529). In his notes of the meeting, Shea wrote:

> Helios Tax Deal
>
> I discussed the IRS notice released [*sic*] and advised

> 1). We don't proceed now until we get a confirmation that KPMG will continue to promote the program
>
> 2). We need to be assured that Brown & Wood will do an opinion letter and will stand behind it
>
> 3). We get a definition of what penalties, if any, we are exposed to –
>
> 4). If this program is dead we can look to Helios for other deals –

(Ex. 529). He added, "Dick still stated that he liked the ordinary income portion and wants to sell stock during this window." (*Id.*).

239. On August 16, 2000, Mox Tan of Helios sent an e-mail to Jeffrey Eisheid of KPMG, on the subject "KPMG SOS Opportunities as of August 11, 2000." (Ex. 532). In the e-mail, Tan stated he was providing a "highly confidential" list of the "roughly 40 SOS opportunities we have discussing with your partners, with a general status as 8/11/2000 (pre-notice)." (*Id.*). The first category of the list of opportunities was entitled "due diligence completed - single member LLC has been formed - preparing to do the trade." (*Id.*). One of those "opportunities" was "Dick and Maureen Egan"; according to the summary prepared by Tan, the Egans were preparing to do a "$230 [million] basis bump on appreciated stock," and that there was a "potential follow-on deal" for a $200 million "trade for stock option OI [ordinary income]." (*Id.*).

240. On August 16, 2000, Stephanie Denby and Pat Shea spoke by telephone concerning the impact of Notice 2000-44. (Shea, 16:6-11; Ex. 533). By that point, Denby had learned the reactions of the law firms who were expected to render favorable opinions. Denby told Shea that she understood that it was "95%

certain" that Proskauer would give a "favorable opinion letter" on the capital gains strategy, because that strategy was "not triggering a loss." (Ex. 533). Denby also told him, however, that Brown & Wood was "not at this point comfortable with [an] opinion letter, especially [with] KPMG," that neither Brown & Wood nor Proskauer would "give [an] opinion on [the] ordinary income portion [of the strategy] because this triggers a loss," and that "loss generation is what the notice attacks." (*Id.*). Denby also told Shea that Brown & Wood would not give an opinion letter to a KPMG client because it was "too broad a market" with "too many circumstances," and because KPMG might keep an "investor list" and presents a "bigger audit risk." (*Id.*).

241.  In a follow-up call, Denby told Shea that "Brown & Wood [was] clearer on opinion letter but not with KPMG – [they] don't want to mass produce the letter." (*Id.*).

## 3.  The August 23, 2000 Conference Call

242.  On August 23, 2000, Michael Egan, Pat Shea, Jim Reiss, and Stephanie Denby participated in a telephone conference to discuss the impact of IRS Notice 2000-44. (Ex. 542). Also participating in that call were R.J. Ruble of Brown & Wood and James Haber, Mox Tan, and Phil Kampf of Helios. (*Id.*). Prior to the conference, Shea prepared typewritten discussion points. (*Id.*; Shea, 15:15; 16:12-13). Shea sent a copy of his discussion points to Denby by fax. (Ex. 540). The discussion points were addressed during the call. (Shea, 16:13).

243.  Shea's first two discussion points stated that in Notice 2000-44, the IRS was

72

"taking the position that there is no economic loss and they are not bona-fide
business losses as required by Section 165" and that "penalties will be assessed
under various provisions and sections." (Ex. 542). As to both points, Shea posed
the question, "how are you arguing against [that position] in your opinion letter?"
(*Id.*). As to the penalty issue, he asked, "[a]re we assured that there will not be
penalties?" and "[i]f we enter this transaction based on your opinion letter and
lose – what are remedies against you for penalties?" (*Id.*).

244.    Shea testified that he asked these questions regarding penalties because "we were
        starting to get concerned or had some concern on whether the transactions that
        Mr. Egan was entering into fell under this notice, and the notice did have penalties
        associated with it." (Shea, 15:16).

245.    Shea's notes posed the following further questions:

> If we enter this deal after this notice is our exposure more? Are there
> benefits to entering this transaction with or without KPMG [?] [I]t
> appears we will have less chance of being audited if not under their radar
> screen -- also[,] do they have more of a responsibility to list the transaction
> where a smaller less visible firm may not have same listing
> interpretations? What are out there for other available strategies that may
> work for us and are not as visible or under scrutiny?

(Ex. 542).

246.    In his notes of the August 23 conference call, Michael Egan wrote "penalties [-]
        yes or no." (M. Egan, 7:82; Ex. 541).

247.    At some point in late August 2000, the Egans decided to go forward with the
        capital gains strategy, notwithstanding the risks of an IRS audit and the imposition
        of penalties.

**4.    The Initial Draft Legal Opinions for Fidelity High Tech**

248.   As noted, the plan for the capital gains strategy was for one of four law firms to
       provide a favorable opinion letter to the Egans. The opinion letter would be
       provided after the transaction was consummated, and before the filing of the
       relevant tax returns.

249.   By late August 2000, the Egans had tentatively decided to use the Proskauer law
       firm for the opinion letter for the capital gains strategy. The parties continued,
       nonetheless, to involve R.J. Ruble of Brown & Wood in their discussions.

250.   At some point in late August 2000, Stephanie Denby spoke with Ira Akselrad of
       Proskauer by telephone concerning IRS Notice 2000-44. (Denby, 29:146-55; Ex.
       3582). Denby's handwritten notes of that conversation indicate that Akselrad was
       taking the position that Notice 2000-44 was distinguishable because it addressed
       losses, not "gain elimination." (Ex. 3582). He also suggested that the IRS had
       issued the notice in order to "reduce [tax shelter] activity," but that it "didn't
       organize [a] strike force" to go after tax promoters. (*Id.*). He also said that he felt
       "good" that the firm "should not get hit with sanctions." (*Id.*).

251.   On August 31, 2000, Matthew Sabloff, an attorney at Proskauer, sent a "draft
       opinion" of a similar transaction to Denby, Reiss, and Shea. (Ex. 138).

252.   On September 11, 2000, Carolyn Fiddy forwarded some questions from Michael
       Egan about the transaction to Shea. (M. Egan, 7:102; Ex. 562). One question was
       whether Carruth had a draft copy of a legal opinion letter relating to the
       transaction. (Ex. 562).

253. On September 15, 2000, Haber sent an e-mail to Shea, Reiss, and Denby with the
subject line of "Notice 2000-44." (Ex. 583). Attached to that e-mail was a "rider"
written by Brown & Wood regarding Notice 2000-44. (*Id.*). In that document,
Brown and Wood questioned the authority of the IRS to issue Notice 2000-44 and
concluded that Notice 2000-44 did not apply to the transactions at issue (which
were not identified). (*Id.*). Among other things, the Brown & Wood "rider"
assumed in distinguishing Notice 2000-44 that the transactions "were motivated
by non-tax reasons" and that the investor "had a reasonable opportunity to earn a
reasonable profit, in excess of all fees and transaction costs, from the
Transactions, without regard to tax benefits." (*Id.*).

254. On September 15, 2000, Denby sent an e-mail to Michael Egan advising him that:

> Jimmy [Haber] forwarded me the portion of Brown &
> Wood's opinion letter that deals with Notice 2000-44. They
> have done a good job differentiating this transaction from
> the notice. I think we should feel comfortable that if
> Proskauer does not come to bat, that Brown & Wood will
> cover us. I would have no problem proceeding at this
> point.

(Ex. 585).

255. On September 20, 2000, Denby sent an e-mail to Tan stating:

> Jimmy [Haber] told me that he thought we would be getting
> a draft of the Proskauer opinion letter this week. Can you
> let me know where we stand.

(Ex. 595). Tan responded:

> Jimmy [Haber] has received a draft of the Proskauer
> opinion and is in the process of reviewing it and making
> comments on it. Would you rather wait for the second draft
> or would you like to see what we have in hand right now?

75

(*Id.*). Denby then responded:

> I can wait to see the second draft. Could Jimmy just give
> me an assurance that this is in fairly good shape & that we
> will be getting a usable product?

(*Id.*).

256. On September 26, 2000, Shea and Denby both received a revised draft of a legal
opinion letter from Proskauer relating to the High Tech transaction. (Shea, 24:82-
83; Denby, 29:40-43; Ex. 604).

257. Ultimately, in its opinion letter dated April 5, 2002, Proskauer opined that Notice
2000-44 is inapplicable to the High Tech transaction, principally because the
option transaction in the Notice "directly results in a tax loss when the investor
disposes of his partnership interest" while in the High Tech transactions, "the
increased outside basis resulting from the contribution of the option spread *simply*
permits [the Egans] to avoid a taxable gain." (Ex. 122 (emphasis added)).

## M. Carruth Resumes Implementation of the Capital Gains Strategy

### 1. The September 5, 2000 Memorandum

258. On September 5, 2000, Tan, Kampf, and Haber of Helios sent Denby the first in a
series of memoranda entitled "Discussion Draft – Implementation Steps for
Purchasing Options - Capital Gains Strategy." (Ex. 550). The September 5, 2000
draft described the parties to the capital gains strategy as "Option A," "Index A,"
"High Tech," Helios, and HSBC. (*Id.*).

259. The September 5 "Implementation Steps" memorandum set forth a series of
specific steps to be implemented over a period of approximately sixty days. (*Id.*).

On the first three days of the plan, the following was to occur: (1) Option A and Index A were to open accounts with HSBC Bank (or an affiliate); (2) Maureen Egan and Richard Egan were to transfer shares of EMC stock to Option A and Index A, respectively; (3) Maureen Egan and Richard Egan were to transfer sufficient capital to purchase options with long and short positions as described in the memorandum and acquire the offsetting options; and (4) Helios was to provide daily valuations of the option positions held by Option A and Index A. (*Id.*).

260.   According to the September 5 plan, approximately two weeks later, Maureen Egan and Richard Egan were to transfer their interests in Option A and Index A, respectively, to Fidelity High Tech in exchange for membership interests. (*Id.*). Under the plan, this transfer would allow the Egans to claim a basis in their Fidelity High Tech interest equal to the premiums "paid" for the long options without any reduction for the premiums "received" for the short options.

261.   According to the September 5 plan, for approximately the next six to seven weeks, Helios would provide daily valuations of the option positions now held by Fidelity High Tech. (*Id.*). During the same time, Helios and Carruth would negotiate and enter into a purchase agreement governing the sale of the Egans' interests in Fidelity High Tech to Helios. (*Id.*). Near the end of that period, Fidelity High Tech was to open an account with HSBC Bank (or an affiliate) and transfer the EMC stock it held to that account. (*Id.*). Fidelity High Tech would then provide Helios with at least a 48-hour notice of the closing date of the sale of the Egans' interests in Fidelity High Tech to Helios. (*Id.*). Thereafter, Helios

77

would purchase 100% of the Egans' interests in Fidelity High Tech for 98.7% of
the fair market value of the EMC shares. (*Id.*).

262. According to the September 5 plan, the sale of the Egans' interests in Fidelity
High Tech – which held the low-basis high-fair-market-value EMC stock – would
generate no capital gain to the Egans, because their claimed stepped-up basis in
their Fidelity High Tech interests would be slightly greater than the gross proceeds
to be received by them on the sale. (Ex. 519).

263. The September 5 plan called for Helios to purchase the Egan's interest in Fidelity
High Tech (and with it, the EMC stock in that entity). As described below, the
plan was later changed to permit the Egans to sell the stock in the open market
directly—what was referred to as the "stock dribble" strategy.

264. On September 7 and again on September 8, 2000, Tan, Kampf, and Haber of
Helios sent Denby a revised version of the memorandum entitled "Implementation
Steps for Purchasing Options - Capital Gains Strategy," which changed some of
the details of the plan for the transaction. It did not, however, materially alter the
plan. (Exs. 557, 564). Tan also sent a copy of the September 8 draft
memorandum to Pat Shea, Jim Reiss, and Ira Akselrad at Proskauer. (Ex. 561).

## 2.    The Parties Begin Implementation of the High Tech Transaction

265. On September 8, 2000, Pat Shea sent Michael Egan an e-mail setting forth an
"estimated schedule of events to implement our plan" with respect to the "Helios
deal." (Shea, 16:22; Ex. 565). The steps set forth in the e-mail tracked the steps
set forth in the updated "Implementation Steps" memorandum. (Ex. 565).

266.    On September 8, 2000, Michael Egan caused Maureen Egan to transfer 1,990,800

shares of low-basis EMC stock to Option A, and Richard Egan to transfer 20,200

shares of low-basis EMC stock to Index A. (M. Egan, 7:98; Ex. 2555; Kolbe,

37:116-17; Dem. Ex. 3000). Those transfers conformed with the first step of the

planned transaction as outlined in the September 8 memorandum from Helios.

267.    On September 14, 2000, funds totaling more than $5 million ($4,989,600 on

behalf of Maureen Egan and $50,400 on behalf of Richard Egan) were wired to

HSBC. (Ex. 594). These transfers conformed with the second and third steps of

the planned transaction as outlined in the September 8 memorandum.

## 3.    The Withdrawal of HSBC as the Counterparty

268.    As of early September 2000, HSBC was the proposed options counterparty in the

Fidelity High Tech transaction. (M. Egan, 7:42; Exs. 507, 566). Helios and

Alpha had recommended HSBC to Carruth. (Shea, 15:19).

269.    On September 13, 2000, Carruth wired $3,999,600 to HSBC to fund the purchase

of options for purposes of implementing the High Tech transaction. (Ex. 573).

270.    At some point before September 15, 2000, R.J. Ruble of Brown & Wood prepared

a draft opinion for HSBC concerning the proposed transaction. (Ex. 582). Ruble

reported to Haber, however, that his partners at Brown & Wood would not "go

along" with his treatment of the transaction, because they did not believe that the

purchase of the short option should be ignored:

> they believe that if the short option is a liability then it is part of the
> 'investment' on which the penalty is imposed. . . . [t]heir view is
> that 'no investment in the partnership would have been made
> without the use of the short option to finance the long.'

79

(*Id.*).

271.   At some point before September 19, 2000, HSBC withdrew from the planned

Helios capital gains transaction.  (M. Egan, 7:96; Shea, 15:19).

272.   James Haber of Helios told Pat Shea that HSBC withdrew as counterparty because

it did not want to take the "reputational risk" in light of IRS Notice 2000-44.

(Shea, 15:20, Ex. 603).

273.   By fax dated September 19, 2000, Robin Calkins, at Michael Egan's direction,

requested the return of the money that had been wired to HSBC on September 14,

2000.  (Shea, 16:27-28; M. Egan, 7:118; Ex. 594).  The money was returned on

September 20.  (Ex. 646).

274.   On September 20, 2000, Denby e-mailed Tan of Helios:

> . . . what is the status of HSHB[sic]?  When are we going to
> implement the purchase?  Please let me know.  FYI - I bet that it
> was not pleasant at Carruth on Tuesday [September 19, 2000].
> This type of thing drives Mike crazy.

(Ex. 595).

275.   As of September 27, 2000, the Egans were looking for a counterparty to replace

HSBC on the transaction.  (M. Egan, 7:119; Ex. 2782).

**4.   The Selection of Refco as the Substitute Counterparty**

276.   On the advice of Helios and Alpha, the Egans decided to use Refco as the counter-

party to the Fidelity High Tech option trades.  (M. Egan, 6:25; Shea, 15:19; Ex.

603).

277.   Refco calculated the bid/ask fee for the High Tech options as 10% of the net

payout, or $1,000,000. (M. Egan, 8:102; Ex. 710).

278.    Michael Egan did not competitively price the High Tech option trades to make a
        determination as to what fees or bid-ask spreads other brokers would charge, even
        after he learned that the fee charged by Refco would be $1,000,000. (M. Egan,
        7:38-39, 103).

## 5.    The First Registration of EMC Shares

279.    Before October 2000, most or all of the EMC stock owned by the Egans was
        unregistered. (R. Egan, 2:16; Denby, 28:42). The stock had to be registered,
        however, in order to be sold as part of the Fidelity High Tech transaction.

280.    On September 26, 2000, a Special Meeting of the Board of Directors of EMC
        approved the filing of a Form S-3 registering 2,000,000 shares of common stock
        owned by the Egans. (Ex. 40).

281.    On October 2, 2000, EMC filed a Form S-3 with the SEC. (Ex. 41). The Form S-
        3 registered for sale 2,020,000 shares of EMC common stock owned by High
        Tech after transfer from Richard and Maureen Egan. (*Id.*). Richard Egan
        reimbursed EMC the registration fee of $52,661. (Ex. 275).

## 6.    Carruth Puts the Fidelity High Tech Transaction on Hold

282.    In the meantime, the price of EMC stock had fallen, making it less desirable to
        sell. The combination of the legal uncertainty after the issuance of IRS Notice
        2000-44 and a decline in the price of EMC stock caused a temporary delay in the
        implementation of the capital gains reduction strategy.

283.    In a memorandum dated October 13, 2000, Carolyn Fiddy informed Richard Egan
        that the Fidelity High Tech transaction was "on hold." (Ex. 634).

284. During the period from October 2000 to December 2000, Shea met and spoke periodically with James Haber and John Schrier to discuss tax reduction strategies. (Ex. 627). Shea also met periodically with Michael Egan to keep him up to date on those discussions. (*Id.*).

285. On December 11, 2000, Schrier notified others at KPMG that he had met with Shea, and that the Egans were "still talking about reducing tax on some built-in gain stock." (Ex. 43).

286. On December 13, 2000, Shea had a meeting with Michael Egan. (Exs. 627, 657). Shea and Michael Egan discussed, among other things, the fact that the capital gains transaction was still "on hold." (Ex. 627).

287. Shea also told Michael Egan that he had spoken with John Schrier, who told him that "KPMG has a deferral plan for options – (ordinary income)," but that there were "no more elimination plans out there." (*Id.*).

**7.    The Year-End Transfer of Maureen Egan's Fidelity High Tech Interest**

288. On December 21, 2000, Carolyn Fiddy sent an e-mail to Jim Reiss, Pat Shea, and Michael Egan alerting them that because Maureen Egan held a 99% interest in Fidelity High Tech, which held 2,020,000 shares of EMC stock, her interest would be subject to the Florida intangibles tax. (Ex. 664). Reiss responded and suggested some solutions for avoiding the tax, including having Maureen Egan make a gift of her interest in Fidelity High Tech to Richard Egan before the end of the year and then having Richard Egan give the interest back after the new year had started. (*Id.*; Ex. 45).

289.   On December 28, 2000, Melody Dunn, an attorney at Burke Warren, e-mailed
       Reiss, Shea, and Fiddy two documents: one to transfer Maureen Egan's entire
       interest in Fidelity High Tech to Richard Egan "effective as of" December 27,
       2000 (in other words, the day before) and to indicate Richard Egan's acceptance
       of that interest, and one to transfer 99% of Richard Egan's entire interest in High
       Tech back to Maureen Egan "effective as of" January 3, 2001, and to indicate
       Maureen Egan's acceptance of that interest. (Ex. 667).

290.   Those documents were sent to Richard Egan by Jim Reiss with a backdated cover
       memorandum. (Ex. 44). Richard and Maureen Egan then executed the
       documents. (Ex. 45). It appears, however, that they were executed after January
       3, 2001. (R. Egan, 2:112-13; M. Egan, 7:125).

291.   No tax return was filed for Fidelity High Tech for the year 2000. (Ex. 1176).
       However, many months later, on October 19, 2001, Shea e-mailed Reiss to report
       that he had met with KPMG and James Haber, and that "it was discussed and
       decided that we should file tax returns for the Fidelity Funds that were set up in
       2000 -- although filings will be late we want to file to establish history for the
       funds -- and start the statute [of limitations] running –." (Ex. 1158). It does not
       appear, however, that any such returns were ever filed.

## N.   Resumption of the High Tech Transaction in January 2001

292.   On January 19, 2001, Shea sent an e-mail to Michael Egan stating: "Helios
       trade – do you want to resurrect – they are ready to go when we are – the stock has
       bounced back somewhat." (Ex. 681).

1.     **The January 23, 2001 Tax Analysis by Shea**

293.   On January 23, 2001, Shea received a "Comparative Investment Summary"

comparing four scenarios for the proposed Helios trades.  (Shea, 16:38; Ex. 698).

294.   Shea made handwritten notes on the document in which he calculated the

projected cost of one of the scenarios, including the fees payable to Helios and

KPMG and the cost of the options, as follows:

| | |
|---|---|
| Fees 150,000,000 x 1.5% = | 2,250,000 |
| Cost of Options | 4,386,398 |
| Total Cost | 6,636,398 |

(Shea, 16:38; Ex. 698).  Based upon these costs, and the 20% capital gains tax

rate, Shea then calculated projected tax benefits for that scenario as follows:

| | |
|---|---|
| Savings 150,000,000 x 20% = | 30 mil[lion] |
| 6.6 ÷ 30 mil = | 22% |
| Cost is 22% of savings – net gain 23,400,000 | |

(Ex. 698).

295.   Shea thus calculated the cost of the Fidelity High Tech transaction as a percentage

of the planned tax benefits.

2.     **The January 24, 2001 Memorandum from Shea**

296.   On January 24, 2001, Shea sent a memorandum to Michael Egan to provide a

"recap of the Helios Trade to bring [him] up to date" and to "refamiliarize [him]

with the transaction and the timing of the trade."  (M. Egan, 7:130; Shea, 16:38;

Ex. 147).  In that memorandum, Shea noted that on September 8, 2000, Richard

and Maureen Egan had contributed a total of 2,020,000 shares of EMC to Fidelity

High Tech. (Ex. 147). Shea also reviewed the series of steps of the transaction

and the timing between each step. (*Id.*).

297.   The January 24 memorandum also noted that James Haber of Helios was "very

comfortable with the timing" of the transaction and that "recent volatility [in the

EMC stock price] supports our timing and strategy -- reinforcing our business

purpose." (*Id.*).

298.   The January 24 memorandum also noted that "this transaction does not require

registration [as a tax shelter with the IRS] and they [KPMG and Helios] are not

maintaining [a] customer list." (*Id.*).

299.   At some point, Shea wrote on the January 24 memorandum that "we are not a tax

shelter because each deal is unique and they [KPMG and Helios] do not promote,"

and that if there was a penalty relating to the transaction, it would be "on Haber"

because he is the "promoter." (Shea, 16:42-43; Ex. 698).

300.   Shea faxed a copy of the January 24 memorandum with the notes to Denby.

(Shea, 16:38; Ex. 698). He also faxed her a marked-up copy of the January 23

"Comparative Investment Summary." (Shea, 16:38; Ex. 698).

301.   On January 30, 2001, Haber sent Shea an e-mail with another "Comparative

Investment Summary" for the proposed trades, again outlining different scenarios

for the transaction. (Ex. 703).

302.   Again, Shea made handwritten notes on the document in which he calculated the

projected cost and tax benefits. (Shea, 16:46; Ex. 678). He projected a cost as to

one scenario as $6,711,439, based on a cost of options of $4,311,439; a Helios fee

of $2,250,000; and a KPMG fee of $150,000. (Ex. 678). Shea also calculated

projected tax benefits for that scenario. (*Id.*). He assumed a capital gains tax rate

of 20% on $150 million, which would result in a tax of $30 million; he then

subtracted the $6.7 million cost and concluded that the net gain from the

transaction would be $23.4 million. (*Id.*). He also calculated that the cost would

be 22.3% of the potential taxes. (*Id.*). He conveyed that information to Michael

Egan. (M. Egan, 8:97-98).

## 3.     The Initial Draft Legal Opinion Letter from Proskauer

303.    Shea's January 24 memorandum to Michael Egan stated that he had requested a

        draft legal opinion letter relating to the High Tech transaction and that the Egans

        would receive a final opinion letter 30 days after the transaction is completed.

        (Ex. 698). The memorandum also stated that "Helios would pay for the legal

        opinion letter from their 1.3% fees," but that "we want [an] invoice to show

        separation from Helios." (*Id.*; M. Egan, 8:86). Shea provided that information to

        Denby. (Shea, 16:38; Ex. 698).

304.    On January 30, 2001, Haber sent a "draft" of a Proskauer legal opinion letter to

        Denby and Shea. (Denby, 29:38-39; Exs. 704, 3271).

305.    On January 31, 2001, Shea e-mailed Michael Egan as follows:

            We received the draft [Proskauer] opinion letter for [Fidelity High
            Tech] -- Stephanie and I both feel comfortable with the wording
            and context -- it addresses all areas of the transaction as well as the
            2000-44 notice that came out last fall -- if we proceed, we will
            have our custom [opinion] letter approximately 30 days after we
            close the deal.

(M. Egan, 8:103-04; Ex. 713).

**4.     The January 29, 2001 Memorandum by Shea**

306.    On January 29, 2001, Pat Shea sent a memorandum to Michael Egan noting that
he had participated in a conference call to review the details of the pending
options trade – "the timing as well as the steps to execute." (Ex. 696). In the
memorandum, Shea specifically pointed out that the assignment by Richard and
Maureen Egan of their respective interests in Index A and Option A to Fidelity
High Tech "is the transaction that gives us the step up in basis." (*Id.*).

**5.     The Decision to Allocate 99% of the High Tech Transaction to Maureen
        Egan**

307.    At some point, Michael Egan decided to allocate 1% of the Fidelity High Tech
transaction (that is, the option trades and stock contribution) to Richard Egan's
wholly-owned LLC (Index A) and 99% to Maureen Egan's wholly-owned LLC
(Option A). (M. Egan, 8:93). He testified that the decision to have Maureen
contribute 99% of the EMC stock to High Tech was based on the fact that she
owned most of the EMC stock that was to be contributed to High Tech. (*Id.*).
However, Richard Egan had given 4 million shares of EMC stock to Maureen
Egan on July 20, 2000, which was the same day (or one day after) the three
entities for the High Tech transaction were formed. (R. Egan, 3:38; Ex. 778).
Maureen Egan, as a resident of Florida, would not be subject to a state capital
gains tax on the sale of her EMC stock. (M. Egan, 5:49).

**6.     Planning for Tax Reporting of the High Tech Transaction**

87

308.   During the same period, Pat Shea kept Michael Egan informed of the anticipated
       tax consequences of the transaction.  (M. Egan, 12:85-86).

309.   On January 22, 2001, Shea informed Michael Egan that they were "using Dick
       and Maureen in order to keep the reporting on one [Form] 1040 and not using
       another partner –  elegant reporting."  (*Id.* at 12:82-83; Ex. 683).

310.   Similarly, Shea's January 24 memorandum to Michael Egan noted that "we
       intentionally want the transaction between Dick and Maureen so that the trade
       only gets reported on one 1040 [tax] return --- elegance in reporting -- not
       exposing other family members to IRS scrutiny."  (Ex. 147).

311.   The Fidelity High Tech transaction called for the opening of an account at Mellon
       Bank, from which the EMC shares would be transferred.  In September 2000, Jim
       Reiss had inquired as to whether the sale of EMC stock would trigger the issuance
       of a Form 1099 by Mellon.  (Ex. 3255).  Specifically, on September 8, 2000, Jim
       Reiss had e-mailed someone at Mellon to inquire whether it would accept a letter
       from Carruth concerning the basis for the stock and whether it would issue a Form
       1099 if the stock were sold and the proceeds went into the account.  (*Id.*).  Mellon
       responded that it would accept a "note or e-mail" from Carruth as to the basis, and
       would not report the proceeds on a Form 1099.  (*Id.*).  Reiss e-mailed Denby that
       he "like[d] this response," which Denby called "a home run!"  (*Id.*).

312.   The original plan for the High Tech transaction called for a transfer of the EMC
       stock to a PaineWebber account, from which it would be sold by Helios.  (Exs.
       53, 696).

313.    On January 29, 2001, Shea informed Michael Egan in a memorandum that:

> The 1099 for the sale of [Fidelity High Tech] will be issued by Mellon and will reflect the adjusted basis that we will provide to them - any 1099 from PaineWebber will be to Helios as they are selling the stock through them - we are selling partnership interests, not securities, and no 1099 will be issued to us.

(M. Egan, 8:91; Shea, 16:43; Ex. 696).

### 7.    The Second Registration of EMC Shares

314.    On February 14, 2001, Shea discussed with Michael Egan the registration of additional EMC shares "for another Helios trade." (Ex. 627). By April 2001, the Egans had decided to proceed with the registration.

315.    On May 9, 2001, the EMC Board of Directors approved the filing of a Form S-3 registering up to 10.1 million shares of EMC common stock owned by the Egans. (Ex. 851).

316.    EMC however, required that the Egans execute an indemnification agreement indemnifying the company in connection with any losses or claims arising out of the registration and sale of the shares. (Ex. 878).

317.    EMC required the indemnification letter in order to ensure that Richard Egan "would be responsible for any and all taxes and penalties if [the] IRS ever audited EMC due to not taking the required withholdings." (Ex. 676).

318.    Richard Egan reimbursed EMC for the registration fee of $98,071. (Ex. 869).

319.    The second EMC registration was approved by the SEC on June 8, 2001. (Ex. 2777).

### O.    Implementation of the Fidelity High Tech Transaction

320.    As described above, Index A, Option A, and Fidelity High Tech were formed as limited liability companies under Delaware law on July 19 and 20, 2000. Index A was a single member LLC whose only member was Richard Egan. Option A was a single member LLC whose only member was Maureen Egan. Fidelity High Tech was a multi-member LLC.

## 1.      Index A and Option A Enter into Option Trades

321.    On January 30, 2001, Index A and Option A were funded with a total of $5 million in cash in a 99-to-1 ratio, with $4.95 million to Option A and $500,000 to Index A. (Kolbe, 37:117; Ex. 711; Dem. Ex. 3000).

322.    The next day, January 31, 2001, Option A and Index A each entered into trades for a pair of offsetting put options on the NASDAQ 100, with very narrowly separated strike prices, each with Refco as the counterparty. (Kolbe, 37:117; Exs. 1, 108; Dem. Ex. 3001). The options were "digital,' meaning that the amount of the payout was fixed in advance as a lump sum. The options were also "European," meaning that they could be exercised only on their expiration date, and not before. Each of the four options comprising the pairs had a term of 44 days. The two options within each pair almost entirely offset one another, because one was a long option (that is, purchased) and the other was a short option (that is, sold), with nearly (but not precisely) identical features. (Kolbe, 37:117; Ex. 1). The terms of the options can be summarized as follows:

**Option A NASDAQ 100 Option Pair**

| Option | Maturity Date | Underlying | Strike Price | Initial Premium | Possible Payout |
|---|---|---|---|---|---|
| Sold Put | 3/16/2001 | NASDAQ 100 | 2,288.15 | $154,997,563 | ($638,800,318) |
| Purchased Put | 3/16/2001 | NASDAQ 100 | 2,288.20 | (S158,400,000) | $648,700,318 |
| | | | | Net Initial Premium: ($3,402,437) | Net Possible Payout: $9,900,000 |

(Ex. 1).

**Index A NASDAQ 100 Option Pair**

| Option | Maturity Date | Underlying | Strike Price | Initial Premium | Possible Payout |
|---|---|---|---|---|---|
| Sold Put | 3/16/2001 | NASDAQ 100 | 2,288.15 | $1,565,632 | ($6,452,528) |
| Purchased Put | 3/16/2001 | NASDAQ 100 | 2,288.20 | (S1,600,000) | $6,552,528 |
| | | | | Net Initial Premium: ($34,368) | Net Possible Payout: $100,000 |

(*Id.*).

323.   The net premium for both pairs of NASDAQ 100 options was $3,436,805, and
was paid by Option A and Index A to Refco. (*Id.*). That is, Option A and Index A
were net buyers in these transactions, because the premium for the option each
bought in its pair exceeded the premium for the option it sold. (*Id.*). Although the
potential "Payout Amount" stated for each individual option was quite large, the
actual net payout available to the Egans if the options were in the money at
expiration was comparatively small, even before accounting for fees and costs
associated with the transaction. (*Id.*). Similarly, the stated premium for each of
the four individual options was many times greater than the net premium actually

91

paid. For example, Option A's long option had a stated premium of nearly $639 million and its short option had a premium of more than $648 million, with the result that the net premium actually paid for this pair was only $9.9 million. (*Id.*).

**2.      The Possibility of a One-Option Payout**

324.    If the long option finished in the money and the short option did not, the payoff to the Egans could be immense. (DeRosa, 39:103). For example, the possible payout on the Option A pair was more than $648 million. (Ex. 1).

325.    There was, however, no realistic possibility that such a large payoff could occur.

326.    For the one-option payout to be even possible, the reference price would have to hit a precise target within a narrow window of time, which was a remote possibility.

327.    Under the Refco agreements, the reference price was defined to mean "the closing price of the NASDAQ 100 index as defined by the prices between 9:30 and 9:45 a.m., New York City time, on the expiration date." (*Id.*; DeRosa, 39:105).

328.    There is no "closing price" on the NASDAQ 100 index during the period when the exchange is open. (DeRosa, 39:105-06). The price fluctuates routinely in any particular 15-minute interval. (*Id.* at 39:107). And the price is measured by three different indices, which are almost always the same, but not necessarily. (*Id.*). Refco thus had the power to select a closing price at any point during the 15-minute interval, and on any one of three indices—even assuming that the highly unlikely event of the index price hitting the right level at the right time came to pass. (*Id.*). As a practical matter, that meant that the possibility of a one-option

payoff was non-existent.  (*Id.* at 39:109, 116-17).

329. Refco could have used a precise, unambiguous number (such as the price when the market closed), but chose not to.  (*Id.* at 39:108).

## 3.    The Capitalization of Fidelity High Tech

330. Effective February 7, 2001, Maureen Egan contributed 100% of her interest in Option A to Fidelity High Tech. (Exs. 1, 742).

331. Effective February 7, 2001, Richard Egan contributed 100% of his interest in Index A to Fidelity High Tech. (Exs. 1, 743).

332. Option A and Index A owned no assets other than the two pairs of options at the time they were contributed to Fidelity High Tech.  Because Option A's option pair was 99 times the size of Index A's option pair, this created an allocation of High Tech membership interests such that 99% belonged to Maureen Egan and 1% belonged to Richard Egan.  All other contributions to Fidelity High Tech by Maureen Egan and Richard Egan were also made in a ratio of 99:1, with Maureen Egan contributing 99% and Richard Egan contributing 1%.  (Ex. 122).  As a result of these contributions, and the LLC agreement, Maureen Egan continued to own a 99% share of Fidelity High Tech, and Richard Egan a 1% share.

333. The Egans took the position that "effective" February 7, 2001, Maureen and Richard Egan contributed 1,999,800 and 20,200 shares of EMC stock, respectively, to Fidelity High Tech. (Ex. 1).  In fact, however, as described above, those shares of EMC stock were actually contributed to Fidelity High Tech on September 8, 2000.

**4.     The Purported Increase in Basis**

334.     As described below, the Egans took the position that only the $158,400,000 of
         stated premium debited for the long NASDAQ 100 option entered into by Option
         A should be taken into account in calculating Maureen Egan's basis in Fidelity
         High Tech, and that the $154,997,563 of premium credited for the short option
         should be disregarded.  (Exs. 3, 4, 8).

335.     As a result, Maureen Egan claimed a basis in Fidelity High Tech of more than
         $158,400,000, even though the net premium paid by her for the contributed
         NASDAQ 100 options was only $3,402,437.

336.     Likewise, in calculating Richard Egan's basis in Fidelity High Tech, the Egans
         took the position that only the $1,600,000 of stated premium debited for the long
         NASDAQ 100 option entered into by Index A should be taken into account and
         that the $1,565,632 of premium credited for the short options should be
         disregarded.  (Exs. 3, 4, 8).

337.     As a result, Richard Egan claimed a basis in Fidelity High Tech of $1,600,000,
         even though the net premium paid by him for the contributed NASDAQ 100
         options was only $34,368.

338.     The Egans therefore claimed a combined basis in Fidelity High Tech as of
         February 2001 of $160 million.

**5.     The Receipt of McData Stock Dividend**

339.     On January 12, 2001, EMC announced that McData Corporation, a subsidiary of
         EMC, would be spun off into a separate publicly-owned company.  (Ex. 145).  As

a result, all shareholders of EMC as of January 24, 2001, would receive Class A common shares of McData on a pro rata basis based on the number of EMC shares owned. (*Id.*). For each EMC share owned, the shareholder would receive approximately 0.0369 of one share of McData stock on February 7, 2001. (*Id.*).

340.   As a result of the contributions made by the Egans, Fidelity High Tech owned 2,020,000 shares of EMC stock, and was eligible to receive McData shares. On February 9, 2001, High Tech received its pro rata shares from the McData dividend. (Kolbe, 37:118). High Tech received 74,349 shares of McData stock. Those shares had a cost basis of $0.0005 per share, 99% of which were attributable to the EMC shares contributed by Maureen Egan and 1% attributable to the EMC shares contributed by Richard Egan. (Exs. 3, 771).

341.   The result of the Egans' combined contributions of stock to High Tech up to February 2001 is summarized in the following table:

**Basis and Value of Stock Contributions to High Tech up to February 2001**

| Contributed Shares | Cost Basis Per Share | Cost Basis for Contribution | FMV Per Share at Time of Contribution | FMV for Contribution |
|---|---|---|---|---|
| 2,020,000 Shares of EMC | $0.0208 | $42,016 | $70.00 | $141,400,000 |
| 74,349 Shares of McData | $0.0005 | $37.17 | $37.06 | $2,755,374 |

(Exs. 1, 3, 4).

## 6.   The Cover/Termination of NASDAQ 100 Options

342.   Because of market movements in the NASDAQ 100 index, within a few days the options showed a gain (before expenses) of more than $1.4 million.

343.    On February 10, 2001, Shea sent an e-mail to Michael Egan informing him of the

following:

> as of Friday, 2/9 – we had a profit of over [$]1 mill[ion] on our
> options in the Helios trade – we can look at Monday – I have
> talked [with] Ivan Ross and confirmed that we can sell the options
> without selling the EMC position – can we discuss that thought –
> if we don't want to sell EMC so low – sell the options and keep the
> EMC – it helps to support our business purpose – it gives us a
> track record – it gives us a profit on the trade – allows us to hold
> EMC until the price increases.

(Ex. 752).

344.    On February 12, 2001, Fidelity High Tech closed out the NASDAQ 100 option

positions entered into by Option A and Index A on January 31, 2001. It did so by

entering into trades for additional pairs of NASDAQ 100 options with terms

precisely offsetting the terms of the January 31, 2001 options. (Exs. 1, 108). As a

result of the entry into this second set of offsetting options, the options

collectively had zero net value and no potential for future gain or loss. (Exs. 1,

108). Even though the options had no value and no economic consequence after

February 12, 2001, they were kept in place and allowed to expire according to

their terms on March 16, 2001. (Ex. 1).

345.    The results following the February 12, 2001 closeout of the NASDAQ 100

options can be summarized as follows:

**Option A NASDAQ 100 Option Pair – Covering Options BEFORE Fees**

| Option | Strike Price | Initial Premium (Paid) / Received 1/31/2001 | Premium (Paid) / Received for Covering Option 2/12/2001 | Resulting Payout (Paid) / Received |
|--------|--------------|---------------------------------------------|----------------------------------------------------------|-------------------------------------|
|        |              |                                             |                                                          |                                     |

| Sold Put | 2,288.15 | $154,997,563 | ($313,082,018) | ($158,084,455) |
| Purchased Put | 2,288.20 | (S158,400,000) | $317,934,007 | $159,534,007 |
| | | Net Initial Premium: ($3,402,437) | Net Covering Premium: $4,851,989 | Net Result before Fees: $1,449,552 |

(*Id.*; Ex.122).

## Index A NASDAQ 100 Option Pair – Covering Options BEFORE Fees

| Option | Strike Price | Initial Premium (Paid) / Received 1/31/2001 | Premium (Paid) / Received for Covering Option 2/12/2001 | Resulting Payout (Paid) / Received |
|---|---|---|---|---|
| Sold Put | 2,288.15 | $1,565,632 | ($3,162,443) | ($1,596,811) |
| Purchased Put | 2,288.20 | (S1,600,000) | $3,211,454 | $1,611,454 |
| | | Net Initial Premium: ($34,368) | Net Covering Premium: $49,011 | Net Result before Fees: $14,643 |

(Exs. 1, 122).

346. As described below, in connection with the Fidelity High Tech transaction, the Egans incurred and paid $1.8 million in fees to Helios and KPMG. In the Form 1065 Short Year Tax Return filed by High Tech covering the period through December 21, 2001, High Tech adjusted its reporting of the option transaction outcomes to reflect $900,518 in fees, resulting in a reported gain of $563,677. (Ex. 3).

347. The results following the February 12, 2001 closeout of the NASDAQ 100 options as reported on the Form 1065 Short Year Tax Return filed by High Tech covering the period through December 21, 2001, can be summarized as follows:

97

**Option A NASDAQ 100 Option Pair – Covering Options AS REPORTED**

| Option | Strike Price | Initial Premium (Paid) / Received 1/31/2001 | Premium (Paid) / Received for Covering Option 2/12/2001 | Resulting Payout (Paid) / Received |
|---|---|---|---|---|
| Sold Put | 2,288.15 | $154,851,562 | ($313,377,643) | ($158,526,081) |
| Purchased Put | 2,288.20 | (S158,549,657) | $317,633,756 | $159,084,099 |
| | | Net Initial Premium: ($3,698,095) | Net Covering Premium: $4,256,113 | Net Result as Reported: $558,018 |

(*Id.*).

**Index A NASDAQ 100 Option Pair – Covering Options AS REPORTED**

| Option | Strike Price | Initial Premium (Paid) / Received 1/31/2001 | Premium (Paid) / Received for Covering Option 2/12/2001 | Resulting Payout (Paid) / Received |
|---|---|---|---|---|
| Sold Put | 2,288.15 | $1,584,165 | ($3,165,431) | ($1,581,266) |
| Purchased Put | 2,288.20 | (S1,601,508) | $3,208,433 | $1,606,925 |
| | | Net Initial Premium: ($17,343) | Net Covering Premium: $43,002 | Net Result as Reported: $25,659 |

(*Id.*).

348.    After February 12, 2001, the only remaining assets owned by Fidelity High Tech were the EMC and McData shares contributed by Richard and Maureen Egan. (Ex. 1). However, although the options had been terminated, the Egans claimed that an outside basis from the long option premiums paid by Option A and Index A remained. (Ex. 122).

349.    On February 14, 2001, Shea sent Richard and Maureen Egan various documents for signature concerning the Fidelity High Tech transaction (including consents

98

for transactions that had already occurred). (Ex. 47). Shea advised the Egans that
the transfer of interests from Index A and Option A to Fidelity High Tech "gives
us our step up in basis for tax purposes," and that "all we need now is the [EMC
and McData] stock to increase to a point where you feel comfortable selling."
(Ex. 47).

P.      **"Stuffing" of Additional Low-Basis Stock into Fidelity High Tech**

350.    At the beginning of September 2000, EMC stock was trading at $98.00 per share.
        (Ex. 634). Thereafter, the share price of EMC steadily declined, with the
        exception of a small increase in January 2001. By the end of November 2001,
        EMC stock was trading at $16.79 per share. (Ex. 1472).

351.    The Fidelity High Tech transaction had created a purported "basis" of $160
        million. As the price of EMC stock began to decline, however, it became
        apparent to Michael Egan and others that the stock could not be sold for a
        sufficient gain to take advantage of that entire "basis." In addition, the Egans did
        not want to show a loss on the sale of the stock. Accordingly, in 2001 the Egans
        added additional low-basis stock to the High Tech Fund—a practice that was
        referred to as "stuffing." As Haber advised Pat Shea, the Egans could "stuff
        [High Tech] with more stock to get our per share basis lower [--] that will allow
        us to sell shares tax free." (Ex. 1150).

1.      **"Stuffing" Activities in May and June 2001**

352.    At least as early as May 2001, Michael Egan was being provided with
        spreadsheets prepared by Carolyn Fiddy that set forth the fair market value of the

stock held in High Tech. The spreadsheets showed how much additional stock

would need to be contributed to bring the value of the portfolio up to the amount

of the $160 million purported basis. (M. Egan, 9:40- 41; Ex. 2780).

353.    The first round of "stuffing" occurred in June 2001, when additional shares of

McData and EMC stock were contributed to Fidelity High Tech.

354.    On May 2, 2001, Stephanie Denby asked Shea and Reiss whether "we [were]

going to stuff any more McData or EMC stock" into Fidelity High Tech. (Ex.

3277). Shea responded that Michael Egan had told him "to put it back on the

front burner to 'stuff' the fund to utilize the basis." (*Id.*).

355.    On May 15, 2001, Shea informed Fiddy, Denby, and Reiss by e-mail that:

> At a lunch meeting with Mike [Egan] today, he informed me of the
> following -- contribute all the McData stock we have to Fidelity
> High Tech Advisor A Fund[;] contribute 1 to 2 million shares of
> EMC to the fund -- we will back in to the number of shares when
> we know the price and fair market value of all McData and the
> fund compared to our basis -- (160 mill[ion]) we want a gain.

(Ex. 3279).

356.    On May 18, 2001, Michael Egan asked members of his staff at Carruth to

determine the amount of additional EMC shares that would have to be contributed

to Fidelity High Tech in order to bring the value of the stock up to the purported

basis of $160 million. (M. Egan, 9:37-38).

357.    The staff calculated that 1,605,912 additional shares of EMC, at a value of $63.2

million, needed to be contributed. (Ex. 860).

358.    In his notes of a meeting on May 22, 2001, with Michael Egan and Reiss, Shea

wrote:

> We will be stuffing w[ith] McData stock and waiting on EMC until
> we know how many shares you want to do.  Carolyn [Fiddy] has a
> spreadsheet w[ith] basis [numbers].

(Shea, 15:26; Ex. 2780).

359.   On May 31, 2001, Shea confirmed with Haber that the Egans could "stuff" the
       account with additional stock, and could withdraw the shares if they chose before
       the transactions were finally consummated.  (Ex. 891).

360.   On June 1, 2001, Maureen Egan contributed 516,978 shares of McData stock to
       Fidelity High Tech.  (Ex. 108).  At the same time, Richard Egan contributed 5,222
       shares of McData stock to Fidelity High Tech.  (*Id.*).  The 522,200 McData shares
       contributed on that date had a total cost basis of $261.10.  (*Id.*).  The fair market
       value of the McData shares was $26.20 per share, or $13,681,640.  (Exs. 1, 3, 4).

361.   On June 4, 2001, Maureen Egan contributed 1,980,000 shares of EMC stock to
       Fidelity High Tech.  (Ex. 108).  At the same time, Richard Egan contributed
       20,000 shares of EMC stock to Fidelity High Tech.  (*Id.*).  The 2,000,000 EMC
       shares contributed on that date had a total cost basis of $41,600.  (*Id.*).  The fair
       market value of the EMC shares was $31.65 per share, or $63,300,000.  (Exs. 1, 3,
       4).

362.   The Egans' contributions of stock to Fidelity High Tech in June 2001 is
       summarized in the following table:

**Basis and Value of Stock Contributions to Fidelity High Tech in June 2001**

| Contributed Shares | Cost Basis Per Share | Cost Basis for Contribution | FMV Per Share at Time of Contribution | FMV for Contribution |
|---|---|---|---|---|
| 2,000,000 Shares of EMC | $0.0208 | $41,600 | $31.65 | $63,300,000 |
| 522,200 Shares of McData | $0.0005 | $261.10 | $26.20 | $13,681,640 |

(Exs. 1, 3, 4).

## 2. Additional "Stuffing" in Late 2001

363. The price of EMC stock continued to decline after May 2001. (Exs. 715, 1472). Although the Egans considered selling the stock in High Tech in the summer of 2001, they decided to wait for the price to rebound. (Ex. 53).

364. In late 2001, employees at Carruth performed further calculations in order to determine how much additional stock needed to be contributed to Fidelity High Tech in order to take advantage of the purported $160 million basis. In addition to EMC stock, Michael Egan authorized contribution of other low-basis stock owned by the Egans to Fidelity High Tech to take advantage of the "stepped-up" basis (or, as Shea put it, to "absorb" that basis). (M. Egan, 9:61-62; Reiss, 27:82; Shea, 16:64).

365. In handwritten notes created in October 2001, Shea made a rough calculation of the number of EMC shares necessary to reach the desired number: "Inside Basis $160,000,000 ÷ 4,000,000 shares = 40.00 per share." (Shea, 16:62; Ex. 1150).

366. On December 13, 2001, Robin Calkins attended a meeting at Carruth. (Calkins,

35:51-52; Ex. 1442). Her notes of the meeting state: "Helios 1 (754 election).

Do not want to show [at] a loss [--] reason for stuffing it [is] to show a gain."

(Ex. 1442).

367.   Calkins also recorded in her notes that various Egan family accounts would "be used to stuff Fid[elity] to get to 160M value." (*Id.*).

368.   On December 14, 2001, the Egans (through entities they controlled) contributed additional low-basis securities to Fidelity High Tech with a market value of $39,615,366. (Ex. 2094).

369.   On December 17, 2001, Fiddy e-mailed Stephanie Denby: "Once we have the cost basis of assets transferred, we will compute (the) number of shares of additional EMC to 'stuff.'" (Ex. 1458).

370.   On December 18, 2001, the Egans (through entities they controlled) contributed 2.3 million additional shares of EMC stock to Fidelity High Tech with a market value of $33,695,000. (Ex. 2094).

371.   On December 18, 2001, Calkins recorded in her notes:

> [Michael Egan] decided to underfund Helios [because] of the [number] of shares needed to stuff it. Assuming a stepped up basis after election taken. KPMG computing this new basis. But what will happen because of underfunding is [the] basis [will be greater] than value. Hoping for a 10 percent [appreciation] of some of the stocks.

(Calkins, 35:53-54; Ex. 1447).

372.   On December 19, 2001, the Egans (through entities they controlled) contributed 280,000 additional shares of EMC stock to Fidelity High Tech with a market

value of $4,110,400.  (Ex. 2094).

373.    The securities contributed on December 18 and 19 all had a relatively low basis.
        (Ex. 1459).

374.    On December 19, 2001, Carolyn Fiddy reported to Reiss that "the final 'stuffing'
        for Fidelity High Tech Advisor A has been organized." (Ex. 1464).  The same
        day, Shea reported to Reiss that "the 'stuffing' of Helios I [High Tech] took place
        today."  (Ex. 1466).  On December 20, Fiddy reported to Haber that "additional
        contributions of low basis stock" had been made to High Tech.  (Ex. 1475).

375.    On December 20, 2001, Pat Shea reported to Haber that "we have 'stuffed' this
        fund with several other assets including more EMC stock." (Ex. 1447).

376.    On December 21, 2001, the fair market value of the securities held by Fidelity
        High Tech was $144,172,002.  (Ex. 108).

377.    On January 2, 2002, Reiss asked Robin Calkins whether "the final stuffing" had
        occurred as expected on December 20, 2001.  (Ex. 1517).

378.    On January 29, 2002, Pat Shea sent Richard Egan (who was by then the
        Ambassador to Ireland) a memorandum with various documents attached for his
        signature. (Shea, 16:78; Ex. 1557).  The memorandum included a contribution
        agreement "prepared by Stephanie Denby [that] details the additional assets we
        'stuffed' into the fund to increase the market value even further to take advantage
        of the high tax basis we structured." (Ex. 1557).

379.    The closing binder for the High Tech transaction recorded that the final stock
        contributions were made "effective December 14, 2001." (Ex. 1).  In fact, some

of those transfers were made afterwards. (Exs. 1464, 1466, 1475).

380. The Contribution Agreement memorializing the final share transfers was signed at some point in 2002, long after December 14, 2001. Shea did not transmit the agreement to Richard Egan for signature until January 29, 2002. (Ex. 1557).

## Q. The Change of Structure of the Fidelity High Tech Transaction

### 1. The Original Final Step of the Transaction

381. The final step in the originally planned structure of the Fidelity High Tech transaction was for Helios to purchase the Egans' 100% interest in High Tech for 98.7% of the fair market value of the stock it held. (Ex. 550). The 1.3% difference in the purchase price would constitute Helios's fee on the transaction. The tax consequence of such a sale, according to the original plan, would be to eliminate any built-in capital gain in the EMC stock, because the Egans' purported basis in their partnership interests would be greater than the proceeds received by them on the sale.

### 2. The October 31, 2001 Tilevitz "Stock Dribble" Memorandum

382. By November 2001, Michael Egan was looking for ways to sell the stock held by Fidelity High Tech directly, instead of selling the Egans' interest in High Tech to Helios. (M. Egan, 9:55; Shea, 16:80-81).

383. On November 1, 2001, Shea e-mailed Haber as follows: "You mentioned that there is a way to [bifurcate] the stock in [Fidelity High Tech] to dispose of some of the stock if we choose . . . can you explain the details of this feature . . . ." (Ex. 1245).

105

384.    On November 5, 2001, Haber sent Shea and Denby a memorandum that had been
        authored by Orrin Tilevitz of DGI on October 31, 2001. (Ex. 1262).

385.    The Tilevitz memorandum described a technique by which taxpayers could
        purportedly step-up the basis of stock that was held by a partnership through the
        use of an election under Section 754. (*Id.*). This technique would allow the
        Egans to dispose of stock held by the partnership directly and gradually over a
        period of time, instead of selling 100% of their partnership interests to Helios.
        (*Id.*). That technique became known as the "stock dribble" strategy.

386.    In substance, the technique called for a transfer of partnership interests in order to
        trigger a technical termination of the partnership under Section 708, followed by
        an election by the partnership under Sections 754 and 743(b) to redistribute the
        basis. (*Id.*).

387.    On November 9, 2001, Reiss sent a memorandum to Michael Egan and Pat Shea
        that stated the following:

> The benefit of the restructuring is that we can dribble out stock
> instead of selling all of it. It would provide more flexibility if you
> prefer not to sell all the shares at one time.

(Ex. 1302).

## 3.      The Initial Proposal to Use a Subchapter S Corporation

388.    A central step in the strategy described in the October 31 Tilevitz memorandum
        called for one of the investors in the multi-member LLC (in this case, Fidelity
        High Tech) to transfer his or her membership interest to a subchapter S
        corporation or partnership, in order to provide a trigger mechanism for a Section

754 election and tax basis adjustment. (Ex. 1262).

389. In accordance with the Tilevitz memorandum, in early November 2001 the Egans were contemplating the transfer of Maureen Egan's interest in High Tech to an S-corporation in order to create the trigger mechanism for a 754 election. (Exs. 3290, 3294). Reiss, however, pointed out that an S-corporation interest could be subject to the Florida intangibles tax, because Maureen was a Florida resident. (Ex. 3294). The Egans accordingly decided to make the transfer to a newly-created partnership. (M. Egan, 9:70-72).

390. On November 9, 2001, in the course of an e-mail discussion between Reiss and Denby on that subject, Reiss raised the topic of an increased "risk factor" if the transaction were to be restructured as discussed. (Ex. 3294). Denby replied, "I do not think that there is much increase in risk with the 754 election. This is a form that I think would never be audited." (*Id.*).

## 4.    The Change to a Partnership

391. On November 14, 2001, Denby sent an e-mail to Shea and Reiss stating the following:

> I just got off the phone with Haber. He agrees that if we put [Maureen Egan's] Fidelity High Tech [interest] into a new partnership (MEE Holdings LP), then we can do the 754 election. This will allow us to shelter the Fidelity interest from the Florida intangibles tax. If we proceed with transferring Fidelity into an S corp., then we are going to have an intangibles tax problem because we can't then put an S corp. interest into an LP (LP can't own S corp. stock) and we can't do a transfer to Dick (will screw up the basis in the Fidelity investment).

(Ex. 3297).

107

392.    The reason for the transfer of Maureen Egan's interest in Fidelity High Tech to
        another entity was to trigger the 754 election pursuant to the strategy outlined in
        the October 31 Tilevitz memorandum. The Egans used a limited partnership,
        rather than a subchapter S corporation, to avoid the Florida intangibles tax.

## 5.    The Transfer of Maureen Egan's Interest to an LLP and Section 754 Elections

393.    On November 14, 2001, Denby caused MEE Holdings LLP to be formed as a
        limited liability partnership. (Denby, 28:51-52; Exs. 108, 180).

394.    Maureen Egan owned 99.8803% of MEE Holdings (through her grantor trust) and
        Richard Egan owned the remaining 0.1197% (through a single-member LLC).

395.    Consistent with the strategy outlined in the October 31 Tilevitz memorandum,
        effective December 21, 2001, Maureen Egan contributed her interest in Fidelity
        High Tech to MEE Holdings, which caused a technical termination of Fidelity
        High Tech for federal income tax purposes. (Shea, 16:88; Exs. 1, 122). The sole
        purpose of the transfer of the interest in Fidelity High Tech to MEE Holdings was
        to allow High Tech to make a Section 754 election. (M. Egan, 9:72-73).

396.    The December 21 "effective date" for the transfer of Maureen Egan's interest in
        Fidelity High Tech to MEE Holdings was assigned retroactively by Reiss on
        January 2, 2002. (Shea, 16:88-89; Ex. 1517).

397.    Eventually, and as described below, Fidelity High Tech filed a Form 1065
        partnership tax return for the short year ending December 21, 2001. It reported
        that a technical termination of the LLC had occurred for partnership tax purposes

as of December 21, 2001. (Ex. 3). With that return, Fidelity High Tech filed an election under Section 754 to redistribute the tax basis in Maureen Egan's 99% interest in the Fidelity High Tech across MEE Holdings' 99% interest in the assets then held by Fidelity High Tech. (*Id.*).

398. Maureen Egan's purported outside basis in her 99% share in High Tech as of the December 21 transfer to MEE Holdings was $162,779,413. (*Id.*). That basis included the $158,400,000 long premium paid by Option A, as well as the cost basis of her 99% share of the securities the Egans had contributed to High Tech. (*Id.*). In contrast, Maureen Egan's cost basis in her 99% share of the stock held in High Tech was only $8,672,617.73. (*Id.*).

399. As described below, the principal claimed tax consequences flowing from the restructuring of the final step of the Fidelity High Tech transaction were as follows: (1) Maureen Egan's stepped-up basis in Fidelity High Tech carried over to MEE Holdings (under Section 723) and became MEE Holdings' basis in High Tech; (2) Fidelity High Tech was deemed to have technically terminated as of the close of December 21, 2001 (under Section 708(b)(1)(B)); (3) a new Fidelity High Tech entity was deemed to have been created in its place; and (4) Fidelity High Tech increased MEE Holdings' proportionate share of basis in its assets up to the full amount of the stepped-up basis (under Sections 754 and 743(b)). (LaRue, 43:106-07, 44:8-9).

400. In short, MEE Holdings claimed the right to receive Maureen Egan's outside tax basis of $162,779,413, and to redistribute that stepped-up basis across its 99%

109

interest in the assets held by Fidelity High Tech. (Ex. 3).

401. Because all of the option positions held in Fidelity High Tech had long since been closed out and then expired, the only assets remaining in Fidelity High Tech were the low-basis securities contributed by Maureen Egan and Richard Egan during 2000 and 2001. (*Id.*). The inside tax basis in the 99% share of the Fidelity High Tech portfolio Maureen Egan had transferred to MEE Holdings was therefore increased from $8,672,618 to $162,779,413, an adjustment of $154,106,795. (*Id.*).

402. In an e-mail dated November 28, 2001, Reiss described the effect of the Section 754 election as follows: "The 754 election steps up the basis of EMC in the Fidelity [High Tech] fund so the sale of EMC in the Fund would show gross proceeds and stepped up cost basis on Sch D for the Fund's tax return -- a pretty decent obscured event." (Ex. 3303).

403. In the Form 1065 partnership tax return filed by "new" Fidelity High Tech covering the short year from December 22 to December 31, 2001, Fidelity High Tech again claimed that a technical termination of the LLC had occurred for partnership tax purposes as of December 21, 2001. (Ex. 4). With that second tax return, Fidelity High Tech filed a second election under Section 754 to redistribute the tax basis in Richard Egan's 1% of Fidelity High Tech across the remaining 1% share in assets then held by the LLC. (*Id.*).

404. Richard Egan's purported outside basis in his 1% share of Fidelity High Tech as of the December 21 technical termination was $1,644,242. (*Id.*). That basis

110

included the $1,600,000 long premium paid by Index A, as well as the cost basis of his 1% share of the securities the Egans had contributed to Fidelity High Tech. (*Id.*). In contrast, Richard Egan's cost basis in his 1% share of the stock held in Fidelity High Tech was only $87,602. (*Id.*).

405. As a result of the second Section 754 election, Richard Egan claimed the right to redistribute his stepped-up outside tax basis of $1,644,242 across his 1% interest in the assets held by the LLC. (*Id.*).

406. Again, because all of the option positions held in High Tech had long since been closed out and then expired, the only assets remaining in the High Tech entity were the low-basis securities contributed by Maureen Egan and Richard Egan during 2000 and 2001. (*Id.*). The inside tax basis in the 1% share of the High Tech stock portfolio retained by Richard Egan following the technical termination was therefore increased from $87,602 to $1,644,242, an adjustment of $1,556,640. (*Id.*).

## 6. Discussions at Year-End 2001 Concerning Sale of Stock

407. Michael Egan had originally considered selling all the EMC stock and other securities held by Fidelity High Tech in calendar year 2001. (Ex. 3303). However, he became concerned about doing so for a variety of different reasons, including the low price of EMC stock, and began to consider selling some of the stock in 2002. (*Id.*; Ex. 3292).

408. On November 9, 2001, Reiss expressed concern about "dribbling" sales of stock into 2002. (Ex. 3292). He asked "Does it increase audit risk[?]" and "would we

111

now have 2 positions to defend rather than 1?" (*Id.*).

409.    On November 28, 2001, Reiss asked Denby by e-mail whether they should

sell/liquidate in 2001 to either start the statute running sooner or whether there is

concern that [the] IRS will require unwinding the transaction before we sell."

(Ex. 3303). Denby replied:

> All things being equal, I would agree with you that it would be
> better to sell [all the stock] in 2001. The 3 key factors being: 1.
> Get the audit clock ticking, 2. The disarray that the IRS is currently
> in and 3. Limit time for the IRS to come out with a ruling barring
> this transaction. However, given the price of the stock, I think the
> economics would probably dictate waiting until 2002.

(*Id.*).

410.    In early December 2001, Michael Egan briefly considered selling all of the EMC

stock in Fidelity High Tech before December 31 of that year and then buying it

back, assuming that such a sale did not create a problem under SEC Rule 16(b) or

with any other SEC rule or EMC policy. (Exs. 3303, 3310). According to Pat

Shea, in an e-mail dated December 6, 2001, "the reason we are considering it is to

start the statute [of limitations] clock running and to protect the transaction from

IRS unwinding." (Ex. 3310).

411.    Ultimately, however, Michael Egan decided against selling the stock because the

price had fallen and because he did not want to report losses from both the

Fidelity High Tech and Fidelity International transactions in the same year.

(Denby, 29:59; Ex. 3292).

## 7.    The Sale of Stock Held by Fidelity High Tech in 2002

412.    The market price of EMC shares continued to decline in 2002. On March 7, 2002,

Shea discussed with James Haber whether the Egans could "pull out [of Fidelity High Tech] at a loss." (Ex. 1419). Among other things, he asked Haber "how will (the transaction) be shown on [tax] returns" and "any issues or risks?" (*Id.*). Haber apparently suggested continuing to contribute "gain assets" to High Tech in order to "disguise the loss . . . to be reported." (*Id.*).

413. In March and April 2002, additional shares were "stuffed" into Fidelity High Tech. (Ex. 1847).

414. On May 10, 2002, Stephanie Denby asked Orrin Tilevitz about selling all the stock in Fidelity High Tech. (Ex. 1851). She stated that "the stock whose basis they stepped up has now gone down in value, so selling it would result in an \$80 million capital loss." (*Id.*). She asked whether the Egans "[were] better off waiting and hoping it will go up in value or selling it now, taking the loss and starting the statute [of limitations] running?" (*Id.*). Tilevitz forwarded her inquiry to Ira Akselrad. (*Id.*).

415. During 2002, Fidelity High Tech sold all of the securities in its portfolio. (Shea, 16:91; Ex. 2093).

416. Due to market conditions, the shares held by High Tech continued to decline in value throughout 2002. By the time they had all been sold, the total proceeds realized were reported by High Tech to be \$79,695,408, composed of \$371,214 in short-term sales and \$77,323,734 in long-term sales. (Ex. 5).

417. On its 2002 Form 1065 partnership tax return, High Tech reported that the sale of its entire stock portfolio had produced a capital loss of \$87,509,884, divided

113

between $87,194,495 in long-term capital losses and $315,389 in short-term capital losses. (*Id.*). The entirety of these capital losses flowed through to the Egans' personal income tax return for 2002; the Form 1040 filed by Richard and Maureen Egan for 2002 reported a capital loss of $87,617,988 flowing from their interests in Fidelity High Tech and MEE Holdings, divided between $87,305,690 of long-term capital losses and $312,298 of short-term capital losses. (Ex. 232).

418.   If the inside basis of the Fidelity High Tech stock portfolio had not been adjusted pursuant to the Section 754 elections, the stock sold by Fidelity High Tech during 2002 would have retained its original aggregate cost basis of $8,760,220. (Ex. 3). In that event, the total sale proceeds for the portfolio of $79,695,408, as reported in Fidelity High Tech's 2002 Form 1065 return, would have resulted in a reportable capital gain of $70,935,188. (Ex. 5).

## R.    The Egans Continue to Explore an Ordinary Loss Strategy

419.   In the meantime, as the Egans and their advisors developed and implemented the capital gains elimination strategy through the Fidelity High Tech transaction, they continued to consider a strategy for eliminating taxes on ordinary income.

### 1.    Exercise of Options

420.   In 2001, the Egans exercised 8,320,000 options to purchase EMC stock. (Ex. 1414). (The options had previously been transferred to a grantor trust, which actually exercised the options). (*Id.*; Ex. 791).

421.   The Egans exercised 2,000,000 options on January 22, 2001, at a strike price of $1.1563. (Exs. 780, 1414). The market price was $76.50. (Ex. 780).

114

422. The Egans also exercised 320,000 options on March 2, 2001, at a strike price of $3.0586 and a market price of $38.40. (*Id.*; Ex. 1414).

423. The Egans also exercised 4,000,000 options on September 7, 2001, at a strike price of $1.15625, and 2,000,000 options on September 7, 2001, at a strike price of $2.3125. (Exs. 791, 1414). The gain from the exercise of the options in September 2001 was treated as deferred compensation pursuant to an EMC plan that was amended for that purpose. (Ex. 325).

424. As noted above, Richard Egan became ambassador to Ireland on September 10, 2001. He was required to resign from the EMC board in order to take that position, which would cause his options to expire. Accordingly, all of the Egans' options were exercised by September 7, 2001.

425. Richard Egan had received these options in his capacity as a member of the EMC board of directors. (Ex. 791). Income received by him on the exercise of the options was therefore self-employment income. (Prifti, 25:92). The income was subject to tax at ordinary income tax rates.

426. The exercise of the options in 2001 produced income to Richard Egan in the amount of $150,687,400. (Ex. 64). EMC Corporation provided a Form 1099 to Richard Egan in January 2002 reflecting that amount. (*Id.*).

427. The exercise of the options in 2001 produced income to Maureen Egan in the amount of $11,309,248. (Ex. 127). EMC Corporation provided a Form 1099 to Maureen Egan in January 2002 reflecting that amount. (*Id.*).

428. At one point, the Egans projected their federal income tax liability on their income

from the exercise of those options (in the absence of a tax shelter) to be

$63,575,074. (Ex. 1192).

## 2. The Search for Ordinary Income Strategies

429. In late 2000 and early 2001, the Egans and their advisors continued to discuss

ways to avoid paying ordinary income taxes on the gain from the exercise of EMC

options.

430. As described above, KPMG directed its employees to "stop marketing" the Short

Option Strategy in the wake of IRS Notice 2000-44. Nonetheless, KPMG

remained interested in marketing a strategy to the Egans to shelter ordinary

income from the exercise of options.

431. On December 11, 2000, John Schrier of KPMG reported internally that he had

met with Pat Shea "to discuss a structure designed to reduce taxes in connection

with [Dick Egan's] proposed exercise of stock options." (Ex. 43).

432. On December 14, 2000, Schrier was notified that Brian Rivotto of KPMG was

making a "pitch [to Carruth] for the ongoing consulting and compliance work,"

with Schrier to be positioned "as the resource for cutting edge tax planning

strategies." (*Id.*).

433. On January 3, 2001, Pat Shea wrote a memorandum to file labeled "Tax strategy

for options." (Shea, 16:35-36; Ex. 676). The memorandum addressed recent

discussions he had with Michael Egan, Jack Egan, and Jim Reiss concerning

"whether [it] made sense" for Carruth to implement "the tax elimination strategies

and deferral plans" of KPMG or another promoter. (Ex. 676). Both Michael

116

Egan and Jack Egan told Shea that "they didn't think it was a good time to enter

into such a transaction" because of the level of "participation and co-operation"

required with EMC.  (*Id.*).

434.    On January 19, 2001, Shea sent an e-mail to Michael Egan:

>   KPMG wants to present to me another program for tax
>   minimization on February 12 -- do you want to attend?  Maybe I
>   can feel it out and if interested you can meet as a follow-up -- let's
>   discuss --

(Shea, 16:37; Ex. 681).

435.    On February 10, 2001, Shea sent Michael Egan an e-mail "update." (Shea, 16:56;

Ex. 752). In the e-mail, Shea informed him that he was

>   meeting [on February 12] with KPMG in Boston to discuss various
>   tax elimination strategies they have available -- they are bringing
>   partners from New York and California to the meeting -- if they
>   have anything interesting or that may work for us I will set a follow
>   up meeting with you.

(Ex. 752). In the same e-mail, Shea indicated that he had also met with another

promoter concerning possible "tax savings."  (*Id.*).  The e-mail continued:

>   I have talked with Helios about other strategies they may
>   have available also -- at least by meeting with KPMG,
>   Helios and [the other promoter] we will get a feel what is
>   on the market for elimination strategies and the amount of
>   activity going on in the industry -- I will keep you posted --

(*Id.*).

436.    On February 12, 2001, Schrier introduced Timothy Speiss of KPMG to Shea for

the purpose of proposing tax strategies for his consideration. (Ex. 735).

According to Shea's notes, one of the strategies discussed was the "loss

importation - Helios short option plan." (Ex. 762).

437.   On February 15, 2001, in an e-mail to Haber concerning the High Tech

transaction, Shea stated, "I also would like to talk to you regarding additional

strategies you may have available." (Ex. 771). Shea and Haber had follow-up

discussions concerning those "additional strategies." (Shea, 16:102-03; Ex. 627).

Shea informed Michael Egan of these discussions. (M. Egan, 9:91; Ex. 627).

438.   On March 16, 2001, Prifti and Shea had a conversation concerning additional tax

strategies. (Ex. 791). Shea was "looking for solutions to help deal with . . . [the

income from the exercise of] those [EMC] options." (Shea, 23:111). Shea

requested that

> KPMG specifically look at a solution that could off-
> set [sic] the ordinary income hit from the spread on
> the exercise of the [nonqualified EMC stock]
> options. Since the spread would be a [Form] 1099
> event, the ideal off-set would be a "Line 21"
> white-paper netting transaction.

(Ex. 791). Line 21 is the line on an income tax return (Form 1040) for reporting

"other miscellaneous income." (Prifti, 25:77). A "white paper" is a statement or

schedule that is attached to a tax return. (*Id.* at 25:78). A "netting transaction" is

one where a gain and a loss are combined. (*Id.* at 25:79).

439.   On March 28, 2001, Speiss spoke with Pat Shea by telephone and suggested a

KPMG tax strategy called "Euram" that would "convert $150 million in ordinary

income." (Ex. 802). The Egans did not, however, adopt the strategy.

440.   In the summer of 2001, Shea attended a Boston Red Sox game with Prifti and

Rivotto of the local Boston office of KPMG. At the game, they discussed tax

strategies. (Ex. 901; Shea, 16:107). Specifically, Shea said the following to

118

Prifti:

> Bob, you know, some of those investments in -- in tax
> structures that you talked to me periodically about, we -- we
> may have an interest in those, and specifically those that
> potentially can result in a favorable tax benefit. And he
> said, you know, a loss generator.

(Prifti, 25:16).

## S. The Design and Development of the FDIS Strategy

### 1. DGI's "2001 Partnership Strategy Memorandum"

441. At some point in early 2001, DGI/Helios and Alpha devised a new variation of its

tax shelter product that it called the "Financial Derivatives Investment Strategy,"

or "FDIS."

442. In a memorandum dated March 23, 2001, entitled "2001 Partnership Option

Strategy," Orrin Tilevitz of DGI detailed the steps of a strategy by which

partnership gains and losses from paired options were allocated among partners

according to their respective common interests in the partnership. (Ex. 801).

According to the memorandum, the "loss" would be largely allocated to the

taxpayer/investor and the "gain" to a "foreign person not subject to U.S. taxing

jurisdiction." (*Id.*).

443. James Haber of DGI sent the Partnership Option Strategy memorandum to R.J.

Ruble at Brown & Wood on March 23, 2001. In his cover e-mail, Haber said:

> We have revised our contemplated Partnership Strategy with what
> we hope will be a better result. Please review the outline and see if
> there are any faults in our reasoning or thinking. We expect to be
> launching the idea within the next 3-4 days, so I humbly ask for
> your immediate attention.

(Ex. 797).

444.    DGI also sent the Partnership Option Strategy memorandum to Ira Akselrad at
        Proskauer. (Ex. 798). Akselrad responded that he "like[d] the change" because
        "we can position it as a hedge[,] i.e. investor likes investment but wants to lessen
        exposure." (*Id.*).

## 2.    Further Development of the "Financial Derivatives Investment Strategy"

445.    On April 4, 2001, Tan circulated for "review and comment" draft marketing
        materials for the new strategy under the name "Financial Derivatives Investment
        Strategy." (Ex. 809). The materials were in the form of a PowerPoint
        presentation. (*Id.*). The materials were sent to, among others, R.J. Ruble at
        Brown & Wood, Ira Akselrad at Proskauer, and lawyers at Lord Bissell & Brook
        and Bryan Cave. (*Id.*).

446.    Ruble and Akselrad participated in a conference call with Haber, Tilevitz, and
        others on April 4 to discuss the new strategy. (Exs. 807, 812).

447.    DGI/Helios also involved four accounting firms to assist in the development and
        marketing of the FDIS strategy and to prepare and file tax returns. The four firms
        were KPMG, BDO Seidman, Grant Thornton, and RSM McGladrey. (Exs. 810,
        811, 924, 2087).

448.    On April 4, 2001, Tan circulated the draft marketing materials to BDO Seidman
        and, on April 5, to RSM McGladrey. (Exs. 810, 811). Ron Wainright at RSM
        McGladrey received a copy of the materials. (Ex. 811).

449.    The draft marketing materials described the strategy (at least as it was to be

pitched to taxpayer-investors) and gave the background of the key personnel at

DGI and Alpha. (Ex. 813). The draft marketing materials—like the earlier Helios

materials—also stated the following:

> . . . we view our ability to firmly manage and control the process of
> getting two to four sets of attorneys and accountants to
> expeditiously reach the desired conclusions as being one of our
> most valuable contributions to our clients.

(*Id.*).

450. On April 5, 2001, Ruble circulated his proposed modifications to the FDIS

marketing materials to Tan, Haber, Tilevitz, Akselrad, and others. (Ex. 814). In

the cover e-mail, Ruble wrote:

> Basically, I have eliminated the term 'Foreign Investor' and
> replaced it with the term 'Investor(s).' To the party
> receiving it, the status of the other investor (or whether
> there are more than one) is irrelevant as an investment
> matter. The status and role can always be explained one-
> on-one.

(*Id.*).

451. On April 5, 2001, Wainwright sent an internal e-mail at RSM McGladrey

concerning the "client presentation" materials for the new FDIS strategy. (Ex.

820). The e-mail noted that the materials

> . . . should "not" be distributed outside our [group] and
> if/when a presentation is made to a client the below
> information is collected by [DGI] and will not be left with
> the client for confidentiality purposes.

(*Id.*).

452. On June 27, 2001, DGI sent Grant Thornton a copy of the marketing materials for

FDIS. (Ex. 924). In the cover memorandum, Haber wrote: "This is to confirm that the enclosed materials will not be distributed to anybody." (*Id.*).

## 3. The Foreign Partners – Mahoney and Hawkes

453. As described above, the FDIS strategy required that the majority of any "gain" from the transaction be allocated to a foreign partner who was not subject to United States tax jurisdiction.

454. James Haber enlisted two Irish citizens, Samuel Mahoney and Martin Hawkes, to play the role of the foreign partners. (Mahoney Dep. at 3-4; Hawkes Dep. at 55). Haber described the FDIS strategy to them, and provided a copy of the PowerPoint presentation, in May 2001. (Mahoney Dep. at 3-4; Hawkes Dep. at 55).

455. Ultimately, and as described in greater detail below, Mahoney or Hawkes served "in the role of foreign partner" in 47 FDIS transactions in 2001, and 55 overall. (Mahoney Dep. at 6-7; Hawkes Dep. at 57-58; Ex. 2060). They served the role of partner on an alternating basis as the deals came in. (Mahoney Dep. at 8; Hawkes Dep. at 59).

456. The role of Mahoney and Hawkes in the FDIS transactions was to follow the steps described in an outline prepared by DGI/Helios. (Mahoney Dep. at 9; Hawkes Dep. at 60). Neither contributed any funds, performed any substantial work, or made any investment decisions. (Mahoney Dep. at 9, 13-22; Hawkes Dep. at 60, 63-72). To the extent funds were required, they were provided by DGI or another entity. (Mahoney Dep. at 20-22; Hawkes Dep. at 70-72). Mahoney and Hawkes

were paid an aggregate fee by DGI for the services in 2001 of $2 million, which

was not differentiated by transaction. (Mahoney Dep. at 16; Hawkes Dep. at 66;

Ex. 1657).

457. The payments to Mahoney and Hawkes were treated as expenses paid by

DGI/Helios and Alpha from gross revenues. (*Id.*).

458. Both Mahoney and Hawkes understood that the purpose of the FDIS transactions

was to "generate tax losses" for U.S. taxpayers. (Mahoney Dep. at 11-12; Hawkes

Dep. at 662).

**4.    The Model Opinion for FDIS Strategy**

459. The FDIS strategy, like its predecessors, included, among other things, the

preparation of individual legal opinion letters for each taxpayer and each

"investment." One of the principal purposes of the legal opinion was to serve as a

form of insurance against the imposition of tax penalties, and therefore induce the

taxpayer/investor to purchase the tax shelter. As Orrin Tilevitz of DGI/Helios put

it in a memorandum to Bryan Cave in February 2002 concerning a different

taxpayer: "The opinion has two goals: to insulate the investor from penalties and

[the law firm] from malpractice." (Ex. 1602).

460. DGI/Helios, the law firms, and the accounting firms together created model, or

template, opinion letters.

461. By April 25, 2001, DGI and Brown & Wood had created a draft model opinion for

the FDIS transaction on Brown & Wood letterhead. (Ex. 864).

462. Ruble, Tilevitz, Haber, and John Barrie of Bryan Cave, among others, made

comments and suggestions on the model opinion over the next few months. (*Id.*;
Exs. 835, 981).

463. Ruble "signed off" on a "generic form" of the FDIS opinion in the summer of
2001. (Ex. 1600).

464. The legal fees of the four law firms for the opinion letters were generally paid by
DGI/Helios and Alpha as an expense. (Ex. 1657).

465. The law firm of Brown, Raysman, Millstein, Felder & Steiner also prepared
"form documents" for the implementation of the FDIS strategy, including an
Investor LLC Operating Agreement, a Fund LLC Operating Agreement, a
Contribution Agreement, and Notices. (Ex. 1282). Those fees were also paid by
DGI/Helios and Alpha as an expense. (Ex. 1657).

## 5. The 2001 FDIS Transactions

466. Ultimately, the FDIS strategy was successfully pitched to dozens of taxpayers.
The exact total is unclear from the record, in part due to differences in the
counting of "customers" or "clients" and "transactions."

467. A DGI/Helios/Alpha fee analysis document from March 2002 listed 61 "2001
customers." (Ex. 1657). The same document indicates that the size of the
transactions of those customers totaled more than $1.5 billion. (*Id.*). The fees
paid to the promoters were listed as more than $32 million. (*Id.*).

468. An internal DGI document from December 2002 listed approximately 44 clients
(including Richard Egan) for what appear to be FDIS transactions. (Ex. 2087).

469. On February 28, 2002, Grant Thornton sent an invoice to DGI for the preparation

of 45 partnership tax returns for 2001 FDIS transactions for a fee of $90,000, or

$2,000 per return. (Ex. 1618). The 45 returns that Grant Thornton prepared

included 25 returns reporting an ordinary loss and 25 returns reporting a short-

term capital loss (some reported both). (Exs. 3826, 3826A).

470.    In January 2002, DGI sent memoranda to attorneys at different firms that stated

the following:

> Below is a list of tax opinions we propose to be prepared by your
> firm and proposed [or agreed to] compensation for such
> preparation.

(Ex. 1519). The memorandum to Ira Akselrad at Proskauer listed 28 opinions for

19 "clients," including Richard and Maureen Egan, and various "opinion types,"

such as "standard partnership" or "stock dribble." (*Id.*). A similar memorandum

sent to R.J. Ruble at Sidley Austin lists 30 opinions for 22 clients, again including

Richard and Maureen Egan; some of the opinions were "old style," and therefore

presumably not FDIS transactions. (*Id.*). A similar memorandum was sent to

John Barrie at Bryan Cave, listing 24 opinions for 12 clients. (*Id.*). The record

does not include any similar memorandum for Lord Bissell.

## T.   **KPMG and Helios Pitch the FDIS Strategy to the Egans**

471.    At some point in the summer of 2001, KPMG and DGI/Helios decided to pitch

the FDIS strategy to the Egans as a strategy for sheltering the ordinary income

they received from the exercise of options.

472.    On August 15, 2001, Brian Rivotto of KPMG sent an e-mail to Speiss seeking to

set up a meeting with the Egans, noting that "[t]hey are still interested in a loss

generator" because they had "ordinary income" from "the exercise of options in January." (Ex. 969).

1.    **The September 2001 KPMG PowerPoint Presentations**

473.    By September 7, 2001, KPMG had prepared presentation materials concerning "Egan Family Entities Tax Advantaged Investment Structures." (Ex. 154). The materials included proposed "income tax elimination solutions." (*Id.*).

474.    On September 13, 2001, Shea, Reiss, Denby, and various representatives of KPMG participated in a conference call concerning the new strategy. (Exs. 1014, 156; Shea, 16:113). Shea's notes indicate that the participants discussed the fact that the Egans had "$150 million of income due to option exercise in January." (Ex. 1014).

475.    On September 17, 2001, Rivotto of KPMG sent Reiss a proposed PowerPoint presentation for an "Egan Family Entities Tax Advantaged Investment Structure." (Ex. 1017). The presentation described a multi-step transaction involving the use of paired options to step up the basis of the Egans' ownership interest in a multi-member LLC. (*Id.*). The transaction used a "straddle" to allocate the gains on the transaction to a tax-indifferent (foreign) co-investor and the losses to the Egans. (*Id.*). The presentation also contained diagrams of the various steps of, and parties to, the proposed transaction. (*Id.*).

476.    As with the earlier marketing presentations, the September 17 PowerPoint presentation indicated that the Egans could obtain a "more likely than not" tax opinion from one of four law firms: Sidley Austin (the successor by merger to

Brown & Wood), Proskauer, Bryan Cave, or Lord Bissell. (*Id.*).

477.   The September 17 PowerPoint presentation stated that the "expected income tax consequence[]" to the Egans on the transaction was an ordinary loss of $150 million, which, in turn, could be used to offset ordinary income of that same amount, resulting in a taxable net gain of zero. (*Id.*).

478.   The September 17 PowerPoint presentation showed that the "Expected Permanent Tax Benefits" of the proposed transaction were $62,500,000. (*Id.*). This "Permanent Tax Benefits" amount was later corrected, after Pat Shea pointed out an error, to be $65,250,000. (Ex. 1034, 2596; Shea, 16:114).

## 2.   Further Discussions and the "Outline of Proposed Transaction"

479.   On September 20, 2001, Speiss forwarded a revised version of the KPMG PowerPoint presentation dated September 21, and related materials, to Pat Shea and James Haber. (Ex. 1034). The September 21 presentation showed essentially the same information and diagrams as the earlier presentation.

480.   Shea kept Michael Egan up to date on the discussions with KPMG and Helios concerning the ordinary income strategy. (M. Egan, 9:90-91, 98-99).

481.   The September 21 PowerPoint presentation included an "Outline of Proposed Transaction" dated September 20 that listed various steps to implement the proposed tax strategy. (Ex. 1034).

482.   Shea took handwritten notes on the September 20 "Outline of Proposed Transaction," based on his conversations with KPMG about the presentation. (Shea, 23:113-14; Ex. 1024).

127

483.    On September 21, 2001, Thomas Levato, an associate at the Brown Raysman law
        firm, e-mailed copies of FDIS "form documents" to Haber. (Ex. 1282). Haber
        forwarded the "form documents" by e-mail to Denby, Reiss, Fiddy, and Shea.
        Denby later edited the forms for their use with the Fidelity International
        transaction. (*Id.*; Denby, 28:48-49).

484.    On September 25, 2001, Speiss, Haber, Denby, and various Carruth employees
        held a conference call to discuss the "outline of proposed transaction" and the
        various steps required to consummate the transaction. (Ex. 1046).

485.    On September 27, 2001, Carruth generated a further updated version of the
        Outline of Proposed Transaction. (Ex. 1056).

486.    On October 5, 2001, Speiss, representatives of Helios, Michael Egan, Shea, and
        others participated in a conference call to discuss the FDIS strategy. (Ex. 161).

## 3.    The Decision to Adopt the FDIS Strategy

487.    At some point prior to October 8, 2001, Michael Egan decided to execute the
        FDIS strategy proposed by Helios and KPMG.

488.    On October 8, 2001, Carruth wired the funds to Refco for the options premium.
        (Ex. 1103).

489.    Also on October 8, 2001, Shea e-mailed Haber:

        > When will we get the opinion letters and do I have to contact
        > anyone or will you take care of that ??

        (Ex. 1092). Haber responded:

        > We work with the law firm. Opinions will be delivered in January.
        > Have you decided on a law firm. Choices are: Proskauer Rose

128

>       LLP, Sidley Austin Brown & Wood LLP, Bryan Cave or Lord
>       Bissell & Brook.

(*Id.*). Shea consulted with Stephanie Denby, who recommended Sidley Austin as

the most "highly regarded," and added that "they have done the best opinion

letters I have seen." (Ex. 1103).

490.    On October 9, 2001, Shea called Ron Buesinger at Alpha. (Ex. 1109). Shea

        advised him that he had met with Michael Egan and that they were "ready to

        move forward" with the Fidelity International transaction. (*Id.*).

## U.    Implementation of the Fidelity International Transaction

491.    The Fidelity International transaction consisted of a sequence of steps that were

        consistent with the Outline of Proposed Transaction dated September 20, 2001, as

        well as later updated Outlines of Transaction dated October 17, 2001, and October

        25, 2001.

### 1.    Step One: Creation of Entities

492.    As described above, Fidelity World and Fidelity International had been formed as

        LLCs on July 19, 2000, before the issuance of Notice 2000-44. Fidelity World

        was a single-member LLC whose only member was Richard Egan. (Ex. 2).

        Fidelity International was a multi-member LLC. (*Id.*).

### 2.    Step Two: Fidelity World Enters Into Interest Rate Options

493.    Following the formation of the two LLCs, the second step of the transaction was

        for Fidelity World to enter into paired interest-rate options. (Ex. 1107).

494.    On October 9, 2001, Fidelity World purchased and sold two pairs of interest-rate

129

options with Refco as the counterparty. (*Id.*; Kolbe, 36:25; Dem. Ex. 2839; Ex. 2). Fidelity World purchased the options for a total of $150 million and sold offsetting options for a price of $147.75 million, for an actual net cost to the Egans of $2.25 million. (Exs. 2, 1110).

495. One of these pairs was a pair of call options on the three-month LIBOR rate and the other was a pair of put options on the ten-year constant-maturity swap ("CMS") yield. (Exs. 2, 1117-1120). The options were "digital" and "European" in nature. As described above, that meant that the amount of the payout was fixed in advance as a lump sum and the options could be excised only on their expiration date, and not before. Each of the four options comprising the pairs had a term of 44 days. The two options, within each pair, almost entirely offset one another, because one was a long option (that is, purchased) and the other was a short option (that is, sold), with nearly but not precisely identical features. (Exs. 2, 1117-1120). The terms of the interest rate options can be summarized as follows:

**LIBOR Option Pair**

| Option | Maturity Date | Underlying | Strike Price | Initial Premium | Possible Payout |
|---|---|---|---|---|---|
| Purchased Call | 10/9/2002 | 3-month LIBOR | 3.8740 | ($75,000,000) | $307,003,559 |
| Sold Call | 10/9/2002 | 3-month LIBOR | 3.8770 | $73,875,000 | ($303,633,750) |
| | | | | Net Initial Premium: ($1,125,000) | Net Possible Payout: $3,369,809 |

(Ex. 2).

**CMS Option Pair**

| Option | Maturity Date | Underlying | Strike Price | Initial Premium | Possible Payout |
|---|---|---|---|---|---|
| Purchased Put | 10/9/2002 | 10-year CMS Swap | 4.7620 | ($75,000,000) | $307,736,486 |
| Sold Put | 10/9/2002 | 10-year CMS Swap | 4.7620 | $73,875,000 | ($303,668,823) |
| | | | | Net Initial Premium: ($1,125,000) | Net Possible Payout: $3,367,663 |

(*Id.*).

496.    As noted, the net premium for each pair of the interest rate options was $1.125
million, or $2.25 million in total, and was paid by Fidelity World to Refco.
Fidelity World was thus a net buyer in the transactions, because the premium for
the option it bought in each pair exceeded the premium for the option it sold.
Although the potential "Payout Amount" stated for each individual option was
more than $300 million, the actual net payout available to the taxpayer if the
options were in the money at expiration was only $3.36 million on either pair,
before accounting for fees and costs. Similarly, the stated premium for each of the
four individual options was many times greater than the net premium actually
paid; the two long options had a stated premium of $75 million each ($150
million in total) and the two short options had a premium of $74.875 million each,
with the result that the net premium actually paid for each pair was only $1.25
million. (Exs. 2, 1117-1120).

497.    The likelihood of both the LIBOR option pair and the CMS option pair being in

131

the money at the same time was effectively equivalent to zero. As a result,

although there was a theoretical possibility of one pair generating a positive

payout before fees and costs, this could not happen for both pairs. (Rausser,

40:47-56; Dem. Exs. 3746-3749).

498.    On October 16, 2001, Haber sent Michael Egan, Denby, and Speiss a revised

Outline of Proposed Transaction that was updated to show details of steps in the

transaction that had already been completed, and enclosing examples of euro and

yen range trades. (Ex. 1140).

## 3.    Step Three: Capitalization of Fidelity International

499.    The next step, and the first of several steps occurring on October 22, 2001, was

the capitalization of Fidelity International. (Kolbe, 36:28-29; Dem. Ex. 2840; Ex.

1181).

### a.    The Contribution of Fidelity World

500.    On October 22, 2001, Richard Egan contributed 100% of his ownership interest in

Fidelity World to Fidelity International. The contribution of Fidelity World was

valued at $1,559,439, based upon the market value of the options, which were its

only asset. (Kolbe, 36:29-30; Dem. Ex. 2841; Ex. 2).

### b.    The Purported Increase in Basis

501.    In any given tax year, individual taxpayers are only permitted to offset capital

losses against ordinary income to the extent of $3,000. (LaRue, 43:90-91). It was

thus necessary for the parties to find a way to create purported ordinary losses that

could be offset against ordinary income.

502.	In addition, under Section 704(d), a partner is permitted to deduct his distributive share of the partnership's losses only to the extent of his tax basis in his partnership interest as of the end of the partnership's tax year (before consideration of those losses). It was thus necessary for the promoters to inflate Richard Egan's tax basis as well as create an artificial loss.

503.	The parties intended that the transfer from Fidelity World to Fidelity International create the claimed step-up in basis. Thus, notes written by Shea on an "Outline of Proposed Transaction" indicate that the contribution by Richard Egan of his member interest in the single-member LLC "creates [the] outside basis [of] $150 million." (Ex. 1024). Notes taken by Calkins during the September 25 conference call state the same. (Ex. 1046).

504.	As described below, the Egans subsequently took the position that only the $150 million of stated premiums debited for the long interest-rate options should be taken into account in calculating their basis in Fidelity International, and that the $147,875,000 of premium credited for the two short interest-rate options should be disregarded.

505.	As a result, Richard Egan claimed a basis in Fidelity International of more than $150 million, even though the net premium paid by him for the contributed interest-rate options was only $2.25 million.

	c.	**Other Capital Contributions**

506.	Also on October 22, 2001, Richard Egan and the other LLC members made or were credited with contributions to capitalize Fidelity International. Specifically,

133

Richard Egan made a cash contribution of $2,674,500; Samuel Mahoney was credited with making a contribution of $651,000; and Alpha and Helios were credited with making a contribution of $7,000. (Ex. 2).

507. These capital contributions were allocated between common and preferred interests in Fidelity International as follows: Richard Egan was assigned a common interest in Fidelity International of 5%; Mahoney was assigned a common interest of 93%; and Alpha and Helios were each assigned a common interest of 1%. (*Id.*; Ex. 6). In addition, Richard Egan was assigned 100% of the preferred interests. (Ex. 2).

508. As a result of these contributions, Richard Egan had an 86% capital share in Fidelity International, but only a 5% share in the common interests. (*Id.*). Conversely, Mahoney, the foreign member, had a 13.29% capital share, but had a 93% share in the common interests. (*Id.*). As a consequence, on October 22, 2001, Richard Egan would have been entitled to receive only 5% of any profits that might be generated from the options and cash he had just transferred to Fidelity International. (Carron, 11:36).

509. Richard Egan thus contributed $1,559,439 in options and $2,674,500 in cash to Fidelity International, for a total initial contribution of $4,233,939.

510. The contributions and resulting membership shares of each partner in Fidelity International as of October 22, 2001, appear in the table below.

**Fidelity International: Capital Contributions and Shares as of October 22, 2001**

| LLC Member | Capital Contributions | | Aggregate Capital Account | Proportionate Capital Share | Proportionate Profit and Loss/Common Share |
|---|---|---|---|---|---|
| | Common | Preferred | | | |
| Richard Egan | $35,000 | $2,639,500 (cash) $1,559,439 (value of Fidelity World) | $4,233,939 | 86.43% | 5% |
| Samuel Mahoney | $651,000 | 0 | $651,000 | 13.29% | 93% |
| Alpha Consultants LLC | $7,000 | 0 | $7,000 | 0.14% | 1% |
| Helios Trading LLC | $7,000 | 0 | $7,000 | 0.14% | 1% |

(Ex. 2).

### 4.    Step Four: Fidelity International Enters Into Foreign Currency Options

511.    In the next step of the transaction, which also occurred on October 22, 2001,

Fidelity International entered into eight currency option trades with Refco as its

counterparty. The eight options consisted of two quartets, with each quartet

consisting of two pairs. (Kolbe, 36:32; Dem. Ex. 2842; Ex. 2).

#### a.    The Terms of the Foreign Currency Options

512.    One of these quartets was a set of options on the U.S. dollar to euro (USD/EUR)

exchange rate, consisting of a purchased call and a sold call as one pair and a

purchased put and a sold put as a second pair. (Kolbe, 36:32; Dem. Ex. 2842; Ex.

2). The second quartet was a set of options on the exchange rate of the Japanese

yen to the U.S. dollar (JPY/USD), consisting of a purchased call and a sold call as

one pair and a purchased put and a sold put as a second pair. (Kolbe, 36:32; Dem.

135

Ex. 2842; Ex. 2).

513. The terms of the foreign currency options can be summarized as follows:

**USD/EUR Option Quartet**

| Option | Maturity Date | Underlying | Strike Price | Initial Premium | Possible Payout |
|---|---|---|---|---|---|
| Sold Call | 4/19/2002 | USD/EUR | 0.8656 | $200,000,000 | ($333,260,084) |
| Purchased Call | 4/19/2002 | USD/EUR | 0.8653 | ($197,706,830) | $328,877,361 |
| Sold Put | 4/19/2002 | USD/EUR | 0.8115 | $200,000,000 | ($1,416,123,720) |
| Purchased Put | 4/19/2002 | USD/EUR | 0.8118 | ($199,460,342) | $1,411,740,997 |
| | | | | Net Initial Premium: ($2,832,828) | Net Possible Payout: ($4,382,723) |

(Ex. 2).

**JPY/USD Option Quartet**

| Option | Maturity Date | Underlying | Strike Price | Initial Premium | Possible Payout |
|---|---|---|---|---|---|
| Sold Put | 4/19/2002 | JPY/USD | 123.63 | $200,000,000 | ($333,260,084) |
| Purchased Put | 4/19/2002 | JPY/USD | 123.66 | ($197,711,391) | $328,877,361 |
| Sold Call | 4/19/2002 | JPY/USD | 130.89 | $200,000,000 | ($1,416,123,720) |
| Purchased Call | 4/19/2002 | JPY/USD | 130.86 | ($199,453,397) | $1,411,740,997 |
| | | | | Net Initial Premium: $2,835,212 | Net Possible Payout: ($4,385,135) |

(*Id.*).

514. Fidelity International's net premium for these currency trades was positive,

meaning that the premium on the options it sold was larger than the premium on

the options it purchased. Fidelity International was credited with a net premium

from Refco of $2,832,828 on the USD/EUR options and $2,835,212 on the

136

JPY/USD options. (*Id.*). However, Refco required Fidelity International to leave these funds on deposit and to post an additional $3 million of cash collateral in case it lost money on the options. (*Id.*; Rausser, 40:39-40).

b. **The Structure of the Foreign Currency Option Pairs**

515. The foreign currency quartets consisted of carefully balanced pairs in which a sold option was matched with a purchased option on almost identical terms. (Kolbe, 36:98-106; Dem. Exs. 2866-2870).

516. It was not possible for both pairs in the USD/EUR quartet to pay off at expiration. The call pair would pay off if the USD/EUR rate was at or above 0.8656; the put pair would pay off if the USD/EUR rate was at or below 0.8115. (Kolbe, 36:33-34; Ex. 2). Because they shared the same expiration date, both pairs could never simultaneously be in the money. (Kolbe, 36:33-34). Likewise, it was not possible for both pairs in the JPY/USD quartet to pay off at expiration. The call pair would pay off if the JPY/USD rate was at or above 130.89; the put pair would pay off if the JPY/USD rate was at or below 123.63. (*Id.* at 36:33-34; Ex. 2). Because they shared the same expiration date, both pairs could never simultaneously be in the money. (Kolbe, 36:33-34).

517. The foreign currency option pairs had very narrowly separated strike prices. (*Id.* at 36:57-58, 99). All of the currency-option pairs had a common expiration date six months away. (*Id.* at 36:99). Like the interest-rate options, all of the foreign-currency options were digital and all had large stated, or "notional," payout amounts. (*Id.*). Despite the large notional payouts, the options had little net gain

137

or loss potential, because the long and short positions offset each other. (*Id.*).

518. The net value of the combined quartet could not materially change over time. As the market price moved closer to or beyond the strike price specified in one of the purchased options, it would gain value. However, that gain would be counterbalanced by a simultaneous loss in value on the paired option with its closely matching terms. A movement in the underlying currency would affect them almost equally but in opposite directions. (Kolbe, 36:98-106; Dem. Exs. 2866-2870).

519. As a result, at any point in time, one side of the pair would be producing a gain while the other side would be producing an offsetting loss. (Kolbe, 36:98-106; Dem. Exs. 2866-2870).

520. In the euro quartet, the purchased call and sold put were both bets that the euro would strengthen relative to the dollar. They were counterbalanced by a sold call and a purchased put that were bets in the opposite direction (that is, that the euro would weaken relative to the dollar). No matter which direction the exchange rate moved, one side of each pair would gain value, while the other would lose value. In the pair of options made up of calls, if the euro increased in value, the purchased call would gain in value, while the sold call would lose a roughly equivalent amount of value. If, on the other hand, the euro decreased in value, these positions would be reversed. The same observation applies to the quartet of JPY/USD options. (Kolbe, 36:100-01; Dem. Ex. 2867).

521. Thus, on a net basis, the foreign currency gains and losses virtually offset each

138

other. (Kolbe, 36:106-14; Dem. Exs. 2871-2874). However, as described below, the Fidelity International transaction was structured to separate these gains and losses, allocating the "gains" principally to Mahoney, a tax-indifferent foreign partner, and the "losses" principally to Richard Egan, the U.S. taxpayer.

### c.     The Possibility of a One-Option Payout

522.     As with the Fidelity High Tech transaction, the Fidelity International transaction involved a theoretical possibility of a huge payout to the Egans if (as to any pair of offsetting options) one option was in the money and the other was not. For example, the theoretical possible payout on one of the USD/EUR option pairs exceeded $1.4 billion. (Ex. 2).

523.     Again, there was no realistic possibility that such an immense payoff would occur.

524.     Again, for any one-option payout to be even possible, the reference price would have to hit a precise target within a narrow window.

525.     Again, Refco effectively had the power to ensure that the final reference price would not permit the long option to be in the money if the short option were not.

526.     Under the Refco agreements, the reference price was defined in a way to permit Refco to select a price in a defined window, usually from three different options.

527.     For the LIBOR option pairs, the reference price was defined to be

> the price of the 3 Month Libor Closing Range defined by the prices between 2:45 and 3:00 P.M., New York City time on the Termination Date, . . . as published by Bloomberg and determined by [Refco] in good faith and in a commercially reasonable manner.

(Ex. 2).

139

528.   For the CMS option pairs, the reference price was defined to be

>   the average of the midpoints of the bid and offer closing prices of
>   the USD 10 Year Swap Yield as quoted by three (3) Money Center
>   Banks between 3:00 and 3:15 P.M., New York City time on the
>   Expiration Date, . . . and determined by [Refco] in good faith and
>   in a commercially reasonable manner.

   (*Id.*).

529.   For the USD/EUR and JPY/USD option pairs, the reference price was defined

   to be

>   the average of the midpoints of the bid and offer closing prices of
>   the USD/EUR [or JPY/USD] Spot Rate as quoted by three (3)
>   Money Center Banks between 10:00 A.M. and 10:15 A.M., New
>   York City time on the Expiration Date, . . . and determined by
>   [Refco] in good faith and in a commercially reasonable manner.

   (*Id.*).

530.   As a practical matter, that meant that the possibility of a one-option payout was

   non-existent. Again, Refco generally had the power to select from multiple prices

   within a particular window of time.

531.   Again, the parties could have used a precise, unambiguous number, but chose not

   to.

### d.   Targeting of Gains

532.   Alpha monitored the value of the individual foreign currency options on at least a

   daily basis. (Kolbe, 36:112; Ex. 2). The selection of foreign currencies as the

   underlying asset made these options especially amenable to generating huge gains

   and losses for bookkeeping purposes, but without any net economic

   consequences. The high volatility and large underlying notional size of the

currencies meant that price movement was inevitable and that even small

movements would be sufficient to produce large changes in the liquidation value

of an individual option. (Kolbe, 36:108-115; Dem. Exs. 2873-2875).

533. On October 25, 2001, Ron Buesinger of Alpha e-mailed Haber that "as of this

morning we had roughly $100MM in gains that could be triggered," and that the

taxpayer's advisors were targeting a gain of $174.716 million for this step of the

Fidelity International transaction. (Kolbe, 36:116-18; Ex. 1207).

534. Also on October 25, Haber prepared another updated Outline of Proposed

Transaction. (Ex. 1202). He circulated the updated outline to Shea, Fiddy,

Michael Egan, Speiss, and Denby. (Ex. 1203). At that point, several of the steps

of the transaction had already occurred; they were reported as completed in that

version of the outline. (Ex. 1202).

## 5. Step Five: Termination of Gain Legs and Entering Into Replacement Legs

535. The fifth step occurred on October 29, 2001. That day, Fidelity International

agreed with Refco to terminate the two USD/EUR options that had experienced

increases in value, one from each pair in the USD/EUR quartet. These were

referred to as the "gain" legs. (Exs. 2, 1236). The premium that was credited to

Fidelity International for these two terminated options was simultaneously used to

purchase replacement options with nearly identical terms. (Exs. 2, 1236). The net

cost of these replacement options was $14,419, meaning that the price of the

options was immaterially different from the premium credited for the terminated

options that they replaced. (Exs. 2, 1236).

141

536.    One day later, on October 30, 2001, Fidelity International entered into the same

        arrangement with regard to the JPY/USD quartet, agreeing with Refco to

        terminate the two JPY/USD options that had gained value, again one from each

        pair in the quartet. (Exs. 2, 1241). The proceeds that were credited upon on the

        termination of these two options (the "gain" legs) were simultaneously used to

        purchase replacement options with nearly identical terms. (Exs. 2, 1241). The net

        cost to Fidelity International for the JPY/USD replacement options was $14,050,

        representing the difference between the premium credited for the termination of

        the old options and the premium debited for the execution of the new,

        replacement options. (Exs. 2, 1241).

537.    The acquisition of the replacement options maintained the carefully balanced risk

        position of the initial quartet and assured that there was no material exposure to

        any economic gain or loss. However, the premium debited on paper for the

        replacement options meant that there was a loss built into the reconstituted quartet

        that approximated the amount of the gain recorded on the termination of the

        "gain" legs. (Kolbe, 36:108-115; Dem. Exs. 2873-2875).   According to the

        strategy, that loss could be realized by Fidelity International at the point the option

        quartets were terminated or expired. (Kolbe, 37:20-22; Dem. Ex. 2880).

538.    Fidelity International received no funds on the termination of the "gain" legs.

        (Ex. 2). Instead, Refco credited Fidelity International with net proceeds of

        $115,641,750 for the termination of the two USD/EUR "gain" legs, all of which

        was applied to acquire the two replacement USD/EUR options. (*Id.*). Similarly,

        for the terminations of the two JPY/USD "gain" legs, Refco credited Fidelity

International with net proceeds in the amount of $55,379,555, all of which was

applied simultaneously to acquire the replacement JPY/USD options. (*Id.*).

539. To calculate the allocable gains from termination of the gain legs of the currency

options, Fidelity International recorded the net proceeds credited to it from each of

the terminated options. (*Id.*). That calculation is shown in the following charts:

| **USD/EUR options terminated October 29, 2001** | **A**<br>**Initial Premium Credited/(Debited) to Fidelity International** | **B**<br>**Termination Proceeds Credited/(Debited) to Fidelity International** | **C=A+B**<br>**Taxable Gain Recorded by Fidelity International** |
|---|---|---|---|
| USD/EUR Call | ($197,706,830) | $227,881,115 | $30,174,285 |
| USD/EUR Put | $200,000,000 | ($112,239,365) | $87,760,635 |
| | | **$115,641,750**<br>=amount of net proceeds Refco credited to Fidelity International, immediately used to purchase replacement option | **$117,934,920**<br>=amount of taxable gain Fidelity International recorded and allocated among its members |

(*Id.*).

| **JPY/USD options terminated October 30, 2001** | **A**<br>**Initial Premium Credited/(Debited) to Fidelity International** | **B**<br>**Termination Proceeds Credited/(Debited) to Fidelity International** | **C=A+B**<br>**Taxable Gain Recorded by Fidelity International** |
|---|---|---|---|
| JPY/USD Put | ($197,711,391) | $210,321,601 | $12,610,210 |
| JPY/USD Call | $200,000,000 | ($154,942,046) | $45,057,954 |
| | | **$55,379,555**<br>=amount of net proceeds Refco credited to Fidelity International, immediately used to purchase replacement option | **$57,668,164**<br>=amount of taxable gain Fidelity International recorded and allocated among its members |

(*Id.*).

540. As a result of the gain leg terminations on October 29 and 30, 2001, Fidelity

International recorded a taxable gain of $117,934,920 on the USD/EUR options

and $57,668,164 on the JPY/USD options, for a total taxable gain of

$175,603,084. (*Id.*).

541. Fidelity International debited against this gain $1,617,246 of the advisory fees it

had incurred, and allocated the remaining $173,985,828 of taxable gain among its

members based on their respective common interests as of October 29 and 30,

2001. (Ex. 2651). Richard Egan was allocated 5% of this gain and Samuel

Mahoney was allocated 93% of this gain. (*Id.*).

542. The member accounts were then further adjusted to allocate the entirety of the

$1,617,246 in fees to the account of Richard Egan. (*Id.*).

543. The following chart shows the allocation of taxable gains among Fidelity

International's members according to their respective percentages of common

ownership prior to November 5, 2001:

| Member Name | Member % of Common Ownership Prior to November 5, 2001 | Allocated Portion of $175,603,084 Taxable Gain | Allocated Portion of ($1,617,246) in Advisory Fees | Net Gain Allocation for October 29-30, 2001 Terminations |
|---|---|---|---|---|
| Richard J. Egan | 5% | $8,780,154 | ($1,617,246) | $7,162,908 |
| Samuel Mahoney | 93% | $163,310,868 | 0 | $163,310,868 |
| Alpha | 1% | $1,756,031 | 0 | $1,756,031 |
| Helios | 1% | $1,756,031 | 0 | $1,756,031 |

(*Id.*; Ex. 2; Kolbe, 37:23-26; Dem. Ex. 2882).

## 6.   Step Six: Buyout of Foreign "Partner"

544. The next step occurred one week later, on November 5, 2001. On that date,

Richard Egan purchased an 88% common interest from Mahoney in Fidelity

International for $325,500. (Exs. 1269, 19, 2). A minimum price had been established in the Fidelity International Operating Agreement, which specified that one member could offer to buy all or part of the interest of another partner for a price not less than 50% of the amount originally contributed by that partner for the sold shares. (Ex. 2). Following this purchase, the common interest percentages of Richard Egan and Mahoney were reversed: Richard Egan now held 93%, and Mahoney 5%. (*Id.*).

545. Haber provided Shea with the buy-sell agreement for Richard Egan's purchase of Mahoney's common interest and arranged for Mahoney to sign that document. (Shea, 23:41; M. Egan, 12:30; Ex. 1253).

546. Shea forwarded the buy-sell agreement to Richard Egan for his execution on November 6, 2001, after authorization by Michael Egan, and after the document had already been signed by Mahoney. (Shea, 23:42; Ex. 1269).

547. The KPMG PowerPoint presentation stated that there was "no requirement or document that infers or states that [Richard Egan] will possess or acquire an option to obtain the co-investor's LLC interest." (Ex. 1034). In fact, that buyout was an integral and planned part of the transaction. Calkins took notes on a copy of the "Outline of Proposed Transaction" that indicate, "[Samuel Mahoney] being bought out for less from [Richard Egan] [because] he gets a portion of the fee collected." (Calkins, 35:54-55; Ex. 1028). On his copy of the September 21 PowerPoint presentation, Shea wrote that "[the co-investor] get[s] fee and 8% interest." (Ex. 1036). In other notes, Shea wrote, "when do we buy out Sam Mahoney[?]," next to which he later wrote, "after we trigger gain." (Ex. 845).

548. On November 1, 2001, Shea e-mailed Haber: "In the current [Fidelity International] transaction I know we need to buy out the Irish [Mahoney] soon . . . ." (Ex. 1245).

## 7. Step Seven: Close Out of Interest Rate Options

549. On November 6, 2001, the day following the buy-back from Mahoney, Fidelity International closed out the interest-rate options. (Ex. 2). This was done by entering into another set of options that were exactly opposite to the terms of the initial interest rate options, in every detail. (*Id.*). As a result of the entry into this second set of offsetting options, the interest rate options collectively had zero net value and no potential for future gain or loss. (M. Egan, 12:32; Shea, 23:50; Ex. 1275). No matter what happened thereafter to interest rates, there would be no effect on Fidelity International's economic position. In addition, the entry into the second set of interest rate options on November 6, 2001, locked in any gain or loss from the interest rate options. (M. Egan, 12:32).

550. On November 27, 2001, Haber advised Robin Calkins that the desired loss could "be triggered at any time." (Ex. 1371). Even though the interest-rate trades had no value and no economic consequence after November 6, 2001, they were kept in place for "tax purposes" until 2002. (*Id.*).

551. Indeed, according to contemporaneous notes taken by Reiss, they were held for at least a "few more weeks" in order to try to avoid the application of the "step transaction" doctrine. (Ex. 1384).

552. On October 18, 2001, Shea had met with Haber and Speiss to discuss the transaction. (Ex. 1151). Shea's notes indicate that Haber advised him that the

146

Egans could "sell out" their interest in the Fidelity International transaction at "any time -- [once] we have established our basis and . . . triggered our gains on the foreign currency trades -- however, for business purpose the longer we keep it alive the better we are for presentation -- we don't want to look as a step transaction in the IRS['s] eyes." (*Id.*).

553. The termination of the foreign currency options prior to the close of the tax year was a planned step in the transactions that had been determined in advance. For example, Shea wrote on the Outline of Proposed Transaction dated September 20, 2001, "Close the loss legs by 12-31-01." (Ex. 1024).

554. Haber also advised Shea that the Egans would "want to keep Helios and Mahoney in as partners until at least Jan[uary] 03 to show bona fide partners for at least 3 tax years," and that they "need[ed] to keep this International Currency Fund open for [approximately] 5 years." (Ex. 1419).

## 8. Step Eight: Termination of Remaining Foreign Currency Options

555. The final step of the transaction occurred on December 3, 2001. That day, by agreement with Refco, Fidelity International simultaneously terminated all of its remaining currency options (including the four replacement options entered into on October 29 and 30, 2001). (Ex. 2). To accomplish the termination, Fidelity International agreed to termination premium amounts that resulted in a recorded "loss" on the euro transactions of $118,290,922 and a recorded "loss" on the yen transactions of $57,861,427, for a total "loss" of $176,152,349. (*Id.*). Fidelity International recorded these amounts on its books for a combined "loss" on the currency trades of $178,124,493, which included $1,972,159 in advisory fees.

(Kolbe, 37:23-26; Dem. Ex. 2882; Ex. 2651). This was the amount of the "loss"

that had effectively been pre-determined when the "gain" legs were earlier

terminated and replaced. (Kolbe, 37:25-26). Again, Fidelity International

adjusted the loss allocations to assign all of the $1,972,159 in advisory fees to

Richard Egan. (Ex. 2651).

556. Fidelity International allocated this taxable loss among its members according to

their respective percentages of common ownership after November 5, 2001, as

reflected in the table below:

| Member Name | Member % of Common Ownership After November 5, 2001 | Allocated Portion of ($176,152,349) Taxable Loss | Allocated Portion of ($1,972,159) in Advisory Fees | Net Loss Allocation for December 3, 2001 Terminations |
|---|---|---|---|---|
| Richard J. Egan | 93% | ($163,821,685) | ($1,972,159) | ($165,793,844) |
| Samuel Mahoney | 5% | ($8,807,617) | 0 | ($8,807,617) |
| Alpha | 1% | ($1,761,523) | 0 | ($1,761,523) |
| Helios | 1% | ($1,761,523) | 0 | ($1,761,523 |

(Kolbe, 37:23-26; Dem. Ex. 2882; Exs. 2, 2651).

## 9. The Stockton and Mariner Investments

557. From the outset, the Egans anticipated making additional capital contributions to

Fidelity International as purported evidence of a non-tax business purpose. (Exs.

1029, 1055). Notes taken by Robin Calkins taken in September 2001 state:

"Need to have a business purpose [sic] that is why there is $ going in the tail end."

(Calkins, 35:59-61; Ex. 1033).

558. As of October 31, 2001, Carruth moved a pre-existing Egan investment,

ownership of 4,028 shares in Stockton Holdings, Ltd., a Cayman Islands

148

company, into Fidelity International. (Ex. 2; Kolbe, 36:39-40; Dem. Ex. 2845).

The daily valuations of Fidelity International's investments report the value of this

block of shares as a static $4,663,135 for the entire period shown (October 31,

2001 through January 14, 2002). (Ex. 2).

559.    In late November 2001, Carruth arranged for Richard Egan to contribute

$5,000,000 to Fidelity International, which it used to purchase an investment in

Mariner Horizon 6A, LLC, a 5-year commitment to a "fund of funds." (*Id.*; Kolbe,

36:42-43; Dem. Ex. 2848). The daily valuations provided in the Fidelity

International documents do not separately report the value of this holding; it

appears in the "cash" column. (Ex. 2).

560.    None of the tax losses claimed by Richard Egan in 2001 and 2002 are attributable

to the Stockton and Mariner investments, which appear to comprise the only other

business activity in which Fidelity International participated. (Exs. 6, 7, 8).

## 10. The Actual Economic Loss From the Termination of the Foreign Currency Options

561.    The actual economic loss from the termination of the foreign currency options can

be calculated using the taxable gain and loss numbers reported by Fidelity

International as follows:

|  | Reported Taxable Gain (Loss) | Allocated Advisory Fees | Total |
|---|---|---|---|
| Reported taxable gain resulting from the October 29-30, 2001 terminations | 175,603,084.00 | (1,617,246.00) | 173,985,867.00 |
| Reported taxable loss of resulting from the termination of all remaining currency options, including the replacement options, on December 3, 2001 | (176,152,349.00) | (1,972,159.00) | (178,124,505.00) |
| Total | (549,265.00) | (3,589,405.00) | (4,138,670.00) |

(Kolbe, 37:23-26; Dem. Ex. 2882; Ex. 2651).

562.    The result is a loss of $549,265, before accounting for millions of dollars in fees

paid to Helios and Alpha on the transaction. Of the $549,265 in actual economic

loss, $837,244 was attributable to the bid/ask fees paid by Fidelity International to

Refco on the currency options: $416,359 for the initial USD/EUR option quartet,

$416,588 for the initial JPY/USD option quartet, and $4,297 for the two

replacement options. (Kolbe, 37:28-29; Ex. 2; Dem. Ex. 2883).

## V.    Documentation of the Purported "Business Purpose" of the Fidelity International Transactions

563.    The Egans were aware that the ordinary income strategy had to have a legitimate business

purpose or the IRS would disallow their tax treatment of the transaction. As with the

Fidelity High Tech transaction, the Egans decided that they would claim that the Fidelity

International transaction was designed as a hedge, this time against interest rate

movements and currency fluctuations. In order to prepare for a possible IRS audit or

challenge, the Egans created, and contemplated creating, a false paper trail to "document"

the purported "purpose."

150

**1.    The October 5, 2001 Buesinger Memorandum**

564.    On October 5, 2001, Ron Buesinger of Alpha e-mailed Haber a memorandum

entitled "Egan Trades.doc." (Ex. 1088). That memorandum set forth potential

option trades that had been discussed with Michael Egan, Shea, Speiss, Haber,

and Buesinger, Ross, and Helene of Alpha in a conference call that same day.

*(Id).*

565.    The October 5 memorandum stated that Richard Egan "has large exposure to

commercial real estate financed with 10 year fixed rate non-call borrowing," and

indicates that this exposure was the reason to enter into option spreads based on

the 10-year CMS rate. *(Id.).*

566.    In fact, and as discussed below, Richard Egan did not have any interest-rate

exposure from commercial real estate; his only commercial real estate holding

was an office building at 87 Elm Street in Hopkinton, Massachusetts, and that

building was not encumbered by debt. (Shea, 23:61-62).

567.    The October 5 memorandum also stated that option spreads based on the 3-month

LIBOR were intended to "mitigate [the] risk of rising short term [interest] rates in

the interim" until Richard Egan "lock[e]d his floating borrowing to fixed." (Ex.

1088).

568.    The variable-rate debt in question was debt owed by Cape Clear LLC and

Westship World Yachts LLC, two Egan-owned entities. *(Id.).* Cape Clear had

$81.1 million, and Westship had $19.9 million, in short-term variable-rate debt;

Richard Egan had guaranteed both sets of obligations. (Exs. 1239, 1062).

569.    As discussed below, the options as structured provided virtually no such hedging

effect for that debt. Moreover, there is no evidence that any variable-rate debt owed or guaranteed by Richard Egan was ever converted to fixed-rate debt.

570. The October 5 memorandum also stated that the yen and euro options could hedge against the impact of a stronger dollar on EMC sales and profits overseas: "Bearish EUR and Yen trades will provide gains in a USD$ rally scenario that will offset losses in EMC stock due to declining revenue and profits in Europe and Japan." (Ex. 1088). As discussed below, the options as structured provided virtually no such hedging effect.

571. Finally, the October 5 memorandum reflected a discussion of entering into a bullish range of options based on the Swiss franc, contemplated "to offset losses in USD equities and USD commercial real estate in a flight to quality scenario" sparked by potential war in the Middle East. (*Id.*). Fidelity International did not, however, enter into any option ranges on the Swiss franc.

## 2. The Proposed David Henry Memorandum

572. Two weeks later, on October 19, 2001, Carolyn Fiddy sent an e-mail to David Henry of Carruth confirming an earlier discussion. (Ex. 1159). Fiddy had asked Henry to prepare a back-dated memorandum that would falsely purport to advise Michael Egan concerning the foreign currency trades. (*Id.*). The e-mail stated:

> The foreign currency trades are expected to happen on Monday, they were discussed today, I will forward the analysis we were sent.
>
> The memo we discussed should be using a date prior to the date of the trades, since the memo should be designed to help Mike decide what trades to do . . . .
>
> So, if you are going to download info from the web, you should

> select appropriate time periods.
>
> The trades to be entered into are 2 foreign currency exchange
> trades hedging the valuation of the $ - half against the yen and half
> against the Euro.  (If the $ strengthens, then their value will
> increase).

(*Id.* (emphasis in original)).

573.   Henry, however, never prepared such a back-dated memorandum.  Carruth
       employees nonetheless continued to discuss such a memorandum into November
       2001.  (Henry, 5:12-13; Ex. 1252).

### 3.   **"Business Purpose" Discussions in October-December 2001**

574.   On October 18, 2001, Shea spoke with Haber about the close-out of the Fidelity
       International transaction.  Haber told Shea that the Egans could "sell out any
       time -- we have established our basis . . . however, for business purposes, the
       longer we keep it alive the better we are for presentation – we don't want to look
       as a step transaction in the IRS['s] eyes."  (Ex. 1151).

575.   On October 22, 2001, **Pat** Shea sent a memorandum to Richard Egan requesting
       that he sign various documents for the Fidelity International transaction, which he
       described as a strategy "to serve as a hedge against the falling markets."  (Ex.
       1165).  The original draft of the memorandum, however, referred to the same
       transaction as "the plan we are working on to reduce your 2001 tax liability."  (Ex.
       1164).

576.   On November 5, 2001, Speiss sent an e-mail to Shea asking if he was available to
       meet "[with regard to] discussing investment documentation."  (Ex. 1282).

577.   On November 6, 2001, Shea sent an e-mail to Carolyn Fiddy and David Henry of

Carruth asking if they were available to meet with KPMG "to define our
investment posture—we are establishing a business purpose and reason for
entering [into] the option trades we put on earlier this month." (Ex. 1268). At the
time that e-mail was sent, all of the major option trades that form the basis of the
claimed losses in Fidelity International had been completed. (Ex. 2).

578.    On December 3, 2001, Shea sent an e-mail to Michael Egan proposing that he
meet with a possible advisor in New York. (Ex. 1394). Among other things,
Shea said that the meeting would "support our business purpose for Helios" by
showing that they considered multiple strategies. (*Id.*).

**4.    Proposed Discussions with Samuel Mahoney**

579.    On December 6, 2001, after all of the options involved in the Fidelity
International transaction had been terminated or covered, Shea sent an e-mail to
Haber that included the following statement:

> KPMG is also requesting that we have a [telephone conference]
> with Sam Mahoney or at least establish a reason that we entered in
> to this transaction with him -- what are your comments on that
> subject?

(Ex. 1415).

580.    On December 14, 2001, Pat Shea wrote a "memo to file" concerning various
matters to discuss with James Haber. (Ex. 1454). Among other things, the
memorandum listed as a discussion topic the fact that "we would like to establish
a business relationship with [Samuel Mahoney] -- would like a tel con with him --
at least a profile of him to establish common investment strategies or
philosophies." (*Id.*). After speaking with Haber, Shea wrote in handwriting on

154

the memorandum, "Haber will send us his profile and suggest that when one [sic] is in Ireland (Dublin) that we set a meeting." (*Id.*).

581.    There is no evidence that Mahoney was consulted or provided any advice or input into the investment decisions of Fidelity International, or that he even spoke with the Egans during the relevant period.   Richard Egan had no contact or communication with Mahoney during the entirety of the Fidelity International transaction, including the period during 2001-2002 when both resided in Dublin, Ireland.   (R. Egan, 3:95-96).   The two did not meet until Richard Egan visited Mahoney's office while on vacation years later, after the Fidelity International transaction had come under IRS scrutiny.   (*Id.* at 3:97-98, 4:29-32).   Moreover, Michael Egan testified that he "neither sought nor worried about Mr. Mahoney's involvement in running the [Fidelity International] partnerships."   (M. Egan, 12:58).

### 5.    The December 18, 2001 Shea Memorandum

582.    After all steps of the transaction had been completed, on December 18, 2001, Shea created another "memo to file."   (Shea, 23:61; Ex. 1463).   In that memorandum, Shea listed areas in which he stated Richard Egan had "significant market exposure." (Ex. 1463).

583.    One area of purported "exposure" identified in the December 18 memorandum was:

> Real estate – the family has substantial investments in commercial real estate with Mr. and Mrs. Egan holding mortgages on certain properties.

(*Id.*).   In fact, and as described above, Richard and Maureen Egan did not have

any interest rate exposure from commercial real estate.

584.    Another area of purported "exposure" identified in the December 18

memorandum was:

> foreign markets—EMC is looking to expand in Europe and we felt
> we needed some foreign investments to participate in the dollar
> getting stronger in the foreign markets as a result of EMC
> expansion and/or general world economics.

(*Id.*). As described below, the market price of EMC was already adjusted by any

relevant currency risk. Moreover, Shea's memorandum contains no mention of

EMC expansion in Asia, and therefore does not attempt to justify the Japanese yen

options.

585.    The December 18, 2001 memorandum by Shea also stated that:

> the initial positions in [Fidelity World] were 10 year CMS
> (constant maturity swap) calls and 3 month LIBOR puts to hedge
> our exposure against increasing interest rates.

(*Id.*). As described below, the options as structured were not rational hedges for

those purposes.

586.    The December 18 memorandum characterized the involvement of Mahoney in

Fidelity International as follows:

> [Fidelity International] is an investment partnership with 2 of our
> advisors (Helios and Alpha) and an unrelated party (Sam
> Mahoney) who has strong experience in international banking and
> financial services between Europe and the U.S.—Due to our
> interest rate exposure and international exposure with EMC we felt
> Mr. Mahoney's background and experience would help us with our
> investment decisions. . . .

(*Id.*). That statement was false, as the Egans never sought Mahoney's advice as to

any investment decisions, and indeed never spoke to him during the relevant time.

### 6.      The March 12, 2001 Speiss Memorandum

587.   On February 28, 2002, Shea sent an e-mail to Denby that stated, among other

things, that he was planning to meet with Haber and Speiss, and that he would be

> looking for written notes in the files to make sure I am comfortable that
> their files adequately show business purpose -- investment objectives [-- ]
> and reasons for us to enter such complex transactions -- I am holding up
> paying the fees until I am comfortable that their files are satisfactory and
> the write-ups are as promised --

(Ex. 3382). Denby responded,

> I think it would be helpful if my business purpose file reflects yours and
> KPMG's. You might want to send me a copy of yours. I will then
> compare it to mine and let you know if I have anything you should have.

(*Id.*).

588.   On March 12, 2002, Tim Speiss of KPMG sent an e-mail to Stephanie Denby

stating that he had "drafted a detailed narrative . . . outlining the business purpose

of the [Fidelity International] investment." (Ex. 1651). The attached

memorandum, after a multi-page discussion of the Egan family's general

investment objectives during 2001, then repeats several of the claimed business

purposes set forth in Shea's December 18, 2001 memorandum to file. (Ex. 201).

### W.      The Proskauer and Sidley Austin Opinion Letters

589.   As described above, a central feature of the tax shelter strategies promoted by

DGI/Helios and KPMG was the issuance of legal opinion letters concerning the

tax consequences of the transactions. The opinion letters were principally

intended to prevent the imposition of tax penalties if the taxpayer's treatment of

the transaction were disallowed by the IRS and that disallowance were upheld by

the courts.

590.    The Egans were to be provided with an opinion letter from Proskauer for the
        Fidelity High Tech transaction and an opinion letter from Sidley Austin for the
        Fidelity International transaction.  The fees of both firms were to be paid by
        DGI/Helios.  DGI/Helios, however, would not be paid by the Egans for the
        transaction until the law firm had issued its opinion.

591.    The final Egan opinions were based in part on template or model opinions that
        had been created as part of the overall design of the strategies, and that were used
        to help market the strategies.

592.    James Haber and Orrin Tilevitz at DGI/Helios played a central role in the issuance
        of the opinion letters, including making arrangements with the law firms, drafting
        and editing the letters, and paying the law firms.

**1.      The Proskauer Legal Opinion for the High Tech Transaction**

593.    On January 30, 2001, Haber forwarded to Denby a redacted copy of a Proskauer
        opinion from a transaction for another taxpayer.  (Ex. 704).  Denby had the
        Proskauer opinion put on her law firm's system so that she could "edit it later."
        (*Id.*).

594.    By at least September 26, 2001, a draft opinion for the High Tech transaction had
        been prepared.  (Ex. 604).

595.    On November 27, 2001, Denby sent an e-mail to Haber, with copies to Reiss and
        Shea, confirming that "you are coordinating with Proskauer to get an opinion for
        the 754 election."  (Ex. 1372).

596.    On December 14, 2001, Shea spoke with Haber concerning the Proskauer legal
        opinion for the High Tech transaction. (Ex. 1454).  Haber confirmed that the

opinion

> will be specific to us, will deal with our facts and the step-up of
> outside basis with the trade in Feb[ruary] 01, as well as the 754
> step-up of inside basis and step-up of individual assets.

(*Id.*; Shea, 16:89-90).

597.    On January 4, 2002, Shea sent an e-mail to Haber stating in part, "I assume that

you are working on the legal opinion letters for both transactions and . . . you don't

need anything from me." (Shea, 24:95-96; Ex. 1525).

598.    On January 25, 2002, Orrin Tilevitz of DGI/Helios e-mailed Ira Akselrad at

Proskauer a draft opinion for the Fidelity High Tech transaction, stating:

> Attached is my draft of the Egan opinion. The deal is a
> variation of the stock dribble: investors contribute
> appreciated stock plus options to an LLC taxed as
> partnership, then the 99% member contributes her
> membership interest to a limited partnership, the better to
> avoid the Florida intangibles tax.
>
> Jimmy [Haber] asked that you please make this opinion
> your top priority so that we can get paid.

(Ex. 68).

599.    Between February and April 2002, drafts of the Fidelity High Tech opinion were

circulated for comment and proposed edits to multiple persons outside of the

Proskauer law firm. Among others, draft High Tech opinions were reviewed by

James Haber, Mox Tan, and Orrin Tilevitz at Helios/DGI; Timothy Speiss at

KPMG; Stephanie Denby at Burke, Warren; and Pat Shea at Carruth. (Exs. 595,

704, 1603, 1612, 1615, 1678).

600.    The drafts of the Fidelity High Tech opinion included proposed "Certificates of

Fact" that were to be executed by Richard and Maureen Egan, and upon which

Proskauer would purportedly rely in rendering its opinion.

601. On February 25, 2002, Michael Swiader at Proskauer sent an e-mail to Tilevitz stating that "we are revising the facts in the draft Egan opinion to conform to the deal binder," and that a "couple of minor discrepancies [had] popped up that we are hoping you can clarify." (Ex. 195). Among the discrepancies were the reported "business purposes" for the transaction. (*Id.*). No one at Carruth was copied on the e-mail, or asked to clarify any "facts" concerning the opinion. (*Id.*).

602. On February 26, 2002, Swiader sent Haber "the draft Egan tax opinion for your initial review." (Ex. 1612). Haber then forwarded the draft opinion to Speiss, Reiss, Denby, and Shea, noting that the attached draft opinion was "as prepared by" Proskauer, and that "[w]e are reviewing it as you are." (Ex. 69). Denby marked up the draft with proposed edits. (Denby, 28:12-13; Ex. 196).

603. On February 27, 2002, Tilevitz sent Swiader his initial suggested changes for the opinion. (Ex. 1613).

604. On February 28, 2002, Swiader e-mailed Tilevitz and asked whether in the opinion he should exclude the amount of fees paid by the Egans relating to the High Tech transaction "as we did in the prior transaction." (Ex. 1621). Tilevitz replied, "leave out the actual amount." (*Id.*).

605. On March 12, 2002, Speiss e-mailed Denby with his comments on the High Tech opinion letter. (Ex. 205). At the same time, and as described below, Speiss sent a "detailed narrative" purportedly "outlining the business purpose of the investment." (Ex. 201).

606. On March 14 and 21, 2002, Denby and Speiss separately provided further

comments to the draft opinion. (Exs. 1655, 1689). Denby provided her
comments to Haber, not Akselrad or Swiader. (Ex. 1655).

607.   On April 3, 2002, Swiader sent Haber a revised draft opinion, along with draft
       supporting "Certificates of Fact." (Ex. 1736).

608.   Between April 3 and April 8, Proskauer again circulated revised drafts, and Denby
       again provided comments to Haber. (Exs. 1738, 1753).

609.   On April 5, 2002, Elizabeth Jung of DGI sent an e-mail to Swiader at Proskauer
       asking that he "please release the final Egan opinion to us." (Ex. 1747).

610.   On April 10, 2002, Pat Shea sent the final version of the Fidelity High Tech
       "Certificate of Facts" to Richard and Maureen Egan in Ireland for their signatures.
       (Ex. 1766). The cover memorandum states that the document was a
       "representation of facts you are making for the Helios trade" and that "[t]he
       information was verified by our staff as well as Stephanie Denby." (*Id.*).

611.   Richard and Maureen Egan both executed the High Tech "Certificate of Facts"
       "effective as of April 5, 2002." (*Id.*). It was actually signed and faxed back on
       April 11, 2002. (Ex. 1767).

612.   On April 11, 2002, Proskauer generated a draft engagement letter addressed to
       Richard and Maureen Egan that provided for a fixed fee of $50,000 for "rendering
       tax advice in connection with certain investment transactions that Investor
       conducted in 2001." (Ex. 1772). The draft letter referred to a $50,000 fee, even
       though any fees relating to the deal were to be paid by DGI/Helios.

613.   The draft Proskauer engagement letter of April 11 contained the following
       language:

161

> We have advised you that we also represent The Diversified Group
> and Helios Financial and their affiliated entities in connection with
> various matters. You acknowledged and expressly agreed that we
> would be free to continue to represent The Diversified Group and
> Helios Financial, and you waived any conflict resulting from or
> attributable to such representation.

(*Id.*). Richard Egan testified that he does not recall whether he ever saw a copy of

the draft engagement letter. (R. Egan, 3:69-70). Both Richard Egan and

Proskauer produced copies of the draft engagement letter, neither of which were

signed. (Exs. 1772, 1774).

614.   On April 12, 2002, Elizabeth Jung of DGI sent an e-mail to Denby stating that

"we would like to release the [Proskauer] opinion to her "but are not able to do so

until the signed Certificate of Facts is received." (Ex. 1777).

615.   On April 15, 2002, Denby e-mailed Haber and Tan that she had received the final

[Proskauer] opinion on the High Tech transaction and that it appeared "fine."

(Ex. 215).

616.   Michael Egan would not have paid Helios for the Fidelity High Tech transaction

unless he had received a satisfactory and favorable legal opinion letter from

Proskauer. (M. Egan, 13:47; Shea, 24:85, 103-04; Ex. 1603).

617.   The Proskauer legal opinion for the High Tech transaction was dated April 5,

2002 and issued to Richard and Maureen Egan. (Ex. 122). The opinion was 47

pages long and included an Exhibit A listing some of the documents purportedly

relied upon by Proskauer in rendering its opinion. (*Id.*).

618.   The Proskauer opinion language regarding Notice 2000-44 is virtually identical to

the language in the generic marketing opinion for the FDIS transaction, "DG Draft

162

4/25/01," that was developed by DGI and Brown & Wood in April 2001 to market

the FDIS transaction. (Ex. 864).

## 2.     The Sidley Austin Legal Opinion for the Fidelity International Transaction

619.    On January 7, 2002, Haber forwarded the closing binder on the Fidelity

International transaction to Michael Egan, with copies to Denby, Speiss, Ruble

and Ross.  (Ex. 67).  Haber's letter stated that "[w]e will be forwarding you a tax

opinion under separate cover."  (*Id.*).

620.    By separate letter dated January 9, 2002, Haber also forwarded Ruble a copy of

the closing binder for the Fidelity International transaction, in which Haber wrote:

> I am forwarding you Richard Egan's closing binder. His opinion is
> a first priority on the new style transactions because his fee is only
> payable upon delivery of this opinion.

(Ex. 1530).  Haber referred to the Fidelity International transaction as a "new style

transaction" because it was an FDIS transaction, as opposed to an "old style

partnership" opinion.

621.    On February 7, 2002, Ruble e-mailed Haber:

> I've been through the Proskauer draft for the new deal. Ira
> [Akselrad of Proskauer] has done an excellent job of paring down a
> number of the discussion[s] from what we have said in the past. In
> a perfect world I would probably adopt many of the changes Ira
> made, but it's hard to get changes to boilerplate here. Do you have
> a problem if we continue to use our form of discussion on most of
> these issues?"

(Ex. 1579).

622.    At some point in early February 2002, Haber received a copy of a draft of Ruble's

"new style" opinion for the Egan transaction.  (Ex. 1600).  On February 13, 2002,

Haber sent an e-mail to Ruble enclosing a redline of the changes in Ruble's initial

163

draft of the "new style" opinion, compared to the "generic form of the opinion"

that Ruble had "signed off on during the summer." (*Id.*). Haber wrote:

> I think that you will find that the changes we agreed to over the
> summer are substantial and for the most part a better approach. At
> the end of the day it's your opinion and your decision.

(*Id.*).

623.  By e-mail dated February 17, 2002, Ruble expressed reluctance to make any

editorial changes, because of the difficulty in obtaining approval from his firm.

(*Id.*). He added:

> . . . There is one quasi-substantive issue. Our economic substance
> and business purpose discussion regarding the new decisions is
> locked in stone. I believe that we come to the same conclusion, but
> our analysis seems somewhat different. *The one real substantive
> issue may be Notice 2000-44. People here are not so sure that it
> doesn't apply if the Notice is a valid exercise of authority. I am
> still arguing the point.*

(*Id.* (emphasis added)).

624.  On February 22, 2002, Ruble forwarded the draft legal opinion to the Fidelity

International transaction to Haber and Tilevitz. (Ex. 1605). He asked them to

"[g]ive it one more look" and that if they were "happy" and willing to "sign [off],"

his office would finalize it and "get it out." (*Id.*).

625.  Haber forwarded a mark-up with another set of changes to Ruble on February 25,

2002. (Ex. 1608). Tilevitz sent his comments by e-mail the same day. (Ex.

1610).

626.  On February 27, 2002, Haber sent Speiss, Reiss, Denby, and Shea a "draft tax

opinion" on the Fidelity International transaction "as prepared by Sidley Austin

164

Brown & Wood," and stating, "we are reviewing it as you are." (Ex. 70). Denby
marked up this draft opinion.

627. On March 11, 2002, Denby wrote Speiss that she had completed her review of the
draft opinion and needed his comments, and that once she incorporated his
comments she would forward the draft to Haber to coordinate with Sidley Austin.
(Ex. 1649).

628. On March 12, 2002, Speiss sent to Denby his detailed comments on the Sidley
Austin opinion. (Ex. 1651). He also attached a nine-page narrative describing the
purported "business purpose" of that transaction that he suggested incorporating
into the opinion. (*Id.*).

629. On March 14, 2002, Denby sent her comments on the Sidley Austin opinion to
Haber, which included suggestions for stating the purported "substantial non-tax
business reasons" for the transaction. (Ex. 1655). She did not provide those
comments to Ruble. (*Id.*).

630. On March 15, 2002, Tilevitz e-mailed Ruble attaching a revised draft of the
opinion, which he copied to both Denby and Haber. Tilevitz wrote that he
thought "most of the changes" proposed by Denby were

> "nits," except for some substantive additions to the
> [representations] (and the reasoning based thereon) and a couple of
> changes necessitated by the fact that the LLC's manager is not
> Helios [but] the Egan's son.

(Ex. 1659).

631. On March 15, 2002, Haber sent Denby for her review a draft of proposed "fact"
representations to be made by Richard Egan to Sidley Austin in connection with

its opinion letter. (Ex. 1661). The same day, Denby forwarded the proposed

representations to Shea, writing:

> Attached are the representations that Sidley will want Dick to sign
> in conjunction with their opinion letter. The investment purpose
> language is picked up from my revisions to the opinion letter. I
> think the letter is fine. Let me and Jimmy [Haber] know if you
> have any comments.

(*Id.*).

632. On March 18, 2002, Haber sent Shea a letter stating: "Your tax opinion is

complete. We will forward it to you upon receipt of the attached Representation

letter. Please sign where indicated, fax a copy to me . . . and return the original to

me in the enclosed Airborne envelope." (Ex. 1664).

633. On March 19, 2002, Haber e-mailed Shea and Denby stating, "We are forwarding

to you via overnight mail the final Sidley Austin Brown & Wood opinion. Please

let us know when we can expect the executed [representation] letter, as well as,

payment ($3,375,000) for this transaction." (Ex. 1678). Shea replied: "Payment

will be wired after I review the opinion and get blessings from Stephanie." (*Id.*;

Shea, 24:97-98).

634. On March 20, 2002, Shea sent the "representation letter" to Richard Egan for his

signature. (Ex. 1680). Shea noted the "purpose" of the letter "is that you as the

investor have asked for a legal opinion from Mr. Ruble for tax and business

purposes." (*Id.*). Richard Egan executed the letter. (Ex. 78).

635. On March 27, 2002, Haber again asked Shea when DGI would receive its fee for

the Fidelity International transaction. (Ex. 1706). Shea responded that:

> payment will be made as soon as we finish reviewing the opinion

166

letters . . . I feel a careful review is critical in light of the changes
that were made on the last final draft– I want to be sure we are
comfortable with the wording–

(*Id.*). In reply, Haber stated:

While I respect your desire for a thorough review of the opinion,
the opinion has been issued in final (to the extent you find further
changes I'm sure the law firm will be cooperative) and I feel that
payment for [Fidelity International] should be forthcoming at this
time. Further delays at this point I do not believe to be appropriate.

(*Id.*).

636.  On April 2, 2002, Denby e-mailed Haber:

It appears in the last version that the discussion on tax
shelter registration . . . is now missing. Why is that? Are
they no longer able to opine on this issue? I am also
concerned as to why we are not advised of these changes in
a document which I had carefully reviewed prior drafts. It
makes me uncomfortable. Perhaps they should provide us
with a redline for Irwin's [Orrin Tilevitz's] version to the
current version.

(Denby, 29:119-20; Ex. 1723).  Haber responded, "I'm sure the omission was

inadvertent." (Ex. 1723).

637.  On April 3, 2002, Tan inquired as to when DGI could expect to receive its

$3,375,000 fee for the Fidelity International transaction. Shea responded, on the

same day, that:

I am planning on wiring [the fees] this week provided
Stephanie gets all the issues resolved with the opinion
letters-- it appears *your law firm* has made several changes
after Stephanie[']s review-- changes were made that were
not brought to our attention-- it seems as though [Sidley
Austin] Brown and Wood tried to slide things past us– it is
a good thing Stephanie is so astute because there was a
significant change without our knowledge–

167

My consistent position is the fees will be wired upon
*satisfactory completion* of the legal opinion letters--
Stephanie is working diligently and not sitting on them to
get them completed -- however, each draft we get there are
more changes -- and no 'redline' drafts pointing out the
changes-- (wait until I charge you for Stephanie[']s third or
fourth review of the same docs)--

I am as anxious as you are to get this done and to get you
paid-- however I must wait for the opinions–

(Shea, 24:104; Ex. 1733 (emphasis added)).

638.    Haber then faxed "replacement pages to the opinion" to Denby for her review and

approval. (Ex. 209).

639.    The Sidley Austin legal opinion for the High Tech transaction was dated March 8,

2002 and issued to Richard Egan at an address for Carruth. (Ex. 121). The

opinion is 131 pages long. (*Id.*).

## 3.    Payment of the Legal Fees of Proskauer and Sidley Austin

640.    The fee paid by the Egans to Helios for the Fidelity High Tech and Fidelity

International transactions included the fee for a favorable legal opinion. (M.

Egan, 13:47-48).

641.    For the Fidelity High Tech transaction, DGI paid the fee for the legal opinion

issued to Richard and Maureen Egan directly to Proskauer. (Ex. 1519). The fee

was part of a lump sum payment for 23 opinions at $50,000 each, for a total

payment to Proskauer of $1,050,000. (*Id.*).

642.    For the Fidelity International transaction, DGI paid the fee for the legal opinion

issued to Richard Egan directly to Sidley Austin. (*Id.*). The fee was part of a

lump sum payment for 28 opinions for a total payment to Sidley Austin of

$800,000. (*Id.*).

643. The relevant invoice from Sidley Austin to DGI lumped services performed for Richard and Maureen Egan together with 16 other sets of taxpayers. (Ex. 2758). The bill for services on behalf of the 17 sets of taxpayers was an undifferentiated amount of $700,000. (*Id.*).

## X. Costs and Fees for the Transactions

### 1. Costs and Fees on the Fidelity High Tech Transaction

#### a. Helios and KPMG Fees

644. As originally proposed in the summer of 2000, the plan for the High Tech transaction called for a fee to Helios and KPMG of 1.95% of the amount of the premium for the long options, which was expected to be $230 million. (Shea, 15:118-21; Ex. 514). Helios was to receive 1.3% of that premium, or $2.99 million, and KPMG was to receive .65%, or $1.495 million. (Ex. 514).

645. On January 29, 2001, Shea advised Michael Egan that the proposed fee agreement had been revised as follows:

> The cost to us will be 1.5 percent to Helios and something to KPMG–Helios will pay KPMG up to 100k from the 1.5% as well as paying for the opinion letter--
> KPMG is looking for an additional 150k from us--
> KPMG total 250k—

(Ex. 697).

646. On November 9, 2001, Stephanie Denby suggested to Jim Reiss that they should "consider renegotiating [Helios's] fees," because the High Tech transaction had been changed, in that the Egans planned to sell the EMC stock on the open

169

market, which reduced Helios's "transaction costs." (Exs. 3294).

647.   On December 6, 2001, Shea e-mailed Haber asking for a reduction in the High

       Tech fee because the "transaction is now completely different [from] what was

       supposed to happen." (Shea, 23:75; Ex. 1415).

648.   Haber responded the same day as follows:

> [The High Tech transaction] was for $160 million. We are
> proposing that Helios be paid a fee of 1% which includes you
> receiving a tax opinion from Proskauer Rose. The transaction will
> be completed from our perspective once the member interests are
> transferred and a section 754 election is triggered.

(Ex. 1415).

649.   On December 14, 2001, Shea prepared a memorandum to file detailing a list of

       issues to discuss with Haber. (Shea, 16:89; Ex. 1454). In that memorandum,

       Shea noted as to "fees" for the Fidelity High Tech transaction that the "deal

       changed" in that Helios was no longer "financing the buy out as well as the costs

       of the trade," and that he thought a lower fee was warranted. (Ex. 1454). That

       day, Shea spoke with Haber. Haber would not lower his fee for the Fidelity High

       Tech transaction below 1% of the premium. (*Id.*; Shea, 23:78). He did agree,

       however, to lower the fee for the Fidelity International transaction. (Ex. 1454).

650.   By mid-December 2001, Shea had agreed on fees for the High Tech transaction of

       $1.6 million to Helios and $200,000 to KPMG. (Shea, 23:76-78; Exs. 1415,

       1456).

651.   In accordance with that agreement, on December 26, 2001, Helios issued an

       invoice for the High Tech transaction to Carruth for $1.6 million. (Ex. 2566).

652. On December 27, 2001, KPMG issued an invoice for the High Tech transaction to Carruth for $200,000. (Ex. 11). The invoice stated that it was "for 2001 tax services rendered" on behalf of Fidelity High Tech. (*Id.*).

653. On January 4, 2002, Shea e-mailed Haber and advised him that he had "the cash ready" to pay him, but that he was "waiting for legal opinions and closing books." (Ex. 1525).

654. On April 23, 2002, on instructions of Michael Egan, Carruth wired Helios $1.6 million and KPMG $200,000. (Exs. 84, 85, 108).

655. Under its fee-sharing arrangement with KPMG, Helios paid an additional $50,000 to KPMG in 2002 with respect to the Fidelity High Tech transaction. (Ex. 2771). Helios described the payment as a "Schrier-Egan" expense. (*Id.*). The $50,000 payment to KPMG was treated as a joint expense of Helios, DGI, and Alpha. (*Id.*).

### b. Refco Fees

656. Refco's bid/ask fees for the four initial NASDAQ 100 options entered into by Option A and Index A totaled 10% of the potential net payout on each option, or $1 million. That amount consisted of $990,000 for the options entered into by Option A and $10,000 for the options entered into by Index A. (Exs. 706, 728; Kolbe, 37:124; Dem. Ex. 3009).

657. On January 31, 2001, Carolyn Fiddy was told by Ron Buesinger of Alpha that the 10% bid-ask fee was an agreed-upon fee that was being paid to Refco when the options were purchased, as a cost to enter the contracts. (Ex. 728). Fiddy wrote:

> Have bought 2 different options for tax purposes - but
> economically [it] is really 1 item. The required payoff nets
> at $9,900,000 for the Fidelity High Tech Option A Fund
> ($100,000 for the Fidelity High Tech Index A Fund). In
> both cases it has been agreed that the 10% bid-ask charge
> would be taken when the options were purchased. Hence
> the bid-ask minus $990,000 on both the Breakdown
> schedule and the Pricing schedule.

(*Id.*).

658. Under the Black-Scholes formula, the net theoretical value of those options was

$2.4 million, which when added to Refco's $1 million bid/ask fees, equals $3.4

million of net premium paid for those four options. (Kolbe, 38:6; Dem. Ex.

3009).

659. Carolyn Fiddy was specifically advised by Buesinger on January 31, 2001, that the

theoretical value of the options was approximately $2.4 million, and that the total

cost of the options was therefore approximately $3.4 million. (Ex. 728).

### c.    Other Fees

660. The total amount of fees paid by the Egans to Burke, Warren in connection with

the Fidelity High Tech transaction is not possible to ascertain on the present

record. It is more likely than not, however, that the fees were greater than

$104,000, and there is substantial evidence that the fees were $280,000 or more.

(Kolbe, 36:65-67, 37:123; Dem. Ex. 3008).

## 2.    Costs and Fees on the Fidelity International Transaction

### a.    KPMG and Helios Fees

661. The fees to be paid by Fidelity International to Helios and KPMG were calculated

as a percentage of the premium for the long interest-rate options. (Shea, 15:32-

172

33; Ex. 1415).

662.    The total Helios and KPMG fees for Fidelity International were originally set at
        3.5% of the $150 million paid for the premium. (Ex. 1415). Of that percentage,
        2.5% was to be paid to Helios and 1% was to be paid to KPMG, or $3.75 million
        to Helios and $1.5 million to KPMG. (*Id.*; Shea, 23:78).

663.    As described above, after negotiation with Shea in early December 2001, Haber
        agreed to reduce Helios's fee on Fidelity International to 2.25%, or $3.375
        million. (Ex. 1415).

664.    On December 26, 2001, Helios issued an invoice to Carruth for the Fidelity
        International transaction for $3.375 million. (Ex. 1484).

665.    On April 10, 2002, Carruth wired $3.375 million to Helios. (Ex. 213).

666.    On December 11, 2001, KPMG issued an invoice to Carruth for the Fidelity
        International transaction for $1.37 million. (Ex. 1432).

667.    Carruth ultimately paid fees to KPMG as part of the Fidelity International
        transaction in the amount of $1,402,000. Carruth paid the December 11 KPMG
        invoice in two installments: $685,000 on December 27, 2001 (Ex. 187), and
        $685,000 on April 15, 2002 (Ex. 214). It also paid KPMG $32,000 on April 25,
        2002, for tax return preparation. (Ex. 2101).

668.    The fees paid to KPMG represented 0.935% of the $150 million premium for the
        long interest rate options.

        **b.    Refco Fees**

669.    Refco's fees for the four interest-rate options entered into by Fidelity World

totaled $606,373. For the LIBOR option pair, Refco received a fee of $303,283. For the CMS option pair, Refco received a fee of $303,090. The fees were calculated at 9% of the net payout Refco would be required to make if both options were "in the money" on their expiration date. (Kolbe, 36:60-61, 68-71; Dem. Ex. 2855; Ex. 2).

670. Under the Black-Scholes formula, the net theoretical value of those four LIBOR and CMS options was $1.64 million, which, when added to Refco's fees, equals $2.25 million of net premium paid for those four options.

671. Refco's fees for the two quartets of foreign-currency options entered into by Fidelity International on October 22, 2001, totaled $832,947. For the USD/EUR option quartet, Refco received a fee of $416,359. For the JPY/USD quartet, Refco received a fee of $416,588. The fees were calculated at 9.5% of the net payout Refco would receive if either of the two pairs in the quartet were "in the money" on their expiration date. (Kolbe, 36:60-61, 73-75; Dem. Ex. 2857; Ex. 2).

672. Under the Black-Scholes formula, the net theoretical value of each quartet was $3.2 million. Fidelity International, however, was credited with only $2.8 million of initial net premium for each quartet. The difference between net theoretical value and the lesser amount credited to Fidelity International represented the fee to Refco. (Kolbe, 36:73-75; Dem. Ex. 2857).

673. Refco's fees for the replacement options for the USD/EUR options terminated on October 29, 2001, and the JPY/USD options terminated on October 30, 2001, were $4,297. (Kolbe, 36:37-38; Dem. Ex. 2844, 2857).

174

674.    In total, Fidelity World and Fidelity International paid $1,443,617 in fees to
Refco.

c.    **Other Fees**

675.    The total amount of fees paid by the Egans to Burke, Warren in connection with
the Fidelity International transaction is not possible to ascertain on the present
record. It is more likely than not, however, that the fees were greater than
$83,000, and there is substantial evidence that the fees were $260,000 or more.
(Kolbe, 36:65-67; Dem. Ex. 3036).

676.    Carruth paid a $50,000 fee to Proskauer for a non-disclosure opinion related to the
Fidelity International transaction. (Shea, 15:35; Ex. 99).

677.    The buyout of Mahoney by Richard Egan was an out-of-pocket expense to
Richard Egan of $325,500. (Kolbe 36:63-64; Dem. Ex. 2854; Ex. 1024). Carruth
paid a $27,500 fee to RSM McGladrey for review of their 2001 individual income
tax returns. (Ex. 2058). Half of that expense, $13,750, was allocable to the
Fidelity International transaction. (Dem. Ex. 3741B).

## Y.    **The KPMG Engagement Letters**

678.    At various points during the planning and implementation of the tax strategies,
KPMG sought to have the Egans execute engagement letters for the transactions.
As described below, Pat Shea eventually executed an engagement letter for the
Fidelity International transaction, but no such letter was ever executed for Fidelity
High Tech.

**1.    KPMG Engagement Letter Policy for the Short Option
         Strategy**

679.   On July 24, 2000, KPMG implemented various requirements concerning its Short

         Option Strategy so that the firm had "the information necessary to maintain an

         investor list should it be needed." (Ex. 487). As part of that requirement, KPMG

         required certain information to be collected on an Electronic Information Form

         ("EIF"). (*Id.*). Prifti and Schrier both received an internal KPMG e-mail dated

         July 24, 2000, notifying them of this requirement. (*Id.*).

680.   The information to be collected for the EIF included the name and address of the

         client, the name or description of the strategy, the amount the client invested, the

         expected tax benefits from the strategy, and the "date the engagement letter was

         signed by the client." (*Id.*).

681.   KPMG had a pre-approved standard engagement letter for the Short Option

         Strategy. (Ex. 426). The standard SOS engagement letter expressly provided that

         if modifications to the letter were desired, the modifications were to be discussed

         with, and approved by, the location's "business unit professional practice partner -

         tax." (*Id.*).

682.   KPMG also had pre-approved "Standard Terms and Conditions for Tax

         Engagements" that were part of the standard engagement letter. (Ex. 947).

683.   The background section of the standard SOS engagement letter provided:

> KPMG understands that Client intends to
> engage . . . [Helios] to provide Client with investment
> advisory services and trading strategies with respect to the
> foreign currency and/or other option contracts entered into
> pursuant to the Investment Program.

176

. . .

> Client has independently determined that there is a
> reasonable opportunity for Client to earn a reasonable pre-
> tax profit from the Investment Program in excess of all
> associated fees and costs, and this determination has been
> confirmed by [Helios] and/or other investment advisors.

(Ex. 426).

684.  KPMG screened the engagement letter approval process to ensure that all letters

conformed with the pre-approved format, and required that any modifications

from the pre-approved format be approved and documented internally. (Ex. 947).

## 2. The Initial Negotiations Concerning a High Tech Engagement Letter

685.  On July 25, 2000, Schrier prepared a draft KPMG engagement letter for the High

Tech transaction. (Ex. 495). The draft engagement letter tracked the language in

KPMG's standard engagement letter for the Short Option Strategy. (Exs. 426,

495).

686.  The terms of the draft engagement letter were not, however, acceptable to the

Egans.

687.  On July 31, 2000, Schrier sent an e-mail to Jeffrey Eischied, the head of KPMG's

PFP practice, requesting permission to modify certain terms in the standard

engagement letter for the Egans. (Ex. 2774). Schrier wrote:

> I've discussed the engagement letter with Carruth
> Management, the family office of the Egans.
> Indemnification and fee cap and limitation of liability to
> gross negligence and intentional misconduct stick in their
> craw and may lead them to walk away, although I'm
> hopeful they'll live with it. I'm assuming that we're not
> flexible on deleting any of those items, and I've held open

177

to them a willingness to discuss any specific concerns.

One of their specific concerns was that they want to know that we've got some skin in the game and will be around for a challenge. With this in mind, I would like to see if you would agree to our undertaking to provide up to 300 hours of defense time at no further charge.

(*Id.*).

## 3. The Proposed Modifications to the High Tech Engagement Letter

688. KPMG agreed to modify its standard engagement letter by agreeing to assume

some of the costs of audit in the event the transaction was challenged by the IRS.

(Ex. 495). On August 1, 2000, Schrier sent an e-mail to Shea enclosing a

modified draft engagement letter. (*Id.*).

689. The modified draft engagement letter provided for the following additional

services:

- Prepare and/or review your income tax returns reflecting the tax results from such participation in the Investment Program, together with returns of certain entities relating to such participation.
- Assist in connection with any tax audit or administrative proceeding concerning the Investment Program, including providing up to 300 hours of professional time at no additional charge.

(*Id.*).

690. By e-mail dated August 1, 2000, Reiss forwarded the revised draft High Tech

engagement letter to Denby for her review, writing:

Please review the attached. See if there is any way you might be able to soften the Limitation of Liability and Indemnification section of the engagement letter. John Schrier has stated that the National Office will not delete this section.

178

(Reiss, 35:95; Ex. 3241).

691. On August 7, 2000, Schrier sent Shea a signed KPMG engagement letter for approval and countersignature by both Richard and Maureen Egan. (Ex. 508).

692. As of August 16, 2000, when the IRS issued Notice 2000-44, the Egans had not signed any engagement letter with KPMG. As described below, although the parties resumed discussions concerning a possible engagement letter in early 2002, the Egans never signed any such letter for Fidelity High Tech.

## 4.    The Fidelity International Engagement Letter

693. As described above, as of late September 2001, the Fidelity International transaction was on the verge of implementation.

694. On September 27, 2001, Speiss sent Shea an executed version of a KPMG engagement letter for the Fidelity International transaction. (Ex. 60).

695. By that point, KPMG's standard terms and conditions included the following language:

> If this engagement relates to a strategy offered by KPMG to Client that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Temporary Treasury Regulation section 301.6111-2T(c) Client (and each employee, representative, or other agent of Client) is expressly authorized to disclose the structure and tax aspects of the strategy to any and all persons, without limitation of any kind.

(*Id.*).

696. Shea did not countersign the September 27 proposed engagement letter. (Ex. 61).

697. On October 19, 2001, Speiss sent Shea an e-mail proposing further modifications to the Fidelity International engagement letter. (Ex. 1251). The proposed

modifications included deleting the standard terms and conditions that would

permit disclosure to the IRS and providing audit services at a reduced rate. (*Id.*).

698. On November 5, 2001, Speiss sent a modified draft engagement letter to Shea for
    his approval. (Ex. 1282).

699. On November 19, 2001, Shea signed the modified version of the engagement
    letter. (Ex. 60).

700. The Fidelity International engagement letter broke down the total agreed-upon fee
    of $1.5 million into different amounts: $1,370,000 and several smaller amounts
    totaling $130,000. (*Id.*). The services for the fee of $1,370,000 were described as
    "tax services," to be billed after "completion of the review of the [Fidelity
    International] capital and ownership (membership) structure" and "determination
    of Richard Egan's tax basis in [Fidelity International] considering [its] investment
    activity." (*Id.*). The letter also stated that KPMG would undertake those services
    "in connection with our preparation and signing of the 2001 [Fidelity
    International] income tax returns." (*Id.*). The remaining portions of the fee were
    for review and signing of various Fidelity International tax returns and the review
    and signing of the Egans' 2001 individual tax returns. (*Id.*).

701. The Fidelity International engagement letter did not include the paragraph of
    KPMG's Standard Terms and Conditions that "expressly authorized" disclosure
    of the transaction. (*Id.*). In addition, the letter was amended to "soften" KPMG's
    limitations as to liability and indemnity. (*Id.*).

## 5. The Egans' Concerns about Appearing on a "List"

702. In the meantime, Shea had not signed any KPMG engagement letter for the Fidelity High Tech transaction. The Egans also continued to express concern about the possibility that their names would appear on a tax shelter investor list at KPMG.

703. On September 27, 2001, Shea sent Brian Rivotto and Bob Prifti at KPMG an article entitled "IRS Disclosure and Registration Rules Hit Tax Shelter Abuses; Hotline Spurs Enforcement." (Ex. 1057). Shea circled a portion of the article that read, "Promoters also must maintain lists of investors in the shelter," and wrote next to it, "Are we on a list[?]" With the article, Shea wrote a note asking, "Should I be nervous?" (*Id.*).

704. On December 28, 2001, Reiss forwarded a document to Denby and Shea called "IRS Letters to Promoters," with a cover e-mail that stated, "we need to know if any third parties we know are affected." (Ex. 3393). Shea checked with Haber (who responded that Helios was not affected) and KPMG. (*Id.*).

705. On January 2, 2002, Denby e-mailed Reiss as follows: "Have you paid KPMG yet? If not, I would add a provision that they return all fees if they disclose you on any lists." (Ex. 3343).

## 6. Renewed Discussions Concerning the High Tech Engagement Letter

706. On February 5, 2002, the IRS notified KPMG that it was "conducting an examination to determine KPMG's liability with regard to all tax shelter activities from January 1, 1994 to the present." (Ex. 1574).

181

707.    On March 1, 2002, Shea sent Speiss an e-mail, with copies to Denby, Haber and

        Reiss, requesting a meeting on March 8 to discuss certain listed items, including

        "KPMG's position on my engagement letter amendment request." (Ex. 1625).

708.    On March 2, 2002, Prifti sent an e-mail to Reiss concerning the outstanding

        unsigned engagement letters, asking if he could check with Pat Shea "as to where

        we stand . . . [w]e have no record those were received." (Ex. 1631). Reiss

        forwarded the e-mail to Shea, noting that KPMG "would like to know [the] status

        of [the] 2000 engagement letters." (*Id.*).

709.    On March 8, 2002, Shea met with Speiss at KPMG's offices in New York to

        discuss the unpaid invoices, the engagement letters, and the preparation of the

        2001 tax returns. (Ex. 72). At the meeting, Shea requested that KPMG amend its

        draft Fidelity High Tech engagement letter to describe the matter as a "tax return"

        engagement. In his notes, Shea wrote "KPMG's position on my engagement letter

        amendment request," next to which he wrote:

> Redefined as a tax return engagement [therefore] there is no
> KPMG internal list as this is a tax transaction only and not
> a listed transaction according to IRS listing rules.

        (Ex. 1625).

710.    Speiss had drafted a new engagement letter for the High Tech transaction with a

        $200,000 fee "payable upon completion of the tax returns (March, 2002)." (Ex.

        72). Shea agreed to review the new draft. (*Id.*).

711.    Shea's list of discussion items for the March 8 meeting included the following:

        "Strategic discussions of KPMG role in our returns -- whether we want to be on

the 'radar' screen in light of Enron scandal and the heat all the big 5 [accounting]

firms will be taking regarding tax shelters." (Ex. 1625).

712.    Shea's notes of the March 8 meeting also reflect the fact that KPMG's

engagement for Fidelity International had already been redefined as a "tax return"

engagement so that it would not be listed. Shea wrote:

-       Will not maintain on any list
-       Will not be on an engagement list letter
-       We amended the 9/27/01 engagement letter
        [for Fidelity International] to comply with
        this reporting
-       Brown & Wood is not being investigated by IRS as a law firm
        promoting transactions –
-       KPMG is not being questioned on these transactions

(Shea, 23:96-99; Ex. 2536). Next to the first two bullets, Shea wrote "[KPMG]

will put in writing." (Ex. 2536).

713.    In his March 8 notes, Shea further wrote:

-       Letter from Tim stating KPMG is not keeping a list.
                            ***
        Tim [Speiss] to do [a High Tech] Engagement letter.

(*Id.*).

714.    Shea's notes of the March 8 meeting also state: "We will not get an opinion letter

from KPMG – we do not want one[,] as that is a guide the IRS uses to get

information." (*Id.*).

715.    On March 8, 2002, Speiss provided a letter to Shea stating the following:

        Our tax services rendered on behalf of [Fidelity International] as
        cited in our engagement letter dated September 27, 2001, are not
        required to be disclosed on an KPMG Engagement Information
        Form (list). No disclosure is required because we were engaged to
        render tax return preparation services, as described in the

183

> referenced engagement letter. Accordingly, our services and
> engagement with [Fidelity International] as described in the
> September 27, 2001 engagement letter has not been disclosed on a
> KPMG Engagement Information Form.

(Ex. 71).

716.   On March 25, 2002, Speiss sent an essentially identical letter to Shea concerning

the draft Fidelity High Tech engagement letter. (Ex. 1700). That same day,

Speiss also provided Shea with a proposed conforming redraft of the KPMG

engagement letter for High Tech dated December 20, 2001. (Ex. 186).

717.   Shea, however, never signed any engagement letter with KPMG for the Fidelity

High Tech transaction. (Shea, 14:118, 24:7).

## Z.   **The Preparation and Filing of the Egans' 2001 Tax Returns**

718.   The original plan for both transactions was for KPMG to prepare and sign all tax

returns for the transactions, including the various partnership returns (Forms

1065) and the Egans' individual income tax returns (Forms 1040).

719.   On December 11, 2001, Speiss confirmed that KPMG would be preparing all the

tax returns for the Fidelity High Tech and Fidelity International entities. (Ex.

1433).

## 1.   **The Partnership Tax Returns (Forms 1065)**

720.   KPMG prepared draft 2001 partnership tax returns (Forms 1065) for Fidelity

International, which it provided for comment to Pat Shea on February 20, 2002,

and to James Haber on March 7, 2002. (Ex. 72). KPMG provided draft 2001

partnership tax returns for Fidelity High Tech to Shea, Stephanie Denby, and

Haber for comment on March 25, 2002. (Ex. 79).

721.    On April 12, 2002, Speiss signed the Fidelity High Tech partnership tax returns
        for the tax year ended December 21, 2001, and the tax year ended December 31,
        2001. (Ex. 108). The same day, he signed the Fidelity International partnership
        tax return for the tax year ended December 31, 2001. (*Id.*).

722.    The Fidelity High Tech and Fidelity International partnership tax returns (Forms
        1065) were timely filed on April 15, 2002. (*Id.*).

723.    Fidelity High Tech filed an election under Section 754 with both of its 2001
        partnership tax returns. (*Id.*).

## 2.    The Individual Income Tax Return (Form 1040)

724.    The 2001 individual income tax return (Form 1040) for Richard and Maureen
        Egan was due by April 15, 2002.

725.    On April 8, 2002, Denby e-mailed Shea and Reiss stating that she "wanted to
        make sure that we were planning to get those tax returns all filed on [April] 15th,"
        and that she thought "the sooner the better." (Ex. 3457). Denby's concern was
        based at least in part on the possibility that the Treasury Department would soon
        finalize revisions to Circular 230 (the regulation governing the practice of
        attorneys before the IRS) that would make it difficult for law firms to issue
        favorable opinions for tax shelters. (Ex. 3433). The Egan return was not,
        however, filed by April 15.

726.    The Egans applied for an automatic extension of time (Form 4868) to August 15,
        2002. (Ex. 8). As of June 14, 2002, the Egan return had not been filed.

727.    As also noted above, by early 2002, KPMG had been notified that it was the

subject of a federal investigation with regard to "tax shelter activities." (Ex. 1574).

**3.    The Impact of the New IRS Regulations in June 2002**

728.   On June 14, 2002, the IRS issued temporary and proposed regulations, including Temp. Treas. Reg. § 1.6011-4T, that imposed new reporting and registration requirements for certain listed tax shelter transactions. Among other things, the regulations extended certain reporting requirements to individual taxpayers, such as the Egans.

729.   The new regulations required, among other things, that an individual taxpayer who participated, directly or indirectly, in a "reportable transaction" that was a "listed transaction" as defined had to file a disclosure statement with his or her tax return. (Temp. Treas. Reg. § 1.6011-4T(a)(1)). A "listed transaction" was any transaction that was the same as or "substantially similar" to a transaction that the IRS had determined to be a tax avoidance transaction, such as that set forth in IRS Notice 2000-44. (*Id.* at § 1.6011-4T(b)). A transaction would be treated as being the same or "substantially similar" to such a transaction if the transaction was expected to obtain the "same or similar" tax benefits and was either factually similar to such a transaction or based on the same or a similar tax strategy. (*Id.* at § 1.6011-4T(b)(1)(I)). The term "substantially similar" was to be construed broadly in favor of disclosure. (*Id.*).

730.   The preamble to the revised regulations stated that the IRS planned to issue future regulations extending the disclosure requirement to other transactions, not simply

"listed" transactions. (Temp. Treas. Reg. § 1.6011-4T).

731. On June 21, 2002, Orrin Tilevitz of DGI/Helios sent Haber and Denby a
memorandum that he had prepared concerning the impact of the new reporting
requirements. (Ex. 1908). Denby forwarded the memorandum to Pat Shea. (*Id.*).

732. On June 24, 2002, Stephanie Denby wrote to Michael Egan and Jack Egan
advising them of the issuance of the new IRS regulations and pointing out that
"the regulations now require individuals to disclose certain tax shelters." (Ex.
3416). She also reported that "Helios, KPMG, and its advisors are analyzing the
new . . . requirements to make a determination as to whether [Dick Egan's]
transactions must now be reported." (*Id.*).

733. On June 26, 2002, Speiss of KPMG wrote to Reiss and Prifti that they should
"strive to complete the [Egans'] 1040 as soon as possible" because there was a
"risk of additional announcements/initiatives" from the IRS. (Ex. 218). On June
27, Speiss sent an e-mail to Prifti stating, "The risk of disclosure increases the
later the 2001 returns are filed." (Ex. 2764).

734. On Sunday, July 14, 2002, Reiss advised the "accounting/tax team" at Carruth that
the Egans' 2001 tax returns "should be done" by July 19. (Ex. 1919). He further
advised that "Each day the return is not filed increases the risk that Disclosure
[sic] becomes a bigger issue than it is now." (*Id.*). He added: "We really don't
want to put [ourselves] into that situation – this would not look good at all for any
of us." (*Id.*). He urged that it was "imperative that we do whatever it takes to be
sure this is completed by the end of the week." (*Id.*).

187

735. The July 19 deadline imposed by Reiss was not met, in part because KPMG had not yet provided a final copy of a tax return signed by Speiss as preparer.

736. During the same period, and as discussed below, the Egans were also negotiating to obtain an opinion letter from Proskauer that disclosure of the Fidelity International transaction was not required.

737. On August 12, 2002, Shea, Reiss, and Speiss spoke concerning the preparation and filing of the 2001 return. (Ex. 1959). They agreed that Reiss would file for a further extension from the IRS; that they would meet in New York on August 19 to discuss the "final legal opinion letter" of Proskauer concerning disclosure; and that Speiss would travel to Massachusetts on August 23 to "sign and review" the final return. *(Id.)*.

738. On August 14, 2002, Reiss filed an application for an additional extension of time to file the 2001 tax return, on the grounds that "all information necessary to file a complete and accurate return is not available at this time." (Ex. 8). The extension was granted to October 15, 2002. *(Id.)*.

739. As of August 21, 2002, the return still had not been filed. (Ex. 1979). Furthermore, KPMG had not yet determined whether it would sign the Egans' tax returns without the disclosure required by the new regulations. *(Id.)*. Reiss advised Denby that he found the "whole process to be very frustrating" and that the returns should have been filed "a few weeks ago." *(Id.)*.

## 4. The Proskauer Non-Disclosure Letter

740. In the meantime, as noted, the Egans were negotiating to obtain an opinion letter

188

from Proskauer stating that disclosure of the Fidelity International transaction was
not required.

741.   On June 26, 2002, Tim Speiss of KPMG e-mailed Stephanie Denby and advised
her that "as of today, me and certain law firms I spoke with are of the view that no
disclosure is required and the transaction is distinguishable from listed
transactions . . . ." (Ex. 217). He also noted that "as of today, there are no
specific penalty regimes [with regard to] non-disclosure[,] however the 25%
accuracy related [penalty] most likely would be asserted." (*Id.*).

742.   Speiss appears to have spoken at some point with R.J. Ruble at Brown & Wood,
who apparently opined that disclosure of the transaction (or a similar transaction)
was not necessary. (Ex. 96).

743.   On July 18, 2002, Speiss spoke with attorneys at Proskauer, who advised him that
they had concluded that the Fidelity International transaction was not
"substantially similar" to those identified in Temp. Treas. Reg. § 1.6011-4T, and
therefore need not be disclosed. (Ex. 219). He passed that information on to Pat
Shea. (*Id.*). The Proskauer non-disclosure opinion was not, however, completed
by that point.

744.   Drafts of the non-disclosure opinion prepared by Proskauer were circulated for
review and comment to multiple persons other than the Egans, including Tim
Speiss at KPMG, James Haber and Orrin Tilevitz at DGI/Helios, and Stephanie
Denby, between July 31, 2002, and August 14, 2002. (Exs. 86, 88, 90, 94, 1940,
1943).

189

745.    On August 13, 2002, Speiss circulated for comment an internal memorandum at
        KPMG with his "observations" on the "arguments prepared by Proskauer Rose"
        concerning disclosure. (Ex. 93).

746.    On August 16, 2002, Ira Akselrad at Proskauer sent an engagement letter to
        Richard Egan concerning its representation for the non-disclosure opinion. (Ex.
        92). The representation was for a fixed fee of $50,000. (*Id.*). Pat Shea forwarded
        the letter for signature to Richard Egan in Ireland on August 28. (Ex. 1992). In
        his cover memorandum, Shea noted that the purpose of the engagement was for
        Proskauer to "provide a legal opinion that [the Fidelity International]
        transaction . . . does not require separate disclosure on your tax return." (*Id.*). He
        added that "[w]e wanted this independent opinion to give another level of
        assurance that we showed 'good faith' in our due diligence." (*Id.*).

747.    On August 16, 2002, Janet Korins and Matthew Sabloff of Proskauer, Tim Speiss
        and Bill Connolly of KPMG, Pat Shea, and Stephanie Denby participated in a
        telephone conference concerning the proposed non-disclosure opinion. (Exs. 91,
        1940). During that conversation, it was reported that the KPMG Washington
        National Tax office had expressed the view that the draft opinion had done as
        "good a job as possible" with regard to the "best case argument," but that it
        needed to "address [the] controlling authorities and dispose of them," and that it
        did "not lay out all arguments the IRS may have." (Ex. 1940 (emphasis in
        original)).

748.    On August 19, 2002, Shea and Speiss met with attorneys from Proskauer in New

190

York as scheduled. (Shea, 15:40-41).

749. During that meeting, or at some other point in mid-August, 2002, Shea and Reiss spoke with Tim Speiss and Matthew Sabloff of Proskauer concerning the disclosure opinion. (Ex. 1419). The parties discussed what penalties might be imposed if no disclosure was made. (*Id.*). Shea's notes state, among other things, that the recent IRS regulations did not specifically impose penalties for "not disclosing," but rather that "non-disclosure [is] considered [a] lack of good faith if the IRS determines that disclosure is required." (*Id.*). Shea noted that because the Egans would be receiving opinion letters, "we have done everything to protect from penalties." (*Id.*).

750. On August 20, 2002, Sabloff sent Speiss, Shea, and Haber a revised draft non-disclosure opinion that incorporated their comments. (Ex. 94). On August 31, 2002, Sabloff sent Denby, Reiss, and Shea another revised draft non-disclosure opinion. (*Id.*).

751. On September 4, 2002, Proskauer issued its opinion letter concerning whether Richard Egan would be subject to disclosure requirements under Section 6011 and Temp. Treas. Reg. § 1-601104T. (Ex. 20). The opinion letter stated, among other things, that the Fidelity International transaction "more likely than not" would not be considered "substantially similar" to the transactions described in Notice 2000-44, and therefore "more likely than not"would not be considered a "listed transaction" for the purposes of the disclosure requirements. (*Id.*).

752. On September 11, 2002, the Egans paid Proskauer $50,000. (Ex. 99).

191

**5.    KPMG's Refusal to Sign the Egans' 2001 Tax Return**

753.    On August 23, 2002, Speiss visited Carruth's offices in Massachusetts with the
        Egans' 2001 tax return as prepared by KPMG. (Shea, 15:41-42; Ex. 1959).

754.    The tax return brought by Speiss was signed by him and dated August 23, 2002.
        (Ex. 97). The return, however, included a disclosure statement pursuant to Temp.
        Treas. Reg. § 1.6011-4T. (*Id.*; Shea, 15:42). The disclosure statement indicated,
        among other things, that the Egans had participated in a tax shelter transaction
        involving off-setting options that produced an "investment loss" of $165.7 million
        that led to an "expected reduction" in tax liability of $65.5 million in 2001. (Ex.
        97).

755.    Speiss advised Shea and Reiss on August 23 that "KPMG had made the
        institutional decision that any returns filed after . . . the regulation on June 14th,
        would have to have the disclosure statement attached to it." (Shea, 15:42). Speiss
        also said that "he did not agree with KPMG's position" and that "he did not
        believe disclosure was required." (*Id.* at 15:42-43).

756.    Speiss also suggested to Shea and Reiss that "once he left the room" they "should
        pull the disclosure statement and file the return without the disclosure." (*Id.* at
        15:43).

757.    On August 26, 2002, Tim Speiss and Bob Prifti telephoned Reiss "to see if
        [Carruth] needed anything from them and if [they] were all set with the tax
        return." (Ex. 3424). Reiss asked Speiss to provide him "with a detailed
        explanation in writing why he can't sign the [tax] return without a disclosure

statement" and "why he is not required to sign even though the engagement letter indicates he would sign." (*Id.*).

758. Speiss refused to provide such a document. (Shea, 15:43; Ex. 1993).

759. On August 28, 2002, Speiss, Shea, Reiss, and Melissa Seaver participated in a telephone conversation concerning the disclosure statement. (Shea, 15:44; Ex. 96). Melissa Seaver took handwritten notes of the conversation, which she later used to create a typed memorandum. (Exs. 2785, 96).

760. As described in Seaver's typed memorandum, Speiss advised Carruth on August 28 that

> KPMG has taken a consistent, firm-wide position that it disclose
> any transaction which could be considered similar to those listed in
> Regulation 2000-44. Despite the fact that the Egans have a signed
> engagement letter and legal opinions that indicate a position to the
> contrary, . . . KPMG is requiring disclosure. He indicated that he
> does not agree with this position and feels that the Brown & Wood
> legal opinion is accurate in its assessment that no disclosure is
> necessary. KPMG does not agree with the [Proskauer] legal
> opinion.
>
> . . .
>
> Tim stated that KPMG has reviewed the June 14, 2002 Regulations
> and they believe that KPMG is not at a "realistic possibility" (a
> more than 1 and 3 chance) to avoid disclosure because some basis
> issues described in the June 14, 2002 Notice are substantially
> similar to those described in the 2000-44 Regulations, thus
> disclosure is required.
>
> . . .
>
> He considers disclosing a show of a "best faith effort" on behalf of
> the practitioner and creates an opportunity to remove any penalties
> that may [be] charged to the taxpayer. He stated this despite the
> fact that an approved legal letter states that disclosure is not

193

> required and no penalties should be charged. He agreed that there
> is probably a 100% chance of audit if disclosure is done.

(Ex. 96).

761.   As described in Seaver's handwritten notes, Speiss said that if "KPMG did not

sign [the] return," then "nothing would be kept in [its] files." (Ex. 2785). Speiss

said that "he wants [the] original signed return sent back" and that he would

"destroy [the] file copy and [the Egan's] copy." (*Id.*). Either Reiss or Shea asked

whether, if the "tax engagement ends," KPMG would "destroy all [workpapers]";

the question was "left unanswered." (*Id.*). Speiss stated that "destroying [the]

return" did "not insulate [against] the risk that the IRS can find out." (*Id.*).

762.   In her typed memorandum, Seaver described that portion of the discussion as

follows:

> The option to not have KPMG sign the returns and to file without
> disclosure was brought up. Tim indicated that if such an option
> was utilized that he would request that his previously signed copy
> of Richard & Maureen's return be returned to him. He would take
> that copy, his copy and the associated workpapers and destroy this
> information, as it represents a return that was never filed, similar to
> a 'draft.'

(Ex. 96).

763.   Shea also took handwritten notes of the discussion. (Ex. 1419). According to

Shea's notes, Speiss stated that after KPMG destroyed the return, the Egans would

"not be on any list and not be on any disclosure." (*Id.*).

764.   Shortly afterward, the Egans decided to terminate its relationship with KPMG.

765.   On August 28, 2002, Shea sent a handwritten note to Tim Speiss stating the

following: "As discussed, please destroy this [tax] return" and "[r]emove any

194

records of Mr. Egan from [your] files." (Shea, 15:46; Ex. 98). With that note, Shea sent the signed copy of the Form 1040 tax return. (Shea, 15:46).

766. Shea also telephoned James Haber of Helios for advice. (*Id.* at 15:49). On August 29, 2002, Haber told Shea that he "sees no upside in disclosing" and "disagrees with KPMG that [the Egans] should disclose." (*Id.*; Ex. 1419). Haber referred Shea to Ron Wainwright, a partner at the Raleigh, North Carolina office of RSM McGladrey, as someone who might sign the tax return without making the disclosure. Haber told Shea that Wainwright had "marketed this strategy." (Shea, 15:49-50; Ex. 1419).

767. At some point thereafter, Haber called Wainwright. (Wainwright Dep., 1:45). Haber told Wainwright, among other things, that the Egans "had done an FDIS transaction," and asked him to call Pat Shea. (*Id.* at 1:45, 96).

768. Wainwright was not an independent source of tax advice. Among other things, he had participated in marketing the FDIS strategy to other clients with Haber, Mox Tan, and Phil Kampf of Helios/DGI. (*Id.* at 1:101, 105, 117-18, 2:67-68; Ex. 1419). Furthermore, Wainwright himself had personally undertaken an FDIS transaction in order to reduce his own taxes, for which DGI had not charged him a fee. (Wainwright Dep., 1:124-28).

769. Wainwright spoke by telephone with Shea and Reiss at the end of August or beginning of September 2002. (*Id.* at 1:109). They explained the situation, and told Wainwright that they did not want to disclose the transaction on the Egans' tax returns. (*Id.*).

195

770.   On August 30, 2002, Stephanie Denby sent Reiss and Shea a proposed draft letter

to Tim Speiss at KPMG. (Ex. 3429). The letter stated that Denby was

"astonished" that KPMG would not sign the tax return without a disclosure

statement, and that she found the firm's position "shocking" and "untenable," as

well as "a breach of KPMG's fiduciary duty and patently unprofessional." In her

cover e-mail, she wrote that "it would make sense to send out [the letter] after we

have confirmation that [Speiss] has purged his files." (*Id.*). It appears, however,

that the letter was never sent.

771.   On September 2, 2002, Shea informed Denby that "once [Speiss] confirms the file

is removed we can proceed." (Ex. 3334).

772.   On September 4, 2002, Denby sent Reiss an e-mail that stated the following:

> I talked to Pat [Shea] last week. I explained that I think it is critical
> that we get Dick's return on file ASAP. As I have mentioned
> before, we are expecting new disclosure regs in mid September.
> We should try to get the return on file prior to that date since there
> is a risk that these new regs would impact Dick's disclosure
> requirements. I told Pat last week that I would make getting
> Mcgladrey (sp?) on board the first priority in correcting the KPMG
> debacle.

(Ex. 3335). Denby went on to complain that KPMG apparently had not destroyed

its copies of the Egan tax return and workpapers and to complain about their

"about-face":

> . . . it appears that KPMG was not honest in its document retention
> program. Why am I not surprised????? This issue is independent of the
> tax returns at this point since KPMG will not sign the returns without a
> disclosure and they are unwilling to provide a written analysis explaining
> their sudden about-face on the disclosure issue. As you know, I don't
> believe KPMG's sudden change in position is supported by law. Instead, I
> believe it is connected to their ongoing negotiations with Justice. I think

they are selling out their clients to save their hides.

(*Id.*).

773. Wainwright agreed to review and sign the tax return, notwithstanding the "very short timetable" involved. (Wainwright Dep. 1:109).

774. On September 10, 2002, Wainwright flew to Massachusetts to meet Pat Shea, and to review the Egans' records, for the first time. (Ex. 2003).

775. Between September 10 and 12, 2002, Wainwright reviewed the draft tax return and supporting papers. He initially disagreed with KPMG's treatment of the transaction, and told Reiss that he "would have expected [any Section] 988 gain or loss to be reflected by the body of the return," as opposed to being buried in supporting schedules. (Wainwright Dep., 1:156). On his own personal tax return, Wainwright reported his FDIS transaction on Schedule E. (*Id.* at 2:175-76, 180-81). Nonetheless, Wainwright eventually agreed to sign the return as KPMG had prepared it. (*Id.* at 1:155-58).

776. Notwithstanding the complexity of the transactions, and the general complexity and magnitude of the Egans' affairs, Wainwright had less than three days in which to review and prepare the return. (*Id.* at 1:106-08).

777. Wainwright did not perform any investigation or review to see whether the Egans' representations as to their purported "business purpose" for entering into the transactions were correct. (*Id.* at 1:165).

778. Wainwright reviewed the Proskauer non-disclosure opinion. He was aware that Proskauer was one of the law firms used by Helios/DGI in marketing and selling

197

its FDIS strategy. (*Id.* at 1:114-15, 224-25).

779.    On September 12, 2002, Pat Shea signed an engagement letter with RSM

McGladrey, Inc., to prepare the 2001 tax returns for Richard and Maureen Egan.

(Ex. 223).

780.    On September 12, 2002, Ronald Wainwright signed the 2001 tax return (Form

1040) for Richard and Maureen Egan as preparer. (Wainwright Dep., 1:74; Ex.

8).  Michael Egan signed the return for his parents under a power of attorney.

(Ex. 8).  The return was then filed. (*Id.*).

781.    The 2001 tax return (Form 1040) for the Egans did not contain a disclosure

statement pursuant to Temp. Treas. Reg. § 1.6011-4T. (*Id.*).

782.    The 2001 tax return for the Egans, with schedules and attachments, was more than

200 pages long. (*Id.*).  Other than the omission of the disclosure statement

proposed by KPMG, it was essentially identical to the draft return prepared by

KPMG. (*Id.*).

783.    On September 13, 2002, Shea prepared a memorandum for Richard Egan,

Michael Egan, and Jack Egan concerning the "2001 federal tax return filing."

(Shea, 15:50-51; Ex. 224).  Shea wrote as follows:

> As you may be aware there [have] been some issues around the
> completion of Richard J and Maureen E Egan's 2001 federal tax
> income return form 1040-- our tax staff with the help of our
> outside tax firms have worked diligently to complete the return
> before new IRS Regulations come out regarding certain "listed
> transactions"–

(Ex. 224).  Shea noted that new IRS regulations had been enacted that "required

disclosure of certain tax transactions," but that "Pat Shea [sic] obtained an outside

198

independent opinion letter from a qualified NY law firm (Proskauer Rose)"

stating that disclosure was not required. (*Id.*). Shea also noted that "the IRS may

issue regulations that require disclosure on future returns" and "one of our outside

advisors (KPMG, Helios, Proskauer Rose) may be summonsed by the IRS to

provide client names." (*Id.*). He also stated that "KPMG will not sign the return

without the disclosure forcing us to find another firm (McGladery) [sic]" and that

"personally, I think not having KPMG sign the return is in our favor as KPMG is

under tight IRS scrutiny." (*Id.*).

784.    On December 4, 2002, Shea sent an e-mail to Speiss and others at KPMG to

"officially inform" them that he was "terminating the services of KPMG." (Ex.

225).

## AA.    The Preparation and Filing of the Egans' 2002 Tax Returns

785.    The Fidelity High Tech and Fidelity International partnership tax returns (Forms

1065) for 2002 were timely filed on April 15, 2003. (Exs. 5, 7).

786.    Michael Egan signed both 2002 partnership tax returns. (Exs. 5, 7).

787.    Both of the 2002 partnership tax returns were prepared and signed by Ronald

Wainwright of RSM McGladrey. (Exs. 5, 7).

788.    The 2002 individual tax return (Form 1040) for Richard and Maureen Egan was

timely filed on October 15, 2003. (Ex. 232). Michael Egan signed the tax return

for his parents under a power of attorney. (*Id.*). Ronald Wainwright signed the

return as preparer. (*Id.*).

789.    No disclosure statement under Temp. Treas. Reg. § 1.6011-4T was filed with the

2002 individual tax return. (*Id.*).

790. Donald Dwight, an RSM McGladrey employee, assisted Wainwright with the
Egans' 2002 tax returns. (Dwight Dep., 23-24).

791. Dwight believed that the Fidelity International transaction should be disclosed to
the IRS and discussed the issue with Wainwright. (*Id.* at 53-54). Wainwright,
however, said that disclosure was not required. (*Id.*).

## BB. The Tax Consequences of the Fidelity High Tech Transaction Claimed by the Egans

792. The purpose of the Fidelity High Tech transaction was to create an artificial step-
up in basis so that the Egans could sell EMC stock (and other stock) without
incurring a capital gain and paying a capital gains tax.

### 1. The Egans' Claimed Tax Basis in Their Partnership Interests in Fidelity High Tech

793. As described above, Maureen Egan claims that her tax basis in Fidelity High Tech
was increased by the $158,400,000 premium charged for the long options
acquired by Option A, but not decreased by the $154,997,563 premium
simultaneously credited to Option A for the short options.

794. Maureen Egan's actual net economic cost of the NASDAQ 100 options was
$3,402,437. The tax basis increase that she claims to have resulted from the
contribution of the NASDAQ 100 options (through Option A) to High Tech was
more than 45 times greater than her economic cost. (LaRue, 43:101-02; Dem. Ex.
3104).

795. As also described above, Richard Egan claims that his tax basis in Fidelity High

200

Tech was increased by the $1,600,000 premium charged for the long options acquired by Index A, but not decreased by the $1,565,632 premium simultaneously credited to Index A for the short options.

796. Richard Egan's actual net economic cost of the NASDAQ 100 options was $34,368. The tax basis increase that he claims to have resulted from the contribution of the NASDAQ 100 options (through Option A) to High Tech was more than 45 times greater than his economic cost. (LaRue, 43:101-02; Dem. Ex. 3104).

797. The inflated basis was purportedly justified, among other things, on the grounds that the short options were only contingent liabilities under Section 752, and therefore assets (but not liabilities) had been contributed. (Ex. 122).

## 2. Fidelity High Tech's Claimed Tax Basis in Stock Contributed by Egans

798. As described above, at various points in 2000 and 2001, the Egans contributed high-value, low-tax-basis stock to Fidelity High Tech. The total tax basis of that stock as of the dates of their respective contribution was $8,760,194. (Dem. Ex. 3102). Under Section 723, the Egans' tax basis in the contributed stock carried over to High Tech and became High Tech's "inside" tax basis in that stock. (LaRue, 43:100-05).

799. As described above, on December 21, 2001, Maureen Egan transferred her 99% interest in Fidelity High Tech to MEE Holdings. Under Section 721, no gain or loss was recognized by Maureen Egan or MEE Holdings as a result of that transfer. Under Section 723, Maureen Egan's tax basis in High Tech carried over

to become MEE Holdings' tax basis in High Tech. Under Section 722, Maureen Egan's tax basis in MEE Holdings was increased by the amount of her tax basis in the 99% of High Tech she transferred to MEE Holdings.

800. As a result of Maureen Egan's contribution of her interest in Fidelity High Tech to MEE Holdings, the Egans contend that High Tech technically terminated under Section 708(b)(1)(B) and that the tax year of "Old" High Tech came to a close on December 21, 2001. (LaRue, 43:105-08; 44:8-9; Ex. 3).

801. As a result of the technical termination that the Egans contend occurred on December 21, 2001, both "Old" High Tech and "New" High Tech made elections under Section 754. (Exs. 3, 4). The effect of these elections on High Tech was that, under Section 743(b), High Tech stepped-up its inside tax basis in the stock previously contributed by the Egans in 2000 and 2001 to match the outside tax basis that MEE Holdings and Richard Egan had in their respective High Tech partnership interests. As previously noted, the tax basis of MEE Holdings in High Tech was a carryover of Maureen Egan's tax basis in High Tech as of the date she transferred that interest to MEE Holdings. (LaRue, 44:9-12).

802. The claimed outside tax basis of MEE Holdings in High Tech as of December 21, 2001, was $162,779,413. (Ex. 3). Its 99% share of High Tech's inside tax basis in the previously contributed stock was $8,672,618. (*Id.*). High Tech therefore increased its claimed tax basis in MEE Holdings' 99% proportionate share of stock in High Tech by $154,106,795. (LaRue, 44:14; Dem. Ex. 3103; Ex. 3).

803. The claimed outside tax basis of Richard Egan in High Tech as of December 31,

2001, was $1,644,242. (Ex. 4). His 1% share of High Tech's inside tax basis in the previously contributed stock was $87,602. (*Id.*). High Tech therefore increased its claimed tax basis in Richard Egan's 1% proportionate share of stock in High Tech by $1,556,640. (LaRue, 44:15-18; Dem. Ex. 3103; Ex. 4).

804.    The previously contributed stock held by High Tech as of January 1, 2002, was sold throughout 2002. High Tech used the "stepped-up" tax basis in that stock to compute its taxable gains and losses from those sales. As a result, High Tech reported capital losses of $87,661,000 on its 2002 Form 1065. (LaRue, 44:21-22; Dem. Ex. 3105; Ex. 5).

805.    The actual tax basis in the stock contributed to High Tech was $8,760,194. (Dem. Ex. 3102). The actual sales price when that stock was sold was $76,194,486. (Dem. Ex. 3105). The actual capital gain was therefore $67,434,292.

806.    The inflated claimed basis as a result of the High Tech transaction was $163,855,486. (*Id.*).

807.    The High Tech transaction accordingly "eliminated" $67,434,292 of otherwise-taxable capital gain and resulted in additional claimed capital "losses" of $87,661,000. (LaRue, 44:22-23; Dem. Ex. 3105).

## CC.    The Reporting of the Fidelity High Tech Transaction on Partnership Returns (Form 1065)

808.    The consummation of the Fidelity High Tech transaction involved the filing of three partnership tax returns: (1) a partnership return (Form 1065) for Fidelity High Tech for the short tax year ending December 21, 2001; (2) a partnership return (Form 1065) for Fidelity High Tech for the short tax year between

December 21 and 31, 2001; and (3) a partnership return (Form 1065) for Fidelity High Tech for 2002.

809. Ultimately, the effect of the artificial step-up in basis was reflected on the Egans' 2002 individual income tax return (Form 1040), as the Egans sold the stock with the inflated basis in 2002.

810. As described above, the Egans took the position on those returns that the Fidelity High Tech transaction "eliminated" more than $67 million in capital gain and generated additional capital "losses" of more than $87 million.

811. In order to disguise the true nature of the Fidelity High Tech transaction, and to reduce the likelihood of an IRS audit, the Egans made a variety of false statements and material omissions on their tax returns, as described below.

## 1.    Form 1065 for the Short Tax Year Ending December 21, 2001

812. As described above, the Egans contend that there was a technical termination of "Old" High Tech on December 21, 2001, under Section 708(b)(1)(B). As a result, High Tech closed its tax year on December 21, 2001. (LaRue, 44:9-10; Ex. 3).

813. "Old" Fidelity High Tech filed a partnership tax return (Form 1065) for the short tax year ending December 21, 2001. (Ex. 3).

814. "Old" Fidelity High Tech filed a Section 754 election with its Form 1065 for the short tax year ending December 21, 2001. (LaRue, 44:9-10; Ex. 3).

815. "Old" Fidelity High Tech filed a Section 743(b) statement with its Form 1065 for the short tax year ending December 21, 2001. (Ex. 3). That statement showed how the $154,106,795 in purported basis step-up attributable to the 99%

204

partnership interest transferred by Maureen Egan to MEE Holdings was calculated

and then allocated among the stock previously contributed to High Tech by the

Egans in 2000 and 2001. (LaRue, 44:12-14; Ex. 3).

816. "Old" Fidelity High Tech's Form 1065 for the short tax year ending December 21,

2001, did not provide any indication as to how Maureen Egan had derived the

outside tax basis that she claims to have had in High Tech and that was used to

make the basis step-up adjustments to the contributed stock. There is no

indication on that return (or on any statement filed with that return) that her

outside tax basis in High Tech had been calculated by increasing her basis by

$158,400,000 in premiums charged for the long options, and without regard to the

$154,997,563 in premiums credited for the short options. There is no indication

that the net premium actually paid by Maureen Egan, through her single-member

limited liability company (Option A), was only $3,402,437. (LaRue, 44:14-15;

Ex. 3).

## 2. Form 1065 for the Short Tax Year Ending December 31, 2001

817. "New" Fidelity High Tech filed a partnership tax return (Form 1065) for the short

tax year beginning December 22, 2001, and ending December 31, 2001. (Ex. 4).

818. "New" Fidelity High Tech filed a Section 754 election with its Form 1065.

(LaRue, 44:17-18; Ex. 4).

819. "New" Fidelity High Tech also filed a Section 743(b) statement with its Form

1065. That statement showed how the $1,556,640 in purported basis step-up

attributable to Richard Egan's 1% partnership interest in New High Tech was

205

calculated and then allocated among the stock previously contributed to High

Tech by the Egans in 2000 and 2001. (LaRue, 44:18; Ex. 4).

820. "New" Fidelity High Tech's Form 1065 for 2001 did not provide any indication as

to how Richard Egan had derived the outside tax basis that he claims to have had

in High Tech and that was used to make the basis step-up adjustments to the

contributed stock. There is no indication on that return (or on any statement filed

with that return) that his outside tax basis in High Tech had been calculated by

increasing his basis by $1,600,000 in premiums charged for the long options, and

without regard to the premiums credited for the short options. There is no

indication that the net premium actually paid by Richard Egan, through his

single-member limited liability company (Index A), was only $34,368.

## 3. Form 1065 for the Tax Year Ending December 31, 2002

### a. Reporting of Claimed Losses

821. On its 2002 Form 1065, High Tech reported net short-term capital losses of

$315,389 (on Schedule K, Line 4(d)) and net long-term capital losses of

$87,194,495 (on Schedule K, Line 4(e)(1)). (LaRue, 44:23-24; Ex. 5).

822. Those losses were reported on Schedule D attached to the 2002 Form 1065. (Ex.

5). The aggregate amounts reported on Schedule D were broken out by groups of

stock on a separate statement from Mellon Bank. The statement showed the

number of units sold, a description of the stock sold, the date that stock had been

acquired, the date that stock had been sold, the "Gross Sales Price," High Tech's

purported "Cost or Other Basis," and the amount of the capital loss

("Short-Term"/ "Long-Term Gain/Loss") claimed by High Tech. (LaRue, 44:24; Ex. 5).

823. The amount shown on the Mellon Bank statement in the column labeled "Cost or Other Basis" was the artificially stepped-up tax basis that High Tech claimed to have had in each group of stock. The amounts shown as "Cost or Other Basis" were not explained or otherwise described anywhere on High Tech's Form 1065. (LaRue, 44:24-26).

### b. Other Required Explanations and Disclosures

824. The instructions to Schedule D of Form 1065 required that if a partnership "does not use cash cost" to compute basis, it must "attach an explanation of the basis." (Ex. 3616).

825. Because Fidelity High Tech did not use cash cost to compute the stepped-up basis, it was required to attach an explanation to Schedule D. No such explanation was attached. (LaRue, 44:24-26; Ex. 3616). An adequate explanation, as required by the instructions, would have included disclosure of the underlying transaction that resulted in the purported stepped-up tax basis used by Fidelity High Tech.

826. Because the transaction qualified as a reportable transaction under Temp. Treas. Reg. 1.6111-4T, a disclosure statement should have been filed. (LaRue, 44:29). No such disclosure statement was filed with any Fidelity High Tech Form 1065 (or with the Egans' individual income tax return). (Ex. 5).

827. No Form 8275 Disclosure Statement was filed with any Fidelity High Tech 2002 Form 1065. (LaRue, 44:29-31; Ex. 5). According to the instructions to the form,

207

> Form 8275 is used by taxpayers and income tax return preparers to disclose items or positions, except those taken contrary to a regulation, that are not otherwise adequately disclosed on a tax return to avoid certain penalties. The form is filed to avoid the portions of the accuracy-related penalty due to disregard of rules or a substantial understatement of income tax if the return position has a reasonable basis.

(Ex. 3137). For items attributable to a partnership, disclosure should be made on the tax return of the partnership. (*Id.*). If the partnership does not make the disclosure, the partner "may make adequate disclosure of these items." (*Id.*).

828. The High Tech transaction was not disclosed on High Tech's 2002 Form 1065. If the High Tech transaction had been disclosed, the likely effect would have been that the risk of audit and ultimate detection would have increased.

## DD. Reporting of the Fidelity High Tech Transaction on the Egans' 2002 Individual Return (Form 1040)

829. As described above, the inflated basis created by the Fidelity High Tech transaction "eliminated" all of the capital gains resulting from the sale of EMC and other stock held in High Tech.

830. As a result, none of those gains were reported on the Egans' 2002 individual tax return, and no taxes were paid on those gains.

831. The net losses allocated to Maureen Egan (through MEE Holdings) and to Richard Egan (through MEE Holdings and Fidelity High Tech) were reported on statements attached to the Egans' 2002 individual tax return, and from there (with other items) to Schedule D.

## EE.   The Tax Consequences of the Fidelity International Transaction Claimed by the Egans

832.   The purpose of the Fidelity International transaction was to create artificial ordinary losses so that the Egans could exercise non-qualified stock options without paying income tax.

### 1.   Richard Egan's Claimed Basis in His Partnership Interest in Fidelity International

833.   As reflected on Richard Egan's 2001 Schedule K-1 for Fidelity International, the amount of capital contributed by Richard Egan during the year to Fidelity International was $164,037,227.   (Ex. 6).

834.   As described above, under Section 704(d), a partner is permitted to deduct his distributive share of the partnership's losses only to the extent of his outside tax basis in his partnership interest as of the end of the partnership's tax year (before consideration of those losses).   (LaRue, 42:111).

835.   As also described above, Richard Egan claims that his tax basis in Fidelity International was increased by the $150,000,000 in premiums charged for the opening interest rate long options acquired by Fidelity World, but not decreased by the $147,750,000 in premiums simultaneously credited to Fidelity World for the opening interest rate short options.   (*Id.* at 42:112; Dem. Ex. 3092).

836.   Richard Egan's actual net economic cost of the opening interest rate options was $2,250,000.   The tax basis that he claims resulted from the contributions of the interest rate options (through Fidelity World) to Fidelity International was more than 65 times greater than his economic cost.

209

837. Again, the inflated basis was purportedly justified, among other things, on the grounds that the short options were only contingent liabilities under Section 752, and therefore assets (but not liabilities) were contributed.

838. Richard Egan's tax basis in his partnership interest in Fidelity International was also increased in 2001 by the following amounts: (1) his cash contributions in the amount of $9,674,500; (2) the contributed shares of Stockton Holding, with a value of $4,663,135; (3) the $325,500 he paid to acquire Mahoney's purported 88% common ownership interest in Fidelity International; and (4) other de minimis amounts (in a net amount of $3,184). (LaRue, 42:112-13; Dem. Ex. 3092).

839. In its December 31, 2001 Allocation of Expenses for Fidelity International, KPMG allocated one-half of the $1,370,000 advisory fee owed to KPMG, and one-half of the $3,375,000 advisory fee owed to Helios, among all the options entered into by Fidelity International and Fidelity World during 2001. (Ex. 1502). As of that date, Fidelity International had paid KPMG half of its fee, or $685,000, but had not yet paid any of the fee owed to Helios. The one-half share of fees to KPMG and Helios were treated as accrued by Fidelity International in 2001, and allocated between and capitalized to the interest rate long and short options, the interest rate close-out options, the foreign currency long and short options, and the replacement foreign currency options. (LaRue, 42:69-73, 94; Dem. Ex. 3070).

## 2.     The Claimed Allocation of $163 Million Gain to Mahoney

840. As described above, on October 22, 2001, Fidelity International entered into

210

opening foreign currency option trades with Refco.

841.   On October 29 and 30, Fidelity International and Refco entered into the
       replacement option trades for the gain legs of the foreign currency options, as to
       which Fidelity International recorded a bookkeeping "gain" of $175,603,084.
       (LaRue, 42:68; Dem. Ex. 3070; Ex. 1404).  Fees in the amount $1,617,246,
       consisting of a portion of the Helios and KPMG fees for the Fidelity International
       transaction, were allocated and capitalized to those trades. (LaRue, 42:68, 102-
       03; Dem. Ex. 3070; Ex. 14).

842.   The recorded bookkeeping "gains" of $175,603,084 were allocated to the
       purported "partners" of Fidelity International (Richard Egan, Mahoney, Helios,
       and Alpha) based upon their ownership interests as of October 29 and 30, 2001.
       (LaRue, 42:68, 102-03; Dem. Ex. 3070; Ex. 14).

843.   Richard Egan was allocated 5% of the "gains," or $8,780,154.  (Ex. 1404).  In
       addition, and as described below, capitalized fees in the amount of $1,617,246
       were specially allocated entirely to Richard Egan.  (LaRue, 42:102-03; Dem. Ex.
       3070; Ex. 14).  Both the bookkeeping "gain" of $8,780,154 and the capitalized
       fees of $1,617,246 are components of the $158,630,922 net ordinary loss reported
       on Richard Egan's 2001 Schedule K-1.  (LaRue, 42:103-04; Dem. Ex. 3071; Ex.
       6).

844.   Samuel Mahoney was allocated 93% of the "gains," or $163,310,868.  Mahoney's
       93% interest in the $1,617,246 of capitalized fees was specially reallocated to
       Richard Egan.  (Dem. Ex. 3070; Ex. 14).  The bookkeeping "gain" of

211

$163,310,868 is a component of the $154,503,242 net ordinary gain reported on

Mahoney's 2001 Schedule K-1. (Dem. Ex. 3071).

## 3.    The Claimed Allocation of $163 Million Loss to Richard Egan

845.    As described above, as part of the plan to implement the Fidelity International

transaction, the loss legs were to be closed out no later than December 31, 2001,

in order to generate an ordinary loss in the year 2001.

846.    As also described above, Richard Egan executed a Buy-Sell Notice dated

November 5, 2001, to purchase 88% of the common membership interest in

Fidelity International from Mahoney for $325,500. As a result, Richard Egan now

held a 93% common ownership interest in Fidelity International and Mahoney

held a 5% interest.

847.    As also described above, on December 3, 2001, Fidelity International terminated

all remaining foreign currency options, including the replacement options. After

the terminations, Fidelity International recorded a bookkeeping "loss" in the

amount of $176,152,349. (Dem. Ex. 3070; Exs. 1404, 14). Fees in the amount of

$1,972,159, consisting of a portion of the Helios and KPMG fees, were allocated

and capitalized to those trades. (Dem. Ex. 3070; Ex. 14).

848.    The "loss" in the amount of $176,152,349 was allocated to the purported

"partners" of Fidelity International (Richard Egan, Mahoney, Helios, and Alpha)

based upon their ownership interests as of December 3, 2001. (Dem. Ex. 3070;

Ex. 14).

849.    Richard Egan was allocated 93% of the "loss," or $163,821,685. (Ex. 1404). In

212

addition, capitalized fees in the amount of $1,972,159 were specially allocated entirely to Richard Egan. (Dem. Ex. 3071; Ex. 14). Both the bookkeeping "loss" of $163,821,685 and the capitalized fees of $1,972,159 are components of the $158,630,922 net ordinary loss reported on Richard Egan's 2001 Schedule K-1. (Dem. Ex. 3071; Ex. 6).

850.    Mahoney was allocated 5% of the "loss," or $8,807,618. Mahoney's 5% interest in the $1,972,159 of capitalized fees was specially reallocated to Richard Egan. (Dem. Ex. 3071; Ex. 14). The bookkeeping "loss" of $8,807,618 is a component of the $154,503,242 net ordinary gain reported on Mahoney's 2001 Schedule K-1. (Dem. Ex. 3071; Ex. 6).

851.    The effect of capitalization of fees to the foreign currency options and the replacement options was to decrease the amounts of the gains, and increase the amounts of the losses, recorded by Fidelity International. (LaRue, 42:94-95; Dem. Ex. 3070).

852.    The fees that were initially allocated to Alpha, Helios, and Mahoney with respect to their allocable ownership interests, were all specially reallocated to Richard Egan. The effect of the special reallocation to Richard Egan was to increase his distributive share of the net loss by $1,673,435 (from a net loss of $156,956,487 to a net loss of $158,630,922), while increasing Mahoney's distributive share of net gain and decreasing Alpha's and Helios' distributive shares of net loss. (LaRue, 42:99-104; Dem. Ex. 3071; Ex. 14).

213

## 4.     The Capitalization of Fees

853.    For purposes of calculating the amount of the "loss" on the 2001 Form 1065,
        Fidelity International capitalized fees totaling $4,745,000, of which $1,370,000
        was payable to KPMG and $3,375,000 was payable to Helios. Those fees were
        accrued and capitalized into the tax basis of the interest rate options (including the
        close-out options) and the foreign currency options (including the replacement
        options). (LaRue, 42:69-70, 43:80-82; Dem. Ex. 3070; Ex. 14).

854.    The capitalization of fees to the options in the amount of $4,745,000 included
        100% of the $3,375,000 fee payable to Helios and more than 90% of the
        $1,500,000 fee payable to KPMG.

855.    The capitalization of fees in that amount was contrary to the treatment in KPMG's
        workpapers. KPMG's workpapers reflect that only one-half of these fees were to
        be capitalized and that the remainder could not be deducted until Fidelity
        International was liquidated. (LaRue, 42:72-73; Exs. 1502, 14).

856.    The capitalization of fees in that amount was also contrary to the conclusion of the
        Sidley Austin opinion letter. The opinion letter states that all or a portion of the
        advisory fees could be treated as organizational or syndication fees under Section
        709(a). (Ex. 121). Organizational fees paid by a partnership are capitalized and,
        at the partnership's election, amortized over 60 months. Syndication fees are also
        capitalized, but are not amortizable or deductible. The fees therefore could not
        have been fully deducted in 2001. (LaRue, 42:73-78; Ex. 121).

## 5. The Reallocation of Fees to Richard Egan

857. The fees allocated to the foreign currency options, including the replacement options, were initially allocated between the Fidelity International partners based on their profit and loss sharing ratios. (Ex. 1502). KPMG, however, reallocated all the fees back to Richard Egan. (*Id.*). Ultimately, 100% of the fees allocated to the foreign currency options were allocated to Richard Egan. (LaRue, 42:100-03; Dem. Ex. 3071; Ex. 14).

858. That reallocation is inconsistent with the purported effect of the transaction, and there is no attempted justification or explanation of the allocation in the record. (LaRue, 42:104; Ex. 2151).

859. The effect of the reallocation of the fees to Richard Egan was to increase his reported loss by $1,674,435. (Dem. Ex. 3071).

860. Fidelity International did not make a special allocation of the fees allocated to the interest rate options and close-out options for 2002. (LaRue, 42:107-09).

## FF. The Reporting of the Fidelity International Transaction on the 2001 Partnership Return (Form 1065)

### 1. The Netting of Gains and Losses

861. Fidelity International filed a partnership return (Form 1065) for the 2001 tax year on April 15, 2002. (Ex. 6).

862. On the 2001 Form 1065, the gains and losses from the transaction were netted on Schedule K and reported as a net loss in the amount of $4,138,665. (LaRue, 42:95-96; Dem. Ex. 3070; Ex. 6).

863. Richard Egan's distributive share of the net gains and losses recorded by Fidelity

215

International in 2001 was a loss of $158,630,921. (Ex. 6). That amount included 5% of the gain from the close-out of the gain legs of the foreign currency trades ($8,699,291), 93% of the loss from the close-out of the loss legs of the foreign currency options (<$165,655,778>), and a special reallocation of capitalized fees in the amount of $1,674,435, producing a net loss of $158,630,921. (LaRue, 42:110; Dem. Ex. 3071; Ex. 6).

864. Mahoney's distributive share of the net gains and losses recorded by Fidelity International in 2001 was a gain of $154,503,242. (Ex. 6). That amount included 93% of the gain ($161,806,820), 5% of the loss (<$8,906,225>), and a special reallocation of capitalized fees from him to Richard Egan, which increased his net gain by $1,602,647 to $154,503,242. (LaRue, 42:110; Dem. Ex. 3071; Ex. 6).

865. Fidelity International allocated a net loss of $158,630,921 to Richard Egan on Richard Egan's Schedule K-1. (Dem. Ex. 3071; Ex. 6).

866. Fidelity International allocated a net gain of $154,503,242 to Mahoney on Mahoney's Schedule K-1. (Dem. Ex. 3071; Ex. 6).

## 2. The Reporting of the Loss as "Other Income"

867. Schedule K of the Form 1065 is a summary schedule that is used to report all of the partners' shares of various items of income, gain, loss, deduction and credit. (LaRue, 42:114-15). Lines 1 through 21 on the first page of Form 1065 detail the income, gains, deductions, and losses from the partnership's trade or business activities. The net income or loss from the partnership's trade or business activities is computed by totaling these amounts on Line 22. (*Id.* at 42:113-15).

216

868.   Line 1 of Schedule K is used to report the partnership's net income or loss from its trade or business activities and is a carryover amount from Line 22 on the first page of the Form 1065. (*Id.* at 43:7-8; Ex. 2719). Lines 2 through 6 of Schedule K are used to report several different types of income. Generally, any income that is not otherwise required to be reported on lines 1 through 6 of Schedule K is reported on Line 7 ("Other income (loss)") of Schedule K. (LaRue, 42:115; Ex. 2719).

869.   The $4,138,665 net loss from the Fidelity International transaction was reported on the Schedule K of Fidelity International on Line 7 as "Other Income (loss)." (Ex. 6).

**3.     The Treatment of the Currency Option "Loss" as a Section 988 Loss**

870.   A Section 988 gain or loss is a gain or loss resulting from a taxable disposition of certain foreign-currency-denominated instruments. Section 988 gains and losses are generally treated as ordinary income and ordinary losses, rather than as capital gains and capital losses. (LaRue, 42:117). Currency option trades are treated as Section 988 transactions.

871.   The gains and losses from the terminations of the foreign currency options and the replacement options were treated by Fidelity International as Section 988 gains and losses. (*Id.* at 42:117; Ex. 6).

**4.     The Failure to File a Form 4797**

872.   Form 4797, entitled "Sale of Business Property," is used to report six categories of transactions. (LaRue, 43:10-11; Ex. 2735). The instructions for Form 4797 state,

among other things, that it should be used to report (1) "The sale or exchange of . . . [p]roperty used in your trade or business . . ."; (2) " The disposition of noncapital assets (other than inventory or properly held primarily for sale to customers in the ordinary course of your trade or business))"; and (3) "The disposition of capital assets not reported on Schedule D." (LaRue, 43:10-11; Ex. 2735).

873.    The disposition of foreign currency options is required to be reported on Form 4797 by a partnership, unless the options were inventory or property held primarily for sale to customers in the ordinary course of business or the dispositions were reported on Schedule D. (LaRue, 43:10-12; 44:42-47, 89-90; Ex. 2735). Because neither of these exceptions are applicable, any Fidelity International foreign currency gains or losses should have been reported on Form 4797. (LaRue, 43:11-12).

874.    Fidelity International did not report any foreign currency gains or losses on a Form 4797.

875.    KPMG's workpapers for the 2001 Form 1065 of Fidelity International show that KPMG originally planned to report the net loss of $4,138,665 from the foreign currency trades on a Form 4797. (LaRue, 43:8-9; Ex. 14). KPMG prepared a draft schedule entitled "Form 4797-Attachment." (Ex. 14).

876.    The schedule actually filed as an attachment to the 2001 Form 1065 was identical to the draft schedule, except that "Form 4797-Attachment" in the title was replaced with "Form 1065, Page 3, Line 7 - Other Income /(Loss) - Attachment --

218

Section 988 Foreign Currency Gain/(Loss)." (LaRue, 43:9-10; Ex. 6).

## 5.   The Failure to Report the Net Loss as a "Trade or Business" Loss

877.   On the "Schedule of Activities" on each Schedule K-1 for each partner, Fidelity
International reported the partner's distributed share of gains and losses from the
foreign currency options under a column labeled "GEN. T/B." (Ex. 6). The
reference "GEN. T/B" meant that the foreign currency gains and losses arose from
"General Trade or Business" activities.

878.   Fidelity International did not report the net loss of $4,138,665 from the foreign
currency options on the face of the partnership return. That failure was
inconsistent with the description of that loss as a "GEN. T/B." (*Id.*).

879.   If the $4,138,665 net loss had been reported as a trade or business loss, the loss
should have been reported on Line 6 of the first page of the Form 1065. The net
loss would then have carried over to Line 1 of Schedule K, with each partner then
reporting their distributive share of the gains and losses reflected in the net loss on
Line 1 of each partner's Schedule K-1. (LaRue, 43:7-8).

880.   If Richard Egan's $158,630,922 distributive share of the $4,138,665 net loss had
been reported on Line 1 of his Schedule K-1, that loss would have been reported
on Part II of Schedule E of the Egans' 2001 individual income tax return (Form
1040). If that loss had been reported on Part II of Schedule E, the net amount
would have carried over and been reported on line 17 on the face of the Form
1040. (*Id.* at 43:22).

881.   If Richard Egan's allocated loss had been properly reported on Line 1 of his

Schedule K-1, and on Part II of Schedule E of the 2001 Form 1040, that loss could not have been netted against the ordinary income recognized by the Egans from the exercise of the EMC stock options on Statement 1 of the Egans' joint 2001 Form 1040 or on Line 21 on the face of their 2001 Form 1040. (*Id.* at 43:22-23).

## 6.    The False Entries on Schedules L and M-2

### a.    The Purpose of Schedule L

882.    Schedule L of Form 1065 ("Balance Sheets per Books") is used to report the partnership's balance sheets as of the beginning and the end of the tax year. The partnership is required to report the beginning and ending balances of the partnership's assets and liabilities and the partners' capital accounts. The "partners' capital accounts" is analogous to the corporate concept of "owners' equity." (*Id.* at 43:32-33).

883.    Schedule L is an informational schedule. None of the numbers reported on the schedule carry through directly to the partners' individual tax returns. Schedule L provides information that may be useful to the IRS in testing the completeness and the accuracy of other amounts of income, gain, loss, deduction, and credit that may be reported elsewhere on the Form 1065. (*Id.* at 43:33).

### b.    The 2001 Fidelity International Schedule L

884.    Line 8 of Schedule L for the 2001 Fidelity International Form 1065 reports an asset of "Other investments" totaling $294,800,575.

885.    Statement 3 of the Schedule L in the 2001 Form 1065 of Fidelity International includes a description of how that amount was determined. (*Id.* at 43:33-34; Ex.

6). Statement 3 shows an "ending" balance for "Investment in Fidelity World" in the amount of $150,304,982 and an "ending" balance for "Foreign Exchange Options" in the amount of $134,832,153. (Ex. 6).

### (1) "Investment in Fidelity World" of $150,304,982

886. The listing of "Investment in Fidelity World" as an asset with an "ending" balance in the amount of $150,304,982 appears to represent the $150,000,000 premium to acquire the opening interest rate long options, plus $304,982 in capitalized advisory fees. (LaRue, 43:34-35).

887. The reference on Statement 3 to an "ending" balance for Fidelity World of $150,304,982 was false.

888. The value of Fidelity World as of December 31, 2001, was zero. Fidelity World owned no assets on that date other than the offsetting interest rate options, and those had no value. The 10-year CMS options and LIBOR options had been closed out on November 6, 2001, with Refco making a net payment to Fidelity International of $1,493,641, representing the then-existing value of those trades. Thus, while the interest rate options remained on the books of Fidelity World, they had no remaining value. (*Id.* at 43:35-37, 39; Dem. Ex. 3075).

889. The Egans and their advisors knew or reasonably should have known that the value of Fidelity World as of December 31, 2001, was zero. (Shea, 23:49-50; M. Egan, 12:31-33; Ex. 1275).

890. Even if the interest rate options had not been closed out, the reference to "Investment in Fidelity World" as an asset with a value of $150,304,982 would

221

still be false. The net premium paid for the interest rate options was only
$2,250,000. (LaRue, 43:36; Dem. Ex. 3075). Furthermore, the interest rate
options when acquired had a value of even less than the net premium, because a
significant portion of the net premium was attributable to Refco's fees.

891.    Furthermore, and in any event, the reference to an investment in Fidelity World in
Statement 3 of Schedule L is inconsistent with Fidelity World's treatment as a
disregarded entity. (LaRue, 43:35).

#### (2)    Investment in "Foreign Exchange Options" of $134,832,153

892.    The reference on Statement 3 to "Foreign Exchange Options" with an "ending"
balance in the amount of $134,832,153 is false.

893.    The listed asset was not the foreign currency options, but relates to the interest
rate options. The foreign currency options had been terminated prior to December
31, 2001, and were no longer on the books of Fidelity International as of the end
of its 2001 tax year. (*Id.* at 43:37-39; Dem. Ex. 3070).

894.    The purported "Foreign Exchange Options" with an "ending" balance in the
amount of $134,832,153, represents the amount of the premiums charged to
Fidelity World by Refco for the close-out interest rate long options, plus allocated
fees, without regard to the premiums credited for the close-out interest rate short
options, and without regard to the $1,493,641 net premium credited and paid to
Fidelity World by Refco in 2001. (LaRue, 43:37-39; Dem. Ex. 3075).

895.    The interest rate options had no value as of December 31, 2001. (LaRue, 43:39;
Dem. Ex. 3075).

896.    On November 6, 2001, Refco paid Fidelity International cash in the amount of
        $1,493,641 from the offset of these trades. Those funds were transferred out of
        Fidelity International's Refco account on December 10, 2001, with interest in the
        amount of $2,807. (Exs. 14, 2095).

897.    The Egans and their advisors knew or reasonably should have known that the
        reference to "Foreign Exchange Options" with an "ending" balance in the amount
        of $134,832,153 was false. Michael Egan and Pat Shea knew that the interest rate
        options had a net value of zero after the offset trades on November 6, 2001. (M.
        Egan, 12:31-32; Shea, 23:49-50). Calkins recorded in her notes that the "value"
        of the interest rate options after November 6 was "$0." (Ex. 1275). The
        Summary of Transaction reported to the Egans that as a result of entering into
        these offset trades, Fidelity World "eliminated its economic risk of gain or loss on
        its October 9, 2001 trades and realized" an aggregate net economic loss of
        $756,359. (Ex. 2).

        **(3)    The Effect of the False Reporting on Schedule L**

898.    The false amounts of $150,304,982 and $134,832,153 that were described in
        Statement 3 to Schedule L were included in the ending balance of "Other
        Investments" on Line 8(d) of Schedule L of Fidelity International's 2001 Form
        1065. (Ex. 6). The inclusion of these amounts overstated the ending balances
        reported on Schedule L for "Other investments" (Line 8(d)), "Total assets" (Line
        14(d)), "Partners' capital accounts" (Line 21(d)), and "Total liabilities and
        capital" (Line 22(d)).  (*Id.*).

899.    Each of those balances was overstated by the aggregate sum of $150,304,982 and

        $134,832,153, or $285,137,135. (LaRue, 43:39-41). The amount shown in

        answer to "Question F" on the face of Fidelity International's 2001 Form 1065,

        where Fidelity International listed "Total assets" of $300,403,052, was also

        overstated by $285,137,135. (*Id.* at 43:40-41; Ex. 6).

### 7.    The Purpose of Schedule M-2

900.    Schedule L to the Form 1065 shows the beginning and ending aggregate balances

        of the partners' capital accounts.  Schedule M-2 reconciles those beginning and

        ending balances by providing a summary description of the events that increased

        and decreased that account during the year.

901.    Schedule M-2 is an informational schedule.  None of the amounts shown on the

        Schedule M-2 directly carry through to the partners' individual Forms 1040.

        Schedule M-2 provides information that may be useful to the IRS in testing the

        completeness and the accuracy of other amounts of income, gain, loss, deduction,

        and credit that may be reported elsewhere on the Form 1065.  (LaRue, 43:41-42).

902.    The amount shown on Line 1 of Schedule M-2 is the same amount shown on Line

        21(b) of Schedule L.  The amount shown on Line 9 of Schedule M-2 is the same

        amount shown on Line 21(d) of Schedule L.  (*Id.*).

### 8.    The 2001 Fidelity International Schedule M-2

903.    The amounts shown on lines 4, 7, and 9 of Fidelity International's M-2 were false.

        (*Id.* at 43:43-44; Dem. Ex. 3084).

904.    The amount shown on Line 4 ("Other increases") was overstated by

224

$134,832,153. (LaRue, 43:53-54; Dem. Ex. 3084).

905. The amount show on Line 7 ("Other decreases") was understated by
$150,304,982. (LaRue, 43:53-54; Dem. Ex. 3084).

906. The net effect of the overstatement on Line 4 and the understatement on Line 7
was that the net amount shown on Line 9 ("Balance at end of year") was
overstated by $285,137,135.

907. The correct ending balance of the partners' capital accounts was $11,205,917.
The amount shown on Schedule M-2 of Fidelity International's 2001 Form 1065
was therefore overstated by 2,645%. (LaRue, 43:53-54; Dem. Ex. 3084).

908. Richard Egan and his advisors knew or reasonably should have known that the
ending balance of the partners' capital accounts was dramatically overstated.

## 9. The Effect of the False Schedule M-2 on the Schedule K-1

909. The aggregate amounts shown on Schedule M-2 are broken out and allocated
among the various partners, and reported separately on Item J, Columns (a)
through (e), of their respective Schedule K-1s. (LaRue, 43:54-55).

910. The amount shown as Richard Egan's "Capital account at end of year" in Column
(e) of Item J of his Schedule K-1 was $286,827,488. (*Id.* at 43:55; Ex. 6).

911. Based on that reported amount, Richard Egan's total partnership capital, before
consideration of the $158,626,538 net loss allocated to him, was purportedly
$445,454,026. As reported, Richard Egan's $158,626,538 allocated loss was 36%
of the total amount of his capital. (LaRue, 43:58-59; Dem. Ex. 3086).

912. The correct amount of Richard Egan's "Capital account at end of year" was

$12,806,195. (LaRue, 43:59-60; Dem. Ex. 3087).

913. Based on that corrected amount, Richard Egan's total partnership capital, before consideration of the $158,626,538 net loss allocated to him, was therefore $171,432,733. Richard Egan's $158,626,538 allocated loss was therefore 93% of his partnership capital. (LaRue, 43:59-60; Dem. Ex. 3087).

914. On its 2001 Form 1065, Schedule L, Line 8(d), Fidelity International reported an ending balance for "Other investments" in the amount of $294,800,575. (Ex. 6). The correct amount was $9,663,440. The total was therefore overstated by $285,137,135, or 3,051%. (LaRue, 43:52-53; Dem. Ex. 3083).

915. On its 2001 Form 1065, Schedules L and M-2, Fidelity International reported an ending balance for "Partners' capital accounts" in the amount of $296,343,052. (Ex. 6). The correct amount was $11,205,917. The total was therefore overstated by $285,137,135, or 2,645%. (LaRue, 43:53; Dem. Exs. 3083, 3084).

916. For its "Analysis of partner's capital account," Schedule K-1, Item J, Column (e), Fidelity International reported that Richard Egan had a "Capital account at end of year" in the amount of $286,827,488. (Ex. 6). The correct amount was $12,806,195. The total was therefore overstated by $274,021,293, or 2,240%. (LaRue, 43:55, 59-60; Dem. Ex. 3087; Ex. 6).

917. Richard Egan and his advisors knew, or reasonably should have known, that the amount stated on his Schedule K-1 for "Capital Account at End of Year" was dramatically overstated.

## 10. The Ultimate Effect of the False Schedules L and M-2

918. The effect of the false statements in Schedules L and M-2, and on Richard Egan's Schedule K-1, was to obscure the magnitude of the loss allocated to Richard Egan as compared to his actual investment in Fidelity International. (LaRue, 43:60-61).

919. If the correct amount had been reported on Richard Egan's "Capital Account at End of Year" on the Schedule K-1, Item J, in Column (e), it would have increased the risk of audit and detection by the Internal Revenue Service.

920. The false entries were made deliberately in order to conceal the Fidelity International transaction from IRS scrutiny.

## 11. The Failure to Disclose the Transaction Otherwise

### a. Schedule K-1, Line 25

921. The 2001 Instructions for Form 1065 require a partnership to disclose on Line 25 of the Schedule K-1 any information or statements a partner needs to comply with the registration and disclosure requirements found in Sections 6111 and 6662(d)(2)(B):

> Any information or statements a partner needs to comply with section 6111 (registration of tax shelters) or section 6662(d)(2)(B)(ii) (regarding adequate disclosure of Items that may cause an understatement of income tax).

(*Id.* at 43:63-64; Ex. 2719).

922. For purposes of the reduction of the substantial-understatement accuracy-related penalty, Section 6662(d)(2)(B)(ii) requires that a partnership adequately disclose the relevant facts affecting the item's tax treatment in the return or in a statement attached to the return and that there be a reasonable basis for the tax treatment of

227

such item by the taxpayer. While Section 6662(d)(2)(B) further generally provides for a reduction of penalties if an item is adequately disclosed, Section 6662(d)(2)(c) provides that Section 6662(d)(2)(B) does not apply to "tax shelters," which are defined to include partnerships the principal purpose of which is the avoidance or evasion of federal income tax.

923.    Line 25 of Richard Egan's Schedule K-1s for 2001 and 2002 were left blank and therefore did not disclose any information regarding the items that caused the understatement of Richard Egan's income tax. (LaRue, 43:65; Exs. 6, 7).

    b.    **Form 8275**

924.    Form 8275 is used by taxpayers and income tax return preparers to disclose items or positions, except those taken contrary to a regulation, that are not otherwise adequately disclosed on a tax return. Disclosure on Form 8275 allows a taxpayer to avoid certain penalties. (LaRue, 43:65-66; Exs. 3135, 3137). As set forth in the Instructions for Form 8275, the form may be filed to avoid the portions of the accuracy-related penalty due to disregard of rules or a substantial understatement of income tax if the return position has a reasonable basis. (LaRue, 43:66-67; Exs. 3135, 3137). For items attributable to a partnership, disclosure should be made on the tax return of the partnership. If the partnership does not make the disclosure, the partner may make adequate disclosure of these items. (LaRue, 43:66-67; Exs. 3135, 3137).

925.    A Form 8275 was not filed with Fidelity International's 2001 or 2002 partnership returns or with the Egans' 2001 or 2002 Form 1040s. (LaRue, 43:68-69; Exs. 6,

7, 8, 232).

### c.   Schedule K-1, Line G

926.   The instructions to Form 1065 require a partnership to show its tax registration

number if the partnership is required to be registered as a tax shelter. (LaRue,

43:69; Ex. 3139A). Item G ("Tax shelter registration number") was left blank on

the 2001 and 2002 Schedule K-1s of Richard Egan and the other partners of

Fidelity International. (Exs. 6, 7).

## GG.   The Reporting of the Fidelity International Transaction on the 2002 Partnership Return (Form 1065)

### 1.   The Reporting of the Capital Loss as an Ordinary Loss

927.   For 2002, Fidelity International reported a loss of $1,911,959 on Line 7 of

Schedule K of its Form 1065. (Ex. 7). Of that amount, $1,155,600 was

attributable to the allocation of the KPMG and Helios fees to the interest-rate

options. (LaRue, 43:74; Dem. Ex. 3075).

928.   Richard Egan was allocated $1,778,122 of the $1,911,959 loss. That amount was

reported as an "other" loss on Line 7 of his 2002 Schedule K-1. (Ex. 7).

### a.   The Purported "Section 988 Loss"

929.   This loss was described in the supporting Statement 2 to Line 7 of Fidelity

International's 2002 Schedule K as a "Section 988 Foreign Currency

Gain/(Loss)." (*Id.*).

930.   Richard Egan's 2002 Schedule K-1 similarly described his allocable share of this

loss as a "Section 988 Foreign Currency Gain/(Loss)." (*Id.*).

931.   The description of the loss as a Section 988 foreign currency loss occurring in

229

2002 was false. (LaRue, 43:74-75).

932. First, the foreign currency options had all been terminated in 2001. No such loss occurred in 2002.

933. Second, the interest-rate options had nothing to do with foreign currency. (*Id.* at 43:82).

934. Third, the interest-rate options (that is, the LIBOR options and the CMS options) were short-term capital assets for federal income tax purposes. (*Id.* at 43:76-78). The claimed loss was attributable to the close-out of the interest-rate options in 2002; that event, however, actually occurred in 2001.

### b. The Failure to Report the Loss on Schedule D

935. Schedule D to Form 1065 ("Capital Gains and Losses") is used by a partnership to report short-term and long-term capital gains and losses. (*Id.* at 43:76). Because the $1,911,959 loss was a short-term capital loss, it should have been initially reported on Schedule D and then carried over to Line 4(d) of Fidelity International's 2002 Schedule K. It should not have been reported on line 7 of the Schedule K as a Section 988 ordinary loss. (*Id.* at 43:76-78).

936. If the $1,911,959 loss had been correctly reported on Line 4(d) of Fidelity International's Schedule K, each partner's distributive share of that loss would have been reported on Line 4(d) of their respective 2002 Schedule K-1s. (*Id.* at 43:79).

937. Richard Egan's distributive share of the loss, which was $1,778,122, should have been reported on Line 4(d) of his 2002 Schedule K-1 as a short-term capital loss,

not on Line 7 as an ordinary loss. (*Id.* at 43:82).

### c. The Resulting Tax Benefit

938.    The Egans claimed Richard Egan's $1,778,122 distributive share of the 2002

Fidelity International loss on their joint 2002 Form 1040 as an ordinary loss. It

was reported (with other losses) on Line 21 ("Other income") of the Form 1040.

(Ex. 232). The loss was described in the supporting Statement 1 to Line 21 as

"Fidelity Int'l. Currency Advisor - Sect. 988 Gain/Loss." (*Id.*).

939.    The claimed loss thus reduced Richard Egan's 2002 adjusted gross income by

$1,778,122. (LaRue, 43:92-93). Although Richard Egan had otherwise already

reduced his taxable income to zero, he was still subject to the Alternative

Minimum Tax ("AMT") at a rate of 28%. (Ex. 232). The claimed ordinary loss

of $1,778,122 reduced his AMT liability by $497,874. (LaRue, 43:89-92).

940.    As noted above, individuals are permitted to deduct capital losses against ordinary

income only to the extent of $3,000 per year. (*Id.* at 43:90-91).

941.    Richard and Maureen Egan were already subject to this $3,000 capital loss

limitation with respect to the capital losses that they were claiming on their 2002

Form 1040 from the Fidelity High Tech transaction. (*Id.* at 43:91; Ex. 232). They

would therefore not have been able to deduct any portion of the loss that they

were claiming from the Fidelity International transaction if that loss had been

properly reported as a short-term capital loss, rather than as an ordinary loss.

### d. A Capital Loss

942.    The Egans' advisors were aware of the fact that any loss from the interest rate

231

options was a capital loss and not an ordinary loss. For example, on December

11, 2001, James Haber sent an e-mail to Speiss and Reiss describing the loss from

the interest rate options as "STCL from Initial Rate Trades." (Ex. 1584). "STCL"

is an acronym for "short-term capital loss." On June 13, 2002, Reiss sent an e-

mail to Shea referring to the loss as a "STCL." (Ex. 1883). On February 14,

2003, Reiss sent an e-mail to Seaver referring to the loss from the interest rate

options as a "STCL." (Ex. 2133).

## 2. The Use of the Accrual Method of Accounting

943.   Under the accrual method of accounting, income is recognized in the year in

which all events have occurred to fix the taxpayer's right to receive that income

and the amount can be determined with reasonable certainty. Expenditures are

considered as having been made in the year in which all events have occurred to

fix the taxpayer's liability for the expenditure, the amount can be determined with

reasonable certainty, and economic performance has occurred. (LaRue, 42:82-83;

Treas. Reg. § 1.461-1(a)(2)).

944.   Under the cash method of accounting, income is recognized in the year in which

cash or property having an ascertainable fair market value is actually or

constructively received by the taxpayer, and expenditures are generally recognized

in the year that cash is paid. (LaRue, 42:83; Treas. Reg. § 1.461-1(a)(1)).

945.   Fidelity International's Operating Agreement stated that "For income tax and

financial accounting purposes, the company shall use the cash method of

accounting." (Ex. 2).

232

946. Fidelity International adopted the accrual method of accounting on its 2001 Form 1065 and used that method in determining its income, gains, losses, and deductions for its 2001 and 2002 tax years. (LaRue, 42:86; Exs. 6, 7).

947. The effect of adopting the accrual method of accounting, rather than the cash method, was to shift the tax recognition of approximately $2.7 million of KPMG and Helios fees from 2002 back to 2001. (LaRue, 42:91).

948. According to Reiss, the fees were "shifted back from 2002 to 2001 to keep the total loss below $2 mil for 2002." (Ex. 2133). If those fees had been reported under the cash method, Fidelity International's 2002 reported loss would have increased by approximately $2.7 million (from $1,911,959 to approximately $4.5 million). (LaRue, 42:91-92). The amount of the net loss reported on Line 21 on the first page of the Egans' 2002 Form 1040 would have increased from a loss of $2,309,970 to a loss of approximately $5 million. (*Id.*).

949. The gross income shown on the face of the Egans' 2002 Form 1040, before consideration of Richard Egan's distributive share of the 2002 Fidelity International loss, was approximately $15 million. (Ex. 232). A $5 million loss would have been about one-third of the total amount of the income, before consideration of the loss, shown on the face of the Egans' 2002 Form 1040. (LaRue, 42:92-93).

950. The income shown on the face of the Egans' 2001 Form 1040 was approximately $230 million, before consideration of Richard Egan's distributive share of the 2001 Fidelity International loss. (Ex. 8). The $2.7 million in fees shifted back

233

from 2002 to 2001 under the accrual method is a relatively small amount when compared with the $230 million of 2001 income, whereas that same amount, had it been recognized in 2002 under the cash method of accounting, would have been a relatively large amount compared with the $15 million of income reported by the Egans in 2002. It would have been considerably more conspicuous to report the same dollar amount in 2002, when income was low, than to report it in 2001, when income was high. (LaRue, 42:92-93).

## 3. The False Statements on Schedules L and M-2 and on Richard Egan's Schedule K-1

951. The misstated ending balances on the Schedules L and M-2 of the 2001 Form 1065 of Fidelity International (and on Richard Egan's Schedule K-1) were carried over to the 2002 Form 1065 as beginning balances. (Ex. 7). As a result, Fidelity International's 2002 beginning balances for "Other investments" (Schedule L, Line 8(b)), "Total assets" (Schedule L, Line 14(b)), "Partners' capital accounts" (Schedule L, Line 21(b)), and "Balance at beginning of year" (Schedule M-2, Line 1) were each overstated by $285,137,135. (LaRue, 43:39-40; Ex. 7). Item J, column (a) ("Capital account at beginning of year") on Richard Egan's 2001 Schedule K-1 was overstated by $274,021,293. (LaRue, 43:59-60; Ex. 7).

952. The value listed for Fidelity International's "Investment in Fidelity World," which was incorrectly reported on the 2001 Form 1065, was again incorrectly reported on its 2002 Form 1065. (LaRue, 43:83-85; Ex. 7).

953. The $150,304,982 amount reported as Fidelity International's "Investment in Fidelity World" as of the end of 2001 and the beginning of 2002 was the total

234

amount of the premiums charged to Fidelity World for the opening interest rate

long options (plus $304,982 of the fees allocated to those options by KPMG),

without regard to the premiums credited to Fidelity World for the opening interest

rate short options. (LaRue, 43:34-35; Exs. 6, 7).

954. As described above, the actual value of Fidelity World at the end of 2001 was

zero. The value of Fidelity World at the end of 2002 was also zero. Furthermore,

the interest rate options, which had an economic value of zero as of the end of

2001, had been formally terminated in May 2002, and thus the interest rate

options did not even exist as of the end of 2002. (LaRue, 43:84-85).

955. Nonetheless, Fidelity International incorrectly reported a value of $147,444,792 as

its ending balance in Fidelity World as of the end of 2002. That amount was

included in the total amount of "other investments" on its 2002 Schedule L (Line

8(d) ("Other investments"). (*Id.* at 43:84; Ex. 7). As a result, the amounts

reported for "Total assets" (Schedule L, Line 14(d) and Question F), "Partners'

capital accounts" (Schedule L, Line 21(d)), and "Balance at end of year"

(Schedule M-2, Line 9) were all overstated by $147,444,792. (LaRue, 43:84; Ex.

7).

956. Richard Egan and his advisors knew or reasonably should have known that the

value of Fidelity World as of the end of 2002 was zero.

957. Item J, column (e) ("Capital account at end of year") on Richard Egan's 2002

Schedule K-1 was also substantially overstated. (LaRue, 43:85-86; Ex. 7).

Richard Egan's $1,778,122 distributive share of the loss reported by Fidelity

International in 2002 from the terminations of the interest-rate options was
relatively small compared to the $158,998,038 amount reported as his ending
capital account balance, but relatively large when compared to the correct ending
capital account balance of approximately $12 million to $14 million. (LaRue,
43:86; Ex. 7).

958.   If the correct amounts had been properly reported, the likely effect would have
been that the risk of detection and audit by the Internal Revenue Service would
have increased.

## HH.   The Reporting Of The Fidelity International Transaction on the Egans' 2001 1040 Return

### 1.   The Reporting of the "Loss" as a "White-Paper Netting Transaction"

959.   The Egans reported both the income from the exercise of the EMC Options
(totaling $162,974,496) and Richard Egan's distributive share of the Fidelity
International loss ($158,630,921) as "Miscellaneous Income" on a "white paper"
labeled Statement 1 attached to the 2001 Form 1040. (Ex. 8).

960.   The net amount of all of the items listed on Statement 1 (income of $6,053,457)
was carried over to Line 21 ("Other income") on the face of the Egans' 2001 joint
Form 1040. (Id.).

961.   If the income from the exercise of the EMC stock options had been reported on
Line 12 ("Business Income or (Loss)") on the face of the Egans' 2001 Form 1040,
then the amount shown on Line 12 would have increased from $0 to
$162,974,496, and the amount reported on Line 21 ("Other Income") would have

236

decreased by that amount from a reported $6,053,457 of ordinary income to a

$156,921,039 ordinary loss. (LaRue, 43:30-31; Ex. 8).

962.    If Richard Egan's $158,630,921 distributive share of the Fidelity International

"loss" had been reported by Fidelity International on Line 1 of its 2001 Schedule

K and on Line 1 of Richard Egan's 2001 Schedule K-1, that amount would have

carried over to Line 27 of Part II of Schedule E of the Egans' 2001 Form 1040.

The total of all of the amounts reported on Schedule E (Line 40) would have

decreased by $158,630,921 and carried over to Line 17 on the face of that return.

Thus, the $6,980,856 loss reported on Line 17 would have increased to a loss of

$165,611,777, while the amount of ordinary income reported on Line 21 would

have increased from $6,053,457 to $164,684,378. (LaRue, 43:26-27; Ex. 8).

963.    If the amounts of both the ordinary income from the exercise of the options and

Richard Egan's distributive share of the claimed Fidelity International "loss" had

been properly reported, the $6,980,856 loss reported on Line 17 would have

increased to a loss of $165,611,777, the amount shown on Line 12 would have

increased from $0 to $162,974,496, and the amount reported on Line 21 would

have decreased from a reported $6,053,457 of ordinary income to ordinary income

of $1,709,882. (LaRue, 43:31-32; Ex. 8).

## 2.    The Reporting of the "Loss" under "Miscellaneous Income"

### a.    The Reporting on Statement 1

964.    Statement 1 was the "white paper" attached to the Egans' 2001 joint Form 1040

on which the Egans reported both the income from the exercise of the EMC

237

options ($162,974,496) and Richard Egan's distributive share of the Fidelity
International loss ($158,630,921). Neither of these amounts was disclosed on the
face of the Egans' 2001 Form 1040. (Ex. 8).

965.    Statement 1 was titled "Miscellaneous Income." It was the 75th page of Richard
and Maureen Egan's 2001 Form 1040. (*Id.*). Statement 1 also listed 27 other
items of ordinary income and loss, totaling $1,709,882. (*Id.*). The net amount of
all of the items listed on Statement 1 (income of $6,053,457) were carried over to
Line 21 on the face of the Egans' 2001 joint Form 1040. (*Id.*).

966.    Richard Egan's distributive share of the Fidelity International loss was described
on Statement 1 as "Fidelity Int'l. Currency Advisor – Sect. 988 Gain/Loss." (*Id.*).
There was no indication that this loss was being allocated to Richard Egan from a
Schedule K-1. There was no indication that Fidelity International was a
multi-member LLC. (LaRue, 43:21-22; Ex. 8).

### b.    The Reporting of the "Loss" on Schedule E

967.    The instructions for the Form K-1 require that a partner's distributive share of
trade or business income (loss) be reported on Part II of Schedule E of Form 1040.
(LaRue, 43:23-24; Ex. 3139A). Richard and Maureen Egan did not report
Richard Egan's distributive share of the Fidelity International loss on Schedule E.
Fidelity International was listed as one of more than 100 entities on Statement 32
("Schedule E: Income or (Loss) From Partnerships and S Corps"). (Ex. 8).
However, no dollar amounts were associated with Fidelity International on
Statement 32. (LaRue, 43:27-28; Ex. 8).

968. If Richard Egan's $158,630,921 distributive share of the claimed Fidelity International "loss" had been properly reported on Part II of Schedule E of the Egans' joint 2001 Form 1040, the $6,980,856 loss reported on Line 17 would have increased to a loss of $165,611,777, while the amount of ordinary income reported on Line 21 would have increased from $6,053,457 to $164,684,378. (LaRue, 43:22-27; Ex. 8).

## 3. The Reporting of the Options Income as "Other Income"

969. The income from the exercise of the EMC options should have been reported on Schedule C, and carried over to Line 12 on page 1 of the Egans' 2001 joint Form 1040. (Ex. 2732). The Egans, however, improperly reported the income on Line 21 as "Other income." (LaRue, 43:29-31; Ex. 8).

970. If the option income had been reported on Line 12 on the face of the Egans' joint 2001 Form 1040, then the amount shown on Line 12 would have increased from $0 to $162,974,496, and the amount reported on Line 21 would have decreased by that amount from a reported $6,053,457 of ordinary income to a $156,921,039 ordinary loss. (LaRue, 43:31; Ex. 8).

## II. The Reporting of the Fidelity International Transaction on the Egans' 2002 1040 Return

### 1. The Reporting of the Claimed Loss

971. Richard Egan's $1,778,122 distributive share of the loss from Fidelity International's early termination of the interest rate options was reported on Statement 1 to Line 21 ("Other Income") of the Egans' joint 2002 Form 1040 as a "Sect. 988" loss. (Ex. 232).

972.   The description of the loss from Fidelity International as a "Section 988" loss was
       false. All of the foreign exchange options had been terminated by Fidelity
       International in 2001. The loss reported on Statement 1 attached to the 2002 Form
       1040 was Richard Egan's distributive share of the loss that was recognized by
       Fidelity International upon the early consensual terminations of the interest rate
       options. (LaRue, 43:89).

973.   The interest rate options (that is, the LIBOR options and the CMS options) were
       short-term capital assets. (*Id.* at 43:76, 89; Reiss, 35:108-09). Accordingly, the
       loss recognized by Fidelity International on the consensual early terminations of
       these options was a short-term capital loss that should have been reported on Line
       5 of the Egans' 2002 Schedule D ("Capital Gains and Losses"). (LaRue, 43:89-
       90).

974.   The Egans and their advisors knew or reasonably should have known that the
       interest rate options generated a short-term capital loss and not an ordinary loss.

975.   Nevertheless, the $1,778,122 loss was treated by Richard and Maureen Egan as an
       ordinary loss on Statement 1 and deducted as an ordinary loss on Line 21 of page
       1 of their 2002 Form 1040.

## 2.     The Resulting Tax Benefits

976.   In any given tax year, individual taxpayers are only permitted to deduct capital
       losses against ordinary income to the extent of $3,000. (LaRue, 43:90-91).

977.   In 2002, Richard and Maureen Egan already had net capital losses far in excess of
       the $3,000 limit as a result of the High Tech transaction, which generated a

purported long term capital loss in excess of $87 million in 2002. (*Id.* at 43:91-92; Ex. 232). That loss flowed through to Richard and Maureen Egan's 2002 Form 1040, Schedule D, from their partnership interests in High Tech and MEE Holdings. (Ex. 232). Accordingly, if the $1,778,122 loss had been properly classified and reported, no amount of that loss would have been deductible in 2002 and Richard and Maureen Egan would have received no immediate tax benefit from that loss. However, by improperly reporting the loss as an ordinary loss, the amount deducted on Line 21 of Richard and Maureen Egan's joint 2002 Form 1040 was overstated by $1,778,122, and the amounts reported as their total income (Line 22) and adjusted gross income (Lines 35 and 36) were understated by the same amount.

## JJ. The Egans Sought to Conceal the Transactions from the IRS

978. From the outset, the Egans were aware that, at a minimum, the IRS was likely to view the tax shelter strategy with great disfavor, and that disallowance of the tax treatment and the imposition of penalties was a very real possibility if the transactions were discovered. The Egans and their advisors sought to ensure that the transactions would be difficult for the IRS to detect. They also repeatedly discussed the risk of audit and detection, and at several points contemplated actions that would trigger the running of the statutory limitation period. Finally, and as discussed below, they filed tax returns with multiple false and misleading statements in a further effort to minimize the risk of audit and avoid detection.

**1.    Denby's Discussions with Reiss in April 2000**

979.    As described above, Stephanie Denby advised Richard Egan in April 2000 that the
        "IRS is certainly aware that these [types of tax shelter] transactions are out there"
        and has "implemented new reporting requirements to try and stop these
        transactions." (Ex. 3566).

980.    She also advised that there was "a very low chance" that these basis-generating
        and loss-generating transactions "would ever be picked up by the IRS." (*Id.*).
        Even so, she advised of "further steps that we could take to limit these risks."
        (*Id.*). One of those steps was to choose transactions that would be "used [only] in
        large situations," meaning that the promoters "would pick and choose" very
        wealthy clients in order to limit the use of the transactions. (Denby, 28:78-79; Ex.
        3566). She also advised that "generating basis as opposed to capital loss" was
        deemed to be "more [discreet] and less likely . . . to cross the IRS radar screen."
        (Ex. 3566).

981.    As described above, Denby and Reiss also considered obtaining insurance to
        guard against the imposition of tax penalties, but rejected the idea so as not to
        create "a bad trail" if they were to "get rejected." (Ex. 3600).

**2.    Denby's May 2000 Analysis**

982.    As described above, in May 2000, Denby prepared charts for Reiss analyzing the
        relative advantages and disadvantages of the various available tax shelter
        strategies. (Ex. 3555).

983.    Denby considered it a positive characteristic that the Helios transaction had

242

"limited marketing (expect no more than 20ish [customers])." (*Id.*). She also considered it a positive that the transactions would be "structured as basis offset so [they would be] harder for [the] IRS to find." (*Id.*). However, she expressed concern that the Helios transaction had a "[s]implicity of structure" which "may make it easier for IRS to trace." (*Id.*).

## 3. Discussions in July 2000

984. As described above, in July 2000, Shea asked Helios and KPMG as to whether, on the Egans' tax returns, the flow-through items could be "run through Schedule E to avoid a large loss on the face of the 1040 . . . ." (Ex. 26). Shea also noted that he "would like to bury [the large loss] with other entities on Sch[edule] E," so that only a net amount would be shown on the face of the Egans' Form 1040. (*Id.*).

985. From the perspective of the Egans, one of the major advantages of the proposed capital gains elimination strategy (that was eventually adopted in the Fidelity High Tech transaction) was the fact that it involved a step-up in basis, which would not be apparent from the face of the tax return.

986. Thus, in July 2000, Denby noted that the Helios "Capital Gains Elimination Strategy" had "very clean reporting on [the] tax return" so it would be "hard for [the] IRS to find." (Ex. 3549). As to the then-proposed "Helios Strategy to Offset Ordinary Income," however, Denby observed that although the Egans could try to "minimize [the] reporting landscape" of this transaction, this "will not be low profile." (*Id.*).

987. On July 13, 2000, with respect to the Helios ordinary income strategy, Shea noted

that it was "risky that we have [a] reporting entity"—that is, EMC, which would report the option income—and therefore it would be "hard to bury on the [Egans' tax] return." (Ex. 496).

988. In July 2000, Shea noted that the High Tech transaction would be a "[c]lean transaction" that would "not [be] easily discovered" by the IRS but would be "easily reported." (Ex. 2569).

## 4.    Discussions of Increased Risk after Notice 2000-44

989. As described above, the Egans and their advisors discussed the increase of risk of audit after the issuance of Notice 2000-44.

990. After the issuance of Notice 2000-44 on August 11, 2000, Shea noted that "[t]he beauty of the transaction was [that it was] so hidden but now it is not hidden." (Ex. 519).

991. Five days later, on August 16, 2000, Denby and Shea discussed the fact that Brown & Wood would not give an opinion letter to a KPMG client because "KPMG might keep an investor list," making KPMG clients a "bigger audit risk." (Ex. 533).

992. One week later, Shea asked if there were "benefits to entering" the "transaction with or without KPMG [because] it appears we will have less chance of being audited if not under their radar screen." (Ex. 542).

## 5.    Later Discussions Concerning Reporting and Audit Risk

993. As described above, the Egans and their advisors continued to discuss audit risk and concealment of the transactions in 2001 and 2002.

994. In a memorandum to Michael Egan on January 24, 2001, Shea wrote that "We intentionally want the [High Tech] transaction [to be] between Dick and Maureen so that the trade gets reported on one 1040 return -- elegance in reporting -- not exposing other family entities to IRS scrutiny." (Ex. 141).

995. On March 19, 2001, Shea asked KPMG to "look at a solution that could offset the ordinary income hit from the spread on the exercise of the NQ options," and that "the ideal offset would be a 'Line 21' white-paper netting transaction." (Ex. 791).

996. In November 2001, in an e-mail discussion with Shea concerning the 754 election, Denby wrote, "I do not think that there is much increase in risk with the 754 election. This is a form that I think would never be audited." (Ex. 3294).

997. On November 28, 2001, Reiss noted that the "754 election steps up the basis of EMC in the Fidelity Fund so the sale of EMC in the fund would show gross proceeds and stepped up cost basis on Schedule D for the Fund's tax return -- a pretty decent obscured event." (Ex. 3303).

998. Also on November 28, 2001, Reiss asked Denby whether they "should sell / liquidate in 2001 to either start the statute [of limitations] running sooner or whether there is concern that IRS will require unwinding the transaction before we sell." (*Id.*).

999. On December 6, 2001, Shea informed Denby that Michael Egan was considering selling all the stock before the end of the year and then buying it back, to start the statute of limitations for an audit running "and to protect the transaction from IRS unwinding." (Ex. 3310).

1000. At multiple points (including September 27 and December 28, 2001, and January 2 and March 8, 2002), Shea, Reiss, and Denby expressed concern about the possibility that KPMG might be maintaining a "list" of investors in the tax shelter strategy that might be turned over to the IRS. (Exs. 1057, 3393, 3343, 2536).

1001. On March 1, 2002, Shea sent an e-mail with proposed discussion items, including "[s]trategic discussions of KPMG role in [the Egans'] returns" and whether the Egans "want[ed] to be on the 'radar' screen in light of the Enron scandal and the heat all the big 5 firms will be taking regarding tax shelters." (Ex. 1625).

1002. On March 8, 2002, Shea noted that the Egans would not be getting an option letter from KPMG, and added that "we do not want one[,] as that is a guide the IRS uses to get information." (Ex. 2536).

1003. On May 10, 2002, Denby asked Tilevitz whether they would be "better off waiting and hoping [the stock] will go up in value or selling it" at that time, "taking the loss and starting the statute [of limitations] running." (Ex. 1851).

1004. During the period between April and August 2002, Denby, Speiss, and Reiss expressed concern that the Egans' 2001 individual income tax return had not been filed, and that the risk of disclosure to the IRS increased each day. (Exs. 3457, 2764, 1919, 1979). On July 14, 2002, Reiss advised the "accounting/tax team" of Carruth that "this would not look good at all for any of us" if disclosure were required. (Ex. 1919).

1005. In August 2002, the Egans fired KPMG rather than follow its advice to make the required disclosure to the IRS under the new Treasury regulation, and demanded

that KPMG destroy the draft tax return and remove "any records of Mr. Egan from [your] files." (Exs. 2785, 96, 1419, 98).

## KK.   From a Subjective Standpoint, the Transactions Had No Business Purpose

1006. From a subjective standpoint, the Fidelity High Tech and Fidelity International transactions had no business purpose of any kind. The Egans did not enter into the transactions for profit or to provide a hedge or other protection against financial or economic risk; the only reason they entered into the transactions was to shelter capital gains and ordinary income from taxation.

1007. From the outset, however, the Egans and their advisors were also aware that the capital gains and ordinary income tax strategies had to have a legitimate business purpose or their tax treatment of the transactions would not be upheld. The Egans and their advisors therefore created false "business purposes" for the transaction.

1008. The purported purpose of the Fidelity High Tech transaction was to serve was a hedge against a downward movement in the price of EMC stock. (E.g., Exs. 752, 2768, 3555, 2569, 3237, 3240.1, 147). The Egans did not, however, actually have any such purpose in entering into the transaction.

1009. The purported purpose of the Fidelity International transaction was to serve was a hedge against fluctuating interest rates and foreign currency exchange rates. (E.g., Exs. 1088, 1159, 1151, 1165, 1463, 3382). The Egans did not, however, actually have any such purpose in entering into the transaction.

1010. The Egans had no subjective intent to profit from either the Fidelity High Tech or Fidelity International transaction, and did not believe that there was a reasonable

possibility of profit from either transaction.

1011.  To the extent that any "business purpose" was discussed by the Egans or their advisors during the planning and implementation of the transactions, it was in the context of preparing for a possible IRS audit or challenge; the parties sought to structure the transactions, and to create a false paper trail, to make it appear as if the transactions in fact had a legitimate business purpose.

LL.  **From an Objective Standpoint, the Transactions Had No Economic Substance**

1012.  From an objective standpoint, the Fidelity High Tech and Fidelity International transactions had no economic substance.

1013.  For a transaction to have economic substance, it must either (1) be reasonably designed and implemented to serve a hedging or other risk-shifting function or (2) have a reasonable possibility of profit.

1014.  The Egans claim that both transactions had economic substance because they were reasonably designed and implemented to serve a hedging function. In fact, and for the reasons set forth below, they were not so designed or implemented.

1015.  The Egans also appear to claim that the transactions also had economic substance because there was a reasonable possibility that they could profit on the transactions. In fact, and for the reasons set forth below, there was no such reasonable possibility.

1.  **Reasonable Hedging or Risk-Shifting Function**

1016.  Hedging is an activity in which investors make investments that offset their risk exposure for other assets. The goal of hedging is to preserve capital or other

248

assets and reduce risk. (Rausser, 40:70; Ex. 3755).

1017. A perfect hedge matches each dollar of loss with a dollar of offsetting gain. An effective hedge generally matches each dollar of loss with $0.80 to $1.20 of offsetting gain. (Rausser, 40:70-71; Ex. 3755).

1018. A rational investor, in considering whether to enter into a hedging transaction, would consider the likely effectiveness of the hedge as well as the overall expenses of entering into the hedge.

## 2. Reasonable Possibility of Profit

1019. A rational investor seeking a profit would consider the expected rate of return as to any potential investment. (Kolbe, 37:27-29; Dem. Ex. 2883). Ignoring tax effects, a rational investor would not make an investment with a negative expected rate of return, or an expected rate of return materially below the rate they could earn elsewhere with the same risk.

1020. A rational investor would consider, among other things, all fees and costs associated with a proposed business or investment transaction in order to determine whether there was a reasonable possibility of profit.

## MM. The Fidelity High Tech Transaction Lacked Economic Substance

### 1. The Transaction Served No Reasonable Hedging Function

#### a. The NASDAQ 100 Option Transactions Were Not a Rational Economic Hedge

1021. The NASDAQ 100 option trades entered into in the Fidelity High Tech transaction were not a reasonable or rational means of hedging against a downward movement in the price of EMC stock. (Rausser, 41:57-65; Kolbe,

249

38:50-58; Dem. Exs. 3779, 3780, 3786).

1022.  Digital options are a poor tool to hedge continuous price risks, such as stock-price fluctuations, because of their fixed all-or-nothing payout characteristics. (Rausser, 41:57-58).

1023.  The purported benefit of using NASDAQ 100 options was that the index correlated closely with the price of EMC stock.  But as Dr. Kolbe, a government expert, pointed out, "once [the options are] deep in the money, they stop being correlated with anything. . . . They just sit there. . . ."  (Kolbe, 38:52).

1024.  The very large notional amounts of the options were unnecessary to accomplish the claimed hedging purpose, because any potential recovery would be in the amount of the net position, not that of each individual option.

1025.  Furthermore, the very large fees paid to Refco, Helios, KPMG and others would have consumed any hedging benefits.  (Rausser, 41:58-60).

1026.  The actual performance of the options after their purchase demonstrates their relative ineffectiveness as a hedge against a decline in EMC stock.

1027.  The value of both EMC stock and the NASDAQ 100 fell materially following the contribution of the EMC stock to Fidelity High Tech on September 8, 2000, and continued to fall after the January 31, 2001, purchase of the options.  (Kolbe, 38:50-51, 66-67; Dem. Exs. 3024, 3025).  The options were closed out early on February 12, 2001, twelve days into their 44-day life and five days after they had been contributed to High Tech.

1028.  The digital options would not have served as effective hedges against the actual

250

decline in value of EMC stock even if they had not been closed out early. The

options would have been continuously in the money after February 20, 2001, and

they would have finished in the money (that is, would have paid off) on March 16,

2001. The value of High Tech's EMC stock fell materially throughout the period,

but once in the money, the value of the digital options hardly changed at all.

(Kolbe, 38:51-52 ; Dem. Exs. 3025, 3026).

1029. The early termination was entirely inconsistent with the purported hedging

purpose. (Kolbe, 38:65-67).

1030. The early close-out of the High Tech options limited any further hedging ability of

the options. (*Id.* at 38:65). At the time the High Tech options were closed out,

they were still out of the money. As a result, their value was below their ultimate

potential as a hedge. (*Id.*).

1031. Publicly traded "vanilla" puts on the NASDAQ 100 were readily available that the

Egans could have purchased for the same outlay in option costs and fees. (*Id.* at

38:53-54). A "vanilla" put on the NASDAQ 100 allows the holder to sell the

index at the strike price, which is profitable if the index can be purchased at a

lower market price at the same time. (*Id.* at 38:55).

1032. A "vanilla" put portfolio would have stabilized the value of High Tech's EMC

portfolio and served as an effective hedge. (*Id.* at 38:54; Dem. Ex. 3025).

1033. Furthermore, the options transaction as structured, even if rationally designed as a

hedge, would only hedge a small portion of the Egans' portfolio of EMC stock.

As Dr. Rausser testified:

> . . . the largest possible profit could only offset a very, very small
> part of the underlying exposure with regard to the concentrated
> holdings . . . it represented only two-tenths of 1 percent of the loss
> in the taxpayer's concentrated holdings of EMC stock.

(Rausser, 41:58; Dem. Ex. 3786).

### b.    **Various Components of the Transaction Served No Hedging Function**

1034.   The formation of Index A and Option A and their contribution to Fidelity High

Tech consumed resources with no benefit to the purported hedging purpose.

(Kolbe, 38:59-60, 62-64; Dem. Exs. 3023, 3028).

1035.   Neither Index A nor Option A engaged in any business activity other than the

NASDAQ 100 trades.  (Kolbe, 38:64-65).

1036.   The "stuffing" of additional stock into High Tech to take full advantage of the

$160 million inflated tax basis, and the calculations performed to determine how

much stock to "stuff," consumed resources with no benefit to the purported

hedging purpose.  (*Id.* at 38:61-62; Dem. Ex. 3027).

1037.   The contribution of Maureen Egan's interest in Fidelity High Tech to MEE

Holdings, and the subsequent Section 754 elections, consumed resources with no

benefit to the purported hedging purpose.  (Dem. Ex. 3028).

### 2.    **There Was No Reasonable Possibility of Profit on the Fidelity High Tech Transaction**

### a.    **The Costs and Fees for the Transaction Were Extremely High**

1038.   The fees associated with the Fidelity High Tech transaction were so high that they

eliminated any reasonable possibility of profit on the transaction.

1039. As described above, Refco's bid/ask fees for the four initial NASDAQ 100 options entered into by Option A and Index A totaled 10% of the potential net payout on each option, or $1 million.

1040. As described above, Pat Shea and Carolyn Fiddy of Carruth were specifically advised as to the size of the Refco fee and how it was calculated. Fiddy was also advised as to the relationship of the size of the fee to the value of the options.

1041. The NASDAQ 100 options that were traded in the High Tech transaction are commonly traded instruments that are available from multiple dealers. (DeRosa, 39:120). The fee for options is usually charged as a bid/ask spread. (*Id.* at 39:118).

1042. Refco, however, calculated its bid/ask fee of $1 million on the High Tech transaction as 10% of the net payout on each option. (*Id.* at 39:123, 130). Such a fee arrangement is not typical in the industry for options trades. (*Id.* at 39:123-24).

1043. Refco's $1 million fee was highly excessive from a market perspective. (*Id.* at 39:118-21). The fee was more than 40% of the theoretical value of the options. (*Id.* at 38:6).

1044. The Egans easily could have obtained substantially better pricing for the options trades. (DeRosa, 39:119-20). They did not, however, attempt to do so.

1045. Refco's fees alone had a materially negative impact on the expected rate of return on the options. Because Refco's fees were effectively 40% of the net premium paid, the fees built in an expected loss on the option under any reasonable or

economically rational scenario. (Kolbe, 38:6-7). The expected rate of return was, from an economic perspective, a large negative number. (DeRosa, 39:117-18).

1046.  As described above, the Helios and KPMG fees for the Fidelity High Tech transaction totaled $1.8 million.

1047.  The Egans and their advisors were aware of the size of the Helios and KPMG fees; indeed, Shea negotiated the fees over an extended period of time.

1048.  When the Egans entered into the Fidelity High Tech transaction, the expected Helios and KPMG fees totaled $2.4 million. (Shea, 16:46-48; Exs. 678, 1415). They were reduced by negotiation afterward to $1.8 million. (Ex. 1415).

1049.  The Helios and KPMG fees, both standing alone and in conjunction with the Refco fees, had a materially negative impact on the expected rate of return on the Fidelity High Tech transaction.

1050.  As described above, the Egans incurred legal fees to Burke Warren in connection with the Fidelity High Tech transaction; those fees were a cost expected and incurred in connection with the transaction.

1051.  As described above, it is not possible to ascertain from the record the precise amount of Burke Warren fees incurred in connection with the Fidelity High Tech transaction, but it is probable that they were at least $104,000.

1052.  Any Burke Warren fees attributable to the High Tech transaction would have further reduced the expected rate of return on the transactions.

1053.  The combined fees and costs incurred by the Egans in connection with the Fidelity High Tech transaction were, at a minimum, $2.9 million.

### b. The Expected Return on the Transaction Was Materially Negative

1054. As Dr. Kolbe testified, the Fidelity High Tech trades did not provide a reasonable

possibility of profit "by any economically sensible definition of the phrase

'reasonable possibility.'"

> . . . [T]hey had hugely negative expected rates of return. They had a
> hugely negative net present value relative to the size of the
> investment. They were simply terrible investments.

(Kolbe, 38:47).

1055. The aggregate net cost of the Fidelity High Tech options was $3,436,805

($3,402,437 plus 34,368) and the maximum gross payoff was $10,000,000

($9,900,000 plus $100,000). (Exs. 711, 712, 1). Net of the cost of the options,

the High Tech transaction provided a maximum net payoff of about $6.563

million ($10,000,000 less $3,436,806).

1056. Net of the cost of the options and the Helios and KPMG fees, the High Tech

transaction provided a maximum net payoff of about $4.763 million ($10,000,000

less $3,436,806 less $1,600,000 less $200,000).

1057. The expected return on the options is the probability the option will finish in the

money times the potential payoff if it does, less the costs associated with the

transaction. (Kolbe, 38:34-35).

1058. The probability that the NASDAQ 100 options would finish in the money was

25%, and thus there was a 75% probability that the options would expire

worthless. (*Id.* at 38:35; Dem. Ex. 3018).

1059. Due to the magnitude of the fees to Refco, the expected rate of return on the High

Tech options was a negative 28%. (Dem. Ex. 3019). Taking into account the Helios, KPMG, and minimum Burke Warren fees, the expected rate of return on the High Tech options was a negative 78%. (Kolbe, 38:38-40, 39:64; Dem. Exs. 3018, 3019).

### c.    The Net Present Value of the Options Was Materially Negative

1060. The net present value of the High Tech options was at most a negative $2.7 million on a $3.4 million investment. (Kolbe, 38:43-44).

### d.    The One-Option Payout Was Not a Real Possibility

1061. As described above, under the terms of the NASDAQ 100 option pairs, there was a theoretical possibility for each pair that the long option in the pair would be in the money while the offsetting short option would not. (Dem. Ex. 3013). Had that occurred, it would have resulted in a large one-sided payout to the Egans. (*Id.*).

1062. As also described above, there was no realistic possibility of a one-sided payout on the Fidelity High Tech transaction, because the options would have to hit specific price targets in a very narrow window, and because Refco had the contractual ability to manipulate the price during the window.

1063. Refco did not take into account in its pricing of the options the possibility of a one-sided payout. (Kolbe, 36:88-91; Dem. Ex. 3037). Rather, Refco priced the options on the assumption that either both parts of the pair would pay off or neither would pay off. (Kolbe, 38:13-14, 22-23; Dem. Ex. 3014; Ex. 729).

1064. Refco hedged its own risk for each pair of options as if the one-option payout

possibility did not exist.  (Kolbe, 38:13-19; Ex. 729).

1065.   Refco Capital Markets hedged the options with Refco Overseas Ltd. with a single strike price, thus indicating that Refco did not believe it had any exposure to a single-option payout.  (Kolbe, 38:14-17; Ex. 729).

1066.   The promoters designed the Fidelity High Tech transaction to appear as if a one-sided payout were possible in order to help disguise its true purpose, which was solely to avoid taxes.

### e.   The Options Were Not in Fact Profitable

1067.   The Fidelity High Tech transaction was not, in fact, profitable.  The Index A and Option A options were closed out early at a purported combined gross profit of $1,464,195.  (Ex. 1; Kolbe 37:118-19; Dem. Ex. 3004).  Taking into account the fees paid to advisors, the transaction resulted in a significant net loss.

## NN.   The Fidelity International Transaction Lacked Economic Substance

### 1.   The Transaction Served No Reasonable Hedging Function

#### a.   The Interest Rate and Currency Option Transactions Were Not Rational Economic Hedges

1068.   The option trades entered into in the Fidelity International transaction were not a reasonable or rational means of hedging against fluctuations in currencies or interest rates.  (Kolbe, 37:60).

1069.   Again, digital options are a poor tool to hedge continuous price risks, whether from currency or interest-rate fluctuations.  (*Id.* at 37:57).

1070.   Again, the very large notional amounts of the options were unnecessary to accomplish the claimed hedging purpose, because any potential recovery would be

a function of the net payout. (*Id.* at 37:57-58).

1071. Again, the very large fees paid to Refco, Helios, KPMG and others would have consumed any gains otherwise accruing to the Egans. (*Id.* at 37:58).

1072. The change in ownership positions taken by Richard Egan over the course of the Fidelity International transaction dramatically undercut the claimed hedging rationale; by contributing his interest in Fidelity World to Fidelity International, Richard Egan went from being entitled to 100% of any hedging benefits from the interest rate options to being entitled to only 5% of any such benefits. As a result, he also would have shared only 5% of any potential hedging benefits available from the currency options. (*Id.* at 37:58-59; Carron, 11:35-36). Thus, 95% of any hedging benefit was provided to someone other than Richard Egan. (Kolbe, 37:64-65).

1073. There is no evidence that Samuel Mahoney—the purported foreign partner who held a 93% common interest in Fidelity International on October 22, 2001, the date the currency options were entered into—owned any EMC stock or had a need to hedge fixed or fluctuating currency rates.

1074. There were multiple readily available alternatives to address the risks the Egans claimed to hedge that would have provided superior hedging qualities with greater liquidity and dramatically lower cost. (Rausser, 41:33-34; Dem. Ex. 3775). Through exchange-traded options, Richard Egan could have offset the claimed risks at a lower cost, with proportional payouts over time instead of the fixed all-or-nothing payout of digital options. (Rausser, 41:33-34; Dem. Ex. 3775).

258

### (1)   The Interest Rate Options

1075.  The purported hedging purpose for the CMS options was to offset interest-rate
       risk associated with long-term debt on Richard Egan's commercial real estate
       properties. (Rausser, 40:83-91; Dem. Ex. 3761; Exs. 1088, 1463, 1652).
       However, and as noted above, Richard Egan did not have any interest-rate risk
       from commercial real estate; his only commercial real estate holding was an office
       building in Hopkinton, Massachusetts, that was not encumbered by debt.  The
       Egan family commercial real estate properties were largely owned by Michael
       Egan and his siblings through various ownership vehicles. (C. Egan Dep. at 22-
       23; M. Egan, 12:51-52; Ex. 160; Dem. Ex. 3761). These properties were
       managed by Carruth Capital, under the leadership of Christopher Egan. (C. Egan
       Dep. at 20-21). Christopher Egan had no knowledge of any hedging of interest-
       rate risk associated with these properties. (C. Egan Dep. at 20-21).

1076.  In any event, the CMS options entered into by Fidelity World were not a rational
       hedge against such risks. (Rausser, 40:105-08; Dem. Exs. 3764-3767). The
       digital nature of the options, the use of largely offsetting pairs, the level at which
       the strike prices were set, and the large fees involved meant that the options would
       not rationally have been constructed for such a hedging purpose by a
       knowledgeable investor. (Kolbe, 37:56-61; Dem. Ex. 2889).

1077.  Furthermore, the CMS options could only have provided a hedge against falling,
       rather than rising, interest rates. (Rausser, 40:78-79, 106).

1078.  The purported hedging purpose for the LIBOR options was to offset interest-rate

risk associated with short-term debt of two Egan family investments, Cape Clear LLC and Westship World Yachts LLC.  (Exs. 1088, 1463, 1652).

1079.  The LIBOR options as structured were not a rational hedge for Richard Egan's variable interest-rate exposure.  (Rausser, 40:97-105; Dem. Exs. 3764, 3765). The digital structure of the options, the use of largely offsetting pairs, the level at which the strike prices were set, and the size of the potential net payout when compared with possible increases to Cape Clear and Westship debt service meant that the options would not rationally have been constructed for such a hedging purpose by a knowledgeable investor.  (Rausser, 40:82-83, 97-105; Dem. Exs. 3764, 3765).

1080.  Moreover, the LIBOR options were closed out and effectively terminated on November 6, 2001, after only 29 days.  (Ex. 2).  Once the LIBOR options had been closed out, they had no value and could no longer have any hedging effect.  (Kolbe, 37:59-60; Ex. 1275).

1081.  Furthermore, and as noted, any hedging benefit that Richard Egan might have received as a result of the LIBOR option pair was largely eliminated when he contributed his 100% interest in Fidelity World to Fidelity International, in which he then owned only a 5% common interest.  (Kolbe, 37:58-59).

1082.  The two claimed interest-rate risks sought to be hedged—that is, the long-term fixed commercial mortgage indebtedness and the short-term variable debt of Westship and Cape Clear—served as natural hedges to one another.  (Rausser, 40:92-94; Dem. Ex. 3762).  If interest rates went up, Westship and Cape Clear

would have to pay more on their loans, but the real estate subject to fixed

mortgages would simultaneously increase in net value. If interest rates fell, that

same real estate would decline in net value but would be offset by lower debt

service payments for Cape Clear and Westship.

1083. Similarly, the CMS and LIBOR interest rate options actually provided a natural

hedge against *each other*, and thus had the effect of offsetting any potential

hedging benefits that either option pair might theoretically have provided.

(Kolbe, 37:59; Rausser, 40:94-97; Dem. Ex. 3763).

### (2) The Currency Options

1084. The purported hedging purpose for the currency options was to offset declines in

EMC stock values that might occur if the dollar strengthened, affecting EMC's

ability to make export sales. (Exs. 1088, 1463, 1652). However, for each foreign

currency quartet, only one-half of the quartet represented a bet that the dollar

would strengthen relative to the yen and euro.

1085. Two of the options in each quartet were structured to require a payment from

Fidelity International to Refco if the dollar experienced a significant

strengthening, and thus worked at cross-purposes with the stated hedging

objectives. (Kolbe, 37:66-67; Dem. Exs. 2892, 2891).

1086. Moreover, the options were structured in such a way that the only purported

hedging benefit would be if there was only a modest increase in the value of the

dollar. (Kolbe, 37:67-68; Dem. Exs. 2891, 2892). As structured, if there was a

significant increase in the dollar, Fidelity International would have to make a

261

payout of approximately $3 million. (Kolbe, 37:67-68).

1087. Viewed as a whole, the quartet structure in which the USD/EUR and JPY/USD options were acquired by Fidelity International provided no real hedging benefit. (Rausser, 40:114).

1088. The currency options were not consistent with the claimed hedging purpose. (*Id.* at 40:108-14; Dem. Ex. 3769). Neither the USD/EUR nor the JPY/USD rates had any historical correlation with EMC stock prices. (Rausser, 40:114-15; Dem. Ex. 3770).

1089. The currency options were further inconsistent with the claimed hedging purpose because EMC was already hedging its currency risk, thus minimizing any impact on its stock price. (Rausser, 40:115-18; Dem. Ex. 3771; Exs. 1697, 788). There would be no benefit to a shareholder to enter into a hedge against specific risks that might affect stock value if the corporation was already adequately hedging those same risks. (Rausser, 41:26). Finally, the amount of EMC stock price risk faced by Richard Egan was dramatically out of proportion to the potential recovery from the alleged hedge instruments. (*Id.* at 41:30-31; Dem. Ex. 3772).

**b.    Various Components of the Transaction Served No Hedging Function**

1090. The formation of Fidelity World and its contribution to Fidelity International consumed resources with no benefits to the purported hedging purpose. (Kolbe, 37:88-89).

1091. Fidelity World did not engage in any business activity other than the interest rate option trades and, under the terms of the proposed trades, it had no economic

exposure with respect to these trades beyond the initial net premium paid.

Fidelity World did not enter into any contracts with any entity other than Refco on

these trades. (*Id.* at 37:88-89).

## 2.   There Was No Reasonable Possibility of Profit on the Fidelity International Transaction

1092.   The interest rate and foreign currency options as structured in the Fidelity

International transaction did not provide a "reasonable possibility of profit by any

economically sensible definition of [the] phrase." (*Id.* at 37:63-64).

### a.   The Capital Structure Was Not Rational

1093.   As described above, at the outset of the Fidelity International transaction, Richard

Egan only had the right to a 5% share of the profits, despite having put up an

overwhelmingly large portion of the capital and paying all of the expenses.

Mahoney, who had the right to a 93% share, contributed essentially nothing.

1094.   The subsequent changes to the capital structure made even less sense, if Richard

Egan had any kind of reasonable profit motive.   Richard Egan paid an additional

amount of $325,500 to acquire most of Mahoney's common interests, even

though they were worthless at the time. (Kolbe, 37:59).   And at the end of the

day, Richard Egan (who contributed nearly all the capital and paid all the

expenses) received 93% of the losses, whereas Mahoney received 93% of the

gains.

1095.   No rational investor seeking a reasonable profit would agree to such a capital

structure.

### b.    The Costs and Fees for the Transaction Were Extremely High

1096.  The fees associated with the Fidelity International transaction were so high that there was no reasonable possibility of profit on the transaction.

1097.  As described above, Refco was paid fees of $1,443,617 in connection with the Fidelity International transaction.

1098.  The fees paid to Refco in connection with the Fidelity International transaction were exorbitant, as compared to market fees normally charged by an options broker for similar transactions. (Rausser, 40:37-38, 40-43).

1099.  The Egans did not obtain competitive quotes for the options or undertake the type of financial analysis normally accompanying the execution of such complex instruments. (M. Egan, 9:127-28).

1100.  As described above, the Helios and KPMG fees for the Fidelity International transaction totaled $4.77 million.

1101.  The Helios and KPMG fees, both standing alone and in conjunction with the Refco fees, had a materially negative impact on the expected rate of return on the Fidelity International transaction.

1102.  The Egans incurred legal fees to Burke Warren in connection with the Fidelity International transaction; those fees were a cost expected and incurred in connection with the transaction.

1103.  As described above, it is not possible to ascertain from the record the precise amount of Burke Warren fees incurred in connection with the Fidelity International transaction, but it is more probable than not that they were at least

$83,000.

1104.  As described above, Richard Egan purchased an 88% common interest in Fidelity
International from Samuel Mahoney on November 6, 2001, for $325,500. That
purchase was contemplated by the parties prior to the implementation of the
Fidelity International transaction.

1105.  The transfer of Mahoney's ownership interest was essential to achieving the
planned tax outcome, was specified in planning documents, and was an expected
cost that any rational investor would have considered in evaluating the profit
potential of the Fidelity International transaction. (Kolbe, 36:61-62; Dem. Ex.
2853).

1106.  The combined fees and costs incurred by the Egans in connection with the Fidelity
International transaction were alone at least $6.68 million.

### c.      The Expected Rate of Return of the Transaction Was Materially Negative

1107.  Possible financial outcomes for investments such as digital options can be
evaluated using a probability-weighted expected return analysis. Using this
approach, each possible outcome is multiplied by the percentage probability that it
will occur. (Kolbe, 36:82-83). The sum of these weighted outcomes represents
the probability-weighted expected return of the investment. (Dem. Exs. 2884,
3033).

1108.  As described below, the Fidelity International options did not provide a reasonable
possibility of profit, taxes aside, because the expected rates of return were "hugely
negative." (Kolbe, 37:53).

### (1) The Expected Return Before Fees

1109. The aggregate premium paid by Fidelity World for the interest rate options was $2,250,000: $1,125,000 for the LIBOR option pair and $1,125,000 for the CMS option pair. (Ex. 167, 2). The maximum possible gross payout for both pairs of options—assuming that both pairs could simultaneously pay off—would have been $6,737,472: $3,369,809 for the LIBOR pair and $3,367,663 for the CMS pair. (Exs. 167, 2). Each of the interest rate options therefore provided a maximum possible net payoff of approximately $2.24 million, for a total of $4.48 million for both sets of options, before accounting for other fees and costs.

1110. However, the likelihood of both the LIBOR option pair and the CMS option pair being in the money at the same time was equivalent to zero. (Rausser, 40:47-56). As a result, the maximum net payout would have been *either* $1,119,809 on the LIBOR pair (the $3,369,809 LIBOR payout minus the $2,250,000 premium for both sets of interest rate options), *or* $1,117,663 on the CMS pair (the $3,367,663 CMS payout minus the $2,250,000 premium for both sets of interest rate options), before accounting for other fees and costs. (Dem. Ex. 3746, 3747).

1111. Fidelity International's gross premium for the foreign currency trades was positive. Fidelity International was credited with a net premium from Refco of $2,832,828 on the USD/EUR options and $2,835,212 on the JPY/USD options, for a total net positive premium of $5,668,040. (Ex. 2). Refco required Fidelity International to leave those funds on deposit and to post an additional $3 million of cash collateral in case Fidelity International lost money on these options.

266

(Kolbe, 37:37-38; Rausser, 40:39-40; Dem. Ex. 2885; Ex. 2).

1112. At inception, each pair of Fidelity World's interest rate options had only a 25% chance of being in the money and producing a positive payout at expiration.

1113. There was a 25% probability that both the purchased and sold LIBOR options entered into on October 9, 2001 would be in the money at expiration. (Exs. 2, 49, 1024, 1056, 1140). In that event, the investor's return would be the positive payout on the long option, less the negative payout on the short option, less the initial net premium paid for the pair. The October 9 LIBOR option pair entered had a maximum possible gross payout of $3,369,809 and an initial net premium of $1,125,000. (Ex. 2). As a result, the maximum positive gross payout was $3,369,809 minus $1,125,000, or $2,244,809. That payout would be substantially reduced by any allocable share of fees and costs, such as the fees of Helios and KPMG.

1114. Applying the 25% stated probability of payout and the 75% implied probability of no payout on the LIBOR option pair results in a probability-weighted expected return of negative $282,548. That calculation is illustrated in the following chart:

267

|  | Amount of Payout | Amount of Initial Premium | Percentage Probability | Probability-Weighted Outcome |
|---|---|---|---|---|
|  | A | B | C | (A + B) x C |
| LIBOR pair "in the money" | $3,369,809 | ($1,125,000) | 25% | $561,202 |
| LIBOR pair not in the money | $0 | ($1,125,000) | 75% | ($843,750) |
|  | Probability-Weighted Expected Return  =  ($282,548) | | | |

(*Id.*).

1115. The same calculation method applies to the CMS option pair, and with the same
results. There was a 25% probability that both the long and short CMS options
entered into on October 9, 2001, would be in the money at expiration. (Exs. 2, 49,
1024, 1056, 1140). In that event, the investor's return would be the net payout for
the option pair, less the initial net premium paid for the pair. The October 9 CMS
option pair had a maximum net potential payout of $3,367,663 and an initial net
premium of $1,125,000. (Ex. 2). As a result, the maximum positive gross payout
for the CMS option pair was $3,367,663 minus $1,125,000, or $2,242,663.
Again, that payout would be substantially reduced by any allocable share of fees
and costs.

1116. Applying the 25% stated probability of a positive payout and the 75% implied
probability of no payout for the CMS option pair results in a probability-weighted
expected return of negative $283,084. That calculation is illustrated in the
following chart:

|                              | Amount of<br>Payout | Amount of<br>Initial Premium | Percentage<br>Probability | Probability-Weighted<br>Outcome |
|------------------------------|---------------------|------------------------------|---------------------------|----------------------------------|
|                              | A                   | B                            | C                         | (A + B) x C                      |
| CMS pair "in<br>the money"   | $3,367,663          | ($1,125,000)                 | 25%                       | $560,666                         |
| CMS pair not in<br>the money | $0                  | ($1,125,000)                 | 75%                       | ($843,750)                       |
|                              | Probability-Weighted Expected Return | | = | ($283,084) |

(*Id.*).

1117. As noted, the likelihood of both the LIBOR option pair and the CMS option pair

being in the money at the same time was essentially zero. (Rausser, 40:47-63;

Dem. Exs. 3746-3749). The following chart illustrates the three possible scenarios

resulting from that fact, and adjusts the calculation of probability-weighted

expected return accordingly:

|                              | Amount of<br>Payout | Amount of<br>Initial Premium | Percentage<br>Probability | Probability-Weighte<br>d Outcome |
|------------------------------|---------------------|------------------------------|---------------------------|----------------------------------|
|                              | A                   | B                            | C                         | (A + B) x C                      |
| LIBOR pays,<br>CMS does not  | $3,369,809          | ($2,250,000)                 | 12.5%                     | $139,976                         |
| CMS pays,<br>LIBOR does not  | $3,367,663          | ($2,250,000)                 | 12.5%                     | $139,708                         |
| Neither pair<br>pays         | $0                  | ($2,250,000)                 | 75%                       | ($1,687,500)                     |
|                              | Probability-Weighted Expected Return | | = | ($1,407,816) |

(Rausser, 40:47-56; Dem. Exs. 3746-3749).

Again, that negative expected payout would be further decreased by the allocable

share of fees and costs.

1118. The same probabilities were reported in connection with the currency options.

1119. The Egans' advisors estimated a 25% probability that both USD/EUR option pairs in the quartet entered into on October 22, 2001, would be out of the money at expiration, and Fidelity International would therefore be able to keep the initial net premium of $2,832,828 with which it had been credited. (Exs. 2, 49, 1024, 1056, 1140). However, if either pair of options in the USD/EUR option quartet was in the money at expiration, Fidelity would forfeit that positive initial net premium and would have to forfeit an additional $1,549,895 to satisfy the payout of $4,382,723 that would be owed to Refco. That amount consisted of the $1.5 million additional margin required by Refco on the trades plus $49,855 of accrued interest on the positive premium retained by Refco. (Ex. 2).

1120. Thus, the possible outcomes for the quartet were either (1) a 75% chance of one pair being in the money, resulting in a payout due to Refco of $4,382,723 minus the $2,832,170 of positive premium Fidelity International had on deposit at Refco for those options (net $1,550,553 due to Refco), or (2) a 25% chance of neither USD/EUR option pair being in the money, and Fidelity International retaining its $2,832,170 positive premium. Again, any positive outcome would be substantially reduced by any allocable fees and costs.

1121. The Egans' advisors estimated a 25% probability that both JPY/USD option pairs in the quartet entered into on October 22, 2001, would be out of the money at expiration. (Exs. 2, 49, 1024, 1056, 1140). If either pair of options in the JPY/USD option quartet was in the money at expiration, Fidelity International would forfeit its positive initial net premium of $2,835,212 and would have to

270

forfeit $1,549,923 to make the $4,385,135 net payout due to Refco. That amount consisted of the $1.5 million additional margin required by Refco on the trades plus $49,855 of accrued interest on the positive premium retained by Refco. (Ex. 2). That outcome was assigned a 75% probability. Conversely, there was a 25% probability that one JPY/USD option pair would be out of the money at expiration, in which case Fidelity International would retain its $2,835,212 of initial positive net premium. Again, any positive outcome would be substantially reduced by any allocable fees and costs.

1122. Thus, the best possible outcome for Fidelity International on the foreign currency options would have been to retain its positive premiums, for a total of $5,668,040, before accounting for other fees and costs.

### (2)    The Expected Returns on the Transaction Was Materially Negative

1123. Even before taking fees into account, and even assuming the interest rate options could pay off simultaneously, the expected rate of return on the interest rate options was a negative 25.1%. (Kolbe, 37:30-32; Dem. Ex. 2884).

1124. Taking into account the fees paid to Helios and KPMG, the expected rate of return on the Fidelity World interest rate options was a negative 77.9%—even assuming that both sets of options could pay out at the same time. (Kolbe, 37:29-35; Dem. Ex. 2884). That calculation takes into account the portions of the advisory fees Fidelity International paid to Helios and KPMG that were allocated by KPMG to those options. (Kolbe, 37:29-35; Dem Ex. 2883; Ex. 1502). The calculation does not include any other fees applicable to the transaction, such as those charged by

271

Burke Warren. (Kolbe, 37:35).

1125. The likelihood of both the LIBOR option pair and the CMS option pair being in the money at the same time was virtually zero. (Rausser, 40:47-63; Dem. Exs. 3748-3749). As a result, the expected rate of return on the interest rate options was even more deeply negative than the estimated negative 77.9%. (Rausser, 40:68-70).

1126. Even before taking fees into account, the expected rate of return on the currency options was a negative 26.9%. (Kolbe, 37:38-40; Dem. Ex. 2886).

1127. Taking into account the fees paid to Helios and KPMG, the expected rate of return was a negative 149.9%. (Kolbe, 37:42; Dem. Ex. 2886). That calculation takes into account the portions of the advisory fees Fidelity International paid to Helios and KPMG that were allocated by KPMG to those options. (Dem. Ex. 2883). The calculation does not include any other fees applicable to the transaction, such as those charged by Burke Warren. (Kolbe, 37:42).

1128. The twelve initial options executed in the Fidelity International transaction (the four options entered into by Fidelity World as of October 9, 2001, and the eight options entered into by Fidelity International as of October 22, 2001), had a negative expected return of 26.2% on the options alone (again assuming that both interest rate options could pay off at the same time). (Kolbe, 37:46-47; Dem. Ex. 2887). The twelve initial options had a negative rate of return of 119.0% after taking into account all fees paid to Helios and KPMG. (Kolbe, 37:46-47; Dem. Ex. 2887). The resulting negative expected rate of return of 119% does not take into account the cost of buying 88% of the common shares of Fidelity

272

International from Mahoney, or the fees paid to Burke Warren for the Fidelity International transaction. (Kolbe, 37:47-48; Dem. Exs. 2887). Including any of those costs would result in an even more deeply negative expected return. (Kolbe, 37:47-48; Dem. Exs. 2887).

1129.  Taxes aside, the net present value of the \$5.25 million investment in the Fidelity International interest rate and foreign currency options, after considering fees only to Helios and KPMG, was a negative \$3.4 million. (Kolbe, 37:50-52, 38:46; Dem. Ex. 2887).

### d.   The One-Option Payout Was Not a Real Possibility

1130.  As described above, there was a theoretical possibility with the interest-rate and currency option pairs that the long option might be in the money at expiration while the offsetting short option would not. Had that occurred, it would have resulted in a large one-sided payout to the Egans.

1131.  As also described above, there was no realistic possibility of a one-sided payout on the Fidelity International transaction, because the options would have to hit specific targets in a very narrow window, and because Refco had the contractual ability to manipulate the price during that window.

1132.  Refco did not take into account in its pricing of the options the possibility of a one-sided payout. (Kolbe, 36:88-91; Dem. Ex. 3037). Rather, Refco priced the options on the assumption that either both parts of any pair would pay off or neither would pay off. (Kolbe, 36:97-98).

1133.  Refco hedged its own risk for each pair of options as if the one-option payout possibility did not exist. (*Id.* at 38:13-19; Ex. 729).

273

1134.  Refco Capital Markets hedged the options with Refco Overseas Ltd., with a single
       strike price, thus indicating that Refco did not believe it had any exposure to a
       single-option payout. (Kolbe, 38:14-17; Ex. 729).

1135.  According to David Donora of Refco, Refco had "discretion" as the calculation
       agent to select the reference price in a manner that would ensure both options in a
       pair were either in or out of the money and that there was no one-sided payout
       risk. (Ex. 746).

1136.  The promoters designed the Fidelity International transaction to appear as if a one-
       sided payout were possible in order to help disguise its true purpose, which was
       solely to avoid taxes.

### e.  The Court Does Not Credit the Conclusion of Plaintiff's Expert

1137.  The Court does not credit the analysis performed by Dr. Carron, plaintiff's expert,
       of the potential profitability of the Fidelity International transaction.

1138.  Among other things, Dr. Carron did not include the fees paid to Helios, the fees
       paid to KPMG, or the payment to Mahoney. (Carron, 8:43-48).

1139.  Dr. Carron characterized these fees and costs as "sunk costs." He reasoned that
       such costs should not be taken into account in evaluating the profitability of the
       Fidelity International transaction because they would have been expended even if
       the transaction had not occurred. (*Id.* at 10:14).

1140.  Dr. Carron's position ignores the reality that a rational investor would consider all
       fees and costs in determining the potential profitability of an investment.

1141.  Furthermore, the payment of the advisory fees to Helios and KPMG was
       conditioned upon Richard Egan implementing the Fidelity International

transaction, which itself was conditioned on the receipt of a favorable legal
opinion regarding tax treatment issued by Sidley Austin. (M. Egan, 11:100-01).
The payment to Mahoney was anticipated at the outset of the transaction. Those
costs were therefore not "sunk" at the time the transaction was implemented.

### f. The Fidelity International Transaction Was Intended to be Profitless

1142. All 47 FDIS transactions that occurred in 2001 incorporated the same major
transaction steps. (Kolbe, 36:51; Dem. Ex. 2852).

1143. All 47 FDIS transactions that occurred in 2001 had essentially similar outcomes.
(Kolbe, 36:51, 71-76; Dem. Ex. 2852). All 47 transactions produced large losses.

1144. In all 47 transactions, the fees charged by Refco for the SMLLC's initial option
pairs were calculated as a fixed percentage of the net potential payout on the
SMLLC's initial option pairs, ranging from 7.5% to 10%. (Kolbe, 36:71-74;
Dem. Ex. 2856). The result of the large fees charged by Refco for the SMLLC
option pairs was that the foreign partners' capital interest initially would be wiped
out virtually simultaneously with the foreign partner's alleged capital contribution,
as the options were marked down to their market value. This occurred in all 47
transactions. (Kolbe, 36:71-74; Dem. Ex. 2856). In addition, in all 47
transactions, Refco charged large fees for the MMLLC option pairs, calculated as
a fixed percentage of the net potential payout on the MMLLC's options, ranging
from 8.5% to 10%. (Kolbe, 36:76; Dem. Ex. 2858).

1145. In short, the Fidelity International transactions, like the other FDIS transactions,
was not intended to produce a profit.

275

## OO. Mahoney Was Not a Real Partner in Fidelity International

1146. Samuel Mahoney was not a real or genuine partner of Richard Egan in Fidelity International. He did not join with Richard Egan, Alpha, and Helios as a partner for the purpose of carrying on a business. Rather, he was a mere nominee or strawman who was paid for his services.

1147. As described above, the FDIS strategy required a tax-indifferent person to play the "role of foreign partner."

1148. As also described above, Mahoney and Hawkes agreed to play the "role of foreign partner" in the FDIS strategy.

1149. As also described above, the role of Mahoney and Hawkes as a "foreign partner" "was primarily that of an implementing party," and to follow steps described in the "Outline of Proposed Transaction" for each transaction.

1150. Both Mahoney and Hawkes testified that "[t]he economics we adhered to with respect to the capital contributions were formulaic." (Mahoney Dep. at 9; Hawkes Dep. at 60).

1151. Neither Mahoney nor Hawkes were involved in the structuring or negotiating of any of the steps of the FDIS transactions in which they took part. (Mahoney Dep. at 9; Hawkes Dep. at 60).

### 1. Mahoney Participated in 47 Identical Transactions in 2001

1152. A total of 47 FDIS transactions (including the Fidelity International transaction) were implemented in 2001 in which Mahoney and Hawkes agreed with Haber to serve in the role of foreign investor. (Mahoney Dep. at 6; Hawkes Dep. at 57; Ex. 2060). An additional eight FDIS transactions involving Mahoney and Hawkes

276

were implemented in 2002, one of which was carried over from 2001 to 2002.
(Mahoney Dep. at 6-7; Hawkes Dep. at 58; Ex. 2100).

1153. In each of the 47 2001 FDIS transactions, the following occurred:

   a.  the taxpayer purchased one or more option pairs of offsetting options
       through a single-member LLC ("SMLLC");

   b.  the taxpayer contributed his/her interest in the SMLLC to a multiple-
       member LLC ("MMLLC") or partnership to step-up the basis in the
       MMLLC;

   c.  Mahoney or Hawkes made purported capital contributions to acquire a
       93% or 95% common interest in the MMLLC;

   d.  the MMLLC bought one or more quartets of options;

   e.  the partnership terminated the gain-leg options and simultaneously
       purchased replacement options;

   f.  the taxpayer then bought most of the foreign party's common interest in
       the MMLLC;

   g.  the remaining legs and the replacement options were then terminated; and

   h.  the termination of the remaining legs and the replacement options
       generated a large reported loss that primarily accrued to the U.S. taxpayer
       and a large gain that primarily accrued to the foreign person.

   (Kolbe, 36:50-58; 37:25-26; Ex. 2852).

1154. Each tax-shelter transaction resulted in the nearly immediate loss of 50% of the
      "foreign partner's" capital investment within the span of a few weeks from their
      initial capital investment. Without a behind-the-scenes agreement to compensate

him, Samuel Mahoney would have lost $991,815 of initial contributions into these tax shelters. He would have lost $325,500 in Fidelity International alone. Similarly, without more, Martin Hawkes would have lost $979,754 of initial contributions.

## 2. Mahoney's Capital Contributions Were Treated as Costs of the Promoters

1155. The funding for the "foreign contributions" for the 2001 FDIS transactions was made by DGI and a Wyoming partnership called Ailesbury. (Mahoney Dep. at 22-23; Hawkes Dep. at 71-73; Ex. 1917).

1156. Over the course of 2001, DGI funded a total amount of capital contributions of $1,505,000. (Ex. 1917). None of these funds were used for anything other than FDIS transactions. (Mahoney Dep. at 23; Hawkes Dep. at 73). As additional funding was required, it was supplied by DGI. (Ex. 1917).

1157. For the year 2002 FDIS transactions, Mahoney and Hawkes used for their capital contributions the money left over from the prior year's FDIS transactions. (Mahoney Dep. at 31; Hawkes Dep. at 80).

1158. All funds provided by Ailesbury were repaid in January 2002. (Mahoney Dep. at 23; Hawkes Dep. at 73; Exs. 1512, 1917). As of that date, only DGI and DGI-controlled entities had money at risk—money that had been provided by the taxpayer-investors—in the FDIS transactions.

1159. On December 31, 2001, Ron Buesinger of Alpha prepared a summary that listed the purported "Investments" by the "Co-Investor," Alpha, DGI, and Helios in each of the 47 2001 FDIS transactions, including Fidelity International. (Exs. 2060, 1497).

278

1160. For Fidelity International, the spreadsheet listed the $651,000 contribution to Fidelity International on Mahoney's behalf as "Co-Investor Orig Cost basis"; the $325,500 sale of Mahoney's common interest in Fidelity International to Richard Egan as "Sale of Common"; and the net amount as "Co-Inve[st]or Adj[usted] Cost basis." (Exs. 2060, 1497).

1161. The aggregate balance of the "Co-Investor Adj Cost basis" for all 47 2001 FDIS transactions, after approximately $2.4 million in buy-out payments, was computed to be $1,302,978. (Exs. 2060, 1497).

1162. The aggregate funding expense of $1,302,978 for the "Co-Investor Adj Cost basis" was recorded by Buesinger as a joint expense of DGI, Helios, and Alpha in a series of spreadsheets that he prepared calculating the net profit from these transactions to be split among DGI, Helios, and Alpha. In each spreadsheet, the amount of $1,302,978 was listed as "SM-MH Cost Basis." (Exs. 1641, 1642, 1644, 1657, 1660, 1845, 2771, 2772).

1163. Buesinger prepared the profit analysis spreadsheet based upon revenue and expense information that Haber dictated to him over the phone. (Buesinger Dep. Oct. 11, 2007, at 243-47).

1164. On March 8, 2002, Ivan Ross of Alpha sent one of these profit analysis spreadsheets to Haber. (Ex. 1641). In his cover e-mail, Ross stated that the attached profit analysis "is based on each of us getting fully reimbursed on our investments in these funds out of the fees." (*Id.*). The "investments in these funds" consisted of the capital contributions for the transactions made by DGI, Helios, and Alpha, as well as the contributions by the "Co-Investor," which was

279

Mahoney or Hawkes. (Ross Dep. Nov. 7, 2007 at 104-06).

## 3. Any Value of the Remaining Interests of Mahoney Was Split Among the Promoters

1165. On May 1, 2002, Buesinger sent DGI a spreadsheet listing the 2001 FDIS customers and related information. (Ex. 1843). That spreadsheet included a breakdown of the cost bases and values of the "Irish value" and the DGI, Helios, and Alpha "investments." (*Id.*). The "Irish value," as of that date, was $138,334. (*Id.*). The "Irish value" was the total of the values of the Mahoney/Hawkes remaining interests, after the buyouts, in each of the 2001 FDIS transactions. (Kolbe, 37:85-86; Ex. 1843).

1166. The total value of the DGI, Helios, and Alpha investments and the "Irish values" was $1,560,709. (Ex. 1843). All of those values, including the "Irish Value," were allocated to DGI, Helios, and Alpha; none of the value was allocated to Mahoney or Hawkes. (Kolbe, 37:86-87; Ex. 1843). In other words, DGI, Helios, and Alpha treated the remaining interests of Mahoney and Hawkes in the 2001 FDIS partnerships as their own assets, as they had already reimbursed Mahoney and Hawkes for their capital contributions. (Kolbe, 37:87).

## 4. Mahoney Was Reimbursed for His Expenses and Paid a Fee for His Participation

1167. Before the first FDIS transaction, Haber promised to pay Mahoney and Hawkes an amount that was "fair and commensurate" with their roles as foreign partners. (Mahoney Dep. at 13-14; Hawkes Dep. at 63-64).

1168. Mahoney and Hawkes were ultimately paid an aggregate fee of $2 million for

playing the role of a foreign partner. (Mahoney Dep. at 3, 4, 15-16; Hawkes Dep.

at 55, 65-66).

1169. Mahoney and Hawkes understood that the fees paid them were

> determined after the fact, [and] were a function of the aggregate
> success of the FDIS program[] and in significant part a function of the
> gross amount of the fees paid by the US participants.

(Mahoney Dep. at 16; Hawkes Dep. at 66).

1170. Each of the profit analysis spreadsheets for the 2001 transactions listed a

$2,000,000 joint expense that was described as "SM-MH." (Exs. 1641, 1642,

1644, 1657, 1660, 1845, 2771, 2772).

## 5. Mahoney Could Not Realize a Profit on the FDIS Transactions, Absent Fees

1171. The Outline of Proposed Transaction for the Fidelity International transaction

dated September 20, 2001, stated that Samuel Mahoney, "an Individual Investor,"

will contribute $651,000. (Ex.1028). The outline also indicated that the

aggregate amount of the contributions allocated to common interests was

$700,000, and that for his $651,000 Mahoney would receive a 93% common

interest in Fidelity International. (*Id.*).

1172. The common interests in Fidelity International had a value of $700,000 upon

contributions on October 22, 2001. (Ex. 1188). Mahoney's common interest was

valued at $651,000. (*Id.*). By the next day, the common interests, including

Mahoney's, had a value of zero. The common interests were "wiped out" by the

large Refco fees before the foreign participant was bought out. (Kolbe, 36:61).

Refco's fees on the foreign currency options were $800,000, more than the value

281

of the common interests. (*Id.* at 36:40). Nonetheless, the operating agreement stated that the buyout could not be for less than the greater of half of the selling partner's initial capital contribution or fair market value (here, $325,500). (*Id.* at 36:40; Ex. 1177).

1173. Mahoney and Hawkes were aware that the partial buyout of their common interests was a planned step in each FDIS transaction. (Mahoney Dep. at 13; Hawkes Dep. at 63). They understood from the outset that they could be required to effectuate a buy-sell agreement after the contribution of capital to the FDIS partnerships, including Fidelity International. (Mahoney Dep. at 13; Hawkes Dep. at 63).

1174. The Outline of Proposed Transaction for the Fidelity International transaction stated that "[a]fter approximately 30 days, [Samuel Mahoney] will sell [85%] . . . of his common interest" to Richard Egan for "[fair market value] with a minimum of $325,500." (Ex. 1028). This $325,500 expense was listed as an "out of pocket" cost. (*Id.*).

1175. The $325,500 out-of-pocket cost for the buyout of Mahoney was the same amount whether Richard Egan purchased 85% of the common interest (as shown on the Outline of Proposed Transaction dated September 20, 2001) or 88% of the common interest (as shown in the revised Outline of Transaction dated October 25, 2001). (Exs. 1028, 1202).

1176. The buyout of the foreign participant's common interest was a planned step in each of the 47 2001 FDIS transactions. In each case, it was also planned that

282

within 30 days the interests of Mahoney and Hawkes would be bought out for 50% of the amount that they purportedly had contributed. (Kolbe, 36:54; Ex. 2852).

1177. Even though the 50% buy-out was a purported minimum amount, Mahoney and Hawkes could not expect a higher figure, because Refco's fee immediately erased the value of their common interests and reduced them to zero. (Kolbe, 36:61). In 35 of the 47 cases, the buyout was for exactly half of the initial contribution credited to the foreign party, while in 12 cases the buyout was for more than half of the credited contribution. (Kolbe, 36:54-55; Ex. 2852).

1178. In light of the magnitude of Refco's fee, it would have been economically irrational for Mahoney and Hawkes to have engaged in these transactions knowing they likely would immediately incur a loss. (Kolbe, 37:71).

1179. The implied losses of Mahoney and Hawkes on the 47 2001 FDIS transactions, calculated by subtracting the buyout amounts from the foreign parties' initial contributions, was $1,302,978. (Kolbe, 37:77-78). That is the same amount shown on the Alpha and DGI spreadsheets as the "SM-MH Cost Basis." (Exs. 1641, 1642, 1660, 1845, 2771). It is also the same amount of the "Co-Investor Adj[usted] Cost basis" that was not recovered by the foreign party upon the sale of his common interest for all 47 2001 FDIS transactions. (Kolbe, 37:77-78; Ex. 1497).

1180. Any payment to Mahoney and Hawkes by DGI, Alpha, and Helios of the "SM-MH" expense would only cause Mahoney and Hawkes to break even. (Kolbe, 37:82).

1181.   As noted, however, Mahoney and Hawkes were paid a flat fee of $2 million for their participation.

## PP.   Fidelity High Tech Was a Sham Partnership for Federal Income Tax Purposes

1182.   As described above, there was no non-tax business purpose for the creation of Fidelity High Tech. It was created solely for the purpose of avoiding taxes, and did not engage in activities that either served a reasonable hedging purpose or provided a reasonable possibility of profit.

1183.   The members of Fidelity High Tech did not join together in good faith for the purpose of conducting a business activity through that entity.

## QQ.   Fidelity International was a Sham Partnership for Federal Income Tax Purposes

1184.   As described above, there was no non-tax business purpose for the creation of Fidelity International. It was created solely for the purpose of avoiding taxes, and did not engage in activities that either served a reasonable hedging purpose or provided a reasonable possibility of profit.

1185.   The members of Fidelity International did not join together in good faith for the purpose of conducting a business activity through that entity.

1186.   As described above, Samuel Mahoney did not join Fidelity International for the purpose of realizing a profit from its option trading activities. Mahoney invested no capital in, bore no risk as to, and contributed no value to, Fidelity International. Mahoney had no reasonable expectation of profit from the activities of Fidelity International. His expenses were paid by DGI/Helios and Alpha, and his compensation was paid by those entities under an arrangement that had no connection to the trading activities of Fidelity International.

284

1187. Likewise, and as described above, Helios and Alpha did not join Fidelity

International for the purpose of realizing a profit from its option trading activities.

## RR.   The Step Transaction Doctrine Applies to Collapse Steps of the Fidelity High Tech Transaction

### 1.   The Steps of the Fidelity High Tech Transaction Should Be Collapsed under the "Interdependence" Test

#### a.   None of the Individual Steps Had an Independent Business Purpose

1188. The Fidelity High Tech transaction was the product of a carefully planned and

orchestrated series of steps that had been designed in advance by the promoters of

the tax shelter strategy. The steps were set out in memoranda or outlines prepared

by the promoters, and in notes or documents prepared by the Egans' advisors to

help them understand and implement the transaction. Several of those documents

even used the word "steps" to describe the process. (*E.g.*, Exs. 3240.1, 550, 698).

1189. The steps of the Fidelity High Tech transaction conformed closely to the

sequential steps set forth in the DGI/Helios memorandum dated September 5,

2000, titled "Implementation Steps for Purchasing Options - Capital Gain

Strategy." (Ex. 550).

1190. The only significant difference was that by November 2001, the promoters had

developed the "stock dribble" strategy to replace the final step of the transaction

as originally planned. The "stock dribble" strategy itself involved a series of

planned, choreographed steps.

1191. Although the final step of the transaction was changed to provide the Egans with

more flexibility on the sale of the stock held by Fidelity High Tech, even as

restructured, the transaction still had as its ultimate objective the elimination of

any capital gain on the Egans' sale of their stock.

1192.  The steps of the Fidelity High Tech transaction were undertaken solely for the

purpose of stepping up the basis of the stock held by High Tech so as to eliminate

any built-in capital gain that would result on the sale of the stock.

1193.  The steps of the transaction were completely interdependent; each individual step

would have been fruitless, and indeed pointless, without the completion of the

entire preplanned service of steps.  None of the steps had any independent

business purpose.

### b.    Certain Intermediate Steps Had No Business Purpose

1194.  As described above, there was no non-tax business purpose for the entire Fidelity

High Tech transaction.  In addition, several of the intermediate steps had no non-

tax business purpose, regardless of the overall purpose.

### (1)    There Was No Business Purpose to the Formation and Use of the Index A and Option A to Acquire the Options

1195.  There was no non-tax business purpose to the formation and use of Index A and

Option A to acquire the options.

1196.  As described above, rather than having Fidelity High Tech enter into the offsetting

options trades, Option A and Index A each entered into the trades.  Maureen Egan

then contributed Option A, and Richard Egan contributed Index A, to Fidelity

High Tech.  The option positions entered into by Option A and Index A were then

closed out.

1197.  The use of Option A and Index A to enter into options that would be ultimately

transferred to High Tech had no business purpose other than tax reduction.

(Kolbe, 38:62-64).  Because High Tech already owned the EMC stock, there was

no non-tax reason to incur the costs in forming single-member LLCs and seven

days later to cause those same entities to be transferred to a multi-member LLC.

The formation and use of Option A and Index A simply consumed resources and

added unnecessary costs to the transaction. (*Id.*).

### (2) There Was No Business Purpose to the Transfer of Maureen Egan's Interest to MEE Holdings

1198. There was no non-tax business purpose for the transfer or Maureen Egan's interest

in Fidelity High Tech to MEE Holdings.

1199. As described above, Stephanie Denby caused MEE Holdings to be formed as a

limited liability partnership. Maureen Egan then contributed her interests in High

Tech to MEE Holdings, which caused a technical termination of High Tech.

1200. The transfer of Maureen Egan's interest in High Tech to MEE Holdings had no

non-tax business purpose. The sole purpose of Maureen Egan's transfer of her

interests in High Tech to MEE Holdings was to allow High Tech to make a

Section 754 election in order to step up the basis of the stock in High Tech,

thereby allowing the Egans greater flexibility in disposing of the stock.

## 2. The Steps of the Fidelity High Tech Transaction Should Be Collapsed Under the "Component" Test

1201. From the outset, the individual steps of the Fidelity High Tech transaction were

planned and implemented to accomplish a single objective – to create an artificial

step-up in the Egans' basis in their ownership interests in High Tech, and thereby

allow them to eliminate any capital gain on the sale of the stock held by High

Tech.

1202. As a result, the steps of the transaction—in particular, the steps where Index A

and Option A acquired NASDAQ 100 options, and where those entities were then

contributed to Fidelity High Tech—should be collapsed, and the options should be

treated as having been acquired in the first instance by High Tech.

## SS.    The Step Transaction Doctrine Applies to Collapse Steps of the Fidelity International Transaction

### 1.    The Steps of the Fidelity International Transaction Should Be Collapsed Under the "Interdependence" Test

#### a.    None of the Individual Steps Had an Independent Business Purpose

1203.  The Fidelity International Transaction was likewise the product of a carefully

planned and orchestrated series of steps that had been designed in advance by the

promoters of the tax shelter strategy.  The steps were set out in memoranda or

outlines prepared by the promoters and in notes or documents prepared by the

Egans' advisors to help them understand and implement the transaction.  (*E.g.*,

Exs. 1017, 1034, 1056, 1140, 1202).

1204.  Helios sent Outlines of Proposed Transaction to Shea and Denby, which were

circulated to Michael Egan and other Carruth employees.  Those outlines were

dated September 20, 2001, September 27, 2001, October 16, 2001 and October

25, 2001.  (Exs. 1034, 1056, 1140, 1202).  The outlines detail most of the steps of

the transaction.

1205.  As described above, the two steps not discussed in the outlines were orally

communicated to Carruth in various meetings and telephone conversations and

were memorialized in notes taken by various Carruth employees.  (*E.g.*, Exs.

1024, 1028, 1036, 1045).

1206.   The description of the planned steps in these outlines corresponds with the final

implementation of the Fidelity International transaction.

1207. The steps of the actual Fidelity International transaction conformed to the steps on the Outlines of Proposed Transaction.

1208. On at least two occasions in the course of planning and implementing the Fidelity International transaction, the parties specifically took into account the possibility that the IRS might invoke the step transaction doctrine.

1209. In a meeting on October 18, 2001, with Haber and Speiss, Pat Shea noted: ". . . for business purposes, the longer we keep it alive, the better we are for presentation - we don't want to look as a step transactions in the IRS eyes." (Ex. 1151).

1210. At around the same time, Reiss wrote that the interest-rate trades would not be terminated "now" because of concerns about the "step transaction" doctrine. (Ex. 1384).

1211. The sequential steps of the Fidelity International transaction were undertaken solely for the purpose of generating a tax loss that could be used to offset the ordinary income realized by Richard Egan on the exercise of his EMC stock options.

1212. The steps of the transaction were completely interdependent; each individual step would have been fruitless, and indeed pointless, without the completion of the entire preplanned service of steps. None of the steps had any independent business purpose.

### b. Certain Intermediate Steps Had No Business Purpose

1213. As described above, there was no non-tax business purpose for the entire Fidelity International transaction. In addition, several of the intermediate steps had no non-tax business purpose, regardless of the overall purpose.

### (1) There Was No Non-Tax Business Purpose for the Use of Fidelity World to Purchase the Options

1214. There was no non-tax business purpose for the use of Fidelity World to purchase the options or the transfer of that entity within days to Fidelity International.

1215. Fidelity World did not engage in any business activity other than the interest rate option trades. Furthermore, under the terms of the proposed trades, it had no economic exposure with respect to those trades beyond the initial net premium paid.

1216. No economic change would have resulted if Fidelity International and not Fidelity World had acquired the interest rate options directly. (Rausser, 41:46).

1217. The formation and use of Fidelity World simply consumed resources and added unnecessary costs to the Fidelity International transaction.

### (2) None of the Other Intermediate Steps of the Transaction, Standing Alone, Had Any Independent Business Purpose

1218. None of the following intermediate steps of the Fidelity International transaction had a non-tax business purpose:

   (a)     the October 22, 2001 contribution by Richard Egan of his interest in Fidelity World (which included the options purchased by Fidelity World on October 9, 2001) and cash to Fidelity International in exchange for a 5% common interest in Fidelity International;

   (b)     the October 29, 2001 termination of the gain legs of the USD/EUR options and the use of those proceeds, plus an additional out-of-pocket cost of $14,491, to purchase new replacement options for the options that were just terminated;

(c) the October 30, 2001 termination of gain legs of the JPY/USD options and the use of those proceeds, plus an additional out-of-pocket cost of $14,050, to purchase replacement options for the options that were just terminated; and

(d) the November 5, 2001 purchase by Richard Egan of 88% of Fidelity International's common interest from Mahoney for $325,500.

1219. The termination of the gain legs of the foreign currency options when Richard Egan owned 5% of the common interests and Mahoney owned 93% of the common interests, and the termination of the loss legs of the foreign currency options when Richard Egan owned 93% of the common interests and Mahoney owned 5% of the common interests, were simply preplanned steps of the transaction from the beginning. The objective of the transaction from the outset was to structure the termination of the currency trades such that a majority of the gain would be allocated to the foreign partner and a majority of the loss would be allocated to Richard Egan.

## 2. The Steps of the Fidelity International Transaction Should Be Collapsed Under the "Component" Test

1220. From the outset, the individual steps of the Fidelity International transaction were planned and implemented to accomplish a single objective—to create an artificial tax loss that could be used to offset ordinary income from the exercise of non-qualified options by the Egans.

1221. As a result, the steps of the transaction—in particular, the steps where Fidelity

291

World acquired interest rate options, and where Fidelity World was then

contributed to Fidelity International—should be collapsed, and the interest rate

options should be treated as having been acquired in the first instance by Fidelity

International.

1222. Alternatively, Richard Egan should be treated as realizing both the gain and the

loss on the Fidelity International transaction.

## TT. The Fidelity High Tech and Fidelity International Paired Options Were, Economically, Single Positions

1223. The various paired offsetting options in the Fidelity High Tech and Fidelity

International transactions were, economically, single positions.

### 1. The Parties Treated the Option Pairs as a Single Position

1224. The option pairs were designed jointly and not as separate options. (Kolbe, 38:75-

76).

1225. Refco treated the options as a single position. Thomas Yorke of Refco advised

others at Refco that the risk from the option transactions was "identifiable at

inception," because the transactions were effectively a "paired trade." (Berhmann

Dep. at 30-31). From Refco's perspective, "it was important that [they] be able to

link" the long and short options "together and look at the net risk of the two trades

as opposed to [as] separate transactions." (*Id*. at 32).

1226. Alpha also treated the options as a single position, as shown in its "Pricing

Matrix" for High Tech. (Ex. 747). In preparing the matrix, Buesinger was only

"pricing a net position, the net economics." (Buesinger Dep. July 31, 2008 at

292

237).

1227. On January 31, 2001, Carolyn Fiddy took notes of a conversation with Ron Buesinger of Alpha in which she wrote that the Egans "have bought 2 different options for [t]ax purposes–but economically [it] is really 1 item." (Ex. 728).

## 2. Separating the Paired Options Would Have Required Huge Amounts of Collateral or Margin

1228. As to the Fidelity High Tech paired options, Option A and Index A had to pay a net premium of $3.4 million. If the High Tech options in each pair had been written with separate counterparties, Option A and Index A would have had to pay $160 million to the counterparty from whom they bought the long options, and would have had to supply $485 million in margin (in addition to withheld premiums) to the counterparty to whom they sold the short options. (Kolbe, 38:69-71). The resulting total capital required, $645 million, would have been nearly 190 times larger than the $3.4 million actually required. (Kolbe, 38:69-72; Dem. Exs. 3029, 3030).

1229. Moreover, because of the options' provisions for determining the "reference price" (that is, the 15-minute window and the use of multiple indexes to measure the value of the NASDAQ 100 within that window), there would be a risk at the end that the counterparty from whom the long options had been purchased would conclude they had not paid off, while the counterparty to whom the short options had been sold would conclude they had paid off. (Kolbe, 38:72). If that had happened, the Egans would have lost their entire $645 million. (*Id.*).

293

1230. As to the Fidelity International transaction, the numbers were even larger. As Dr.

Kolbe, a government expert, explained,

> Had [the options] been written separately with separate
> counterparties . . . the out-of-pocket costs would have gone up
> dramatically. It would have cost [$]994 million to buy all the long
> options. And the short options would have their payments
> withheld and there would have had to be another $3.1 billion
> supplied in margin to be held against the risks that the short option
> would finish in the money. So the total cash outlay would be more
> than $4 billion.

(*Id.* at 37:92).

1231. The risk to a counterparty from such a trade—that is, where the options were

separate and not one position—would be enormous. (*Id.* at 37:93). Accordingly,

it would have been economically "irrational in the extreme for someone not to

require a margin . . . enough to pay it off." (*Id.*).

1232. Refco did not, however, require such margin or other collateral and therefore

treated the option pairs as if they were economially single positions.

1233. In summary, as Dr. Kolbe explained, "the end result of this is that separated, the

options are much more costly. They are more risky. And economically . . . they

are two products separated and a single product combined." (*Id.* at 38:72).

"[T]ogether there's a single investment; apart, they're two investments." (*Id.* at

38:73).

## UU.  The Egans Did Not Receive Independent Legal Advice from Proskauer and Sidley Austin

### 1.  Proskauer and Sidley Austin Did Not Provide Independent Legal Advice

1234. Both Proskauer and Sidley Austin had an inherent conflict of interest in

294

purporting to render legal advice to the Egans.

1235. As described above, R.J. Ruble of Sidley Austin and Ira Akselrad of Proskauer
      Rose actively assisted DGI/Helios in the design, development, marketing, and
      implementation of the tax shelter strategy and its variants. (Exs. 797, 798, 809,
      814).

1236. Among other things, Ruble and Akselrad provided input on the strategies,
      commented on the marketing materials, and provided or commented on model
      legal opinions to use in the promoting tax shelter strategy.

1237. Ruble and Akselrad knew, or reasonably should have known, that DGI/Helios
      used the names and reputations of their law firms and their model opinions in
      marketing the strategy to prospective clients.

1238. As part of the strategy, Ruble and Akselrad agreed in advance to provide
      favorable legal opinions in order to induce taxpayer-investors to utilize the
      strategy.

1239. Ruble and Akselrad knew, or reasonably should have known, that the issuance of
      favorable legal opinions from prominent law firms was a central feature of the
      successful promotion of the strategy.

1240. As also described above, in the FDIS marketing materials, DGI/Helios had stated
      that one of its "most valuable" contributions to its clients was in "ability to firmly
      manage and control the process of getting . . . attorneys . . . to *expeditiously reach
      the desired conclusions*." (Ex. 809 (emphasis added)).

1241. Ruble and Akselrad knew, or reasonably should have known, that DGI/Helios was

marketing the strategy in that fashion.

1242. Proskauer provided at least 28 favorable opinions, and Sidley Austin provided at
least 30 favorable opinions, in support of the tax shelter strategy. (Ex. 1519).

1243. Proskauer and Sidley Austin provided legal advice both to DGI/Helios and to the
individual taxpayer/investors who invested in the tax shelter strategy.

1244. Proskauer specifically acknowledged to the Egans, in a draft representation letter
dated April 11, 2002, that it represented DGI/Helios and therefore had a conflict
of interest if it also represented the Egans. (Ex. 1772).

1245. In addition, Ira Akselrad of Proskauer personally participated in a DGI tax shelter
transaction in 2000. (Exs. 669, 2759). The favorable opinion letter concerning
his personal transaction was issued by Brown & Wood on December 31, 2000.
(Ex. 669).

1246. As described above, DGI/Helios played a substantial role in the drafting and
delivery of the legal opinions by Proskauer and Sidley Austin.

1247. As described above, in nearly all instances, the legal fees of Proskauer and Sidley
Austin were paid by DGI/Helios rather than the taxpayer/investors. Ruble and
Akselrad were aware of that arrangement.

1248. DGI/Helios paid the fees of Proskauer and Sidley Austin in order to assert firmer
management and greater control over the opinions rendered by the law firms. (Ex.
809).

1249. Proskauer and Sidley Austin derived substantial profit from the promotion and
sale of the tax shelter strategy, and therefore had a financial interest in upholding

the strategy.

## 2. The Egans Knew That the Legal Advice from Proskauer and Sidley Austin Was Not Independent

1250. The Egans knew, or reasonably should have known, that the legal advice they received from Proskauer and Sidley Austin was not independent, and that the firms had an inherent conflict of interest.

1251. The Egans were highly sophisticated taxpayers with considerable business experience.

1252. The Egans and their advisors knew that DGI/Helios marketed its ability to "manage and control the process" of getting attorneys "to expeditiously reach the desired conclusions." (*Id.*).

1253. The Egans and their advisors knew, or reasonably should have known, that DGI/Helios had arranged in advance for four law firms, including Proskauer and Sidley Austin, to render favorable opinions to taxpayer/investors.

1254. The Egans and their advisors knew, or reasonably should have known, that Proskauer and Sidley Austin had developed model opinions, and that they had rendered favorable opinions for other taxpayer/investors who had used the same or similar strategies.

1255. The Egans and their advisors knew, or reasonably should have known, that Proskauer and Sidley Austin intended to render favorable opinions from the onset of the transactions.

1256. The Egans and their advisors knew that their communications with Proskauer and

Sidley Austin were frequently shared with DGI/Helios and KPMG.

1257. The Egans and their advisors knew that none of their communications with

Proskauer and Sidley Austin were privileged, or marked "privileged."

1258. The Egans and their advisors provided their comments on the draft opinions to

James Haber or Tim Speiss, and not exclusively (or even always directly) to the

law firms.

1259. The Egans received a draft engagement letter from Proskauer that specifically

noted a conflict of interest based on the fact that Proskauer also represented

DGI/Helios.

1260. The Egans and their advisors knew, or reasonably should have known, that

Proskauer had a conflict of interest, because it also represented DGI one of the

principal promoters of the tax shelter strategy.

1261. The Egans and their advisors knew that the fees of Proskauer and Sidley Austin

(other than the fee for the non-disclosure letter by Proskauer) were paid by

DGI/Helios.

1262. The Egans would not have paid Helios for the transactions until Helios provided

satisfactory and favorable legal opinion letters.

## VV.    The Proskauer Opinion for Fidelity High Tech Was Based on Unreasonable Factual Assumptions

1263. The Proskauer opinion letter dated April 5, 2002, on the Fidelity High Tech

transaction was based on unreasonable factual assumptions, including

assumptions that the Egans knew, or reasonably should have known, were untrue.

1264. The Egans did not reasonably rely on the April 5, 2002, Proskauer opinion letter

for tax reporting purposes.

## 1.     The Opinion Contained False and Misleading Factual Assumptions

1265. The Proskauer opinion letter was purportedly based on factual representations that

were false and misleading.

### a.     Investor Representation No. 1 Was False

1266. Paragraph 1 of the Investor Representations in the Proskauer opinion letter stated:

> Investors entered into the options trades to hedge against market volatility
> in a large concentrated holding of technology stock so as to produce an
> overall economic profit. Investors believed that the options were
> correlated to this concentrated position so that the options would produce
> an effective hedge.

(Ex. 122 at 8-9). This representation was also made verbatim in the Certificate of

Facts executed by Richard and Maureen Egan. (Ex. 1766).

1267. That representation was false from both a subjective and objective standpoint.

1268. From a subjective standpoint, the Egans did not enter into the option trades "to

hedge against market volatility." Moreover, the Egans did not believe that the

options "would produce an effective hedge."

1269. From an objective standpoint, as described above, the transaction was not

reasonably designed to create an effective hedge.

### b.     Investor Representation No. 2 Was False

1270. Paragraph 2 of the Investor Representations in the Proskauer opinion letter stated:

> Based on advice of the Investment Advisor as to the probability of the
> referenced property reaching certain price levels at which the Option

> would be profitable and on Investors own independent evaluation, *Investors believed* they had a reasonable opportunity to earn a profit from the option trades in excess of all fees and transaction costs without regard to tax benefits.

(Ex. 122 at 9 (emphasis added)). That representation was also made verbatim in

the Certificate of Facts executed by Richard and Maureen Egan. (Ex. 1766).

1271. That paragraph is template language, and is also contained in the Sidley Austin

opinion letter. (Ex. 121 at 12).

1272. That representation was false from both a subjective and objective standpoint.

1273. From a subjective standpoint, the Egans did not believe that they had "a

reasonable opportunity to earn a profit from the option trades in excess of all fees

and transaction costs without regard to tax benefits." Moreover, the Egans did not

rely on the advice of the "Investment Advisor [that is, Alpha] as to the probability

of the referenced property reaching certain price levels at which the Option would

be profitable," nor did they conduct an "independent evaluation."

1274. From an objective standpoint, as described above, there was no reasonable

possibility of profit on the option trades in excess of all fees and transaction costs

and without regard to tax benefits.

### c.   **Investor Representation No. 3 Was False**

1275. Paragraph 3 of the Investor Representations in the Proskauer opinion letter stated:

> Each investor contributed his or her membership interest in [Index] or [Option] to [Fidelity High Tech] for substantial non-tax business reasons, including the short term risk management of concentrated stock positions.

300

(Ex. 122 at 9). That representation was also made almost verbatim in the

Certificate of Facts executed by Maureen Egan and Richard Egan. (Ex. 1766).

1276. That paragraph is template language, and similar language is also contained in the

Sidley Austin opinion letter. (Ex. 121 at 12).

1277. That representation was false from both a subjective and objective standpoint.

1278. From a subjective standpoint, the Egans did not enter into the transaction for

"substantial non-tax business reasons," or indeed any non-tax business reasons;

they did so solely to avoid taxes.

1279. From an objective standpoint, there were no substantial non-tax business reasons

to enter into the transaction. There was no reasonable possibility of profit on the

transaction, and the transactions did not provide "short term risk management of

concentrated stock positions."

### d. Investor Representation No. 10 Was False or Misleading

1280. Paragraph 10 of the Investor Representations in the Proskauer opinion letter

stated:

> There existed no understanding, agreement, obligation, or
> arrangement pursuant to which any of the parties described
> herein committed to undertake all or any of the transactions
> described herein upon the happening of any other
> transaction, except to the extent that owner of the Options
> and Bank were contractually obligated to perform under the
> Options in accordance with their stated terms.

(Ex. 122 at 9). That representation was also made verbatim in the

Certificate of Facts executed by Maureen Egan and Richard Egan. (Ex.

1766).

1281. That paragraph is template language, and is also found essentially verbatim in the Sidley Austin opinion letter. (Ex. 121 at 13).

1282. The language is apparently intended to provide a basis for the inapplicability of the step-transaction doctrine. In context, the representation was misleading or false.

1283. If the language is construed to mean only that there was no legal obligation on the part of the Egans to undertake any of the steps of the transaction, it is literally true, but misleading. The opinion itself recognizes that the "binding commitment test" is only one of three possible tests in determining the applicability of the step-transaction doctrine. (Ex. 122 at 36).

1284. If this language is construed to mean that the Egans had no "understanding" or "arrangement" that the parties would undertake the steps of the transaction in a particular order with a particular end result in mind, the language is false. The Fidelity High Tech transaction was a planned and choreographed transaction from start to finish, and implemented for the sole purpose of avoiding taxes.

### e.   The Date of the Original Contribution of EMC Stock Was False

1285. The High Tech Certificate of Facts falsely stated that Richard and Maureen Egan had contributed shares of EMC stock to High Tech on February 7, 2001. Those shares were actually contributed on September 8, 2000.

1286. If the Proskauer opinion letter had correctly stated that Fidelity High Tech had

been holding EMC stock since September 8, 2000, it would have been more obvious that there was no business purpose for the Egans to acquire options in Index A and Option A, and then within days thereafter transfer those options to High Tech.

## 2. The Opinion Omitted Essential Facts

1287. The Proskauer opinion letter did not include any facts concerning the true purpose of the Fidelity High Tech transaction, which was to create an artificial step-up in basis in order to reduce the Egans' tax liability. The omission of those facts was unreasonable.

1288. The Proskauer opinion letter did not include any facts concerning the design and implementation of the Fidelity High Tech transaction, including the fact that it involved an orchestrated series of steps that were intended to occur in a particular order, and were executed in that order. The omission of those facts was unreasonable.

1289. The Proskauer opinion letter did not include any facts concerning the amounts of fees paid to Helios and KPMG on the transaction. The omission of those facts was unreasonable.

1290. The opinion omitted any reference to the fees paid to Helios and KPMG, even though it appeared to recognize that a critical question was whether the Egans had a reasonable opportunity to earn a profit "in excess of all fees and transaction costs."

303

1291. The omission of the fees was deliberate, and was done at the instruction of Orrin Tilevitz to Michael Swiader at Proskauer. (Ex. 1621).

## 3. Proskauer Knew That the Opinion Contained False and Misleading Factual Assumptions and Omitted Critical Facts

1292. As described above, Ira Akselrad of Proskauer personally provided substantial assistance in the design, marketing, and development of the FDIS strategy.

1293. As also described above, Akselrad was personally substantially familiar with the Fidelity High Tech transaction independent of the Certificate of Facts executed by the Egans, including the Egans' purposes in entering into the transaction.

1294. Among other things, Akselrad knew, or reasonably should have known, (1) that the strategy involved an elaborate series of planned steps to execute; (2) that the Egans paid large fees to Helios, KPMG, Refco, and others in connection with the transaction; (3) that the transaction was designed and intended to generate an artificial step-up in basis, and had no other purpose; (4) that the transaction served no genuine hedging or risk-reduction function; and (5) that there was no economic substance to the transaction.

1295. Ira Akselrad therefore knew, or reasonably should have known, that the opinion letter contained false and misleading factual assumptions and omitted critical facts.

## 4. Richard Egan Did Not Read the Certificate of Facts or the Proskauer Opinion Letter

1296. Richard Egan did not read the Certificate of Facts relating to the High Tech

304

transaction before signing it. (R. Egan, 3:100-01).

1297. Richard Egan did not read the legal opinion letter from Proskauer relating to the

High Tech transaction at the time it was issued, and, in fact, did not read it until

the IRS initiated an audit years after the opinion was issued. (*Id.* at 3:76-77).

## WW. The Sidley Austin Opinion for Fidelity International Was Based on Unreasonable Factual Assumptions

1298. The Sidley Austin opinion letter dated March 8, 2002, on the Fidelity International

transaction was based on unreasonable factual assumptions, including

assumptions that the Egans knew, or reasonably should have known, were untrue.

1299. The Egans did not reasonably rely on the March 8, 2002 Sidley Austin opinion

letter for tax reporting purposes.

### 1. The Opinion Contained False and Misleading Factual Assumptions

1300. The Sidley Austin opinion letter was purportedly based on factual representations

that were false and misleading.

#### a. Investor Representation No. 1 Was False

1301. Paragraph 1 of the Investor Representations in the Sidley Austin opinion letter

stated:

> Investor entered into the Transaction *for substantial non-tax business reasons*, predominately related to offsetting various investment risks associated with a large single concentrated holding in a U.S. technology company, and to hedge against currency fluctuations in international markets in which this technology company has significant currency exposure due to sales. . . . Also investor has entered into certain Options to hedge against interest rate fluctuations . . . .

305

(Ex. 121 at 12) (emphasis added). That representation was also made verbatim in

paragraph 1 of the representation letter signed by Richard Egan relating to the

Fidelity International transaction. (Ex. 78).

1302. That representation was false from both a subjective and objective standpoint.

1303. From a subjective standpoint, the Egans did not enter into the transactions for

"substantial non-tax business reasons," or indeed any non-tax business reasons;

they did so solely to avoid income taxes.

1304. From an objective standpoint, there were no substantial non-tax business reasons

to enter into the transaction. The transactions did not offset "various investment

risks," nor was it reasonably designed to create an effective hedge against

"currency fluctuations" or "interest rate fluctuations."

**b.**      **Investor Representation No. 2 Was False**

1305. Paragraph 2 of the Investor Representations in the Sidley Austin opinion letter

stated:

> Based on advice of the Investment Advisor as to the probability of
> the referenced property reaching certain price levels at which the
> Options would be profitable and on Investor's own independent
> evaluation, *Investor believed* that he had a reasonable opportunity
> to earn a reasonable profit from the Transactions in excess of all
> fees and transaction costs and without regard to tax benefits.

(Ex. 121 (emphasis added)). That representation was also made verbatim in

paragraph 2 of the representation letter signed by Richard Egan relating to the

Fidelity International transaction. (Ex. 78).

1306. That paragraph is template language, and is also contained in the Proskauer

opinion letter. (Ex. 122 at 9).

1307. That representation was false from both a subjective and an objective standpoint.

1308. From a subjective standpoint, the Egans did not believe that they had a "reasonable opportunity to earn a reasonable profit from the transaction in excess of all fees and transaction costs and without regard to tax benefits." Moreover, the Egans did not rely on the advice of the "Investment Advisor" as to "the probability of the referenced property reaching certain price levels at which the Options would be profitable," nor did they conduct an "independent evaluation."

1309. From an objective standpoint, as described above, there was no reasonable possibility of profit from the transaction in excess of all fees and transaction cots and without regard to tax benefits.

c. **Investor Representation No. 3 Was False**

1310. Paragraph 3 of the Investor Representations in the Sidley Austin opinion letter stated:

> Investor contributed the membership interest in World to [Fidelity] International for substantial non-tax business reasons. . . . .

(Ex. 121 at 12). That representation was also made verbatim in paragraph 3 of the representation letter signed by Richard Egan relating to the Fidelity International transaction. (Ex. 78).

1311. That representation was false from both a subjective and an objective standpoint.

1312. From a subjective standpoint, the Egans did not enter into the transaction for "substantial non-tax business reasons," or indeed any non-tax business reasons;

307

they did so solely to avoid taxes.

1313. From an objective standpoint, there were no substantial non-tax business reasons

to contribute the membership interest in World to Fidelity International.

### d. Investor Representation No. 9 Was False or Misleading

1314. Paragraph 9 of the Investor Representations in the Sidley Austin opinion letter

stated:

> There existed no understanding, agreement, obligation, or
> arrangement pursuant to which any of the parties described herein
> committed to undertake all or any of the transactions described
> herein upon the happening of any other transaction, except to the
> extent that Investor/World (and International as transferee of
> Investor) and Counterparty were contractually obligated to perform
> under the Options in accordance with their stated terms.

(Ex. 121 at 13). That representation was also made verbatim in paragraph 9 of the

representation letter signed by Richard Egan relating to the Fidelity International

transaction. (Ex. 78).

1315. That paragraph is template language, and is also found verbatim in the Proskauer

opinion letter. (Ex. 122 at 9).

1316. The language is apparently intended to provide a basis for the inapplicability of

the step-transaction doctrine. In context, the representation was misleading or

false.

1317. If the language is construed to mean only that there was no legal obligation on the

part of the Egans to undertake any of the steps of the transaction, it is literally true,

but misleading. The opinion itself recognizes that the "binding commitment test"

308

is only one of three possible tests in determining the applicability of the step-
transaction doctrine. (Ex. 121).

1318. If this language is construed to mean that the Egans had no "understanding" or
"arrangement" that the parties would undertake the steps of the transaction in a
particular order with a particular end result in mind, the language is false. The
Fidelity International transaction was a planned and choreographed transaction
from start to finish, and implemented for the sole purpose of avoiding taxes.

## 2.    The Opinion Omitted Essential Facts

1319. The Sidley Austin opinion letter did not include any facts concerning the true
purpose of the Fidelity International transaction, which was to create an artificial
loss in order to reduce the Egans' tax liability. The omission of those facts was
unreasonable.

1320. The Sidley Austin opinion letter did not include any facts concerning the design
and implementation of the Fidelity International transaction, including the fact
that it involved an orchestrated series of steps that were intended to occur in a
particular order, and were executed in that order. The omission of those facts was
unreasonable.

1321. The Sidley Austin opinion letter did not include any facts concerning the role of
the foreign partner in the transaction, including the fact the fact that he invested no
funds, bore no risk, added no value, and was separately compensated by the
promoters for his role in the transaction.

1322. The Sidley Austin opinion letter did not include any facts concerning the amounts of fees to Helios and KPMG on the transaction. The omission of those facts was unreasonable.

1323. The opinion omitted the fees paid to Helios and KPMG, even though it appeared to recognize that a critical question was whether the Egans had a reasonable opportunity to earn a profit "in excess of all fees and transaction costs."

## 3. Sidley Austin Knew That the Opinion Contained False and Misleading Factual Assumptions and Omitted Critical Facts

1324. As described above, R.J. Ruble of Sidley Austin personally provided substantial assistance in the design, marketing, and development of the FDIS strategy.

1325. As also described above, Ruble was personally substantially familiar with the Fidelity International transaction independent of the representation letter executed by Richard Egan, including the Egans' purposes in entering into the transaction.

1326. Among other things, Ruble knew, or reasonably should have known, (1) that the strategy involved an elaborate series of planned steps to execute; (2) that the Egans paid large fees to Helios, KPMG, Refco, and others in connection with the transaction; (3) that Samuel Mahoney was not a true partner; (4) that the transaction was designed and intended to generate losses for tax purposes, and had no other purpose; (5) that the transaction served no genuine hedging or risk-reduction function; and (6) that there was no economic substance to the transaction.

1327. R.J. Ruble therefore knew, or reasonably should have known, that the opinion

310

letter contained false and misleading factual assumptions and omitted critical facts.

## 4.    Richard Egan Did Not Read the Investor Representation Letter

1328.  Paragraph 10 of the representation letter relating to the Fidelity International transaction states as follows: "Investor has reviewed the description of the Transactions attached hereto and such description is accurate and materially complete." (Ex. 78).

1329.  Richard Egan did not read the representation letter relating to the Fidelity International transaction before signing it. (R. Egan, 3:100).

## XX.    Both the Proskauer Opinion Letter and the Sidley Austin Opinion Letter Were Based on Unreasonable Legal Assumptions

1330.  The purported purpose of the Proskauer and Sidley Austin opinion letters was to advise the Egans of the potential tax consequences of the Fidelity transactions.

1331.  The April 5, 2002, Proskauer opinion letter, among other things, contained the following conclusions:

(1)    "that for federal income tax purposes it is more likely than not" that the claimed step-up in basis would be "used to compute gain on the sale of the [stock in Fidelity High Tech]";

(2)    that "[t]he sham transaction doctrine would not apply and, based on the representations of [the Egans and Alpha], the Transactions would have the requisite business purpose and economic substance";

(3)    that "[t]he step transaction doctrine would not apply to recharacterize the

311

Transactions";

(4)    that "there is a greater than 50 percent likelihood that the tax treatment of the Transactions would be upheld if challenged by the IRS"; and

(5)    the IRS "should not be successful were it to assert a penalty against an Investor under Section 6662(b)(2) or (3)."

(Ex. 122 at 10-12).

1332.  The March 8, 2002 Sidley Austin opinion letter, among other things, contained the following conclusions:

(1)    that "for federal income tax purposes it is more likely than not" that the claimed step-up in basis, and the claimed allocations of gains and losses, would be respected;

(2)    that "[t]he sham transaction doctrine would not apply and, based on the representations of Investor, the Transactions would have the requisite business purpose and economic substance";

(3)    that "[a]lthough the matter cannot be entirely free from doubt because of the factual nature of the inquiry, on balance, the requisite profit motive exists to support the deduction of any loss from the Transactions under Code Section 165(c)(2) and Code Section 183";

(4)    that "[t]he step transaction doctrine would not apply to the Transactions";

(5)    that "there is a greater than 50 percent likelihood that the tax treatment of the Transactions would be upheld if challenged by the IRS"; and

312

    (6)    that "the IRS should not be successful were it to assert a penalty against

             Investor Code Section 6662(b)(2) or (3) for positions taken on Investor's

             federal income tax return with respect to the Transactions."

             (Ex. 121 at 16-18).

1333. A reasonable opinion letter would have laid out the likely positions that would be

asserted by the IRS, and discussed the relevant authorities, whether favorable or

unfavorable, in order to evaluate the likelihood that the courts would uphold the

positions taken by the Egans.

1334. The opinion letters superficially purport to discuss the relevant authorities, but in

reality their analysis is incomplete, incorrect, and misleading in multiple respects.

1335. Furthermore, the opinion letters were not written as a measured or reasoned

analysis of a likely legal outcome, but rather as advocacy pieces intended to

defend a previously determined conclusion.

1336. For example, any reasonable and experienced tax attorney would have recognized

that the IRS would assert that the economic substance doctrine (or a variant)

would apply to the Fidelity High Tech and the Fidelity International transactions.

Both opinion letters recognize that fact, and both devote several pages to a

purported analysis of that issue.

1337. The Proskauer opinion letter concluded that the Fidelity High Tech transaction

would be upheld even if it had no economic substance, as long as the taxpayer

was subjectively motivated by a business purpose other than obtaining tax

313

benefits. (Ex. 122 at 29). It then stated in conclusory fashion that the Egans "contributed the Options and the Stock to [High Tech], and Maureen [Egan] contributed her interest in [High Tech] to [MEE Holdings], for substantial non-tax business reasons including investment management, risk control, and estate planning purposes which reasons would likely satisfy any business purpose requirement for engaging in the Transactions." (*Id.* at 31).

1338. The Proskauer opinion letter thus effectively assumed that the transaction would be upheld as long as the Egans represented that they subjectively believed the transaction had a business purpose.

1339. No reasonable tax attorney would assume that a transaction of that nature would be recognized and upheld by the courts simply because the taxpayer made a self-serving statement about his or her supposed business purpose.

1340. Because Richard Egan was a resident of Massachusetts, it should have been obvious that there was a substantial likelihood that the applicability of the economic substance doctrine would be litigated in the First Circuit. The opinion letter, however, contains no mention of any relevant First Circuit case law on the subject. Among other things, the opinion letter does not mention, much less analyze, the First Circuit's opinion in *Dewees v. Comm'r*, 870 F.2d 21 (1st Cir. 1989), a tax shelter case in which the court noted (in a discussion of Section 165(c)) that where the "objective features of the situation are sufficiently clear, self-serving statements from taxpayers could make no legal difference."

314

1341. Furthermore, and in any event, Proskauer knew, or reasonably should have known, that the Egans subjectively had no non-tax business reasons or purposes for entering into the transaction.

1342. The Sidley Austin opinion letter indicated that different circuits took different approaches to the economic substance doctrine, but that the "correct" approach was to uphold the transaction if it had either a business purpose (a subjective inquiry) or economic substance (an objective inquiry). (Ex. 121 at 62). The opinion later, and inconsistently, stated that it is "well-established that a transaction . . . will not be respected for tax purposes unless the transaction . . . [has] economic substance separate and distinct from the economic benefit derived from the tax reduction." (*Id.* at 70).

1343. Like the Proskauer opinion letter, the Sidley Austin opinion letter addressed the Egans' purported "business purpose" in conclusory fashion:

> Investor believed that he had a reasonable opportunity to earn a reasonable profit, in excess of all fees and transaction costs, from the Transaction, without regard to tax benefits. Also as stated above, Investor contributed the Options to International for substantial non-tax business reasons, including hedging of risk in a highly concentrated stock, hedging currency risk as foreign markets made up an increasingly large component of the business in their concentrated holdings, and hedging currency risk with respect to a line of credit, the professional management provided by [Alpha], and the desire to create a larger pool of capital through the involvement of other investors such as [Samuel Mahoney].

(*Id.* at 62).

1344. Like the Proskauer opinion letter, the Sidley Austin opinion letter did not mention

315

the *Dewees* case, or otherwise address the issue of whether the courts were likely to accept self-serving statements from taxpayers at face value.

1345. Like Proskauer, Sidley Austin knew, or reasonably should have known, that the Egans subjectively had no such business reasons or purposes for entering into the transaction.

1346. The discussion in the Proskauer opinion letter concerning the "economic substance" of the Fidelity High Tech transaction contained virtually no analysis of the actual facts of the transaction. (Ex. 122 at 32-34).

1347. The discussion in the Sidley Austin opinion letter concerning the "economic substance" of the Fidelity International transaction contained some factual analysis. (Ex. 121 at 70-77). That opinion letter, however, ignored several critical issues, such as whether the Fidelity International transaction actually served a reasonable hedging function, or whether the Egans had a reasonable possibility of profit in excess of fees and costs associated with the transaction.

1348. The discussion in both opinion letters as to whether the transactions described in IRS Notice 2000-44 are the "same as" or "substantially similar to" the High Tech transaction was incomplete and misleading. (Exs. 122 at 35; 121 at 93-98). Indeed, the opinion letters disposed of the issue summarily, with virtually no analysis.

1349. The Proskauer opinion letter stated that in the Notice 2000-44 transaction, the contribution of the option spread "directly results in a tax loss," whereas in the

316

High Tech transaction, "the increased outside basis resulting from the contribution of the option spread simply permits investors to avoid a taxable gain." (Ex. 122 at 35). No explanation was given as to why the creation of an artificial basis step-up through the contribution of an option spread is not "substantially similar" to the creation of an artificial loss through the contribution of an option spread. Likewise, the opinion letter stated that in Notice 2000-44, the taxpayer's net economic outlay was described as "zero or nominal," whereas in the High Tech transaction it was "far greater than 'nominal.'" (*Id.*). Again, no explanation was given as to why a net economic outlay that was a small fraction of the claimed tax benefit is not "substantially similar" to an outlay that was "nominal."

1350. The Sidley Austin opinion letter contained the same language verbatim. (Ex. 121 at 97-98).

1351. In summary, the neither opinion letter provided a meaningful or coherent analysis as to several critical issues, including the applicability of the economic substance doctrine.

1352. The lack of a meaningful or coherent analysis as to those issues was deliberate. The authors of the opinion letters knew that it was not likely that the Fidelity High Tech or Fidelity International transaction would survive a legal challenge in which all the underlying facts were made known.

1353. The purpose of the opinion letters was not to provide legal guidance, but to provide a potential defense against the imposition of penalties, and thus to induce

the taxpayer/investor to enter into the transaction.

1354. The Egans were highly sophisticated and experienced taxpayers and knew, or reasonably should have known, that the legal analysis in the opinion letters was not reasonable.

## YY. The Egans Did Not Reasonably Rely on Any Other Professional Advisors for Tax Advice

### 1. The Egans Did Not Reasonably Rely on the Tax Advice of KPMG

1355. The Egans did not reasonably rely on KPMG for advice concerning the tax reporting of the Fidelity High Tech or Fidelity International transactions.

1356. The Egans knew that KPMG was a promoter of the tax shelter strategies, and thus had an inherent and obvious conflict of interest with regard to rendering any tax advice.

1357. The Egans did not seek or obtain an opinion letter from KPMG as to either the Fidelity High Tech or Fidelity International transactions

1358. The Egans deliberately avoided obtaining such an opinion, out of concerns that the IRS might obtain a copy and use it as a "guide" to "get information" about the transactions. (Ex. 2536).

1359. In any event, the Egans deliberately disregarded the advice of KPMG. When KPMG required the Egans to make a tax shelter disclosure with their 2001 individual tax return pursuant to Temp. Treas. Reg. § 1.6011-4T, the Egans fired KPMG rather than make the disclosure. (Exs. 2785, 96, 98, 224).

318

## 2. The Egans Did Not Reasonably Rely on the Tax Advice of RSM McGladrey

1360. The Egans did not reasonably rely on RSM McGladrey for any tax advice concerning the tax reporting of the Fidelity High Tech or Fidelity International transactions.

1361. The Egans knew, or reasonably should have known, that RSM McGladrey had an inherent conflict of interest with regard to rendering any tax advice. The Egans knew that RSM McGladrey had been referred to them by James Haber, a principal promoter of the tax shelter strategy. Haber told Pat Shea that Ron Wainwright of RSM McGladrey had experience marketing the tax shelter strategy. (Ex. 1419).

1362. Wainwright reviewed and signed the Egans' individual tax returns for 2001 within a matter of days, notwithstanding the immense size of the returns and the complexity of the underlying Fidelity High Tech or Fidelity International transactions.

1363. The Egans did not seek or obtain an opinion letter from RSM McGladrey as to either the Fidelity High Tech or Fidelity International transactions.

## 3. The Egans Did Not Reasonably Rely on the Tax Advice of Stephanie Denby

1364. The Egans did not reasonably rely on Stephanie Denby for advice concerning the tax reporting of the Fidelity High Tech or Fidelity International transactions.

1365. The Egans did not seek or obtain an opinion letter from Stephanie Denby as to either the Fidelity High Tech or Fidelity International transactions.

1366. The Egans knew, or reasonably should have known, that Stephanie Denby

319

understood that the transactions were so risky, and so unlikely to survive IRS
scrutiny, that they should be concealed from the IRS to the extent possible.

1367. Stephanie Denby knew, or reasonably should have known, that the legal advice
that the Egans received from Proskauer and Sidley Austin as to the Fidelity High
Tech and Fidelity International transactions was not independent and was based
on unreasonable factual and legal assumptions.

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction and Nature of Proceeding

1. The Court has jurisdiction over this matter pursuant to 26 U.S.C. § 6226(b), (e),
and (f), and 28 U.S.C. § 1346(e).

2. This case is governed by the partnership provisions of the Tax Equity and Fiscal
Responsibility Act of 1982 ("TEFRA"), now codified in relevant part at 26 U.S.C.
§§ 6221-6234. Since the enactment of TEFRA, the Code provides for a "unified
proceeding in which all items of partnership income, loss, deduction, or credit that
affect each partner's tax liability would be uniformly adjusted at the partnership
level." *Chef's Choice Produce, Ltd. v. Comm'r*, 95 T.C. 388, 393 (1990); *Harrell
v. Comm'r*, 91 T.C. 242, 243 (1988); *see* 26 U.S.C. § 6221.

3. This Court has jurisdiction to determine all "partnership items" of Fidelity High
Tech and Fidelity International that were raised in the FPAAs. 26 U.S.C.
§§ 6221, 6226(f). A "partnership item," in substance, is an item "required to be
taken into account" by the partnership for tax purposes. *Id.* § 6231(a)(3). Among

320

other things, this Court has jurisdiction to determine whether the partnership was a sham or lacked economic substance and should be disregarded for tax purposes. *Petaluma FX Partners, LLC v. Comm'r*, 591 F.3d 649, 652-54 (D.C. Cir. 2010).

4. Determinations made as to partnership items in a partnership-level proceeding are conclusive and binding on all partners. 26 U.S.C. § 6230(c)(4); *Stobie Creek Invs., LLC v. United States*, 2008 U.S. Claims LEXIS 75, at *13 (Fed. Cl. 2008).

5. "Affected item" means "any item to the extent such item is affected by a partnership item." 26 U.S.C. § 6231(a)(5). Nonpartnership items and affected items are resolved in separate proceedings following the partnership-level proceeding, although they may be controlled by any determinations made at the partnership level. *See Petaluma FX*, 591 F.3d at 655; *Monahan v. Comm'r*, 321 F.3d 1063, 1066 (11th Cir. 2003).

6. Thus, after the completion of a partnership-level proceeding, adjustments to partners' tax items are made based upon the adjustments to partnership items. If a taxpayer believes that the IRS has made a computational error, or has erroneously imposed a penalty, the partner may then bring a separate proceeding. *See* 26 U.S.C. § 6230(c). In such a proceeding, however, there is no review of the substantive partnership issues, as the partnership-level determinations are conclusive. *Id.* § 6230(c)(4).

## B.    The Economic Substance Doctrine

### 1.    The Doctrine Generally

7.    As a general matter, transactions that are shams, or without economic substance,

will not be recognized under the Internal Revenue Code. That principle originates

in the Supreme Court's holding in *Gregory v. Helvering*, 293 U.S. 465 (1935).

8.    In *Gregory*, the Supreme Court affirmed the denial of claimed deductions for

losses and expenses incurred in a corporate reorganization. The Court affirmed

the denial, even though the taxpayers followed the literal requirements of the

Internal Revenue Code for the reorganization, because the transaction was a "mere

device" for the "consummation of a preconceived plan" and not a reorganization

within the intent of the Code. *Id.* at 469. The Court noted:

> The legal right of a taxpayer to decrease the amount of what
> otherwise would be his taxes, or altogether avoid them, by means
> which the law permits, cannot be doubted. . . . But the question for
> determination is whether what was done, apart from the tax
> motive, was the thing which the statute intended.

*Id.* The Court went on to conclude:

> In these circumstances, the facts speak for themselves and are
> susceptible of but one interpretation. The whole
> undertaking . . . was in fact an elaborate and devious form of
> conveyance masquerading as a corporate reorganization, and
> nothing else. The rule which excludes from consideration the
> motive of tax avoidance is not pertinent to the situation, because
> the transaction upon its face lies outside the plain intent of the
> statute. To hold otherwise would be to exalt artifice above reality
> and to deprive the statutory provision in question of all serious
> purpose.

*Id.* at 470.

9.    Similarly, in *Knetsch v. United States*, 364 U.S. 361, 366 (1960), the Supreme

Court affirmed the denial of claimed deductions arising out of a transaction in

which a taxpayer purported to borrow money and pay interest to acquire an

annuity, but was "lent" back a substantial portion of the "interest" payments. The

Court held that the transaction was a "fiction" with "nothing of substance," and

that it was a "sham" and would not be recognized. *Id.* The Court rejected the

taxpayer's argument that the statute sanctioned the claimed tax deductions and

refused to "attribute to Congress" a statutory meaning that did not "plainly"

appear. *Id.* at 367. The Court said that it had "look[ed] in vain" for evidence of

congressional intent "to authorize the deduction of payments made under sham

transactions." *Id.*

10.   By contrast, in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), the

Supreme Court noted:

> [W]here . . . there is a genuine multiple-party transaction with
> economic substance which is compelled or encouraged by business
> or regulatory realities, is imbued with tax-independent
> considerations, and is not shaped solely by tax avoidance features
> that have meaningless labels attached, the Government should
> honor the allocation of rights and duties effected by the parties.

*Id.* at 583-84.

11.   In short, the economic substance doctrine "prevent[s] taxpayers from subverting

the legislative purpose of the tax code by engaging in transactions that are

fictitious or lack economic reality simply to reap a tax benefit." *Coltec Indus.,*

11

*Inc. v. United States*, 454 F.3d 1340, 1353-54 (Fed. Cir. 2006). Although the
basic principle is clear, the precise nature of the doctrine has never been
articulated by the Supreme Court, and has been framed in a bewildering variety of
formulations by the courts. Indeed, even the name of the doctrine—which is
sometimes called the sham transaction doctrine—has never been settled.

12. Nonetheless, many circuits have adopted some version of a two-part test that takes
into account both the taxpayer's subjective intent (that is, whether the taxpayer
subjectively had a non-tax business purpose for transaction) and the objective
features of the transaction (that is, whether the transaction from an objective
standpoint had a reasonable possibility of profit or otherwise reasonably served a
non-tax business function). *See, e.g.*, *ACM P'ship v. Comm'r*, 157 F.3d 231, 247
(3d Cir. 1998) (the subjective and objective factors are "related factors both of
which inform the analysis of whether the transaction had sufficient substance,
apart from its tax consequences, to be respected for tax purposes"); *James v.
Comm'r*, 899 F.2d 905, 908-09 (10th Cir. 1990) ("The better approach . . . holds
that the consideration of business purpose and economic substance are simply
more precise factors to consider in the [determination of] whether the transaction
had any practical economic effects other than the creation of income tax losses."
(quotation omitted)); *Shriver v. Comm'r*, 899 F.2d 724, 725-27 (8th Cir. 1990)
(the objective and subjective prongs are simply factors to be considered when
determining whether a transaction has economic substance); *Bail Bonds by*

*Marvin Nelson, Inc. v. Comm'r*, 820 F.2d 1543, 1549 (9th Cir. 1987) ("In determining whether a transaction is a sham, courts typically focus on two related factors: 1) has the taxpayer shown that it had a business purpose for engaging in the transaction other than tax avoidance? 2) has the taxpayer shown that the transaction had economic substance beyond the creation of tax benefits?"); *see also Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 781-82 (5th Cir. 2001) (noting existence of competing tests but finding it unnecessary to decide issue).

13.  The Federal Circuit has held that a lack of objective economic substance is sufficient by itself to disqualify a transaction without proof that the taxpayer's sole motive is tax avoidance. *Coltec*, 454 F.3d at 1355; *accord Jade Trading, LLC v. United States*, 598 F.3d 1372, 1376-77 (Fed. Cir. 2010). The court has emphasized, however, that a transaction can also be disregarded as an economic sham "if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance." *Coltec*, 454 F.3d at 1355; *see also Dow Chemical Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) ("The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses." (quotation omitted)); *Winn-Dixie Stores, Inc. v. Comm'r*, 254 F.3d 1313, 1316 (11th Cir. 2001) (the economic-substance doctrine provides that a transaction is not entitled to tax respect if it lacks economic effects or substance other than the generation of tax benefits, *or* if the transaction serves no business purpose); *ASA*

*Investerings P'ship v. Comm'r*, 201 F.3d 505, 511-12 (D.C. Cir. 2000) ("[T]he absence of a nontax business purpose is fatal.").

14. The Fourth Circuit, by contrast, employs a more rigid two-part test for disregarding a transaction under the economic substance doctrine. The first prong looks to whether the transaction could generate a reasonable possibility of profit (an objective inquiry) and the second prong considers whether the transaction had a tax-independent business purpose (a subjective inquiry). The transaction must fail both prongs before it can be disregarded as lacking economic substance. *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91-92 (4th Cir. 1985); *see also Black & Decker Corp. v. United States*, 436 F.3d 431, 441 (4th Cir. 2006).

## 2. The Doctrine in the First Circuit

15. The First Circuit appears to have adopted a version of the economic substance doctrine that looks to both the subjective and objective features of the transaction, without a rigid two-part test. *See generally Dewees v. Comm'r*, 870 F.2d 21 (1st Cir. 1989) (Breyer, J.).

16. In *Dewees*, the court considered a tax shelter scheme involving straddle trades on the London Metals Exchange. The Tax Court had disallowed loss deductions on the grounds that the transactions "were shams, without economic substance," and because the transactions were not "entered into for profit" within the meaning of Sections 108 and 165 of the Internal Revenue Code. *Id.* at 22.

17. The *Dewees* court noted that the existence of the economic substance doctrine

326

(which it called the "sham in substance" doctrine) had its origins in the Supreme Court's decision in *Gregory v. Helvering* and cited later decisions, including *Knetsch. Id.* at 29-30. It then upheld the Tax Court's finding that the transaction was a sham. In making that analysis, the court considered both the objective features of the transaction and the subjective intent of the participants.

18. First, the court noted that Dewees's case was one of 1,100 similar transactions, and that the Tax Court was free to draw "reasonable conclusions" from the "general pattern" of the transactions. The court concluded that the pattern "is one designed to produce tax gains . . . not . . . real gains." *Id.* at 31.

19. Second, the court noted that the promoters of the scheme advertised it as a program "designed (1) to convert ordinary income into capital gain, and (2) to defer capital gain taxable in the present year to (possibly long-term) capital gain taxed in future years." *Id.* It also noted that "[n]othing in the brochures suggests that the brokers would try to make real profits or that the investors risked significant real losses." *Id.* It concluded:

> Whether or not the Deweeses themselves received these promotional materials, they provide evidence of the general nature and purpose of the trading strategy, especially since the results of the actual transactions so closely mirror the promoters' claims.

*Id.*

20. Third, the Court noted that although the scheme included the opening of a margin account, "none of the 1,100 investors *ever* received a 'margin call' from his broker." *Id.*

> This fact is evidence that the brokers did not believe any investor
> would lose more money than his initial margin deposit would
> cover. These facts also suggest that the investment program
> achieved only what the promotional materials seemed to promise,
> namely a tax loss for a set fee, without exposing the investors to
> real risks and gains.

*Id.*

21.    Fourth, the court observed:

> [A]lthough the investors' account balances at times showed net
> profits or losses, in each case, *after completing the whole series of
> transactions, no investor received any net profit, and no investor
> was ever asked to pay a loss, beyond the initial margin deposit*.
> And, no broker ever returned any of the initial margin deposit to an
> investor.

*Id.*

22.    The court went on to note that none of the 1,100 investors' trading records

showed "any evidence of the real risks, profits, and losses" that "genuine"

speculation would create.

> And the odds against the trades of 1,100 genuine speculators,
> seeking real profits, just happening to fit the pattern of [the
> taxpayer's] trading, and just happening to lose exactly the amount
> of their margin deposits, must be phenomenal. It might not be
> reasonable to think a coin was unbalanced because it lands "heads"
> once, but that conclusion becomes far more reasonable when
> "heads" turns up 1,100 times in a row.

*Id.* at 32.

23.    It then concluded that "[t]hese features of the case are sufficient, in our view, to

permit the Tax Court to find these transactions to be 'shams.'"  *Id.*

24.    The *Dewees* court thus upheld the finding of a sham transaction based both on the

328

objective features of the transactions viewed as a whole (that is, considering all

1,100 transactions, not merely those of the specific taxpayers) and on the

subjective intent of the promoters (that is, even without regard to the subjective

intent of the taxpayers).

25.  The *Dewees* court then took up the question of whether the transactions were

"entered into for profit" within the meaning of Sections 108 or 165(c), which was

a prerequisite for the deductibility of any losses. *Id.* at 33-36. Among other

things, the court considered whether the taxpayers were entitled to a hearing on

their subjective motives. The court held that no such hearing was necessary, for

three reasons. *Id.* at 34-36.

26.  First, it held that "[w]here the objective features of the situation are sufficiently

clear, [the Tax Court] has the legal power to say that self-serving statements from

taxpayers could make no legal difference, and that it would find the transaction

was not primarily for profit, regardless of any such statements." *Id.* at 35

(quotation omitted). Second, "a taxpayer cannot deduct a 'sham transaction' loss,

irrespective of his subjective profit motive." *Id.* Third, the Tax Court could

employ a traditional 'sham in substance' analysis, without regard to the statutory

framework. *Id.* at 36.

27.  The *Dewees* court did not expressly formulate a test for application of the

economic substance (or sham transaction) doctrine. It is nonetheless clear that (1)

the experiences of other taxpayers in an alleged tax shelter scheme may be

329

considered in determining whether the scheme is a sham; and (2) the subjective

intentions of the promoters of the scheme may also be considered for the same

purpose. If the overall features and pattern of the tax shelter scheme, and the

subjective intentions of its promoters, may be considered in making that

determination, it also follows, as a matter of logic, that (1) the objective features

of the specific taxpayer's transactions may be considered for the same purpose,

and (2) the subjective intentions of the specific taxpayer may also be considered.

28.   Plaintiffs rely on a trio of older First Circuit opinions for the proposition that a

transaction that is not fictitious should be upheld, without regard to the subjective

intent of the taxpayer. *See Stone v. Comm'r*, 360 F.2d 737, 740 (1st Cir. 1966);

*Fabreeka Products Co. v. Comm'r*, 294 F.2d 876, 878-79 (1st Cir. 1961); *Granite

Trust Co. v. United States*, 238 F.2d 670, 678 (1st Cir. 1956). The Court notes

that there is no evidence that the Egans or their advisors were even aware of those

cases during the design and implementation of the transactions, or that they relied

upon the cases in their tax treatment decisions.

29.   In *Granite Trust*, a taxpayer divested itself of some of its shares of stock in a

corporation through sales and gifts. Despite a clear tax-avoidance motive, the

court held that the transactions were not factual economic shams, and that

congressional intent favored the taxpayer. 238 F.2d at 675-77. The court

observed that a transaction that is "not fictitious or so lacking in substance as to be

anything different from what they purported to be" should be given effect under

330

the tax code. *Id.* at 678.

30. In *Fabreeka Products*, the taxpayer bought bonds at a premium, using working capital to pay for the premium portion of the purchase price. It borrowed the remainder of the purchase price from a bank, pledging the bonds as collateral for the loan, and prepaid all interest on the loan. At the time, the tax code allowed taxpayers to amortize the bond premium, and Fabreeka claimed a deduction for this amount. Fabreeka then distributed the bonds (still subject to the loan) to its stockholders as a dividend. The stockholders then sold the bonds receiving essentially the same premium that Fabreeka had paid for them, and retained this premium after paying off the loan. In effect, Fabreeka managed to take a deduction for amounts that it distributed to its stockholders as dividends. The court found that the taxpayer "incurred fully all of the risks of ownership," and that the "exposure" to risks was "the very matter for which the [applicable] statute provided the deduction." 294 F.2d at 878. The court also observed that "unless Congress makes it abundantly clear, we do not think tax consequences should be dependent upon the discovery of a purpose, or a state of mind, whether it be elaborate or simple." *Id.*

31. In *Stone*, the taxpayers borrowed bank money, bought bonds from a broker, kept them beyond the minimum 30 days required for a call, pledged the bonds to the bank, gave the bonds subject to the bank loan to a family charity, and deducted both the bond amortization premium and the charitable contributions. The charity

331

then sold the bonds to the same broker, paid the bank, and kept essentially the amount of the premium. The broker immediately resold the same bonds to the taxpayers, who executed a new loan and pledge, and so on, following the cycle four times in each taxable year. Reversing the tax court's disallowance of the deductions beyond the first transaction, the *Stone* court cited a Fourth Circuit case, *Halle v. United States*, 346 F.2d 543, 551 (4th Cir. 1965), also relating to amortizable bond premiums, for the proposition that the Court should not "attempt to formulate a rule apportioning to a taxpayer the benefit clearly provided by Congress." *Stone,* 360 F.2d at 740.

32.    The *Dewees* court did not expressly overrule the *Granite Trust, Fabreeka Products*, or *Stone* cases, or indeed even mention them. Those cases may be distinguished based on their particular facts and the relevant congressional intent; certainly, there is no evidence whatsoever that Congress intended the results the plaintiff seeks here.

33.    It is also accurate to state, however, that the *Dewees* opinion effectively overruled those cases, at least as to the broad contours of the economic substance doctrine. The *Dewees* opinion is in accordance with the modern view, shared by most circuits, that the courts may take into account both objective and subjective factors in assessing whether a particular transaction had economic substance, or was a sham. To the extent that the three older cases may be read to support the proposition that a taxpayer's subjective intent is irrelevant, that proposition cannot

332

survive the holding or the reasoning of *Dewees*. Put another way, the opinion in *Dewees* cannot be read in a way that would permit this Court to uphold a transaction simply because it was not fictitious, or not "different from what [it] purported to be," without regard to all the objective features of the transaction or the taxpayer's subjective intent.

34. In the absence of more specific guidance from the Supreme Court or the First Circuit, this Court will consider both the objective features of the transactions and the subjective intent of the participants, including the overall features of the tax shelter scheme and the intentions of the promoters. Under the circumstances presented here, it is not necessary to decide what degree of weight should be accorded to any particular factor, or whether the objective or subjective features, standing alone, would be sufficient to support a finding of a lack of economic substance or a sham. Under either an objective or subjective analysis, the transactions were without economic substance and were shams. For the sake of convenience, the Court will use the term "economic substance doctrine" rather than "sham transaction doctrine."

## 3. The Objective Inquiry

35. The objective aspect of the economic substance inquiry normally focuses on whether the transaction had a reasonable possibility of a profit. *See Coltec*, 454 F.3d at 1356; *Black & Decker Corp.*, 436 F.3d at 441-42; *ACM P'ship*, 157 F.3d at 248-49; *Dewees*, 870 F.2d at 32. A transaction reasonably designed to serve

other legitimate business interests, such as presentation of capital or mitigation of risk, would also suffice for these purposes.

36.   The question is whether there was a "reasonable" possibility of profit, not a mere possibility. A transaction lacks objective economic substance if it does not "appreciably affect" a taxpayer's beneficial interest except to reduce his taxes. *Knetsch*, 364 U.S. at 366; *ACM P'ship*, 157 F.3d at 248. A *de minimis* economic effect is insufficient. *Knetsch*, 364 U.S. at 365-66 (finding transaction involving leveraged annuities to be a "sham" because possible $1,000 cash value of annuities at maturity was "relative pittance" compared to purported value of annuities); *ASA Investerings P'ship*, 201 F.3d at 514; *ACM P'ship*, 157 F.3d at 251-52.

37.   In making its objective inquiry, the court should view the transaction from the standpoint of a "prudent" or "rational" business person—for example, by considering whether a prudent or rational investor would engage in the transaction with a belief that profits could be earned. *See Gilman v. Comm'r*, 933 F.2d 143, 146-47 (2nd Cir. 1991) (requiring the plaintiff to demonstrate that a prudent investor could have concluded that there was a realistic opportunity for a profit); *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 672-73 (2008) (requiring determination from standpoint of prudent investor); *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 172 (D. Conn. 2004).

38.   Thus, there must be an objective inquiry into economic reality that would ask

"whether a reasonable possibility of profit from the transaction existed" and "whether the transaction has realistic financial benefit." *Coltec,* 454 F.3d at 1356 & n. 16 (internal quotations omitted). The transaction will be recognized for tax purposes only if, from the perspective of a rational economic investor, the "transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits." *Long Term Capital Holdings,* 330 F. Supp. 2d at 172; *see also Jade Trading,* 598 F.3d at 1377 (noting that a paired option transaction "was virtually guaranteed to be unprofitable" and that "[n]o reasonable investor would engage in such a transaction to earn a profit").

39. In determining whether there was a reasonable possibility of profit, all reasonably anticipated expenses and costs associated with the transaction that produced the tax benefits must be taken into account. *See Stobie Creek,* 82 Fed. Cl. at 691 ("[A] reasonable investor would take into account all of the costs and fees associated with entering and completing the transaction in evaluating whether an investment has a reasonable possibility of making a profit."); *Long-Term Capital Holdings,* 330 F. Supp. 2d at 175-84.

40. A negative expected rate of return is evidence of a lack of a "reasonable possibility" of profit. *See Dow Chemical Co.,* 435 F.3d at 601-02 (holding that a life insurance plan lacked economic substance in part because it was cash-flow-negative in all relevant years); *Stobie Creek,* 82 Fed. Cl. at 696 (a negative expected return indicates "scant profit potential," and the transactions therefore

must be disregarded for tax purposes); *Long-Term Capital Holdings*, 330 F. Supp

at 181-86 (rejecting taxpayer's transaction in part because it produced an expected

return far below what a reasonable economic actor would accept).

## 4. The Subjective Inquiry

41.    The other aspect of the economic substance inquiry examines the taxpayer's

subjective business purpose—that is, "whether the taxpayers have shown that they

had a business purpose for engaging in the transaction other than tax avoidance."

*Casebeer v. Comm'r*, 909 F.2d 1360, 1363-64 (9th Cir. 1990).

42.    In determining the taxpayer's subjective purpose, the Court may consider, among

other things, evidence of the experience and sophistication of the taxpayer. *See*

*id.* at 1364. Where a taxpayer is sophisticated in economics and/or taxation,

entering into a transaction with no reasonable prospect of profit is strong evidence

of the taxpayer's true tax-avoidance motivation. *See Long Term Capital*

*Holdings*, 330 F. Supp. 2d at 186 ("[T]he absence of reasonableness sheds light

on Long Term's subjective motivation, particularly given the high level of

sophistication possessed by Long Term's principals in matters economic.").

## C. The Treatment of Sham Partnerships

43.    An entity is a sham and will not be recognized for tax purposes "if it is fictitious

or if it has no business purpose . . . other than the creation of tax deductions."

*Ferguson v. Comm'r*, 29 F.3d 98, 101 (2d Cir. 1994) (quotation omitted); *accord*

*Boca Investerings P'Ship v. United States*, 314 F.3d 625, 632 (D.C. Cir. 2003)

336

("In order to satisfy the legal test for this kind of partnership, [there must be] a
non-tax business purpose need for the partnership in order to accomplish the goals
of the partners."); *Merryman v. Comm'r*, 873 F.2d 879, 881 (5th Cir. 1989).

44. The "basic inquiry . . . [is] . . . whether, all facts considered, the parties intended
to join together as partners to conduct business activity for a purpose other than
tax avoidance." *ASA Investerings*, 201 F.3d at 513; *see Comm'r v. Culbertson*,
337 U.S. 733, 742 (1949) (the inquiry turns on whether "the parties in good faith
and acting with a business purpose intended to join together in the present conduct
of the enterprise"); *Comm'r v. Tower*, 327 U.S. 280, 287 (1946) ("[T]he
question . . . [is] whether the partners really and truly intended to join together for
the purpose of carrying on business and sharing in the profits or losses or both.");
*Andantech L.L.C. v. Comm'r*, 331 F.3d 972, 978-79 (D.C. Cir. 2003) (partnership
disregarded because foreign partners did not intend to join together to share in
profits and losses of the business but instead were well-compensated to facilitate
the tax avoidance feature of the transaction). The "absence of a nontax business
purpose is fatal." *ASA Investerings*, 201 F.3d at 512.

45. Merely engaging in business activity is not sufficient to validate a partnership. *Id.*
The pursuit of business activity in furtherance of tax avoidance "is no more a
business purpose than actually engaging in tax avoidance." *Id.* at 513 n.6; *see*
*TIFD III-E, Inc. v. United States*, 459 F.3d 220, 232 (2d Cir. 2006) ("The IRS's
challenge to the taxpayer's characterization is not foreclosed merely because the

337

taxpayer can point to the existence of some business purpose or objective in
addition to its tax-avoidance objective.").

46.   If a partnership is found to be a sham, the partnership should be disregarded, and
the partnership's activities are deemed to be engaged in by one or more of the
partners.

## D.   The Step Transaction Doctrine

47.   The step transaction doctrine is "a judicial manifestation of the more general tax
law ideal that effect should be given to the substance, rather than the form, of a
transaction, 'by ignoring for tax purposes, steps of an integrated transaction.'"
*Falconwood Corp. v. United States*, 422 F.3d 1339, 1349 (Fed. Cir. 2005)
(quoting *Dietzsch v. United States*, 498 F.2d 1344, 1346 (Ct. Cl. 1974)); *see also*
*Stobie Creek*, 82 Fed. Cl. at 698-99; *King Enters., Inc. v. United States*, 418 F.2d
511, 516 n.6 (Ct. Cl. 1969).

48.   "The [step transaction] doctrine treats the steps in a series of formally separate but
related transactions involving the transfer of property as a single transaction, if all
the steps are substantially linked. Rather than viewing each step as an isolated
incident, the steps are viewed together as components of an overall plan." *Long
Term Capital Holdings*, 330 F. Supp. 2d at 191 (quoting *Greene v. United States,*
13 F.3d 577, 583 (2d Cir. 1994)). Thus, under the doctrine, "interrelated yet
formally distinct steps in an integrated transaction may not be considered
independently of the overall transaction." *Falconwood*, 422 F.3d at 1349 (quoting

*Comm'r v. Clark*, 489 U.S. 726, 738 (1989)).

49.     The step transaction doctrine has three tests—(1) the "end result" test; (2) the
        "interdependence" test; and (3) the "binding commitment" test. The three tests
        "may have different meanings in different contexts" and apply differently to
        different substantive provisions of the Code. *Falconwood*, 422 F.3d at 1349-50.
        In evaluating whether steps should be combined, particular scrutiny is given to
        steps taken between related parties. *United States v. Gen. Geophysical Co.*, 296
        F.2d 86, 89 (5th Cir. 1961). Two of the tests are relevant here: the
        "interdependence" test and the "end-result" test.

## 1.     The "Interdependence" Test

50.     The "interdependence" test focuses on the relationship between the steps that a
        taxpayer has taken, examining whether they "were so interdependent that the legal
        relations created by one transaction would have been fruitless without a
        completion of the series." *Falconwood*, 422 F.3d at 1349 (quotation omitted); *see
        also Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1523
        (10th Cir. 1991). Application of the test is "especially proper where . . . it is
        unlikely that any one step would have been undertaken except in contemplation of
        the other integrating acts." *Kuper v. Comm'r*, 533 F.2d 152, 156 (5th Cir. 1976).
        Courts applying this test have examined whether each of the steps under scrutiny
        had a "reasoned economic justification standing alone." *Security Indus. Ins. Co.
        v. United States*, 702 F.2d 1234, 1247 (5th Cir. 1983). Any intermediate step that
        lacks such a justification is a candidate for elimination under the step transaction

doctrine. *See, e.g., True v. United States*, 190 F.3d 1165, 1178-79 (10th Cir. 1999).

## 2. The "End Result" Test

51.    The "end-result" test applies when separate transactions were "really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *Falconwood*, 422 F.3d at 1349 (quotation omitted). When the test is met, "purportedly separate transactions will be amalgamated into a single transaction." *King Enters.*, 418 F.2d at 516 (quotation omitted). Subjective intent "is especially relevant . . . because it allows [a court] to determine whether the taxpayer directed a series of transactions to an intended purpose." *True*, 190 F.3d at 1175.

## E. The Partnership Anti-Abuse Rules – Treasury Regulation § 1.701-2

52.    As a complement to the common-law doctrines addressed above, the Treasury Department has issued Treasury Regulation § 1.701-2, which establishes an "anti-abuse" rule for partnerships. In substance, the regulation authorizes the IRS to disallow or recast partnership transactions that have tax consequences that are inconsistent with the intent of subchapter K.

53.    The regulation provides that a "partnership must be bona fide and each partnership transaction . . . must be entered into for a substantial business purpose." *Id.* § 1.701-2(a)(1). The regulation goes on to provide that the IRS may recast a transaction for federal tax purposes "if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce

substantially the present value of the partners' aggregate federal tax liability in a

manner that is inconsistent with the intent of subchapter K." *Id.* § 1.701-2(b).

Among other things, the IRS may determine that

> [t]he purported partnership should be disregarded in whole or in
> part, and the partnership's assets and activities should be
> considered, in whole or in part, to be owned and conducted,
> respectively, by one or more of its purported partners[.]

*Id.* § 1.701-2(b)(1).

54.     Whether such treatment is appropriate depends "on all of the facts and

circumstances, including a comparison of the purported business purpose for a

transaction and the claimed tax benefits resulting from the transaction." *Id.* §

1.701-2(c). The factors to be considered in the analysis include whether—

> (1) The present value of the partners' aggregate federal tax liability
> is substantially less than had the partners owned the partnership's
> assets and conducted the partnership's activities directly; [and]

> (2) The present value of the partners' aggregate federal tax liability
> is substantially less than would be the case if purportedly separate
> transactions that are designed to achieve a particular end result are
> integrated and treated as steps in a single transaction.

*Id.*

## F.     **Recharacterization of Transactions Based on Substance Rather than Form**

55.     It is axiomatic that the "incidence of taxation depends upon the substance of a

transaction" rather than its form. *Comm'r v. Court Holding Co.*, 324 U.S. 331,

334 (1945). Courts must therefore "focus on the substance rather than on the

form of a transaction where necessary to reflect the economic realities of the

situation." *Holiday Vill. Shopping Ctr. v. United States*, 773 F.2d 276, 280 (Fed.

Cir. 1985). Such a determination is based on an "assessment of the practical

realities." *TIFD III-E*, 459 F.3d at 234.

56. Under this doctrine, the IRS and the courts may "recharacterize a transaction in

accordance with its commercial significance." *Grojean v. Comm'r*, 248 F.3d 572,

576 (7th Cir. 2001) (citing cases). Here, the court may recharacterize the

offsetting pairs as a single transaction, rather than considering the individual legs

of the transaction in isolation. *See Jade Trading*, 598 F.3d at 1378 (upholding

determination of lower court that paired option transactions "cannot be separated

because they were totally dependent on one another from an economic and

pragmatic standpoint" (quotation omitted)).

## G.  Section 165(c)

57. Section 165(c) is the Tax Code's "basic loss provision." *Dewees*, 870 F.2d at 33.

As relevant here, Section 165(c) limits a taxpayer's deduction to the "losses

incurred in any transaction entered into for profit." 26 U.S.C. § 165(c)(2). As the

First Circuit held, "transaction entered into for profit [has] a well-established

meaning." *Dewees*, 870 F.2d at 33. It means that "the taxpayers, in entering into

the transaction, must have been *primarily* motivated by the desire to make a

profit." *Id.* (emphasis added); *see also United States v. Generes*, 405 U.S. 93, 105

(1972) (Section 165 requires dominant profit motive).

58. Under Section 165(c)(2), in order for individual taxpayers to be entitled to loss

deductions arising out of their investment in a partnership, the underlying

partnership transactions themselves must have been entered into for a profit

motive, and, at the partner level, the individual taxpayers must have had a profit objective for investing in the partnerships. *See Illes v. Comm'r*, 982 F.2d 163, 165 (6th Cir. 1992); *Marinovich, v. Comm'r*, 77 T.C.M. (CCH) 2075, 1999 WL 339316, at *2 (1999); *Farmer v. Comm'r*, 68 T.C.M. (CCH) 178, 1994 WL 386167, at *3 (1994); *Wright v. Comm'r*, 67 T.C.M. (CCH) 3125, 1994 WL 276907, at *7 (1994).

59. Even if taxpayers invest in a partnership with the individual objective of making a profit, they are not entitled to deduct any amounts invested in the partnership as losses under Section 165(c)(2) if the partnership transactions are not entered into for profit. *See Illes*, 982 F.2d at 165; *Hoffpauir v. Comm'r*, 71 T.C.M. (CCH) 1968, 1996 WL 43575, at *3 (1996); *Schafer v. Comm'r*, 68 T.C.M. (CCH) 1216, 1994 WL 652250, at *2 (1994); *Farmer*, 1994 WL 386167, at *3; *Wright*, 1994 WL 276907, at *7; *Daoust v. Comm'r*, 67 T.C.M. (CCH) 2914, 1994 WL 168287, at *5 (1994). Thus, in this proceeding, the Court's focus is limited to whether the "partnerships" entered into the offsetting options transactions for a profit motive.

60. Section 165(c) applies to limit the deductibility of losses to individuals. Thus, the issue of whether the Egans, as partners, are required to limit the losses allocated to them from the Fidelity High Tech and Fidelity International "partnerships" is an "affected item," which can only be resolved at the partner level following a final judgment in these proceedings. But the Court does have jurisdiction to determine whether the transactions generating the losses were entered in by the partnerships primarily for profit. That issue is a partnership-level determination.

## H.   Accuracy-Related Penalties

61.   Tax penalties are generally determined on an individual partner level. *See Carroll v. United States*, 339 F.3d 61, 68 (2d Cir. 2003). However, this Court has jurisdiction to determine "the applicability of any penalty . . . which relates to an adjustment to a partnership item." 26 U.S.C. § 6226(f); *see* Treas. Reg. § 301.6221-1(c). Furthermore, partnership-level determinations "include all the legal and factual determinations that underlie the determination of any penalty," other than "partner-level defenses." Treas. Reg. § 301.6221-1(c). Individual partners may, however, raise partner level defenses in later proceedings. 26 U.S.C. § 6230(c)(4).

61a.   A partner's "outside basis" is the partner's basis in his or her partnership interest. A partnership's "inside basis" is the partnership's basis in its own property.

61b.   In general, a partner's outside basis in a partnership is not a partnership item. *Jade Trading, LLC v. United States*, 598 F.3d 1372, 1379-80 (Fed. Cir. 2010). The partnership's inside basis is, however, a partnership item. *Stobie Creek Investments LLC v. United States*, 608 F.3d 1366, 1380 (Fed. Cir. 2010).

61c.   Adjustments made pursuant to an election under 26 U.S.C. § 754 are also partnership items. *Id.*

61d.   This Court lacks jurisdiction over the imposition of a penalty in this partnership-level to the extent the penalty relates solely to outside basis. *Jade Trading*, 598 F.3d at 1379-80; *Petaluma Fx Partners, LLC v. Comm'r*, 591 F.3d 649, 655 (D.C. Cir. 2010). However, the Court has jurisdiction over the imposition of penalties

344

relating to misstatements of inside basis and other inaccuracies relating to partnership items.

61e. Because partnerships do not pay income taxes, the actual calculation and imposition of any penalty is determined at a partner-level proceeding. This Court nonetheless has jurisdiction to determine the "applicability" of such a penalty in this proceeding.  26 U.S.C. § 6226(f).

62. Four penalties potentially apply with respect to these transactions under 26 U.S.C. § 6226. The four penalties are as follows:

  (1)   a 40% penalty for a gross valuation misstatement (§ 6662(b)(3) and (h));

  (2)   a 20% penalty for a substantial valuation misstatement (§ 6662(b)(3));

  (3)   a 20% penalty for a substantial understatement of income tax (§ 6662(b)(2)); and

  (4)   a 20% penalty for negligence or disregard of rules and regulations (§ 6662(b)(1)).

63. These penalties are alternatively, and not cumulatively, applied. There is no stacking of penalties, so the maximum penalty is either 20% or 40% of the underpayment of tax, even if an underpayment is attributable to more than one type of misconduct. *See* Treas. Reg. § 1.6662-2(c).

## 1.   **Gross Valuation Misstatement Penalty**

64. The first penalty is the "gross valuation misstatement" penalty. A gross-valuation misstatement exists if the value or adjusted basis of property claimed on the return is 400% more than the amount determined to be the correct amount of such value

345

or adjusted basis. *See* 26 U.S.C. § 6662(a), (b)(3), (e)(2), (h)(1)-(2).

65. Where a partnership transaction lacks economic substance, the outside basis of the partners in that transaction is presumably zero. *See Long Term Capital Holdings*, 330 F. Supp. 2d at 199 n.99 ("The Court's economic substance ruling . . . produc[es] a basis of zero for the contributed stock in the hands of Long Term.").

66. Where a partner's actual outside basis is zero, and the claimed basis is adjusted accordingly, the 400% threshold would be infinitely exceeded. *See Gilman*, 933 F.2d at 150-51.

67. [omitted]

68. Under 26 U.S.C. § 6662(e)(2), no valuation misstatement penalty may be imposed "unless the portion of the underpayment for the taxable year attributable to substantial valuation misstatements under chapter 1 exceeds $5,000." The determination of whether the dollar limitation has been exceeded is applied at the taxpayer level, so that issue is not addressed in this proceeding. *See* Treas. Reg. § 1.6662-5(h)(1).

68a. Plaintiffs do not contest that this Court has jurisdiction to determine whether a valuation misstatement occurred with regard to the Fidelity High Tech transaction, and thus whether a valuation misstatement penalty applies.

68b. Here, the value or adjusted basis of property claimed on the 2001 and 2002 Fidelity High Tech partnership tax returns is 400% more than the correct amount of such value or adjusted basis.

346

68c.    The "gross valuation misstatement" penalty of 26 U.S.C. § 6662(a), (b)(3), and (h)
        therefore applies as to the Fidelity High Tech transaction.

68d.    Plaintiffs do, however, contest whether this Court has jurisdiction to determine
        whether a valuation misstatement occurred with regard to the Fidelity
        International transaction, and thus whether a valuation misstatement penalty
        applies. In substance, plaintiffs contend that any valuation misstatement as to
        Fidelity International concerned outside basis, not the partnership's inside basis,
        and is therefore not a partnership item.

68e.    For the reasons set forth below, the Court concludes that the valuation
        misstatement as to the Fidelity International transaction occurred at the
        partnership level, and therefore it has jurisdiction over the applicability of any
        penalty related to that item.

68f.    The assets of Fidelity International included both interest rate options that were
        contributed to the partnership and foreign currency options that the partnership
        itself purchased and sold. Fidelity International claimed losses in 2001 and 2002
        that were generated by the disposition of those assets.

68g.    Whether a partnership incurred a gain or a loss is a partnership item. Treas. Reg.
        § 301.6231(a)(3)-1(a)(1)(i). In order to ascertain whether a partnership incurred a
        gain or a loss from the disposition of its assets requires that the partnership must
        calculate its basis in those assets (that is, the inside basis). As noted, that inside
        basis is a partnership item.

68h.    Fidelity International's reported losses were based in part on foreign currency

347

options that were acquired and sold within the partnership. The partnership's calculation of basis for those options, and any gain or loss resulting from the sales, are partnership items.

68i. Fidelity International's reported losses were also based in part on interest rate options that were contributed to the partnership. The partnership necessarily used the basis of those options (that is, the inside basis) in determining whether the partnership sustained a gain or a loss. Again, the partnership's calculation of basis for those options, and any gain or loss resulting from the sales, are partnership items. *See* Treas. Reg. § 301.6231(a)(3)-1(c)(2) (the basis of contributed property is a partnership item); *Stobie Creek*, 608 F.3d at 1380.

68j. The partnership returns (Forms 1065) therefore contained valuation misstatements with respect to inside basis.

68k. Alternatively, the Fidelity International transaction lacked economic substance, and should be disregarded. The basis of a disregarded asset is zero. A valuation misstatement is thus inherent in the Fidelity International transaction as reported on the partnership returns. The overvalued basis was an integral part of the transaction, and the valuation misstatement thus bore a direct relationship to the underpayment of tax.

68l. Here, the value or adjusted basis of property claimed on the 2001 and 2002 Fidelity International partnership tax returns is 400% more than the correct amount of such value or adjusted basis. *See* Treas. Reg. § 1.6662-5(g) ("the value or adjusted basis claimed on a return of any property with a correct value or

348

adjusted basis of zero is considered to be 400 per cent or more of the correct
amount.").

68m.   The "gross valuation misstatement" penalty of 26 U.S.C. § 6662(a), (b)(3), and (h)
therefore applies as to the Fidelity International transaction.

## 2.   Substantial Valuation Misstatement Penalty

69.   The second penalty is the "substantial valuation misstatement" penalty. The
substantial valuation misstatement penalty applies if the value or adjusted basis of
property claimed on the return is 200% more than the amount determined to be
the correct amount of such value or adjusted basis. *See* 26 U.S.C. § 6662(e)(1)
(2002).[2]

69a.   Here, the value or adjusted basis of property claimed on the partnership tax
returns at issue is 200% more than the correct amount of such value or adjusted
basis.

69b.   The "substantial valuation misstatement" penalty of 26 U.S.C. § 6662(a) and
(b)(3) therefore applies.

70.   [omitted]

## 3.   Substantial Understatement Penalty

71.   The third penalty is the "substantial understatement of income tax" penalty. *See*
26 U.S.C. § 6662(b)(2). An "understatement" of tax exists if the correct tax
exceeds the reported tax. *Id.* § 6662(d)(2)(A). An understatement is "substantial"
if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the

___

[2] That percentage was reduced in 2006 to 150%. Pension Protection Act of 2006, Pub. L. No. 109-280,
title xii, § 1219(a)(1)(A), 120 Stat. 780, 1083.

return. *Id.* § 6662(d)(1)(A).

71a.   Here, as a result of the misstatements at the partnership level, the correct income

tax of Richard Egan for the relevant years exceeded the reported tax by more than

$5,000 and more than 10% of the tax required to be shown on the return.

71b.   The "substantial understatement" penalty of 26 U.S.C. § 6662(a), (b)(2), and

(d)(2)(A) therefore applies.

72.   Under 26 U.S.C. § 6662(d)(2)(B), a reduction in the amount of an understatement

of tax may be allowed (1) if there was "substantial authority for such treatment" or

(2) if "the relevant facts affecting the item's tax treatment are adequately disclosed

in the return or in a statement attached to the return" and "there is a reasonable

basis for the tax treatment of such item by the taxpayer."

73.   The calculations necessary to determine the amount of an understatement are

conducted at the partner level. *Id.* § 6662(d)(1)-(2)(A); Treas. Reg. §

301.6221-1(d); *see also Long Term Capital Holdings*, 330 F. Supp. 2d at 200

n.100.  However, to the extent that the tax treatment at issue was claimed by the

partnership certain factual determinations that may affect whether a reduction in

any understatement is warranted for the reasons set forth in Section 6662(d)(2)(B)

can be conducted at the partnership level.

   a.   **"Substantial Authority"**

74.   The first prong of § 6662(d)(B) provides for a reduction where there was

"substantial authority" for the treatment claimed by the taxpayer.  "Substantial

authority" exists "only if the weight of the authorities supporting the treatment is

substantial in relation to the weight of authorities supporting contrary treatment."

Treas. Reg. § 1.6662-4(d)(3)(I). The types of authorities to be considered include the Internal Revenue Code, as well as other statutory provisions, treasury regulations, revenue rulings and the like; case law; congressional intent; and other IRS memoranda, notices, and publications. *Id.* § 1.6662-4(d)(3)(iii).

75.     The substantial authority standard is "an objective standard, involving an analysis of the law and application of the law to relevant facts." *Id.* § 1.6662-4(d)(2).

76.     There is not "substantial authority" for tax treatment of partnership items where the transactions lack economic substance or must be recharacterized under the step transaction doctrine. *See Stobie Creek*, 82 Fed. Cl. at 706 n.64 (holding that where the "plaintiffs' transactions lack economic substance, or must be disregarded pursuant to the step transaction doctrine, plaintiffs cannot contend successfully that substantial authority supported the tax treatment claimed based on the form of their transactions rather than their substance"); *Long Term Capital Holdings*, 330 F. Supp. 2d at 204-05 (holding that, when underlying merits determination is that transaction lacks economic substance, taxpayer cannot cite authority, much less substantial authority, to support claimed tax treatment); *Santa Monica Pictures, LLC v. Comm'r*, 89 T.C.M. (CCH) 1157, 2005 WL 1111792, at *100-01 (2005) (finding no substantial authority when transactions had no economic substance beyond creation of tax benefits).

### b.     "Adequately Disclosed" and "Reasonable Basis"

77.     The second prong of § 6662(d)(2)(B) provides for a reduction where the taxpayer "adequately disclosed" the relevant facts in a tax return or attached statement and there was a "reasonable basis" for the tax treatment at issue.

78.     Treas. Reg. § 1.6662-3(b)(3) defines "reasonable basis" as follows:

> Reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim. If a return position is reasonably based on one or more of the authorities set forth in § 1.6662-4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662- 4(d)(2).

### c.     Limitation on Relief for Tax Shelter Transactions

79.     Any relief under § 6662(d)(2)(B) is limited where the understatement is "attributable to a tax shelter." 26 U.S.C. § 6662(d)(2)(C).

80.     A tax shelter is defined as "a partnership or other entity," "any investment plan or arrangement," or "any other plan or arrangement," "if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax." *Id.* § 6662(d)(2)(C).

81.     Where the item is attributable to a tax shelter, the taxpayer is not entitled to relief under the "adequate disclosure/reasonable basis" prong of the statute. Furthermore, the "substantial authority" prong can only be satisfied if "the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment." *Id.* § 6662(d)(2)(C)(i)(II) (2002).[3]

### 4.     Negligence or Disregard of Rules Penalty

82.     The fourth penalty is the "negligence or disregard of rules or regulations" penalty. Section 6662(a) and (b)(1) impose a 20% penalty to the portion of an

---

[3] Section 6662(d)(2)(C) was amended in 2004. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, title viii, § 812(d), 118 Stat. 1418, 1580.

underpayment that is attributable to "[n]egligence or disregard of rules or regulations."

83.    [omitted]

84.    The statute defines "negligence" as "any failure to make a reasonable attempt to comply with the provisions of this title." *Id.* § 6662(c). Negligence includes any failure "to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662-3(b). The regulation further states that negligence "is strongly indicated where . . . [a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." *Id.*; *see Neonatology Associates, P.A. v. Comm'r*, 299 F.3d 221, 234 (3d Cir. 2002) (when "a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril"); *see also Stobie Creek*, 82 Fed. Cl. at 713-14; *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, 56 (2007), *reversed on other grounds by* 598 F.3d at 1374; *Santa Monica Pictures*, 2005 WL 1111792, at *99.

85.    The statute defines "disregard" as including "any careless, reckless, or intentional disregard." 26 U.S.C. § 6662(c). Under the regulations,

> The term disregard includes any careless, reckless or intentional disregard of rules or regulations. The term 'rules or regulations' includes the provisions of the Internal Revenue Code, temporary or final Treasury regulations issued under the Code, and revenue rulings or notices (other than notices of proposed rulemaking) issued by the Internal Revenue Service and published in the Internal Revenue Bulletin. A disregard of rules or regulations is 'careless' if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation. A disregard is 'reckless' if the taxpayer makes

353

> little or no effort to determine whether a rule or regulation exists,
> under circumstances which demonstrate a substantial deviation
> from the standard of conduct that a reasonable person would
> observe.

Treas. Reg. § 1.6662-3(b)(2).

86.    The negligence standard is an objective one, requiring a finding of "the lack of
       due care or the failure to do what a reasonable and prudent person would do under
       similar circumstances." *See Goldman v. Comm'r*, 39 F.3d 402, 407 (2d Cir. 1994)
       (quoting *Allen v. Comm'r*, 925 F.2d 348, 353 (9th Cir. 1991)).

86a.   Here, Richard Egan did not report or pay the correct income tax for the relevant
       years because of negligence and disregard of rules and regulations as to the
       preparation and filing of the Fidelity High Tech and Fidelity International
       partnership tax returns for 2001 and 2002.

86b.   The "negligence or disregard of rules or regulations" penalty of 26 U.S.C. §
       6662(a) and (b)(1) therefore applies.

## 5.    Defense to Penalties

87.    A taxpayer may avoid penalties for any portion of an understatement if he shows
       that "there was a reasonable cause for such portion and that [he] acted in good
       faith[.]" 26 U.S.C. § 6664(c). Only the partnership itself may raise that defense
       in a partnership-level proceeding; the alleged "reasonable cause" of the individual
       partners must be asserted in partner-level proceedings. Treas. Reg. § 301.6221-
       1(c).

88.    When a taxpayer argues that reasonable cause and good faith is demonstrated by
       reliance on professional advice, two threshold requirements must be satisfied:

> (i) *All facts and circumstances considered.* The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, the advice must take into account the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner. In addition, the requirements of this paragraph (c)(1) are not satisfied if the taxpayer fails to disclose a fact that it knows, or should know, to be relevant to the proper tax treatment of an item.
>
> (ii) *No unreasonable assumptions.* The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner.

*Id.* § 1.6664-4(c)(1)(i)-(ii).

89.    The requisite showing was described by the United States Court of Federal Claims

as follows:

> The most important factor in determining whether the taxpayer acted with reasonable cause and good faith is the extent to which the taxpayer made efforts to assess his proper tax liability. *See* Treas. Reg. § 1.6664-4(b)(1). In order to appraise the taxpayer's efforts, the court "tak[es] into account all pertinent facts and circumstances." *Id.* . . . As with the standards for the negligence penalty, the concept of reliance on the advice of professionals is a hallmark of the exception for reasonable cause and good faith. However, "[r]eliance on . . . the advice of a professional tax advisor . . . does not necessarily demonstrate reasonable cause and good faith." *Id.* The reliance on professional advice must, under all the circumstances, be reasonable. *See id.*

*Stobie Creek*, 82 Fed. Cl. at 717 (citation omitted).

90.    "Reasonable reliance" on professional advice requires that the advice itself be

reasonable. For professional advice to be reasonable, it must, among other things, be based upon accurate information and representations supplied by the taxpayer; reflect reasonable investigation into the facts; and not be based on unreasonable or unsupported assumptions. *See Illes*, 982 F.2d at 164-66.

91.     Professional advice may not be objectively reasonable where the taxpayers knew or reasonably should have known that the professional had a conflict of interest. *See Am. Boat Co. v. United States*, 583 F.3d 471, 481 (7th Cir. 2009); *Neonatology*, 299 F.3d at 234 ("[T]he reliance itself must be objectively reasonable in the sense that . . . the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about."); *Chamberlain v. Comm'r*, 66 F.3d 729, 732 (5th Cir. 1995) ("The reliance must be objectively reasonable; taxpayers may not rely on someone with an inherent conflict of interest, or someone with no knowledge concerning that matter upon which the advice is given." (footnotes omitted)); *Pasternak*, 990 F.2d at 903 ("[T]he purported experts were either the promoters themselves or agents of the promoters. Advice of such persons can hardly be described as that of 'independent professionals.'"); *Illes*, 982 F.2d at 166 (reasonable reliance precluded where accountant was "not a disinterested source" because he was a tax-shelter promoter.).

92.     An effort to conceal items on tax returns is evidence of a lack of good faith. *Long Term Capital Holdings*, 330 F. Supp. 2d at 211.

92a.    Here, to the extent that the matter is appropriately raised at the partnership level,

there was no reasonable cause for any portion of any understatement of the

income tax liability of Richard Egan with respect to his participation in the

Fidelity High Tech and Fidelity International transactions, and Richard Egan did

not act in good faith with respect to those transactions.

## V. SUMMARY FACTUAL CONCLUSIONS

### A. Fidelity High Tech

1.  The Fidelity High Tech transaction had no business purpose other than tax
    avoidance and lacked economic substance.

2.  For federal income tax purposes, Fidelity High Tech should not be treated as a
    partnership. It was not a partnership in fact; it was not created or maintained for
    any business purpose other than tax avoidance, and it was a sham and lacked
    economic substance.

3.  The intermediate steps of the Fidelity High Tech transaction should be
    disregarded for federal income tax purposes, and the transaction should be treated
    as a single integrated transaction.

4.  Fidelity High Tech should be disregarded as an entity, and its assets and activities
    should be considered to be owned and conducted by its partners, pursuant to
    Treas. Reg. § 1.701-2(c).

5.  The offsetting option pairs transferred to Fidelity High Tech should be treated, in
    substance, as a single position for federal income tax purposes.

6.  The Fidelity High Tech transaction was not entered into for profit.

### B. Fidelity International

1.  The Fidelity International transaction had no business purpose other than tax

avoidance and lacked economic substance.

2.     For federal income tax purposes, Fidelity International should not be treated as a
partnership. It was not a partnership in fact; it was not created or maintained for
any business purpose other than tax avoidance, and it was a sham and lacked
economic substance.

3.     Samuel Mahoney was not a true partner of Fidelity International; he was a mere
nominee who was paid for his services, and he did not join the venture to share
profits or losses.

4.     The intermediate steps of the Fidelity International transaction should be
disregarded for federal income tax purposes, and the transaction should be treated
as a single integrated transaction.

5.     Fidelity International should be disregarded as an entity, and its assets and
activities should be considered to be owned and conducted by its partners,
pursuant to Treas. Reg. § 1.701-2(c).

6.     The offsetting option pairs transferred to Fidelity International should be treated,
in substance, as a single position for federal income tax purposes.

7.     The Fidelity International transaction was not entered into for profit.

## C.     **Penalty Issues**

1.     There was not "substantial authority" for the tax treatment of the Fidelity High
Tech and Fidelity International transactions on the 2001 and 2002 partnership tax
returns within the meaning of 26 U.S.C. § 6662(d)(2)(B)(i).

2.     The relevant facts affecting the tax treatment of the Fidelity High Tech and
Fidelity International transactions were not adequately disclosed in any

partnership tax return or in any statement attached to such a return in 2001 or 2002 within the meaning of 26 U.S.C. § 6662(d)(2)(B)(ii).

3.  There was no reasonable basis for the tax treatment of the Fidelity High Tech and Fidelity International transactions on the 2001 and 2002 partnership tax returns within the meaning of 26 U.S.C. § 6662(d)(2)(B)(ii).

4.  Both the Fidelity High Tech and Fidelity International transactions constitute "tax shelters" within the meaning of 26 U.S.C. § 6662(d)(2)(C).

5.  Richard Egan, as managing member and tax matters partner of Fidelity High Tech and Fidelity International, and Michael Egan, as his attorney-in-fact and as agent of the entities, did not reasonably believe that the tax treatment of the Fidelity High Tech and Fidelity International transactions on the 2001 and 2002 partnership tax returns was more likely than not the proper treatment within the meaning of 26 U.S.C. § 6662(d)(2)(C)(i).

6.  Richard Egan, as managing member and tax matters partner of Fidelity High Tech and Fidelity International, and Michael Egan, as his attorney-in-fact and as agent of the entities, did not make a reasonable attempt to comply with the provisions of the Internal Revenue Code in claiming the losses and other tax benefits on the 2001 and 2002 partnership tax returns within the meaning of 26 U.S.C. § 6662(c).

7.  There was no reasonable cause for the tax treatment of the Fidelity High Tech or Fidelity International transactions on the 2001 and 2002 partnership tax returns, and Richard Egan, as managing member and tax matters partner of Fidelity High Tech and Fidelity International, and Michael Egan, as his attorney-in-fact and as agent of the entities, did not act in good faith with respect to such tax treatment,

within the meaning of 26 U.S.C. § 6664(c).

8.    Richard Egan, as managing member and tax matters partner of Fidelity High Tech and Fidelity International, and Michael Egan, as his attorney-in-fact and as agent of the entities, did not rely with reasonable cause or act in good faith on the professional advice of attorneys and accountants with regard to the 2001 and 2002 partnership tax returns of Fidelity High Tech and Fidelity International.

9.    The Fidelity High Tech and Fidelity International partnership tax returns for 2001 and 2002 contained gross valuation misstatements within the meaning of 26 U.S.C. § 6662(a), (b)(3), and (h), and the 40% penalty for such misstatements is therefore applicable to any understatement of income tax liability of Richard Egan arising out of those misstatements.

10.   The Fidelity High Tech and Fidelity International partnership tax returns for 2001 and 2002 contained substantial valuation misstatements within the meaning of 26 U.S.C. § 6662(a) and (b)(3), and the 20% penalty for such misstatements is therefore applicable to any understatement of income tax liability of Richard Egan arising out of those misstatements.

11.   As a result of misstatements on the Fidelity High Tech and Fidelity International partnership tax returns for 2001 and 2002, the correct income tax of Richard Egan exceeded the reported tax by more than $5,000 and more than 10% of the tax required to be shown on the return, and the 20% penalty for substantial understatement under 26 U.S.C. § 6662(a), (b)(2), and (d)(2)(A) is therefore applicable.

12.   As a result of negligence and disregard of rules and regulations as to the

preparation and filing of the Fidelity High Tech and Fidelity International

partnership tax returns for 2001 and 2002, the correct income tax of Richard Egan

was not reported or paid in the relevant years, and the 20% penalty for negligence

or disregard of rules and regulations under 26 U.S.C. § 6662(a) and (b)(1) is

therefore applicable.

## D.   Other Issues

The Court does not reach the following issues:

1.   Whether Treasury Regulation § 1.752-6, which addresses the treatment of short

option positions for partnership tax purposes, was a valid exercise of the rule-

making authority of the Treasury Department;

2.   Whether the Fidelity High Tech or Fidelity International transactions are

substantially similar to the transactions described in IRS Notice 2000-44; and

3.   Whether, if the transactions otherwise had economic substance, were not subject

to the step transaction doctrine, and involved valid partnerships, the short options

contributed to the partnerships constituted liabilities within the meaning of 26

U.S.C. § 752.

4.   [omitted]

## VI.   CONCLUSION

For the foregoing reasons,

1.   The adjustments made by the Internal Revenue Service to the partnership items of

Fidelity High Tech Advisor A Fund, LLC, for the tax year ending December 21,

2001, were not erroneous, and should not be readjusted.

2.   The adjustments made by the Internal Revenue Service to the partnership items of

Fidelity High Tech Advisor A Fund, LLC, for the tax year ending December 31, 2002, were not erroneous, and should not be readjusted.

3.   The adjustments made by the Internal Revenue Service to the partnership items of Fidelity International Currency Advisor A Fund, LLC, for the tax year ending December 31, 2001, were not erroneous, and should not be readjusted.

4.   The adjustments made by the Internal Revenue Service to the partnership items of Fidelity International Currency Advisor A Fund, LLC, for the tax year ending December 31, 2002, were not erroneous, and should not be readjusted.

5.   The request of plaintiffs that the United States return and refund all amounts deposited with or paid to the Secretary of the Treasury with respect to these consolidated actions is denied.

6.   The following accuracy-related penalties are applicable to any understatement of the income tax liability of Richard Egan arising from the treatment of the Fidelity High Tech and Fidelity International transactions on the tax returns of those entities for the years 2001 and 2002.

   a.   a 40% penalty for gross valuation misstatement pursuant to § 6662(a), (b)(3), and (h);

   b.   a 20% penalty for substantial valuation misstatement pursuant to § 6662(a) and (b)(3);

   c.   a 20% penalty for substantial understatement of income tax pursuant to § 6662(a), (b)(2), and (d)(2)(A); and

   d.   a 20% penalty for negligence or disregard of rules and regulations pursuant to § 6662(a) and (b)(1).

The penalties are alternatively, and not cumulatively, applied.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  October 18, 2010